**Exhibit Index**

A. Proposed Route
B. Permit Application
C. Amended Permit Application
D. Amended Proposed Route
E. Denial Letter
F. Alternate Route
G. Administrative Hearing Transcript
H. Administrative Ruling
I. March on the DNC Denial Letter
J. Poor People's Campaign Denial Letter
K. March for the People's Agenda Denial Letter
L. SDS Denial Letter
M. March on the DNC Administrative Ruling
N. March for the People's Agenda Administrative Ruling
O. SDS Administrative Ruling
P. Footprint Ordinance
Q. Permit Ordinance

# Exhibit A

# Proposed Route

## Proposed Route 1



Jane M. Byrne Plaza



Proposed Route 1



John Alexander Logan Monument

# Exhibit B




## APPLICATION ONLY - NOT A PERMIT
## Application for a Parade Using the Public Way

Application Must Be Submitted 15 Business Days Before Event

Deliver in person or by certified mail to:

CITY OF CHICAGO - DEPARTMENT OF TRANSPORTATION
ATTN: PUBLIC WAY PERMIT OFFICE
CITY HALL, ROOM 905
121 N. LA SALLE STREET, CHICAGO, ILLINOIS 60602

DATE: January 2, 2024

CK #
507

APPLICATION NO.: 24-218    APPLICATION FEE: $50.00

A non-refundable processing fee of $50.00 must accompany the application for a parade permit unless an application for a waiver of the fee has been granted per Chicago Municipal Code section 10-8-330(r).

1. Name of Parade: __Bodies Outside of Unjust Laws__

   Traditional Parade as defined by section 10-8-330?    ( ) Yes    ( X ) No

2. Requested Date for Parade: __Sunday, August 18, 2024__

3. Sponsoring Organization (or Individual): __Bodies Outside of Unjust Laws: Coalition for Reproductive Justice and LGBTQ+ Liberation__
   Address: __c/o Thayer, 4835 N Kenmore Ave Apt 2, Chicago, IL 60640__

   24-Hour Contact Number: __773-209-1187__

   Organization's Leader(s)/Representative(s): __Andy Thayer__

4. Name of Parade Organizer/ Applicant: __Andy Thayer__

   Address: __4835 N Kenmore Ave Apt 2, Chicago, IL 60640__

   Email Address: __LGBTliberation@aol.com__    Fax Number: ____

   24-Hour Contact Number: __773-209-1187__

5. Time Parade will start: __6 pm__

   Estimated time Parade will end*: __8:15 pm__

   * Per section 10-8-330(o)(1), a parade shall be no longer than 2 hours and 15 minutes, except as provided under the ordinance.

6. Time Parade will begin to assemble: __5 pm__

   Time Parade will begin to disband: __9 pm__

Revised 2/2012

7. Location and exact street address of assembly area: Water Tower Park, 180 E. Pearson Street, Chicago.

Location and exact street address of disbanding area: Sidewalk in front of General John Logan statue, 901 S. Michigan Avenue, Chicago.

Permit obtained from property owner to use assembly/disbanding area?

( ) Yes          ( ) No          ( X ) Not Applicable

8. Proposed Parade Route (including sidewalks or lanes of traffic parade will occupy): East on Pearson Street (all lanes) to Michigan Avenue. South on Michigan Avenue in all southbound lanes of traffic to Wacker Drive. West on Wacker Drive in all westbound lanes of traffic to State Street. South on State Street in all southbound lanes of traffic past ABC 7 studios to Adams Street. East on Adams Street in all lanes of traffic to Michigan Avenue. South on Michigan Avenue in all southbound lanes past the Art Institute and Hilton Hotel to 9th Street, crossing the northbound lanes of Michigan Ave at 9th Street to end at 901 S. Michigan Avenue.

9. Estimated Number of Participants: 1000-3000 people

    Basis for this estimate: ____ Previous experience organizing events of this nature.

10. Number of units participating in the parade:

    Floats: ___0___

    Vehicles: ___2___

    Marching Groups: ___The group will march as one mass, not separate groups.___

11. Will animals participate in the parade? ( ) Yes ( X ) No (unless brought as service animals by Participants)

    If so, what type of animals and how many?* _____

---

*Participation of animals in a parade is governed by section 10-8.330(n)(2) of the Chicago Municipal Code.

12. Description of any sound amplification or other equipment that is on wheels or too large to be carried by one person, and a description of the size and dimension of any sign, banner, or other attention-getting device that is too large to be carried by one person.

Bigfoot and Liberty 2 sound systems by Anchor Audio. A 30' x 3' banner, four 10' x 4' banners, plus numerous banners of similar sizes brought by participants that it is impossible to predict.

---

13. Ward(s) involved: Wards 2, 4 and 42.

## TERMS AND CONDITIONS

Per section 8-4-120 of the Chicago Municipal Code, the applicant must promptly reimburse the City for any and all damage of any kind to any property of the City which may result from the use by the applicant of the City's premises under the permission granted herein, and the applicant further agrees that it will not hold liable the City for or on account of any losses or damage to property owned by it or controlled by the applicant or for or on account of any loss or damage sustained by the applicant as a result of injuries to employees or agents of the applicant.

For large parades, as a condition of the permit, it is required that the parade organizer: (1) obtain a $1,000,000.00 commercial general liability insurance policy, naming the City as an additional insured; (2) indemnify the City against any additional and uncovered third party claims against the City arising out of or caused by the parade; and (3) agree to reimburse the City for any damage to the public way or to City property arising out of or caused by the parade.

Any person violating any of the provisions of section 10-8-330 of the Municipal Code of Chicago, shall be fined not less than $200 nor more than $1000 or may be subject to incarceration for up to ten days or both. In addition to any other penalty or fine provided, any person who sells or transfers a permit granted under this section shall be barred from applying for another such permit for a period of three years.

If applicant is applying on behalf of an organization, applicant warrants that he/she has authority to bind the organization listed in line 3 above. If applicant does not have such authority or if no organization is involved, applicant agrees that this application is made on his/her own behalf and is binding on applicant.

Any change in information on this application shall be reported to the Commissioner immediately.

Signature: _____ Date: ___1/2/2024___

Printed Name: __Andy Thayer__

Title/Position(if any): _____

Telephone number: __773.209.1187__ E-Mail Address: __LGBTliberation@aol.com__

Revised 2/2012

# Exhibit C

January 8, 2024

JAN 8 PM 2:29

TO: Chicago Department of Transportation

FROM: Bodies Outside of Unjust Laws: Coalition for Reproductive Justice and LGBTQ+ Liberation

RE: Per your request, modifications to parade permit application submitted 1/2/24

Per your, the 1st District's and the Special Events Departments' telephoned requests for flexibility regarding our permit application to march on Sunday, August 18, 2024, attached please find a modified version of our parade permit application originally submitted on January 2, 2024.

The changes to the original application are noted in red. Please note that to better accommodate your concerns, the portion of the march on Michigan Avenue north of the Chicago River is substantially lessened. Also, with this new version, in every instance the marchers will be going with the flow of traffic on all portions of the route, including on one-way streets.

Delivered to Susan @
The DOT. 1/8/24



# Application for a Parade Using the Public Way



Application Must Be Submitted 15 Business Days Before Event

Deliver in person or by certified mail to:

    CITY OF CHICAGO - DEPARTMENT OF TRANSPORTATION
    ATTN: PUBLIC WAY PERMIT OFFICE
    CITY HALL, ROOM 905
    121 N. LA SALLE STREET, CHICAGO, ILLINOIS 60602

DATE: _____ January 2, 2024 _____

APPLICATION NO.: _____ APPLICATION FEE: _____

A non-refundable processing fee of $50.00 must accompany the application for a parade permit unless an application for a waiver of the fee has been granted per Chicago Municipal Code section 10-8-330(r).

1. Name of Parade: _____ Bodies Outside of Unjust Laws _____

    Traditional Parade as defined by section 10-8-330? ( ) Yes ( X ) No

2. Requested Date for Parade: _____ Sunday, August 18, 2024 _____

3. Sponsoring Organization (or Individual): Bodies Outside of Unjust Laws: Coalition for Reproductive
    Justice and LGBTQ+ Liberation
    Address: · c/o Thayer, 4835 N Kenmore Ave Apt 2, Chicago, IL 60640

    24-Hour Contact Number: _____ 773-209-1187 _____

    Organization's Leader(s)/Representative(s): _____ Andy Thayer _____

4. Name of Parade Organizer/ Applicant: _____ Andy Thayer _____

    Address: _____ 4835 N Kenmore Ave Apt 2, Chicago, IL 60640 _____

    Email Address: _____ LGBTliberation@aol.com _____ Fax Number: _____

    24-Hour Contact Number: _____ 773-209-1187 _____

5. Time Parade will start: _____ 6 pm _____

    Estimated time Parade will end*: _____ 8:15 pm _____

    * Per section 10-8-330(o)(1), a parade shall be no longer than 2 hours and 15 minutes, except as provided under the ordinance.

6. Time Parade will begin to assemble: _____ 5 pm _____

    Time Parade will begin to disband: _____ 9 pm _____

Revised 2-2015

7. Location and exact street address of assembly area: __Water Tower Park, 180 E. Pearson Street,__

Chicago.

Location and exact street address of disbanding area: __Sidewalk in front of General John Logan statue,__

__901 S. Michigan Avenue, Chicago.__

Permit obtained from property owner to use assembly/disbanding area?

( ) Yes        ( ) No        ( X ) Not Applicable

8. Proposed Parade Route (including sidewalks or lanes of traffic parade will occupy): __East on Pearson__

Street (all lanes) to Michigan Avenue. South on Michigan Avenue in all southbound lanes of traffic to Ontario Street. West on Ontario in all lanes of traffic to Wabash Avenue. South on Wabash in the southbound lanes to Wacker Drive. West on Wacker Drive in all westbound lanes of traffic to State Street. South on State Street in all southbound lanes of traffic past ABC 7 studios to Washington Street. East on Washington Street in all lanes of traffic to Michigan Avenue. South on Michigan Avenue in all southbound lanes past the Art Institute and Hilton Hotel to 9th Street, crossing the northbound lanes of Michigan Ave at 9th Street to end at 901 S. Michigan Avenue.

9. Estimated Number of Participants: __1000-3000 people__

Basis for this estimate: __Previous experience organizing events of this nature.__

10. Number of units participating in the parade:

Floats: __0__

Vehicles: __2__

Marching Groups: __The group will march as one mass, not separate groups.__

11. Will animals participate in the parade? ( ) Yes ( X ) No (unless brought as service animals by

If so, what type of animals and how many?* Participants)

*Participation of animals in a parade is governed by section 10-8-330(a)(2) of the Chicago Municipal Code

12. Description of any sound amplification or other equipment that is on wheels or too large to be carried by one person, and a description of the size and dimension of any sign, banner, or other attention-getting device that is too large to be carried by one person:

__Bigfoot and Liberty 2 sound systems by Anchor Audio. A 30' x 3' banner, four 10' x 4' banners, plus__

__numerous banners of similar sizes brought by participants that it is impossible to predict.__

13. Ward(s) involved: __Wards 2, 4 and 42.__

Revised 2/2012

## TERMS AND CONDITIONS

Per section 8-4-120 of the Chicago Municipal Code, the applicant must promptly reimburse the City for any and all damage of any kind to any property of the City which may result from the use by the applicant of the City's premises under the permission granted herein, and the applicant further agrees that it will not hold liable the City for or on account of any losses or damage to property owned by it or controlled by the applicant or for or on account of any loss or damage sustained by the applicant as a result of injuries to employees or agents of the applicant.

For large parades, as a condition of the permit, it is required that the parade organizer: (1) obtain a $1,000,000.00 commercial general liability insurance policy, naming the City as an additional insured; (2) indemnify the City against any additional and uncovered third party claims against the City arising out of or caused by the parade; and (3) agree to reimburse the City for any damage to the public way or to City property arising out of or caused by the parade.

Any person violating any of the provisions of section 10-8-330 of the Municipal Code of Chicago, shall be fined not less than $200 nor more than $1000 or may be subject to incarceration for up to ten days or both. In addition to any other penalty or fine provided, any person who sells or transfers a permit granted under this section shall be barred from applying for another such permit for a period of three years.

If applicant is applying on behalf of an organization, applicant warrants that he/she has authority to bind the organization listed in line 3 above. If applicant does not have such authority or if no organization is involved, applicant agrees that this application is made on his/her own behalf and is binding on applicant.

Any change in information on this application shall be reported to the Commissioner immediately.

Signature: _____  Date: ___1/8/2024___

Printed Name: __Andy Thayer__

Title/Position(if any): _____

Telephone number: __773.209.1187__  E-Mail Address: __LGBTliberation@aol.com__

Revised 2/2012

# Exhibit D

# Amended Proposed Route

Proposed Route 2



Jane M. Byrne Plaza



Proposed Route 2



John Alexander Logan
Monument

# Exhibit E



# CHICAGO DEPARTMENT OF TRANSPORTATION

## CITY OF CHICAGO

January 16, 2024

Bodies Outside of Unjust Laws: Coalition for Reproductive Justice and LGBTQ+
Liberation
C/O Andy Thayer
4836 N. Kenmore Ave., #2
Chicago, IL 60640

Dear Mr. Thayer,

Pursuant to subsection 10-8-330 (g) of the Municipal Code of Chicago ("Code"), your
application dated January 2, 2024, for a parade on August 18, 2024, is denied for the
following reasons:

1.       Under section 10-8-330(g)(1) of the Code, the Commissioner finds that the
proposed parade will substantially and unnecessarily interfere with traffic in the area
contiguous to the activity, and there are not available at the time of the proposed parade
sufficient city resources to mitigate the disruption.

2.       Under section 10-8-330(g)(2) of the Code, the Commissioner finds that there
are not available at the time of the parade a sufficient number of on-duty police officers,
or other city employees, authorized to regulate traffic, to police the public, and to protect
parade participants and non-participants from traffic-related hazards because of the
other requirements for police protection during the time of the proposed parade.

The Commissioner's decision is based on a number of factors, including, but not limited
to the following:  on the week in question, Chicago will host the 2024 Democratic
National Convention (DNC), a large presidential nominating convention that will involve
the attendance of delegates from all 50 states, the District of Columbia, and U.S.
territories.  Additionally, many  high-level protectees, including President Biden, and
other political leaders will attend the convention.  Motorcades for DNC attendees will
create significant traffic impediments and safety issues that will not permit the proposed
parade route to occur.  Moreover, the proposed parade route winds through the city center
on a day many attendees are expected to arrive and would create significant traffic
concerns and a drain on existing police resources.  Movement of up to 50,000 delegates,
staff, public officials, and high-level protectees from various locations, including the city
center, to McCormick Place and the United Center (the sites of the event) and the
associated entry to the event sites on this date will require heightened security, traffic

rerouting, and security checkpoints and will demand large numbers of police and other city resources. In addition to covering the entire downtown area, including the hotel zone and business district, and routing of traffic near and to McCormick Place and the United Center, police and other city resources will also be required to provide protection and services to the rest of the city. Thus, sufficient city resources are not available to mitigate the traffic disruption that would be caused by the proposed parade, or to police and protect parade participants and non-participants in light of these other demands. Although your application for a parade is denied as to the precise terms of your January 8th, 2024, application, pursuant to Section 10-8-330(k) of the Municipal Code, your group is authorized to conduct a parade under the following conditions:

Date: August 18, 2024
Assembly time: 5:00pm
Step-off time: 6:00pm
Disband time: 8:15pm
Assembly area: Assemble on Columbus DR north of Roosevelt Rd.
Disbanding area: Jackson Dr between Michigan and Columbus.
Route: Proceed north along Columbus Drive from Roosevelt Rd ending at Jackson Dr

Pursuant to Section 10-8-330(o)(2) of the Municipal Code , "Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodations to increase the portion of the right of way made available in order to preserve public health and safety. Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present."

This alternate permit only authorizes the use of the public way. To the extent your proposed event may desire to utilize the property of the Chicago Park District, another governmental entity, or a private owner, authorization of such locations must be sought directly from the affected entity.

If you wish to accept this alternate parade permit subject to the above indicated specifications, Section 10-8-330(k) of the Municipal Code requires that you file a written notice of acceptance with the Commissioner of the City of Chicago Department of Transportation, Public Way Permit Office, 121 N. La Salle Street, Room 905, Chicago, Illinois, 60602 or email address CDOTPermitsupport@cityofchicago.org, within 5 business days of the date of this notification. Failure to provide such notice within the time provided will result in the authorization for the alternate parade permit being rescinded.

On January 8, 2024, the Department of Transportation also received your amended or duplicate application for the same parade. Therefore, please consider this letter responsive to that duplicate application or amendment as well.

The Department of Transportation reserves the right to modify or condition any issued parade permit in light of developing circumstances and information surrounding the DNC, including circumstances outside of the City of Chicago's control, such as the logistical or security needs or plans connected with the DNC.

If you believe your application is being wrongfully denied, you may appeal this decision by filing and appeal with the Department of Administrative Hearings. Your appeal should be filed with the Director of the Department of Administrative Hearings, 740 N. Sedgwick Street, 6th Floor, Chicago, Illinois 60654. If no appeal is filed with the Department of Administrative Hearings within five business days of notice of this decision, this decision shall be deemed final.

If you have any questions regarding this letter, you may contact Bryan Gallardo at 312-744-4652

Sincerely,

Bryan Gallardo
Assistant Commissioner
Public Way Permit Office
CDOT Division of Infrastructure Management

CC:     Chief Devries
        Deputy Chief Stevens
        Cmdr. Harris
        Cmdr. Barz
        J. Kalayil
        M. Imparato
        T. Carney
        A. Owens
        J. Tirado
        C. Pettineo
        M. Peterson
        T. Doran
        M. Siegel
        C. Hake

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7017 1450 0000 7649 1518

CITY OF CHICAGO

DEPARTMENT OF TRANSPORTATION

DIVISION OF INFRASTRUCTURE MANAGEMENT
DRIVEWAY SECTION
CITY HALL, ROOM 905
121 NORTH LASALLE STREET
CHICAGO, IL 60602

U.S. POSTAGE PAID
FCM LETTER
CHICAGO, IL 60604
JAN 17, 2024

$8.56

R2304H107675-08

60640

**Retail**

UNITED STATES
POSTAL SERVICE

**RDC 99**

RETURN RECEIPT
REQUESTED

7/12

Bodies Outside of Unjust Laws
4836 N. Kenmore Ave APT 2
c/o Andy Thayer
Chicago, IL 60640

60640-372702

# Exhibit F

# Alternate Route

## City's Proposed Route



City Alternative Route
Assembly Area



City Alternative Route



City Alternative Disbanding
Area

# Exhibit G

BEFORE THE

DEPARTMENT OF ADMINISTRATIVE HEARINGS

CITY OF CHICAGO, a            )
municipal corporation,        )        C O P Y
                              )
          Plaintiff,          )
                              )
          vs.                 ) No. 24PA000001
                              )
BODIES OUTSIDE OF UNJUST      )
LAWS:  COALITION FOR          )
REPRODUCTIVE JUSTICE AND      )
LGBTQ+ LIBERATION,            )
                              )
          Defendant.          )


          RECORD OF PROCEEDINGS held
before HEARING OFFICER DENNIS FLEMING, taken in
the above-entitled cause, taken by audio
recording at 400 West Superior Street, Room 110,
Chicago, Illinois, commencing on the 30th day of
January, 2024.

```
 1   APPEARANCES:

 2

 3          CITY OF CHICAGO - DEPARTMENT OF LAW
            LEGAL INFORMATION AND PROSECUTIONS
 4          DIVISION
            BY:  CHRISTOPHER DIONNE, ESQ.
 5               CHRISTINE HAKE, ESQ.
                 MATTHEW SPAHR, ESQ.
 6          740 North Sedgwick Street
            Chicago, Illinois 60654
 7          (312) 744-8309
            christopher.dionne@cityofchicago.org
 8          christine.hake@cityofchicago.org
            matthew.spahr@cityofchicago.org
 9              Appeared on behalf of the Plaintiff.

10

11

12          FIRST DEFENSE LEGAL AID
            BY:  JOSEPH DiCOLA, ESQ.
13          601 South California Avenue
            Chicago, Illinois 60612
14          (708) 967-3344
            joseph@first-defense.org
15              Appeared on behalf of the Defendant.

16

17

18

19

20

21

22

23

24
```

1           I N D E X
2   RASHAD SPRIGGS                         PAGE

3   Direct by Mr. Dionne                      7
    Cross by Mr. DiCola                      37
4
5   BRYAN GALLARDO
6   Direct by Mr. Dionne                    105
    Cross by Mr. DiCola                     117
7   Redirect by Mr. Dionne                  105
    Recross by Mr. DiCola                   117
8
9   DANIEL O'CONNOR
10  Direct by Mr. Dionne                    118
    Cross by Mr. DiCola                     144
11
12  ANDREW THAYER
13  Direct by Mr. DiCola                    170
    Cross by Ms. Hake                       196
14
15  LINDA LOEW
16  Direct by Mr. DiCola                    217
17
18  KRISTI KEORKUNIAN-RIVERS
19  Direct by Mr. DiCola                    224
    Cross by Ms. Hake                       231
20
21
22
23
24

1                    EXHIBITS

2                                        ADMITTED

3    City No. 1A-C                          61

4    City No. 2                            62

5    City No. 3A-D                          64

6    City No. 4                            64

7    City No. 5A-D                          74

8    City No. 6                            84

9    City No. 7                            17

10

11   Respondent No. 1                     173

12   Respondent No. 2                     186

13   Respondent No. 3                     189

14

15

16

17

18

19

20

21

22

23

24

```
 1              P R O C E E D I N G S

 2

 3          HEARING OFFICER FLEMING:  All right.

 4   The attorneys for the Movant, have you guys

 5   filed appearance forms?

 6          MR. DIONNE:  I have an appearance

 7   form, your Honor.

 8          HEARING OFFICER FLEMING:  Okay.  All

 9   right.  We are going to open this morning's

10   session of the Municipal Division of the

11   Department of Administrative Hearings.  The

12   matter in front of me is 24PA000001.

13              My name is Dennis Michael

14   Fleming.  I am the Hearing Officer that has been

15   assigned to this matter.

16          MR. DiCOLA:  Judge, is the recording

17   on?

18          HEARING OFFICER FLEMING:  It's on,

19   it's just the light's not.  They try to confuse

20   us.

21              They haven't put the case in

22   the system yet for me to enter an order at the

23   end of the day but we have time on that.  They

24   still have the impound cases in there.
```

1                  All right.  So I have Mr.
2     DiCola on behalf of Andy Thayer, Bodies Outside
3     of Unjust Laws.
4                  And City attorneys, please
5     identify themselves for the record.
6              MR. DIONNE:  ACC Chris Dionne for the
7     City.
8              MR. SPAHR:  ACC Matthew Spahr for the
9     City.
10             HEARING OFFICER FLEMING:  Okay.  This
11    is the first parade case that I have done in my
12    career over here, so I did take an opportunity
13    to review the ordinance and the like.
14                  And the reason I did it,
15    Mr. DiCola, is I sometimes will do what they
16    call dangerous dog cases which are also appeals
17    from a Commissioner's decision.  In that
18    particular situation, they specifically say that
19    the hearing over there would be de novo.  I
20    don't see language like that in the parade
21    ordinance.
22                  Other cases that have come
23    down, one including dealing with the
24    environmental cases coming out of Hegewisch

1   dealing with the recycling plants and that

2   particular situation, the Administrative Law

3   Judge took the position that it was the burden

4   on the Appellant to present their evidence and

5   proceed with it.

6                    I have reviewed the ordinance

7   and my interpretation of the language -- give me

8   a second here -- is that the decision here is to

9   be based on the evidence that is presented at

10  this hearing, which leads me to take the

11  position that, although it doesn't say it

12  specifically, the City would have the burden of

13  moving forward with their evidence.  And at the

14  end of their evidence, obviously, you would have

15  the right to cross-examine, and then if you have

16  evidence you wish to present.

17                    But it appears to me that that

18  is the way the ordinance suggests it should be,

19  which would mean then that, again, the burden as

20  I see it would be, as in most of the cases over

21  here, is a preponderance of the evidence.

22                    Any response or anything from

23  that?

24            MR. DIONNE:  Nothing from the City.

 1              HEARING OFFICER FLEMING:  If not, then
 2      that's how we will proceed.
 3              MR. DiCOLA:  Thank you, your Honor.
 4      That was my understanding and that sounds great.
 5              HEARING OFFICER FLEMING:  I didn't
 6      want to get to a situation where we were
 7      partially through and that issue came up and
 8      hadn't been addressed.  So we are all on the
 9      same page relative to that.
10              MR. DiCOLA:  I appreciate that.
11              HEARING OFFICER FLEMING:  Are there
12      any preliminary matters that we need to address?
13              MR. DiCOLA:  I don't believe so, your
14      Honor.
15              HEARING OFFICER FLEMING:  Okay.
16              MR. DIONNE:  Judge, the City has a
17      preliminary motion to exclude any witnesses that
18      will not be testifying presently.
19              HEARING OFFICER FLEMING:  Okay.  Any
20      objection to the motion to exclude?
21              MR. DiCOLA:  Yes, your Honor.  I would
22      object just on the basis that it's a public
23      proceeding and that my clients with the
24      organization have a right to hear what the fate

1    of their parade permit and other attendees also

2    have a right to be here.

3              HEARING OFFICER FLEMING:  Well, they

4    have a right to be here but, you know, when we

5    get into the question of witnesses, I think that

6    the motion to exclude is proper.  Once,

7    depending on who has testified and at what

8    point, if there is no objection, the person can

9    remain in after they have testified, if we get

10   to that.

11             MR. DiCOLA:  Fair enough, your Honor.

12             HEARING OFFICER FLEMING:  All right.

13   Okay.  Opening statement if you wish, City.

14             MR. DIONNE:  Yes.  Judge, we are here

15   today on an appeal for an application for a

16   parade permit that was submitted by the parade

17   applicants in this matter in which the City has

18   responded to both the initial application, as

19   well as an amended application, in which the

20   City did not say that they are not permitted to

21   parade.

22                  The City simply said that

23   based upon the locations were provided in both

24   the initial application as well as the amended

1 application, that they would be unable to secure

2 the route due to the safety of the participants

3 of that proposed parade, as well as all the

4 other traffic and buses, city traffic, other

5 pedestrians that would be in the proposed

6 initial location as well as the amended

7 location.

8                    Additionally, the City also

9 cited that the resources that would be needed

10 during the proposed time frame of the date and

11 times provided by the applicants on this

12 application, the City would simply not have the

13 resources available from Chicago Police

14 Department, as well as the other necessary

15 departments within the City, that would

16 adequately allow to keep the safety of the

17 participants of this parade safe during the

18 route of the proposed time, date and location.

19                    It is solely the bases that

20 were listed as one and two in the denial that

21 were listed, and those are the only two bases in

22 which the applications were denied.

23                    Furthermore, Judge, the City

24 did not say they could not parade.  The City

1  said, in fact, you can parade at the same date

2  and time, simply a different location that was

3  provided.  And that location that was provided,

4  testimony will be elicited, that that location

5  is able to have the amount of transportation not

6  affected as well as the resources available to

7  ensure not only the safety of the participants

8  of that parade but also all the other citizens

9  of Chicago.

10              And paramount to what is going

11  on during this time is the Democratic National

12  Convention, which the City will elicit testimony

13  too that during this time frame is considered a

14  National Special Security Event or NSSE.

15              For all the reasons the City

16  will provide in this case, we are asking that

17  the Court affirm the determination from

18  Transportation and deny the route as proposed by

19  the Applicants.

20          HEARING OFFICER FLEMING:  Do you wish

21  to do opening now or do you wish to reserve?

22          MR. DiCOLA:  I would like to reserve,

23  your Honor.

24          HEARING OFFICER FLEMING:  Okay.  Very

1   good.

2                    Okay.  Call your first

3   witness.

4            MR. DIONNE:  With that, Judge, City is

5   calling its first witness, Mr. Rashad Spriggs.

6                    RASHAD SPRIGGS,

7   called as a witness herein, having been first

8   duly sworn, was examined and testified as

9   follows:

10                   DIRECT EXAMINATION

11  BY MR. DIONNE:

12       Q.   Good morning.  Could you please

13  introduce yourself stating your name for the

14  record?

15       **A.   My name is Rashad Spriggs.**

16       Q.   And could you spell your last name as

17  well?

18       **A.   S-p-r-i-g-g-s.**

19       Q.   All right.  And who is your current

20  employer?

21       **A.   I am employed by the United States**

22  **Secret Service.**

23       Q.   And how long have you worked for the

24  United States Secret Service?

1      **A.     I have been there 17 years.**

2      Q.     All right.  What is your current

3  position within the Secret Service?

4      **A.     Currently, I am assigned as the Deputy**

5  **Coordinator or Assistant Coordinator for the**

6  **Democratic National Convention within our**

7  **Department of Dignitary Protective Division.**

8      Q.     And when did you receive that

9  assignment?

10     **A.     In April of 2023.**

11     Q.     Okay.  And in that position, what are

12  some of your current responsibilities?

13     **A.     So myself as well as the overall**

14  **coordinator, Jeff Burnside, we are responsible**

15  **for the implementation and coordination with our**

16  **city, state and local federal partners in coming**

17  **up with the security plan for the Democratic**

18  **National Convention.**

19     Q.     Are you based here out of Chicago?

20     **A.     No, sir.**

21     Q.     Where are you based out of?

22     **A.     New York.**

23     Q.     Okay.  So you mentioned the Democratic

24  National Convention in Chicago.  What exactly is

1   your role in planning that event?

2       **A.    Can you say it again?**

3       Q.    What exactly is your role in planning

4   that event here in Chicago?

5       **A.    So with the NSSE the Secret Service**

6   **takes the lead -- is the lead federal agency**

7   **that is responsible for implementation, planning**

8   **and coordination of all security operations.  So**

9   **we work closely with all of our federal**

10  **partners, CPD in this case, as one of the**

11  **co-chairs of the event to make sure that the**

12  **security plan and visit of our delegates, as**

13  **well as our protectees, are safe and secure.**

14      Q.    And you mentioned NSSE.  What does

15  that stand for?

16      **A.    NSSE stands for National Special**

17  **Security Event, which have been around since**

18  **1998.  They were established as any event of**

19  **international or national significance in which**

20  **terrorism or criminal activity has a higher**

21  **chance of occurring.**

22      Q.    Okay.  And who designates which events

23  are considered NSSEs?

24      **A.    The Secretary of Homeland Security is**

1    responsible for designating an event as an NSSE.

2         Q.   Is the Democratic National Convention

3    designated as an NSSE?

4         A.   Yes.  Secretary Nielsen in 2018 made

5    the political conventions as standing NSSEs,

6    meaning that they do not have to go through the

7    application process as other events would,

8    similar to the presidential inaugurations as

9    well as state funerals.  The political

10   conventions have been designated as standing

11   NSSEs, meaning any time that they occur, they

12   will be given the NSSE designation.

13        Q.   Is the standing NSSE also known as a

14   recurring NSSE?

15        A.   Correct.

16        Q.   Okay.  Now, I'm showing you what's

17   been marked as City Exhibit No. 7.  Do you

18   recognize this document?

19        A.   Yes.

20        Q.   Okay.  And how do you recognize this

21   document?

22        A.   It is the document sent out to members

23   of DHS in which Secretary Nielsen in 2018

24   referenced political -- Presidential Policy

1   **Directive 22 which designated political**

2   **conventions to be recurring NSSEs.**

3       Q.   And DHS stands for?

4       **A.   Department of Homeland Security.**

5       Q.   Okay.  And who is this letter from?

6       **A.   Secretary Nielsen.**

7       Q.   And who is it to?

8       **A.   All federal departments and agencies.**

9       Q.   All right.  And who is it signed by?

10      **A.   Signed by Secretary Nielsen.**

11      Q.   All right.  And would you say this is

12  a complete and accurate copy of the letter that

13  was sent out by Secretary Nielsen on September

14  24, 2018?

15      **A.   Yes.**

16          MR. DIONNE:  Judge, at this point City

17  asks what's been marked as City Exhibit No. 7 be

18  entered into evidence.

19          HEARING OFFICER FLEMING:  Any

20  objection?

21          MR. DiCOLA:  No, your Honor.

22          HEARING OFFICER FLEMING:  Admitted

23  without objection.

24

1                    (WHEREUPON, City

2                    Exhibit No. 7 was admitted

3                    into evidence.)

4    BY MR. DIONNE:

5        Q.   All right.  You mentioned President

6    Directive 22.  Is that contained within this

7    letter?

8        **A.   Yes.**

9        Q.   And generally, what does this

10   directive mean?

11       **A.   The directive is stating that when an**

12   **event is considered to be an NSSE, that the full**

13   **capacity and capabilities of the Federal**

14   **Government are to be used to help in the**

15   **securing of the event.**

16       Q.   Okay.  And you mentioned briefly about

17   terrorism, anti-terrorism.  Was it the only

18   reason why the directive was implemented?

19       **A.   Was it the only reason why?**

20       Q.   Yes.

21       **A.   It's the main reason to ensure a safe**

22   **and secure event.**

23       Q.   All right.  Are there other reasons

24   why that you know of?

1    **A.    No.**

2    Q.    All right.  So once an event such as

3    the DNC is designated as an NSSE, what exactly

4    has to happen?

5    **A.    So the framework of the NSSE starts**

6    **off with the Secret Service as the lead federal**

7    **agency appointing two coordinators, a main**

8    **coordinator and a deputy coordinator.  They**

9    **begin the planning process by working with the**

10   **local governments to establish what we call an**

11   **Executive Steering Committee, and then there is**

12   **also subcommittees that make up each NSSE.**

13                 **So the coordinators begin the**

14   **planning of organizing the Executive Steering**

15   **Committee and working with local governments to**

16   **make sure that the assets are in place for the**

17   **event.**

18   Q.    And who is in this Steering Committee

19   that you mentioned?

20   **A.    So there is 18 local and federal**

21   **agencies that are making up the Executive**

22   **Steering Committee.  The Chicago Police**

23   **Department is included in that, Chicago Fire**

24   **Department, Office of Emergency Management, the**

**FBI, FEMA, the Coast Guard, Cook County Sheriffs Department and the US Attorney's Office, just to name a few.**

Q.   Okay.  But there are additional ones besides the ones that you enumerated?

**A.   Yes.**

Q.   Okay.  And when is the DNC scheduled to occur in Chicago?

**A.   The DNC is set to take place August 19th through the 22nd of 2024.**

Q.   All right.  And so when do you have to start -- you mentioned you started preparing for this in April of 2023.

What has to occur in anticipation of the dates that the DNC is actually going to be in Chicago?

**A.   So we work closely -- the first thing we do is establish relationships with our local partners and seeing what capabilities are already in place.  In this case, for the City of Chicago, what they have personnel-wise, what they have equipment-wise, and coordinating with our federal partners as well to see what additional assets would be needed to establish**

1    the event.

2         Q.    Are these personnel as well as

3    objects?

4         **A.    Correct.**

5         Q.    Okay.  And in anticipation of the DNC

6    being in Chicago, do you have an estimate of

7    roughly how many people will be attending?

8         **A.    So the overall scope of the convention**

9    **is approximately 6,000 delegates will be**

10   **attending to conduct the party's business.**

11   **There will be anywhere from 12 to 15,000 members**

12   **of the media, both local and national, as well**

13   **as international, and approximately 50,000**

14   **additional visitors to the City of Chicago for**

15   **DNC-related events, even though they may not**

16   **attend the actual convention itself.  But Union**

17   **members, different organizations within the**

18   **Democratic party that would come here for**

19   **meetings and face-to-face time with their party**

20   **representatives.**

21        Q.    Okay.  And do these estimated figures

22   include family and possibly children of the

23   attendees?

24        **A.    Correct.**

1    Q.    Okay.  So when exactly does this NSSE

2    directive take effect in anticipation of August

3    19th through 22nd?

4    **A.    So the NSSE will stand up or take**

5    **effect approximately 48 hours prior, which is**

6    **when we will send our security perimeters in**

7    **place.  However, that date could potentially**

8    **fluctuate based on any adverse intelligence that**

9    **could arise.**

10    Q.    And what are the main locations in

11    which the DNC is going to be occurring?

12    **A.    So right now the DNC has established**

13    **two primary venues, one being McCormick Place**

14    **and the main event, kind of what you would think**

15    **a political convention -- when you think of what**

16    **a political convention is with the nomination of**

17    **the candidates and the big balloon drop and all**

18    **the fun confetti stuff, that would all take**

19    **place at the United Center.**

20    Q.    Are there any other locations in the

21    city that will also require additional security?

22    **A.    So the delegate hotels will also have**

23    **an increased presence from CPD, as well as**

24    **motorcade routes that will be used to move not**

1    only the delegates but also our VIPs who will be

2    attending, as well as the DNC may have

3    additional events throughout the City that would

4    require CPD assets.

5        Q.    Without getting into the specifics of

6    the motorcade routes, specifically where they

7    are, what is required to secure a route?

8        A.    So our motorcade routes are very, very

9    personnel intensive, especially coming out of

10   the City of Chicago heading to the United Center

11   where you have multiple intersections that would

12   be controlled by not only vehicles but also CPD

13   personnel, as well as State Police assets that

14   would be a part of the motorcade.  So keeping

15   pedestrians safe and off of the streets is the

16   primary focus of the law enforcement officers

17   along that motorcade route.

18       Q.    Will pedestrians or other commercial

19   traffic be permitted to cross a motorcade once

20   one is put into effect?

21       A.    No.  So once the motorcade -- for

22   example, if the President is moving, all traffic

23   along that motorcade route will be in what we

24   call a freeze, meaning that those vehicles and

1  **pedestrians will not be allowed to cross**

2  **intersections or roadways until the motorcade is**

3  **cleared.**

4  Q.  And who would be anticipated to ensure

5  that motorcade route?

6  **A.  One of our subcommittees is the**

7  **transportation subcommittee.  They are working**

8  **closely with CPD and the Illinois State Police**

9  **to establish those routes to try to make those**

10  **routes the least intrusive to the community and**

11  **the people who are not attending the events, and**

12  **to cause the least amount of disruption**

13  **possible.**

14  **Although clearly with the size**

15  **and magnitude of the event, it would be**

16  **impossible to do so without causing some**

17  **disruption to traffic.**

18  Q.  Now, you mentioned that CPD and other

19  agencies will be securing these routes.  Do you

20  direct them as to how to secure those routes?

21  **A.  We work in coordination depending on**

22  **the assets that are available.  If there are**

23  **intersections that need additional support, we**

24  **can recommend based on what we've seen from**

1    other cities, for example, sometimes we will use

2    large equipment like sanitation trucks if a

3    roadway needs to temporarily be closed and

4    opened up quickly as opposed to setting up, you

5    know, concrete Jersey barriers.

6                          So we can make those

7    recommendations on how to secure, but we work

8    hand in hand with CPD relying primarily on their

9    knowledge of the City and what assets they have

10   available to make sure that they have the

11   capability of controlling that intersection.

12       Q.   So, to your knowledge, then would that

13   be CPD's decision on how to allocate those

14   resources to obtain the objective?

15       A.   Yes, very much so.

16       Q.   Okay.  Now, you mentioned that there

17   was going to be heightened security within

18   Chicago.  Besides the areas that were already

19   listed, are there other events that are going to

20   be occurring inside the city besides McCormick

21   and United Center that require heightened

22   security locations?

23       A.   Yes.  As I mentioned, the delegate

24   hotels will have an increased CPD presence at

those hotels.  There will be impacts to other
things; obviously, are the air space.  There
will be a temporary flight restriction over the
City of Chicago which would impact the ability
to fly drones, helicopter tour traffic, just
regular commercial traffic coming out of the
airports that we try to minimize the impact of
that.  But, obviously, those temporary flight
restrictions will be in place as well.

    Q.   All right.  We'll get back to that in
a moment with the flight restrictions.  But how
are --

        HEARING OFFICER FLEMING:  One moment,
please.

            (WHEREUPON, a discussion
            was held off the record.)

        HEARING OFFICER FLEMING:  Sorry.
BY MR. DIONNE:

    Q.   How are these delegates supposed to
get from where they are staying to the events,
if you know?

    A.   So the delegates' transportation to
and from the venues is our responsibility as the
coordinators for the NSSE.  They will be

1    **traveling along dedicated motorcade routes that**

2    **will be established.**

3         Q.   Will CPD be assisting in those routes?

4         **A.   Yes.**

5         Q.   Now, you are aware of the Petitioner's

6    application for the parade route; is that

7    correct?

8         **A.   Yes.**

9         Q.   All right.  Have you seen any of their

10   applications before?

11        **A.   Yes.**

12        Q.   Okay.  And when did you see these

13   applications?

14        **A.   We have a monthly meeting with CPD and**

15   **the DNC Committee, and they were brought to our**

16   **attention that permits had been filed.  We had**

17   **made the request to be made aware of any**

18   **potential protest or parades or demonstrations**

19   **that would be occurring during the week of the**

20   **convention, and we have made that determination**

21   **based on our history of working the NSSEs.**

22        Q.   All right.  And you say we.  Who is we

23   in this case?

24        **A.   Jeff Burnside and myself, as well as**

1  **CPD leadership and the DNC themselves.**

2  Q.   All right.  Based upon the

3  applications that were submitted, did you make

4  any directions to anybody at CPD as to the

5  application itself?

6  **A.   No.**

7  Q.   All right.  Did you make any

8  recommendations or directions to anyone at

9  Chicago Department of Transportation?

10  **A.   No.**

11  Q.   Do you have an opinion as to the

12  proposed routes from the applicants in this

13  instance?

14  **A.   Our main objective is to ensure that**

15  **everyone who is attending the conventions gets**

16  **what they want to get out of the convention,**

17  **meaning we have every intention of making --**

18  **giving people the ability to express their First**

19  **Amendment rights.  However, in this case we**

20  **understand that in this particular petition it**

21  **would be unfeasible as the proposed route would**

22  **be directly next to the United Center which will**

23  **have perimeter fencing around it and would make**

24  **it physically impossible to conduct that.**

1    But, you know, we as the
2  Secret Service are very adamant about making
3  sure that there is the ability for anyone who
4  would like to express their First Amendment
5  rights have the ability to do so, just not
6  within our security perimeters.
7    Q.   All right.  And you previously
8  mentioned that there would be a no fly zone
9  within Chicago.  Can you explain what that is
10  going to be?
11    A.   So without getting into the specifics,
12  but if you are familiar with a presidential
13  visit, any time the President travels somewhere
14  there will be a temporary flight restriction
15  around anywhere that he goes, whether it be the
16  airport, the hotel he is staying at or the venue
17  in which he is speaking.
18    The size and scope of that
19  just needs to be reasonable and it needs to be
20  posted so they will make notification to airmen,
21  which is called a NOTAM, letting commercial and
22  private pilots aware of the flight restrictions
23  and they are not authorized to violate that.
24    For an NSSE, the actual flight

 1  **restriction doesn't just encompass the President**

 2  **himself when he is in town, it actually**

 3  **encompasses the entire event for the duration of**

 4  **the event.  So it basically will cover, you**

 5  **know, a pretty significant flight restriction**

 6  **over the entire city of Chicago.**

 7      Q.   Now, as a result of the Democratic

 8  National Convention being designated an NSSE,

 9  are you aware of any other Chicago events that

10  have had to have been rescheduled?

11      **A.   Yes.  Based on the flight**

12  **restrictions, the air show which was to take**

13  **place the first weekend of the convention, and**

14  **would be within NSSE designation, has been moved**

15  **to a date that would accommodate, as well as I**

16  **believe the school has been pushed back as well**

17  **based on CPD's assets that are required.**

18      Q.   Now, you mentioned that you have

19  worked on other NSSE events before; is that

20  correct?

21      **A.   Yes.**

22      Q.   Approximately how many?

23      **A.   I have probably worked on about ten**

24  **other NSSEs during my time in the New York field**

office, as well as in our Dignitary Protective
Division.  And those would include presidential
inaugurations for both President Obama and
President Trump, as well as the United Nations
General Assembly which takes place annually in
New York every year.

Q.    All right.  And New York, is that a
similar big city as to compared to Chicago?

A.    Yes.

Q.    And could you explain the magnitude of
the events that have taken place in previous
NSSEs in large cities?

A.    So to use the UN General Assembly as
an example, you have approximately 164 Heads of
State in one building at one time.  As you can
imagine, the security perimeter around the UN is
quite extensive.  The island of Manhattan is
very, very densely populated, and there is
really no area within the security perimeter
where you don't have residential buildings,
office buildings, people coming to and from
work, as well as subway stations, buses.

                    And all of that coordination
takes place with the New York City Police

Department as well as their Department of
Transportation and Secret Service to try to be
as least intrusive as possible to the people
that live there.

We realize that when we have
these big events, typically, the people who are
not attending the event seems to be the most
frustrated, but we also understand that the City
must go on.  You can't shut down a big city like
New York.  You can't shut down a big city like
Chicago.

If it was up to us, that would
be great to be able to do that, or to have these
in the middle of nowhere, but the Secret Service
is not responsible for selecting the host
cities.  But we try to be as least intrusive as
possible.

Q.  So do other city services shut down
just because the NSSE is located in Chicago?

A.  There will be some services that are
impacted, but we try not to make sure that --
that day-to-day operations are shut down.
Trains will still be running.  Sanitation trucks
will still be, you know, able to do their job,

1    deliveries, Amazon, UPS, FedEx.  We work in

2    coordination with all of those companies to make

3    sure that if there is a residential area or a

4    business that needs to get their deliveries.

5                    Now, what it impacts greatest

6    is they may get their deliveries every day at

7    4:00 o'clock.  We may have to shift that where

8    they get those deliveries at 3:00 a.m. just to

9    make sure that all the deliveries are in and out

10   and trash is removed prior to heavy pedestrian

11   and vehicle traffic in which we would be

12   establishing those motorcade freeze routes.

13              MR. DIONNE:  Judge, one moment.

14                   (Brief pause.)

15   BY MR. DIONNE:

16        Q.   Agent Spriggs, you mentioned that you

17   had looked at the application of parade routes

18   for the Petitioner in this case; is that

19   correct?

20        A.   Yes.

21        Q.   All right.  And do you know what those

22   routes were?

23        A.   I do not.

24        Q.   All right.  If I showed you -- is your

1  memory exhausted as to what those routes were?

2      **A.    I believe that they were -- there was**

3  **a route that was going -- that had been**

4  **requested to go down Madison Avenue, but that's**

5  **the only section of the route that I was aware**

6  **of.**

7      Q.    If I were to show you the route, would

8  that refresh your recollection as to the actual

9  route that was proposed?

10     **A.    Yes.**

11     Q.    All right.  I'm showing you the

12  initial application route.  Just give it a look,

13  refresh your recollection.

14             HEARING OFFICER FLEMING:  Has that

15  been marked as an exhibit?

16             MR. DIONNE:  It has been.  It is not

17  --

18             HEARING OFFICER FLEMING:  Even if it's

19  just for identification.

20             MR. DIONNE:  For identification it's

21  marked as City's Group 1A through C.

22             HEARING OFFICER FLEMING:  Okay.

23  BY MR. DIONNE:

24     Q.    Is your memory refreshed?

1      **A.    Yes.**

2      Q.    Okay.  And where does that route

3  exactly go?

4      **A.    This route would take essentially**

5  **through some of our security perimeters based on**

6  **the delegate hotels, as well as, you know, right**

7  **down the main Michigan Avenue which would impact**

8  **some of our transportation efforts.**

9      Q.    Did you direct CPD to deny that route?

10     **A.    No, we did not.**

11     Q.    Okay.  Why did you then leave it up to

12  CPD to make the determination?

13     **A.    As Jeff and myself are not local to**

14  **the City of Chicago and have only been here for**

15  **a few months, we leave it up to our local**

16  **partners when these type of opportunities arise**

17  **for them as the experts in the traffic patterns**

18  **and the knowledge of their personnel and**

19  **equipment that would be required to make sure**

20  **that the parade participants were safe and**

21  **secure.  We rely on our local partners to be**

22  **able to make those determinations.**

23     Q.    And are you aware of the amended route

24  proposal by the applicants in this matter as

1    well?

2         **A.    Yes.**

3         Q.    And are you familiar with the route or

4    is your memory exhausted as to what that route

5    was?

6         **A.    I would need to look at it.**

7         Q.    Okay.  I am showing you what has been

8    marked as City Exhibit -- Group Exhibit 3A

9    through D.  Go ahead and take a look.  When your

10   memory is refreshed, just look up and let me

11   know.

12        **A.    Okay.**

13        Q.    Okay.  And so what is the proposed

14   amended route?

15        **A.    It would be a route that would be more**

16   **feasible for -- that would be outside of our**

17   **secured areas.**

18        Q.    The amended route would not touch any

19   of the secured areas, is that what you are

20   saying, or it would touch secured areas still?

21        **A.    Well, not being 100 percent familiar**

22   **with every street in Chicago, I believe that the**

23   **proposed route is -- is currently outside of**

24   **where our security perimeters would be.**

1    Q.   But you have no idea of knowing where

2  exactly the secured areas are going to be at the

3  moment?

4    **A.   So we have established a notional**

5  **perimeter.  Again, as intelligence comes in,**

6  **whether that zone needs to be retracted or**

7  **expanded is always something that's flexible up**

8  **until the event itself.**

9    Q.   All right.  So it could change before

10  the event actually starts?

11    **A.   Correct.**

12    Q.   All right.  And whose determination as

13  to how to secure that route; whose

14  responsibility would that ultimately be?

15    **A.   Secret Service along with Chicago**

16  **Police Department.**

17    Q.   But the how as to how to implement

18  that, who would be responsible as to how to

19  deploy and secure that area?

20    **A.   We would rely on CPD assets.**

21    Q.   Okay.  And they would make the

22  ultimate determination; is that correct?

23    **A.   They would make the determination as**

24  **to what personnel and equipment would be used to**

1  **secure that route, yes.**

2      Q.    But Secret Service did not instruct

3  either Transportation or CPD to deny the

4  Petitioner's application?

5      **A.    Correct.**

6          MR. DIONNE:  Judge, nothing further at

7  this point.  We tender the witness.

8          HEARING OFFICER FLEMING:  Cross?

9          MR. DiCOLA:  Yes, your Honor.

10          HEARING OFFICER FLEMING:  I should

11  have said this before.  I have a tendency to

12  just keep moving.  So at any time we need a

13  break, you can let me know.

14          MR. DiCOLA:  Thank you very much.

15              CROSS-EXAMINATION

16  BY MR. DiCOLA:

17      Q.    Agent Spriggs, my name is Joseph

18  DiCola.  I represent the Respondents in this

19  matter.  I thank you for your time today.  I

20  just have a few questions for you.

21                  You -- in your experience with

22  NSSE events, does that -- does the planning

23  involve accommodations for anticipated First

24  Amendment activity at those events?

1    **A.    At the Secret Service, we do not**
2    **establish protest zones or free speech zones.**
3    **We establish our security perimeters, which**
4    **under 1752 gives us the authority to do so, and**
5    **we rely on the local partners who would**
6    **establish those First Amendment zones.**
7    Q.    In your experience, NSSEs typically
8    draw or can be expected to draw protests and
9    First Amendment activity; is that correct?
10   **A.    Correct.**
11   Q.    And you testified that -- something to
12   the effect of it's important to bring the full
13   capacity of the Federal Government to ensure
14   safety for the event; is that correct?
15   **A.    Yes.**
16   Q.    Does the full capacity of the Federal
17   Government involve contracting with federal
18   agency personnel to work with the City of
19   Chicago agencies to secure the City for the
20   event?
21   **A.    Contracting federal employees to?**
22   Q.    In terms -- does full capacity to you
23   imply -- mean that the -- that federal employees
24   can work with the City directly?

1              Can the City deputize federal

2     employees to help secure the event?

3          **A.    We do not do that for NSSEs.**

4          Q.    Do you -- does the Federal Government

5     deploy additional staff to the area of a

6     national security event to keep it secure?

7          **A.    Deploying federal employees -- for**

8     **example, Jeff and I have relocated to Chicago to**

9     **be on the ground here as coordinators.  We bring**

10    **in multiple additional personnel from the Secret**

11    **Service, as well as from FEMA will have**

12    **additional personnel here as well.  The FBI will**

13    **have additional personnel here as well.  So all**

14    **of our federal agencies do increase their**

15    **footprint in the city of which the NSSE is**

16    **taking place.**

17         Q.    And all those federal employees,

18    federal law enforcement, they are there to

19    supplement CPD's capacity to secure the city for

20    the event, correct?

21         **A.    Not necessarily.  For example, Secret**

22    **Service agents do not have peace officer status**

23    **here in Chicago, meaning that we cannot act in a**

24    **police officer role.  So those additional assets**

1   **are there to do the job to secure the NSSE, but,**

2   **for example, FEMA is not going to have officers**

3   **or any of their personnel working in a police**

4   **capacity where they would supplement CPD.**

5   Q.   But is it correct that there will be

6   more federal employees than ordinarily in the

7   City of Chicago working to keep this event

8   secure?

9   **A.   Yes.**

10   Q.   Can you tell me, what are the

11   established delegate motorcade routes?  Have

12   they been -- let me rephrase the question.

13                   Have those motorcade routes

14   been established?

15   **A.   No.**

16   Q.   So in reviewing any permit

17   applications, you cannot say for certain whether

18   or not they are going to intersect a motorcade

19   route?

20   **A.   Correct.  Those motorcade routes that**

21   **will be used for the delegates will be not**

22   **standing 24 hours.  They will be utilized during**

23   **the time in which the delegates will be required**

24   **to move from venue to venue.**

1    Q.   At the time you reviewed the permit
2   application in this case, those routes were not
3   established, correct?
4        **A.   Correct.**
5        Q.   You testified that you first learned
6   of this application at a monthly meeting with
7   CPD; is that right?
8        **A.   Correct.**
9        Q.   What was the exact date of that
10  meeting?
11       **A.   I do not remember.**
12       Q.   You testified that you became aware
13  that permits had been filed.  Were you referring
14  to permits in addition to the permit that we are
15  discussing at this hearing today?
16       **A.   Yes.  We had asked CPD to keep us**
17  **informed of any permits that would be filed**
18  **within the city that would potentially be in**
19  **zones that we had previously discussed as areas**
20  **that would impact our security operation.**
21       Q.   And so, to your knowledge, there had
22  been other permit applications filed apart from
23  the Respondent's in this matter?
24       **A.   Yes.**

1      Q.   Did one of those parade permit
2   applications request a route that would pass the
3   United Center?

4            MR. DIONNE:  Objection, vague.

5            HEARING OFFICER FLEMING:  You can
6   answer if you know, if you recall.

7            MR. DIONNE:  And relevance.

8            HEARING OFFICER FLEMING:  You can
9   answer it if you recall.

10           THE WITNESS:  I believe that they did,
11  yes.

12  BY MR. DiCOLA:

13     Q.   And you testified a few moments ago
14  that a route went next to the United Center; is
15  that correct?

16     **A.   I believe there was a petition to have**
17  **a route that went by the United Center.**

18     Q.   Did you conflate a different permit
19  application with the one under consideration
20  today at this hearing?

21     **A.   We haven't looked at any -- we haven't**
22  **made it -- Secret Service has not made any**
23  **decisions on whether a permit is to move**
24  **forward.  We rely on CPD to do that.**

1       Q.    I'm going to rephrase the question.

2                   Did you confuse a permit

3   application that requested a route that marched

4   to the United Center with the permit application

5   under consideration at this hearing?

6       **A.    Yes, I believe so because that route**

7   **does not go through United Center.**

8       Q.    Thank you.

9                   Agent Spriggs, you testified

10  that there were two primary venues for the NSSE,

11  McCormick Place and the United Center; is that

12  correct?

13      **A.    Yes.**

14      Q.    Can you describe the -- or define for

15  me the difference between a primary venue and a

16  perimeter, the way -- which I believe you

17  mentioned a few moments ago?

18      **A.    So the primary venues for this are**

19  **McCormick Place and the United Center.  They**

20  **will have a significantly larger security**

21  **presence.  There will be no scale fencing around**

22  **the venues.  There will be vehicle restrictions**

23  **around those venues.  Some of the other venues**

24  **that will fall under the DNC's responsibility**

1    during the NSSE would be, like, the delegate

2    hotels.

3                So I mentioned there are 6,000

4    delegates that will be coming.  They will be

5    staying based on their state and how the DNC

6    coordinates their lodging, but there will be

7    specific hotels in which DNC delegates will be

8    staying at.  Those hotels, for example, will not

9    have the large scale fencing, the vehicle

10   restrictions, as well as the DNC, you know,

11   typically, with a convention will have a welcome

12   party for the delegates at a specific venue.

13               Let's say it's, you know, a

14   hotel ballroom, you know, that hotel itself

15   won't have the large impact security perimeter

16   that McCormick Place and the United Center would

17   have.

18       Q.    Thank you.

19               And to your knowledge, are

20   there hotels along the route that was requested

21   by the Respondents here?

22       A.    Not being sure of where every hotel

23   is, I would imagine so but I can't say for sure

24   that there is.

1      Q.   And the route requested in this parade

2   permit application, it doesn't approach

3   McCormick Place, correct?

4        **A.   Correct.**

5        Q.   And the route requested here doesn't

6   approach the United Center, correct?

7        **A.   Correct.**

8        Q.   And there is no other established

9   primary venue with the high security protocols

10  you described within the Loop at this time,

11  correct?

12       **A.   At this time, correct.**

13       Q.   You testified that you work hand in

14  hand with CPD; is that right?

15       **A.   Yes.**

16       Q.   But you also stated that you or the

17  Secret Service did not make recommendations

18  about the disposition of this permit

19  application; is that right?

20       **A.   Correct.**

21       Q.   Can you explain for me how that

22  cooperation, how the working hand in hand works

23  where you're not making recommendations?

24       **A.   So at our monthly meeting that we do a**

1  check in with both the DNC and CPD, as well as

2  the weekly subcommittee meetings that are taking

3  place, our transportation section, our venue

4  section subcommittees are constantly in

5  communication to identify potential motorcade

6  routes.

7                    Like I mentioned, our

8  motorcade routes are not established and set in

9  stone at this point; however, we do have a

10  notional idea of where those motorcade routes

11  will be just based on the, you know, roadwork

12  and the way the City operates, looking at what

13  we prefer to take, you know, in terms of streets

14  that give us, you know, the best ingress and

15  egress from hotels or venues.  So we are

16  constantly in communication with them to, you

17  know, keep up to date with any information that

18  comes our way from the DNC.

19       Q.   And does anyone at the City, the

20  Department of Transportation and the Chicago

21  Police Department, have they shared with you so

22  far assessments of traffic volume or traffic

23  patterns in the Loop during the time of the DNC?

24       A.   We have discussed heavy traffic volume

1  **areas, but in terms of, like, a matrix of**
2  **traffic flow, no.**
3  Q.   And so to clarify, there isn't a set
4  of empirical data about -- reflecting traffic
5  flow on days of the week, times of the day in
6  the city of Chicago that you have reviewed?
7  **A.   There could be.  There is nothing that**
8  **we have had to review.**
9  Q.   And data like that showing number of
10  cars anticipated at different times throughout
11  the day, has that ever been introduced at any of
12  the monthly meetings with the Chicago Police
13  Department?
14  **A.   No.**
15  Q.   Thank you.
16              Agent Spriggs, the permit
17  application that we're discussing, is it for --
18  it's for August 18th, 2024, correct?
19  **A.   Correct.**
20  Q.   And the DNC starts the next day on
21  August 19th; is that right?
22  **A.   The official start date of the DNC is**
23  **the 19th; however, our security perimeters will**
24  **go up more than likely on the 17th.  And that**

1  date is always subject to change.

2                    For example, the presidential

3  inauguration, based on the events that took

4  place at the Capital on January 6th, the NSSE

5  was extended an additional week on the front

6  end.  Based on the events from January 6th, that

7  NSSE official date -- those dates are able to

8  shift.  So if we had any, you know, adverse

9  intelligence that would tell us that we needed

10  to set up those security perimeters longer, then

11  we would have the authority to do that.

12      Q.    To your knowledge, will delegates be

13  going to either McCormick Place or the United

14  Center on Sunday the 18th?

15      A.    They could be.  Like I said, there is

16  a delegate welcome event at that event location.

17  It is not the responsibility of Secret Service

18  or CPD to establish.  That's the DNCC that puts

19  that together.  So at this point we haven't been

20  told where that welcome event is going to be.

21          MR. DiCOLA:  Thank you very much.  If

22  you'll just give me one moment.

23                    (Brief pause.)

24

1  BY MR. DiCOLA:

2      Q.   I would like to clarify, if possible,

3  the approximate date of that monthly meeting

4  with CPD where you learned of this application.

5  Do those happen typically on the same day of the

6  week?

7      **A.   Typically, we try to shoot for a**

8  **Tuesday just because it worked for everyone.  I**

9  **know it was probably the week or two weeks**

10  **before the Christmas holiday, but, like I said,**

11  **specifics, actual date, I do not recall the**

12  **date.**

13      Q.   This application was submitted

14  originally on January 2nd and then modified on

15  January 8th, correct?

16      **A.   Is that on here?  Yes, January 2nd.**

17      Q.   And so I just want to clarify.  When

18  you say the Christmas holiday, do you mean time

19  off after the holiday that people ordinarily get

20  or that you learned of this permit before

21  Christmas?

22      **A.   We reviewed a submission -- well, we**

23  **were made aware of a number of petitions at that**

24  **December meeting.  Whether it was this specific**

1 **one, we didn't have any follow-up meetings after**
2 **that initial one in December.**
3     Q.   You haven't -- did you meet in
4 January?
5     **A.   We did.**
6     Q.   And what date was that meeting?
7     **A.   I don't recall the actual date.  It**
8 **was --**
9         MR. DIONNE:  Objection -- Judge,
10 objection to relevance.
11         HEARING OFFICER FLEMING:  What's the
12 relevance of the date of the meeting?
13         MR. DiCOLA:  Well, your Honor, the
14 investigation that the City performed to
15 ascertain the facts of this permit application
16 are -- it's a mandatory duty under the statute.
17 I'm trying to understand what that investigation
18 entailed.
19             The City has called a
20 representative of the Secret Service as a
21 witness.  He has testified that he has been
22 involved in the City's response to these permit
23 applications.  I am trying to understand when
24 that happened.  If there were records of that

1   meeting, records that the other City witnesses
2   prepared in preparation of that meeting, it
3   would help us to ascertain what they were
4   talking about and what investigation the City
5   did, to what extent they made use of the Secret
6   Service's information.
7                MR. DIONNE:  Judge --
8                HEARING OFFICER FLEMING:  Objection
9   sustained.
10               MR. DIONNE:  Thank you.
11   BY MR. DiCOLA:
12       Q.   So just to clarify, you don't know
13   when you first learned of this permit
14   application exactly, correct?
15       **A.   This specific permit, no.**
16               MR. DIONNE:  Objection, Judge.  Asked
17   and answered.
18               HEARING OFFICER FLEMING:  You can
19   answer.
20               THE WITNESS:  No.
21               MR. DiCOLA:  Thank you.
22   BY MR. DiCOLA:
23       Q.   You testified that the amended route
24   would not touch secured areas; is that right?

1   Is that what you testified?

2       **A.      The amended route at this point**
3   **potentially will not touch the United Center or**
4   **McCormick Place.**

5       Q.   Okay.  You testified a moment ago that
6   you do not set up free speech zones or you
7   referenced free speech zones.  Could you say
8   what you mean by a free speech zone?

9       **A.      Just a place where those that want to**
10  **gather and engage in their First Amendment right**
11  **would be able to do so.**

12      Q.   And a free speech zone, is that a
13  cordoned off or relatively enclosed space
14  dedicated for First Amendment activity?

15      **A.      Typically, when we travel with the**
16  **President or Vice President, the Secret Service**
17  **is not responsible for establishing those zones.**
18  **If -- you know, each particular city has its own**
19  **way of handling those situations, and so we**
20  **would rely on CPD to manage any of those**
21  **potential situations that would come up.**

22      Q.   So, to your knowledge, the City of
23  Chicago remains with all -- with its public and
24  private forums for public expression, those are

```
 1   still available for First Amendment activity?
 2            MR. DIONNE:  Objection, calls for
 3   speculation.
 4            HEARING OFFICER FLEMING:  Sustained.
 5            MR. DiCOLA:  No further questions for
 6   this witness, your Honor.
 7            HEARING OFFICER FLEMING:  All right.
 8   Redirect?
 9            MR. DIONNE:  Redirect, yes, Judge.
10                   (Brief pause.)
11                   No.  Nothing further, Judge.
12            HEARING OFFICER FLEMING:  Okay.
13                   All right.  Why don't we take
14   about five minutes or ten.
15            MR. DIONNE:  May I excuse the witness
16   or does the Petitioner have intention of
17   recalling?
18            MR. DiCOLA:  No intention to recall.
19            HEARING OFFICER FLEMING:  Okay.  You
20   are excused then.
21                   (WHEREUPON, a brief recess
22                   was held.)
23            HEARING OFFICER FLEMING:  All right.
24   We are back on the record.
```

1                    Call your next witness, City.

2              MR. DIONNE:  Okay.  City calls its

3     second witness, Bryan Gallardo.

4                    BRYAN GALLARDO,

5     called as a witness herein, having been first

6     duly sworn, was examined and testified as

7     follows:

8                    DIRECT EXAMINATION

9     BY MR. DIONNE:

10        Q.    Good morning.  Could you please

11    introduce yourself, spelling your last name for

12    the record?

13        **A.    My name is Bryan Gallardo,**

14    **G-a-l-l-a-r-d-o.**

15        Q.    All right.  Mr. Gallardo, who do you

16    currently work for?

17        **A.    I work for the City of Chicago in the**

18    **Department of Transportation.**

19        Q.    And how long have you worked for the

20    City?

21        **A.    A little over six years.  Since**

22    **October of 2017.**

23        Q.    All right.  And how long have you

24    worked for the Department of Transportation?

1      **A.     That entire time.**

2      Q.    Okay.  And what is your current job

3  position or title at CDOT?

4      **A.     Assistant commissioner in charge of**

5  **the public way permitting office.**

6      Q.    Okay.  And you have held that for the

7  full seven years?

8      **A.     Correct.**

9      Q.    And so as assistant commissioner, what

10  are some of your responsibilities?

11      **A.     So our office processes all**

12  **applications for activities on the public right**

13  **of way, so whether it's related to construction,**

14  **parades, moving vans, anything like that.  If it**

15  **is going to obstruct something on the public**

16  **right of way, the applications are processed**

17  **through our office and I manage that office.**

18      Q.    Okay.  And so you mentioned that one

19  of the responsibilities is parade applications.

20  So can you just walk us through generally how a

21  parade application is submitted to the City?

22      **A.     Sure.  So there is a form that is**

23  **filled out, provides all the information,**

24  **including the applicant's name and contact**

1   information, the dates and times that they are

2   looking for, as well as the route that they are

3   looking for.

4               That would be submitted to our

5   office during business hours, and at that point

6   we would take in that application.  We time

7   stamp it just to show what date and time it came

8   in, and then that application is distributed to

9   various other City agencies and departments to

10  -- for their review to see if there's any

11  conflicts or issues with the request.

12      Q.   All right.  And you say we take it,

13  and who is the we that you are referring to?

14      A.   The CDOT permit office.  So me or some

15  member of my team.

16      Q.   All right.  And approximately how many

17  people are there that would receive

18  applications?

19      A.   There are currently ten people working

20  in our office.

21      Q.   Okay.  Do you receive personally every

22  application that is submitted?

23      A.   Not every application.  We receive

24  over 200,000 permit requests a year, including

1    **all different types, so I'm not able to look at**
2    **every single one.**
3    Q.   Are you the representative from
4    Transportation that responds to all permit
5    parade applications?
6    **A.   Not necessarily, no.  It depends,**
7    **again, on who is available to talk to it, or if**
8    **it's in the Central Business District or**
9    **something like that, then it might be flagged**
10   **for my attention and my response, but it doesn't**
11   **have to be me.**
12   Q.   And in this instance, did you respond
13   to the applicant's submissions?
14   **A.   Yes.  Once it was taken in, it was**
15   **flagged as during the DNC in the Central**
16   **Business District, and so it was brought to my**
17   **attention to review for any potential conflicts.**
18   Q.   Do you know who accepted at
19   Transportation this application?
20   **A.   Her name is Susan Pawlak.  She is a**
21   **member of the staff there.  She processes the**
22   **majority of parade and assembly applications.**
23   Q.   And was it Ms. Pawlak who brought this
24   application to your attention?

1     **A.    Yes.**

2     Q.    One moment.

3          I am showing you what the City

4     has marked as City's Group Exhibit 1 through C.

5     Do you recognize this document?

6     **A.    Yes, it looks to be a copy of the**

7     **application that was submitted for the parade by**

8     **Bodies Outside of Unjust Laws.**

9     Q.    Okay.  And when was this application

10    submitted?

11    **A.    It was submitted on January 2nd of**

12    **2024.**

13    Q.    Okay.  And does it specify as to who

14    is requesting the permit?

15    **A.    Yeah.  So the applicants have to**

16    **provide their information.  So the name of the**

17    **organization is Bodies Outside of Unjust Laws:**

18    **Coalition for Reproductive Justice and**

19    **LGBTQ-plus Liberation, and that was submitted by**

20    **Mr. Andy Thayer.**

21    Q.    Okay.  And does that have a proposed

22    date for the application?

23    **A.    It does.  It was requested for August**

24    **18th, 2024.**

1    Q.   All right.  And does it have a
2  proposed location as to where it is to start?
3       **A.   Yes.  They had requested that it start**
4  **at Pearson and Michigan, if I recall correctly.**
5       Q.   Okay.  And does it have a proposed
6  number of potential parade attendees?
7       **A.   They estimated between one and 3,000**
8  **people would participate.**
9       Q.   And does it have a proposed assembly
10  time?
11       **A.   The proposed assembly time is listed**
12  **at 5:00 p.m.**
13       Q.   And a start time?
14       **A.   Okay.  6:00 p.m.**
15       Q.   And an end time?
16       **A.   8:15 p.m.**
17       Q.   And a disbanding time?
18       **A.   9:00 p.m.**
19       Q.   Okay.  And you said it had a start
20  location of the proposed route.  Did it include
21  a full route?
22       **A.   Yes, it does.  It does describe the**
23  **route that they had requested.**
24       Q.   All right.  And on that initial

1    application, City's 1 through C, what is that

2    proposed route?

3         **A.   So the application, they would**

4    **assemble on Pearson at Michigan and then they**

5    **would proceed south on Michigan to Wacker Drive;**

6    **and then they would proceed west on Wacker Drive**

7    **to State Street; and then south on State Street,**

8    **it says here past ABC 7 studios.**

9                   **And their initial request was**

10   **to turn back east on Adams Street; and then back**

11   **south again on Michigan Avenue and then they**

12   **would proceed to 9th Street.**

13        Q.   Okay.  And was this application

14   request signed by anyone?

15        **A.   The submitter was Andy Thayer, and**

16   **that's the signature here.**

17        Q.   Okay.  And is that on page -- what

18   page number?

19        **A.   Page 3.**

20        Q.   All right.  And what was the date of

21   that signature?

22        **A.   It's dated the 2nd of January, 2024.**

23             MR. DIONNE:  All right.  Judge, at

24   this point City asks to be -- what's marked as

1   City's 1 A through C be entered into evidence.

2            HEARING OFFICER FLEMING:  Any

3   objection?

4            MR. DiCOLA:  No, your Honor.

5            HEARING OFFICER FLEMING:  Okay.

6   Allowed without objection.

7                      (WHEREUPON, City

8                      Exhibit No. 1A-C was admitted

9                      into evidence.)

10  BY MR. DIONNE:

11      Q.   Now I am showing you what's been

12  marked as City Exhibit No. 2.  Do you recognize

13  this map?

14      **A.   It looks like a Google Earth image of**

15  **the proposed route, perhaps.**

16      Q.   Okay.  And does that route start at

17  the top on Pearson Street?

18      **A.   It appears to.**

19      Q.   All right.  And does that look like a

20  fair and accurate representation of the route

21  that was initially proposed by the applicant?

22      **A.   It does appear to be the route that**

23  **was described in the application.**

24                MR. DIONNE:  Judge, at this point City

1  asks what's been marked as City Exhibit No. 2 be

2  entered into evidence.

3          HEARING OFFICER FLEMING:  Any

4  objection?

5          MR. DiCOLA:  No.

6          HEARING OFFICER FLEMING:  Allowed

7  without objection.

8                  (WHEREUPON, City

9                  Exhibit No. 2 was admitted

10                 into evidence.)

11 BY MR. DIONNE:

12     Q.   Mr. Gallardo, did you also receive an

13 amended application from the Petitioner in this

14 case?

15     **A.   Yes, we did.  A few days later another**

16 **application was submitted with a slightly**

17 **amended route.**

18     Q.   Okay.  I'm showing you what's been

19 marked as City's Group Exhibit 3A through D.  Do

20 you recognize this document?

21     **A.   Yes.  So on January 8th another copy**

22 **of the application was submitted along with a**

23 **cover letter, and the route was slightly**

24 **amended.  I believe the change was to utilize**

 1   **Washington instead of Adams as they proceeded**
 2   **east back to Michigan Avenue.**
 3       Q.   Okay.  Otherwise, was everything else
 4   in that amended application the same as what's
 5   been marked as City's A through C?
 6       **A.   I believe so.**
 7       Q.   Do you want to check it over and
 8   confirm whether that is true or not?
 9       **A.   Yes, it looks to be the same.  Yes.**
10       Q.   All right.  So the only difference on
11   the amended application is the route that was
12   proposed?
13       **A.   Yes.**
14       Q.   Showing you what's been marked as --
15   sorry, just Exhibit 4.  Do you recognize this?
16       **A.   It looks to be the route that they had**
17   **requested in the second submittal.**
18       Q.   Would you say it's a fair and accurate
19   representation of the Google map as the amended
20   route on the amended application?
21       **A.   Yes.**
22           MR. DIONNE:  All right.  Judge, at
23   this point City is asking what's been marked as
24   Group Exhibit 3 A through D as well as 4 be

1    entered into evidence.

2              HEARING OFFICER FLEMING:  Any

3    objection?

4              MR. DiCOLA:  No, your Honor.

5              HEARING OFFICER FLEMING:  Allowed

6    without objection.

7                        (WHEREUPON, City

8                        Exhibit Nos. 3A-D, and 4 were

9                        admitted into evidence.)

10   BY MR. DIONNE:

11       Q.   All right.  So, Mr. Gallardo, once you

12   received both the initial and the amended

13   application, could you explain the next process

14   of what happened?

15       **A.   So we would review the application.**

16   **We would check the route for conflicts.  Those**

17   **conflicts could be with other events.  They**

18   **could be with construction or basically any**

19   **other activity.  We also check to see the**

20   **streets that are being used, how impactful is**

21   **the route going to be for commuters, for**

22   **pedestrians, things like that and other**

23   **activities and see if it's going to be**

24   **burdensome.**

1          **And then we gather any**
2    **comments from other departments or agencies that**
3    **may have also commented on the application.**
4         Q.   And you mentioned we a lot of times in
5    that process.
6         **A.   So CDOT.  So myself in this particular**
7    **case, I looked at the route and potential**
8    **conflicts.**
9         Q.   Okay.  And does CDOT just look at the
10   transportation impact on the proposed routes?
11        **A.   So, yeah, our responsibility is to**
12   **look at transportation impacts as well as**
13   **traffic impacts of old conflicts with other**
14   **permits that have been issued.**
15        Q.   Okay.  Now, you mentioned that you
16   also contact other City resources and other
17   individuals, and so did you do that in these
18   instances for these applications?
19        **A.   Yes.  These applications, copies of**
20   **these applications were sent to other City**
21   **departments for their review and comment as**
22   **well.**
23        Q.   Okay.  And do you know who or which
24   departments some of these applications were sent

1   to?

2      **A.   They were sent to the Police**

3   **Department, Streets and Sanitation, OEMC, to the**

4   **affected ward offices, as well as DCASE, which**

5   **is the Department of Cultural Affairs and**

6   **Special Events, and Streets and Sanitation.**

7      Q.   Right.

8               Did you personally send these

9   applicants to those bodies?

10      **A.   No.  Susan Pawlak who did the initial**

11   **intake sent out the application to those**

12   **individuals -- or those departments, I should**

13   **say.**

14      Q.   And do you recall approximately when

15   those were sent out to the other bodies?

16      **A.   The same day that the applications**

17   **were taken in.  So an email was sent out on the**

18   **2nd after that application was taken in, and**

19   **then when the amended application was received**

20   **on the 8th, later in the day on the 8th an email**

21   **was sent to those departments.**

22      Q.   Okay.  So, did you speak to any

23   representative from the Chicago Police

24   Department after this was -- either one of these

1  were submitted?

2      **A.    Yes.**

3      Q.    All right.  Who did you speak to?

4      **A.    So I have had conversations with**

5  **Deputy Chief Jill Stevens, Deputy Chief Dan**

6  **O'Connor, as well as Scott --**

7              HEARING OFFICER FLEMING:  Is that

8  O'Connor or O'Connell?

9              THE WITNESS:  O'Connor.

10             HEARING OFFICER FLEMING:  Okay.  What

11 was the first one?  I'm sorry.

12             THE WITNESS:  Yeah.  Deputy Chief Jill

13 Stevens.

14             HEARING OFFICER FLEMING:  How do you

15 spell his last name?

16             THE WITNESS:  Stevens, S-t-e-v-e-n-s.

17             HEARING OFFICER FLEMING:  Oh, okay.

18             THE WITNESS:  Yeah, as well as Scott

19 Spears from the Police Department to discuss

20 their concerns with the impacts and conflicts.

21 BY MR. DIONNE:

22     Q.    All right.  Do you recall when that

23 meeting was?

24     **A.    So we had a phone call on, I believe,**

1    the Friday after the initial application was

2    submitted.  Then we had a subsequent call the

3    following Thursday.

4        Q.   Okay.  Were all the individuals,

5    Stevens, O'Connor and Spears all on the phone

6    call conversation with you?

7        A.   Not all on the same call.  They were

8    all on the Thursday call.  The initial call was

9    just with Deputy Chief Jill Stevens.

10       Q.   On the initial call with Stevens, what

11   did you discuss?

12       A.   I just reminded her that we -- that we

13   had sent out the application and if they wanted

14   to comment on it, we had a set timeline per the

15   ordinance in case they had any comments.  And I

16   let her know that the route would include

17   Michigan Avenue as well as State Street and

18   Wacker, which were pretty impactful streets to

19   be utilizing.

20       Q.   At that initial conversation with Jill

21   Stevens, did she tell you anything about the

22   proposed routes?

23       A.   No.  She said she was going to speak

24   with other folks at the Chicago Police

1    Department and let me know if they had any
2    concerns with the proposed date, time and route.
3          Q.   Okay.  And it was -- was that
4    conversation held on the following Thursday?
5          A.   Yes.
6          Q.   Okay.  And at that -- on that
7    conversation, was it on the phone?
8          A.   Yeah, it was a -- like a Teams
9    meeting.
10         Q.   Okay.  And so that happened on the
11   Thursday.  What was discussed on this Teams
12   meeting?
13         A.   We discussed -- the police expressed
14   concerns with having the possible resources to
15   accommodate this route and asked what the next
16   steps were to file an objection letter.  And I
17   also discussed with them that I had reached out
18   to the CTA and looked at potential traffic
19   impacts with the route as well.
20         Q.   And what did you learn from CTA?
21         A.   So this particular route at that time
22   would affect multiple bus routes on Michigan
23   Avenue, State Street, Washington per the amended
24   route, as well as Madison Street.

1    Q.   Who did you speak to at the CTA?

2    **A.   I spoke to a gentleman named Jack**

3    **Chalabian.**

4    Q.   Do you know what Jack Chalabian's

5    title is?

6    **A.   I do not know his exact title.**

7    Q.   Do you recall when you had this

8    conversation with Mr. Chalabian?

9    **A.   Shortly after that first initial --**

10   **that initial call, and then again yesterday I**

11   **spoke with him as well.**

12   Q.   And the initial call being that

13   Thursday call that you previously mentioned?

14   **A.   No, it was the -- I reached out the**

15   **Friday on that first Friday call.**

16   Q.   Okay.  Did CPD give you an ultimate,

17   like, opinion as to whether they would be able

18   to accommodate the routes proposed?

19   **A.   They said that they were concerned**

20   **given with the activities at the DNC that they**

21   **weren't going to have sufficient resources to**

22   **safely provide a path that they had requested.**

23   Q.   On both the initial and the amended?

24   **A.   On both routes, correct.**

1    Q.   And was this determination by CPD made

2    on that Thursday call that you mentioned

3    previously?

4    **A.   That's when they relayed it to me.  I**

5    **don't know what conversations happened prior to**

6    **that.**

7    Q.   Okay.  Now, based upon that

8    conversation, what happened next?

9    **A.   I prepared a letter.  I asked for**

10   **input from City Law Department on the letter to**

11   **make sure that I followed the ordinance as**

12   **needed, and then I signed that letter and sent**

13   **it out to the applicant as required by the**

14   **ordinance.**

15   Q.   Who did you contact on the City's Law

16   Department in regards to this letter?

17   **A.   I spoke with Christine Hake, Tom Dorn**

18   **and Mark Siegel.**

19   Q.   And had the letter already been

20   written before speaking to them?

21   **A.   I had a -- I had drafted a letter, and**

22   **I asked them for their comments on it.**

23   Q.   All right.  Did anyone from Law write

24   this response letter for you?

1    **A.    No, no.    They did provide comment but**
2    **the original initial draft I crafted from**
3    **previous letters that had been sent out.**
4    Q.    All right.
5              Were you the sole author of
6    the letter that you are referencing?
7    **A.    Again, I received comments from**
8    **others, but I was the one who drafted the final**
9    **letter.**
10    Q.    I'm showing you now what's been marked
11    as City's Group Exhibit 5 A through D.  Mr.
12    Gallardo, do you recognize this exhibit?
13    **A.    This appears to be a copy -- yes, a**
14    **copy of the letter that I sent, the denial**
15    **letter that I sent, as well as the certified**
16    **mail slip that went along with it.**
17    Q.    Okay.  And when was this letter
18    written?
19    **A.    This letter was written on January**
20    **16th.**
21    Q.    All right.  And by whom?
22    **A.    By me.**
23    Q.    All right.  And to whom?
24    **A.    To the organization Bodies Outside of**

**Unjust Laws and care of Andy Thayer.**

Q.   Okay.  And is this letter signed?

**A.   Yes, I signed the letter prior to sending it out.**

Q.   All right.  And you said you sent it via certified mail previously; is that correct?

**A.   Correct.  I sent an email copy as well as certified mail.**

Q.   All right.  And would you say this is a fair and accurate copy of the letter that you drafted on January 16th, 2024 and sent to the applicant?

**A.   Yes, this looks like the same letter that I sent.**

MR. DIONNE:  All right.  Judge, at this point City is asking what's been marked as City's Group Exhibit A through D be entered into evidence.

HEARING OFFICER FLEMING:  Any objection?

MR. DiCOLA:  No objection.

HEARING OFFICER FLEMING:  Allowed without objection.

1              (WHEREUPON, City

2              Exhibit No. 5A-D was admitted

3              into evidence.)

4  BY MR. DIONNE:

5      Q.   All right.  Now, Mr. Gallardo, what

6  was the purpose of this letter?

7      **A.   So, according to the City ordinance,**

8  **if there is an issue with a proposed**

9  **application, we have to send a response to the**

10 **applicant letting them know that the parade has**

11 **been denied and providing them an alternative.**

12     Q.   Okay.  And in this letter did you

13 provide the reasons or bases for the denial?

14     **A.   Yes.  Within the letter there are**

15 **multiple paragraphs describing the conflicts and**

16 **a lack of resources that our City police believe**

17 **will be the case in August.**

18     Q.   And how many reasons are stated for

19 denial in this letter?

20     **A.   So there are multiple reasons.  Off**

21 **the top of my head I don't recall how many, but**

22 **chief among them would be the traffic impacts**

23 **and the lack of resources to safely protect both**

24 **the participants as well as the general public**

1    at the time.

2        Q.    Okay.   So let's start with the traffic

3    impact.   How would the proposed routes from the

4    applicants affect traffic in the area of those

5    routes?

6        **A.    So many of the streets that they have**

7    **a proposed route are heavily trafficked streets.**

8    **So in my review of it, I checked the State**

9    **website where they maintain traffic counts on**

10   **the streets and looked at the potential impacts**

11   **in terms of number of vehicles, as well as other**

12   **nearby businesses or residents that might be**

13   **impacted by the parade.  I also contacted the**

14   **CTA to find out how many bus lines would be**

15   **impacted through the proposed route.**

16       Q.    Did you find out how many bus lines

17   would be impacted?

18       **A.    Yes.   So on Michigan Avenue there are**

19   **13 bus routes that would be impacted.  There are**

20   **three bus routes that use Wacker as an access**

21   **point.  There are eight bus routes that use**

22   **State Street, eleven that use -- and eleven that**

23   **use Washington.**

24       Q.    And where would these buses have to be

1   redirected if the application was accepted?

2       **A.    So that determination would be made by**

3   **the CTA.    All I can say is that in the past,**

4   **typically, if you are going to reroute buses off**

5   **of State Street they would be rerouted to**

6   **Michigan Avenue and vice versa.    But in this**

7   **case that wouldn't be possible because both**

8   **streets would be impacted.**

9       Q.    Okay.    And is that for both north and

10  southbound on Michigan?

11      **A.    So in their application they only**

12  **requested one direction.    However, since there**

13  **would be no actual barricades protecting**

14  **pedestrians or participants of the parade, for**

15  **safety reasons we would recommend -- CDOT would**

16  **recommend that both directions of traffic be**

17  **closed so as not to cause confusion among**

18  **drivers and not to allow live traffic next to**

19  **unprotected pedestrians.**

20      Q.    Was the number of parade participants

21  also affecting that determination?

22      **A.    Yes.    So they anticipated 1,000 to**

23  **3,000, so that is a large enough number that**

24  **it's likely they would not able to remain on**

1    sidewalks.  They would have to be in the street.

2                    And so when you have that many

3    participants, it's -- they're going to be in a

4    traffic lane next to live opposing traffic if

5    you allow the other direction of traffic to

6    continue.

7         Q.   Would the Department of Transportation

8    be a -- strike that.

9                    Would it be feasible for the

10   Department of Transportation to close down only

11   a westbound on an east and westbound street?

12        A.   It's possible, but if we do it, it's

13   typically related to construction, and they

14   would have barricades and maybe Jersey walls or

15   Type 3 barricades in place as an added measure

16   of protection.  For a rolling closure like this,

17   it wouldn't be practical to have that kind of

18   protection in place for pedestrians.

19        Q.   And is it both -- is it only for the

20   pedestrians that are participating's concern, or

21   are there other concerns?

22        A.   No, there could be other pedestrians

23   that would still have a legal right to access

24   the sidewalk, and that might also be in that

1    location.  And with a road closure like this
2    without any actual detour signage or barricades,
3    it can cause confusion with drivers not knowing
4    -- you know, they see one side of the street
5    open, they may not know is it a one-way street,
6    are they using the -- one side of the street for
7    both directions of traffic and so that would be
8    a much greater effort to try and manage that
9    traffic adjacent to pedestrians.
10        Q.   All right.  And as a result of the
11   proposed routes suggested by the applicants,
12   where would just regular traffic have to go?
13        A.   We might be able to push them towards
14   Lake Shore Drive if they are just going through
15   the Loop and Central Business District, if
16   they're just passing through.  If they were
17   trying to stop somewhere within the Central
18   Business District, there wouldn't be a lot of
19   options.  You could proceed on Clark and LaSalle
20   would probably be the closest streets for
21   southbound access and then northbound access
22   would have to be, perhaps, Dearborn.
23        Q.   All right.  What kind of resources
24   from Transportation would be required to reroute

1 these traffic routes?

2     **A.   We wouldn't be able to provide any**

3 **resources.  So we didn't provide a review and it**

4 **becomes incumbent on the applicant to make sure**

5 **that their event is conducted in a safe manner.**

6 **And in the case of a protest, that often falls**

7 **back on police since the protesters wouldn't**

8 **necessarily be providing barricades or parade**

9 **marshals or anything like that.  So we don't**

10 **have the resources in-house at CDOT.  We've only**

11 **got a few dozen inspectors and they would not be**

12 **able to redirect traffic.**

13     Q.   So that would be CPD's responsibility

14 potentially?

15     **A.   Correct.**

16     Q.   Okay.  Now, you list a secondary

17 reason for the denial of the proposed route

18 under Municipal Code 10-8-330, Subsection G2 of

19 the code.  Do you recall what the basis of that

20 denial was?

21     **A.   I would have to reread the letter.**

22     Q.   All right.  Is your memory exhausted

23 as to that?

24     **A.   Hmm?**

1    Q.   Is your memory exhausted as to that

2    reason?

3    **A.   Yes.**

4    Q.   Would seeing the letter refresh your

5    recollection?

6    **A.   Yes.**

7    Q.   All right.  Showing you the letter.

8    When your memory is refreshed just look up at

9    me.

10   **A.   So the Code -- Commissioner finds that**

11   **they are not available at the time, to --**

12   **(inaudible) -- sufficient number of on-duty**

13   **police officers or other City employees**

14   **authorized to regulate traffic, to police the**

15   **public and to protect parade participants and**

16   **non-participants from traffic-related hazards.**

17   Q.   Okay.  And what exactly does that

18   mean?

19   **A.   So as we just discussed, given the**

20   **size of the crowd you're going to have a lot of**

21   **pedestrian traffic in vehicular lanes, and so**

22   **they would require protection from potential**

23   **vehicles or other hazards that would be in the**

24   **roadway.**

1           **And so the City, since this**
2   **isn't construction and they wouldn't necessarily**
3   **have traffic control or Jersey walls or**
4   **something like that protecting those**
5   **individuals, the City would have to provide**
6   **personnel to manage traffic and to try and**
7   **protect both the parade participants as well as**
8   **any other pedestrians or vehicles that would be**
9   **in the public right of way at the time.**
10          Q.   And who made that determination as to
11  Point 2?
12          **A.   So based on my conversations with the**
13  **Chicago Police Department, they stated that they**
14  **did not believe that they would have the**
15  **resources available to protect pedestrians along**
16  **that route.**
17          Q.   Do you know why they wouldn't have the
18  resources available?
19          **A.   Due to several events, not the least**
20  **of which is the DNC, they are going to have to**
21  **provide officers to various areas in a greater**
22  **number, but you would have to talk to the police**
23  **to get details on that.**
24          Q.   Okay.  Now, in your letter to the

1  Petitioners you also proposed an amended route,

2  correct?

3       **A.    Yes.**

4       Q.    All right.  Do you recall what that

5  amended route was?

6       **A.    So we amended the route to be on**

7  **Columbus Drive between Roosevelt and Jackson.**

8       Q.    Okay.  And when you say we, is that

9  just your determination or did you make it with

10  somebody?

11       **A.    That was done in consultation with**

12  **Chicago Police Department.  That was a route**

13  **that had a much less impact on traffic, and that**

14  **was the route that they suggested they might be**

15  **able to have sufficient resources to**

16  **accommodate.**

17       Q.    Do you recall what the proposed

18  assembly time for that amended City proposed

19  route would be?

20       **A.    We left the date and time as the same**

21  **as what was requested on the initial**

22  **application.**

23       Q.    Okay.  And aside from the change of

24  the actual location of the route, are there any

1   other changes to the Petitioner's application?

2       **A.    No.    The date and time remained the**

3   **same.    We just asked for a change of route.**

4       Q.    To your knowledge, was that amended

5   route that was proposed accepted by the

6   Petitioner?

7       **A.    I believe they objected to the amended**

8   **route.**

9       Q.    I am showing you what's been marked as

10  City's Exhibit No. 6.    Do you recognize what

11  this is?

12      **A.    So this appears to be the proposed**

13  **amended route that we had suggested in the**

14  **letter from Roosevelt going north.**

15      Q.    Starting at Roosevelt going north to?

16      **A.    Jackson.**

17      Q.    Okay.    And would you say this is a

18  fair and accurate representation of the amended

19  route that was proposed in the letter to the

20  applicants?

21      **A.    Yes.**

22          MR. DIONNE:    Judge, we would ask that

23  what is marked as City Exhibit No. 6 be entered

24  into evidence.

1          HEARING OFFICER FLEMING:  Any
2    objection?
3          MR. DiCOLA:  No, your Honor.
4          HEARING OFFICER FLEMING:  Allowed
5    without objection.
6                    (WHEREUPON, City
7                    Exhibit No. 6 was admitted
8                    into evidence.)
9          MR. DIONNE:  One moment, Judge.
10                   (Brief pause.)
11   BY MR. DIONNE:
12        Q.   Do you know why this proposed route
13   was made that's on Columbus?
14        **A.   It has a much less of an impact in**
15   **terms of bus traffic, so commuter traffic, as**
16   **well as pedestrian traffic and it, at least as**
17   **expressed today, would require fewer resources**
18   **to secure that route for both the parade**
19   **participants and any pedestrians in the area.**
20        Q.   Is it also located in a downtown area
21   of Chicago?
22        **A.   Yes.  So the original request was to**
23   **be in the Central Business District, so we kept**
24   **the location in the Central Business District so**

1   **that it wouldn't have been moved too far.**

2       Q.   All right.  Did you also speak with

3   CTA in relation to the proposed route that you

4   sent out?

5       **A.   No, not on this particular route.**

6   **Just checking that it didn't have as many bus**

7   **routes that would be affected.**

8       Q.   And was that the case in the proposed?

9       **A.   Far fewer bus routes would be affected**

10  **by the use of Columbus.**

11      Q.   Okay.  Do you have an estimate of how

12  many?

13      **A.   I don't know how many bus routes are**

14  **affected by Columbus.  I forgot what the numbers**

15  **were for the original route.**

16              MR. DIONNE:  Okay.  Judge, we tender

17  the witness.

18              HEARING OFFICER FLEMING:  Ready or do

19  you need a moment?

20              MR. DiCOLA:  I'm ready.

21              HEARING OFFICER FLEMING:  Okay.

22              MR. DiCOLA:  Thank you, Judge.

23                  CROSS-EXAMINATION

24

1  BY MR. DiCOLA:

2     Q.   Hi, Mr. Gallardo.  My name is Joe

3  DiCola.  I represent the Respondents in this

4  matter.

5               You testified that when you

6  are reviewing parade permit applications, that

7  you are looking to see how impactful they will

8  be for commuters and pedestrians; is that right?

9     **A.   Yes.**

10    Q.   How do you measure impact?

11    **A.   I would look at average daily traffic,**

12 **so those numbers are available on the State**

13 **website.  Sometimes we have internal numbers**

14 **that would show the estimated number of vehicles**

15 **that are on a particular road.  We also would**

16 **check for public transportation impacts, bus**

17 **routes, CTA or el stops, things like that that**

18 **might be impacted.**

19    Q.   And is the goal -- is CDOT's goal in

20 handling these permit applications to reduce all

21 impact?  So to create zero impact, is that the

22 goal?

23    **A.   It's to minimize impact.  I don't know**

24 **that there's -- if you are going to be walking**

1    **in the street, I don't know how you would have**

2    **no impact.**

3         Q.   Well, no.  My question is, when you

4    are gauging to see how impactful the parade is

5    going to be, my question is, how do you measure

6    an acceptable amount of impact?  How do you

7    determine what's an acceptable impact?

8         **A.   How do we determine what's acceptable**

9    **impact?**

10        Q.   Correct.

11        **A.   Ideally, it would -- whatever affects**

12   **the least amount of traffic, whether that's**

13   **vehicular traffic, pedestrian traffic, bicycle**

14   **traffic, whatever has the least amount of impact**

15   **would be the preferred route.**

16        Q.   So is there any way to parade through

17   downtown Chicago without impacting traffic?

18        **A.   If you have a small enough group, it**

19   **may not have a significant impact, but with --**

20   **if you're talking about this particular group, I**

21   **don't know how you wold parade without impacting**

22   **any traffic, whether it's pedestrian, vehicular,**

23   **bicycle.**

24        Q.   Does CDOT ever issue permits for

1   parades that go through any of these major

2   streets that -- in the requested route?  So, for

3   example, Michigan Avenue.  We can keep it to

4   Michigan Avenue.

5        **A.    There have been parades on Michigan**

6   **Avenue, yes.**

7        Q.    And how is it determined that the

8   impact on Michigan Avenue -- what example comes

9   to your mind when you think of a parade on

10  Michigan Avenue?

11       **A.    There's the Festival of Lights parade**

12  **that takes place on Michigan Avenue.**

13       Q.    And so does the Festival of Lights

14  parade impact traffic?

15       **A.    It does.**

16       Q.    And how is it determined that that

17  impact is acceptable so that you would issue a

18  permit versus a parade permit in this case?

19       **A.    So the organizers of that particular**

20  **event provide their own traffic control, their**

21  **own parade marshals.  They provide Type 3**

22  **barricades, as well as Jersey walls.**

23                 **We meet with them ahead of**

24  **time to discuss their plan so that we know that**

1 **it's -- so that the standard pedestrian traffic**
2 **is still going to be safe and that they have all**
3 **the proper detour signage and barricades in**
4 **place to manage any traffic that's going to be**
5 **impacted.  So although it is impacted, it is**
6 **minimized to the best of our ability.**
7     Q.   Do you know whether or not the permit
8 requesters in this case plan to have marshals
9 for their parade?
10     **A.   I do not.**
11     Q.   And as you just testified, it is
12 relevant in your review of the impact of a
13 parade whether or not the group itself has their
14 own marshals; is that right?
15     **A.   They can be helpful to have marshals,**
16 **yes.**
17     Q.   And it's relevant to your
18 determination?
19     **A.   It does have a bearing on it, yes.**
20     Q.   You testified that Susan Pawlak from
21 CDOT originally received and reviewed this
22 application, correct?
23     **A.   Yes.**
24     Q.   Did you instruct Susan to call

1  Mr. Thayer?

2       **A.    Yes.**

3       Q.    And what did you -- why did you

4  instruct her to call him?

5       **A.    That was after a conversation with the**

6  **Chicago Police Department.  They, again,**

7  **expressed concern that they weren't going to**

8  **have sufficient resources to accommodate this**

9  **route, and so I asked her to let the applicant**

10 **know that we were going to be working with the**

11 **Police Department and any other affected**

12 **departments to possibly issue the denial letter.**

13      Q.    And was your goal in instructing Susan

14 to make that call to give the requester an

15 opportunity to modify their route to avoid

16 having their permit denied?

17      **A.    They can choose to resubmit if they**

18 **want, but it was really more just about good**

19 **customer service.  They had submitted an**

20 **application and per the ordinance there are set**

21 **timelines for our responses and their responses.**

22 **So I wanted to make sure that the applicant was**

23 **aware that the City had discussed this and had**

24 **concerns.**

1    Q.   So at the time -- and do you recall
2  the date that Susan Pawlak called Andy Thayer?
3    **A.   I don't recall the exact date.  No, I**
4  **do not.**
5    Q.   But so at the time of that call, her
6  instructions were simply to explain the City
7  intends to deny this permit; is that right?
8    **A.   I don't know.  I wasn't on the call so**
9  **I don't know specifically what she said, but I**
10  **did let her know that we -- to tell him that we**
11  **had concerns with the route.**
12    Q.   Had the decision to ultimately deny
13  the permit already been finalized in your office
14  at the time of that call?
15    **A.   No.**
16    MR. DiCOLA:  Just give me one moment,
17  please.
18    (Brief pause.)
19  BY MR. DiCOLA:
20    Q.   Were you aware -- did you have prior
21  knowledge that anybody from the Chicago Police
22  Department had reached out to Andy Thayer about
23  his permit application?
24    MR. DIONNE:  Objection, calls for

1    speculation.

2         HEARING OFFICER FLEMING:  Overruled.

3    If he knows, he knows; if he doesn't, he

4    doesn't.

5         THE WITNESS:  Susan had let me know

6    that when she contacted Mr. Thayer that he had

7    already been in contact with someone from the

8    Chicago Police Department.

9    BY MR. DiCOLA:

10        Q.   Did you -- did you know that CPD had

11   been planning to reach out to Mr. Thayer?

12        **A.   I did not know they had called him**

13   **prior to that.**

14        Q.   Is that a standard part of the permit

15   review process?

16        **A.   It depends.  Typically, it's up to the**

17   **commander of the district.  Sometimes they like**

18   **to reach out and talk to the organizers since**

19   **they are going to be responsible the day of.  So**

20   **nobody at CDOT would have objected to them**

21   **contacting them, but they are not required to.**

22        Q.   Did CDOT check statistics for traffic

23   for a Sunday in August?  Did you or anyone at

24   CDOT check those statistics?

1     **A.    So I went on the State website to get**
2   **what they call the ADT, the average daily**
3   **traffic.**
4     Q.   And what did it show you?
5     **A.    On Michigan Avenue you have an average**
6   **daily traffic of 24,400 vehicles.  On Wacker you**
7   **have an average daily traffic of 19,500**
8   **vehicles.  On State Street you have an average**
9   **daily traffic of 15,200 vehicles, and on**
10  **Washington you have an average daily traffic of**
11  **12,000 vehicles.**
12    Q.   Is that standardized across days of
13  the week?  Is that an average for any day of the
14  week?
15    **A.    Typically, yeah, that's the**
16  **information that they give.  They don't**
17  **necessarily give out specific hours or days.**
18  **It's an average that they collect, information**
19  **they collect.**
20    Q.   And what -- what number of daily
21  vehicles -- where is the threshold or is there a
22  threshold for determining when a street has too
23  many or few enough daily vehicles to allow a
24  parade on that street?

1     **A.    It's not specifically a threshold.**
2  **It's just to understand the potential impacts.**
3  **So, you know, there are certain streets that**
4  **would be selected that don't have a high enough**
5  **ADT that they would even be listed on the State**
6  **website, in which case that would be a minimal**
7  **impact.**
8     Q.   And so a heavily trafficked street, a
9  parade -- pedestrians and other visitors to the
10  city are likely to see a parade on a heavily
11  trafficked street, correct?
12     **A.    It can happen, yes.**
13     Q.   And of those streets that you
14  mentioned, there are likely to be people who see
15  a parade passing by, right?
16     **A.    So, yeah, if you're on a street that a**
17  **parade is happening, I would imagine you would**
18  **see it.**
19     Q.   So -- and a Sunday in August could
20  have less traffic than other days and you're not
21  certain?
22         MR. DIONNE:  Objection, that calls for
23  speculation and vagueness.
24         HEARING OFFICER FLEMING:  Overruled.

1    I mean, he can answer.

2            THE WITNESS:  I -- again, the

3    statistics don't separate out Sundays, so I

4    don't know that that's necessarily the case.

5    BY MR. DiCOLA:

6        Q.   Mr. Gallardo, you have been with CDOT

7    for six years, right?

8        **A.   Just over six years.**

9        Q.   Does your personal experience with

10   traffic patterns inform the way you analyze

11   these routes?

12       **A.   I'm not sure what you're asking.**

13       Q.   In your personal experience, is

14   Michigan Avenue likely to be less busy on a

15   Sunday evening versus a Monday morning?

16       **A.   Again, the statistics that I use are**

17   **just the ADT from the State, and that doesn't**

18   **separate out Sunday traffic.**

19       Q.   So separate from the statistics you

20   looked at, in your personal experience and your

21   personal knowledge, is Michigan Avenue likely to

22   be less busy or -- on a Sunday night versus a

23   Monday morning?

24       **A.   No, not necessarily.**

1    Q.   So it might -- so it could be busier
2  on Sunday night?
3       **A.   It can be.  So -- because Michigan**
4  **Avenue, although it's a heavy commuter street,**
5  **it also has lots of shops and restaurants on it.**
6  **So I wouldn't want to speculate as to what type**
7  **of traffic you are going to see, folks coming**
8  **down to see shows or going to dinner, and assume**
9  **that that's going to be any kind of significant**
10 **reduction.  I just got -- have to go with the**
11 **numbers that are on the State website.**
12      Q.   And -- but just to confirm what those
13 numbers showed you is that Michigan Avenue and
14 State Street are busy streets, which is --
15      **A.   Yes.**
16      Q.   -- knowledge you already possessed,
17 correct?
18      **A.   Yes.**
19      Q.   And CDOT does not have a published
20 metric or standard for determining what streets
21 are too busy to have a parade on them; is that
22 right?
23      **A.   No, I'm not aware of a specific**
24 **number.**

1        Q.    Thank you.

2                       Are you aware of other parades

3    that have been -- that have crossed the streets

4    in the requested route within the last 12

5    months?

6        **A.    Yes, there are other parades that have**

7    **crossed some of the streets.**

8        Q.    And CDOT had sufficient personnel to

9    accommodate those parades?

10       **A.    So, again, CDOT doesn't provide**

11   **personnel during the parade.  We simply evaluate**

12   **the impacts and the plan of the applicant, and**

13   **then it falls to other departments, such as CPD**

14   **or, perhaps, Streets and Sanitation or OEMC, to**

15   **determine if they have resources available on**

16   **the day of.**

17       Q.    But so those parades within the last

18   12 months along streets within the requested

19   route, CPD was able to accommodate those?

20       **A.    That would be up to CPD to answer that**

21   **question.  All I know is that those parades did**

22   **take place, so I wouldn't want to speculate on**

23   **what CPD had to do to accommodate it.**

24       Q.    Does CDOT ever have to respond to

1    unpermitted parades that occur spontaneously and

2    take up busy streets?

3            MR. DIONNE:  Objection as to

4    relevance.

5            HEARING OFFICER FLEMING:  What's the

6    relevance?

7            MR. DiCOLA:  The ability to prepare

8    versus -- I would like to be able to show that

9    -- I believe the testimony will show that

10   typically or almost every year there are

11   unpermitted protests and demonstrations that

12   take streets on Lake Shore Drive and Michigan

13   Avenue, on State Street, and the Department of

14   Transportation, the CTA, the CPD are able to

15   spontaneously accommodate those unpermitted

16   marches.

17           HEARING OFFICER FLEMING:  I'll sustain

18   your objection.  I don't think Mr. Gallardo is

19   in a position to testify to that.

20   BY MR. DiCOLA:

21       Q.   Is it easier to prepare for a

22   permitted parade than for an -- than -- strike

23   that.

24                Is it easier for CDOT to

1  prepare for a permitted parade versus an

2  unpermitted one?

3      **A.    From a CDOT standpoint, yes.  If we**

4  **have all the information and we are able to**

5  **coordinate with the applicant, that's going to**

6  **make it a lot more practical to accommodate any**

7  **type of activity whether it's a parade,**

8  **construction, anything like that.**

9              **But, yeah, scrambling at the**

10 **last minute would pose problems for us and I**

11 **imagine anybody else.**

12     Q.    And here is an application that's

13 submitted eight months before the parade was

14 requested for, correct?

15     **A.    Correct.**

16         MR. DiCOLA:  Just a moment, please.

17         HEARING OFFICER FLEMING:  Take your

18 time.

19              (Brief pause.)

20         MR. DiCOLA:  Thank you so much for

21 your patience.

22 BY MR. DiCOLA:

23     Q.    Mr. Gallardo, are you aware that the

24 Parade Permit Ordinance requires comparable

1  public visibility for alternative proposed

2  routes?

3  　　　　A.　　Yes, I believe I read that in the

4  ordinance.

5  　　　　Q.　　And you testified earlier that you

6  offered a route that was also within the Central

7  Business District; is that right?

8  　　　　A.　　Yes.

9  　　　　Q.　　And the route that you offered is less

10  than a mile on Columbus Drive between Roosevelt

11  and Jackson; is that right?

12  　　　　A.　　Correct.　　I don't know if it was -- on

13  Columbus between Roosevelt and Jackson, yes.

14  　　　　Q.　　And part of the logic for selecting

15  that route was that there is less impact on

16  pedestrian and vehicle traffic, right?

17  　　　　A.　　That is part of the reason, yes.

18  　　　　Q.　　And so it follows then that that route

19  is less visible than the amended -- than the

20  requested routes?

21  　　　　A.　　Not necessarily.

22  　　　　Q.　　So it's less impactful meaning there's

23  fewer pedestrians and fewer vehicles, right?

24  　　　　A.　　There are fewer vehicles that would be

affected.  That doesn't mean that there's going
to be fewer vehicles driving by.  They would
actually be in visible range of Lake Shore
Drive, which has an average daily traffic count
of over 120,000.

> You are also in the middle of
Grant Park, so there may not be pedestrians on
the sidewalk, but there could be hundreds if not
thousands of people that are in the park at that
time.  So I really wouldn't want to speculate
that there wouldn't be any type of visibility or
crowd that would see this -- what would happen.

Q.   Does this route cover less area than
the requested route?

**A.   In terms of overall length?**

Q.   Geographic area, distance, yes.

**A.   Yes.**

Q.   And so is it more likely that more
people would see and hear the protest on the
requested route versus the alternative route?

MR. DIONNE:  Objection, speculation.

HEARING OFFICER FLEMING:  You can make
that as an argument.  It is speculation.

THE WITNESS:  Again, I wouldn't want

1   to speculate.  I don't know how many people are

2   going to be in the park or driving by on Lake

3   Shore Drive at that specific time or how many

4   people may be on State Street or Michigan Avenue

5   at that time.  I don't have statistics for

6   pedestrian counts, only vehicular counts.

7   BY MR. DiCOLA:

8       Q.   But you do know that it's -- that's

9   it's a number -- you don't know the exact

10  numbers but you know that it's a satisfactory

11  number of people in the alternative route versus

12  too many impacted people in the requested route?

13      **A.   It would affect fewer cross streets,**

14  **yes.**

15      Q.   Is Lake Shore Drive within the sight

16  and sound of Columbus Drive?

17      **A.   It's the next road east from Columbus.**

18      Q.   If you're driving on Lake Shore Drive,

19  can you hear people chanting in a protest march

20  on Columbus Drive?

21          MR. DIONNE:  Objection, speculation.

22          HEARING OFFICER FLEMING:  Yes, that's

23  speculation.  You can make an argument on that.

24  Objection sustained.

1          MR. DiCOLA:  Thank you, Judge.

2          THE WITNESS:  I suppose.  I would

3    imagine.

4          HEARING OFFICER FLEMING:  Objection

5    sustained.

6          THE WITNESS:  Okay.

7    BY MR. DiCOLA:

8          Q.   So you don't have exact numbers for

9    the number of CPD personnel available to protect

10   this event on August 18th; is that right?

11         **A.   That would be a question you would**

12   **have to ask the Police Department.  I don't have**

13   **that information.**

14         Q.   Thanks.

15               You testified earlier that at

16   one of the calls, whether the Teams meeting on

17   Thursday the 11th or perhaps the first call,

18   forgive me, that CPD expressed concerns that

19   they wouldn't have enough personnel; is that

20   right?  Is that how you testified?

21         **A.   Yes.**

22         Q.   And later I believe you testified that

23   CPD at some point stated they did not have the

24   resources; is that right?

1    **A.    Correct.   That's the information they**
2    **provided to me.**

3    Q.   And do you know how they made the
4    journey from concerned to definitively not
5    having enough resources?

6    **A.   No.**

7    Q.   When did you learn of the -- of CPD's
8    definitive denial, that their position was that
9    this permit should be denied?

10    **A.   They informed me -- I'm trying to**
11    **think of the exact date.  I don't recall the**
12    **exact date, but I received email -- an email**
13    **from the police department's special events**
14    **division that they were formally objecting to**
15    **this parade.**

16    Q.   To your knowledge, did someone from
17    special events call Andy Thayer prior to Susan
18    Pawlak's call with him?

19    **A.   I -- when I asked Susan, she said that**
20    **Andy had stated that he had already spoken to**
21    **someone from the Police Department.**

22    Q.   But you're not sure whether there was
23    a call from someone in the First District and
24    then a separate call from someone in special

1  events?

2  **A.  No, I'm not --**

3  HEARING OFFICER FLEMING:  Just so our

4  record is clear, when you're saying special

5  events you're referring to Chicago Police

6  special events as opposed to the department of

7  special events?

8  MR. DiCOLA:  Yes, your Honor.  I'm

9  talking about the special events department

10  within the Chicago Police Department.

11  BY MR. DiCOLA:

12  Q.  You testified that you left the date

13  and time the same in the alternative proposed

14  parade route; is that right?

15  **A.  Yes.**

16  Q.  I don't need to introduce my own

17  exhibit.  If you wouldn't mind -- if you

18  wouldn't mind, take a look at the route

19  requested on January 8th with the disband time.

20  MR. DiCOLA:  Thank you very much,

21  Counsel.

22  MR. DIONNE:  On City's 5?

23  MR. DiCOLA:  City's 5, correct.

24

1    BY MR. DiCOLA:

2         Q.    And then as compared to your denial

3    letter.  If you could tell me, are the disband

4    times the same in your letter dated January 16th

5    and Mr. Thayer's permit submission on January

6    8th?

7         **A.    So the disband time listed here is**

8    **8:15, which is actually the parade's end time**

9    **that was listed on the initial application.**

10        Q.    Was it your intent for the -- in your

11   alternative proposal for the parade to disband

12   45 minutes earlier than they had requested?

13        **A.    No.  I think that was probably -- I**

14   **just didn't include that line in the objection**

15   **letter.  So the disband time and the parade end**

16   **time just merged into the same time.  So, you**

17   **know, the parade would end at 8:15 and they**

18   **would disband as was safe.**

19        Q.    So just to clarify, there is a

20   discrepancy and a change in terms in the

21   proposed route?

22        **A.    Yes, there is a slight discrepancy.**

23   **Yeah.**

24        Q.    Thank you.

1                    Could you please describe how

2     the -- how you conferred with the US -- or if

3     you can -- strike that.

4                    Did you confer with the US

5     Secret Service in reviewing this permit

6     application?

7          **A.    No, I did not.  Not personally.**

8          Q.    Were you present on any group meetings

9     that a US Secret Service representative was

10    present for?

11         **A.    I have been in meetings with the US**

12    **Secret Service related to the DNC but not on any**

13    **call where they expressed any specific sentiment**

14    **about this application.**

15         Q.    Did you discuss this permit

16    application at all with Agent Spriggs of the US

17    Secret Service?

18         **A.    No.  The calls that I had been on**

19    **included different Secret Service agents.**

20         Q.    Do you happen to know their names?

21              MR. DIONNE:  Objection, relevance.

22              HEARING OFFICER FLEMING:  What's the

23    relevance of the names?

24              MR. DiCOLA:  Your Honor, Agent Spriggs

1   mentioned another agent he works with.  I was
2   just going to confirm that it was the other
3   agent assigned to this task.
4             HEARING OFFICER FLEMING:  If you know
5   who the other agent was.
6             THE WITNESS:  The agent that I've
7   spoken with is Byron Schute (phonetic).
8             MR. DiCOLA:  Thank you very much.
9   BY MR. DiCOLA:
10       Q.   When you learned that Chicago would be
11  hosting the DNC this summer, did you anticipate
12  that the event would bring First Amendment
13  activity that might affect transportation?
14       **A.   I don't know that I gave it much**
15  **thought, but I expect that it probably would.**
16       Q.   Was there a point prior to the -- your
17  receipt of this application when CDOT engaged in
18  any preparation for the DNC or for First
19  Amendment activity at the DNC?
20       **A.   No specific preparation.  Like I said,**
21  **I've been on calls, both internal to the City,**
22  **as well as with the Secret Service, about the**
23  **DNC and the requirements that will be coming**
24  **along with it.  But I haven't made any specific**

1 **preparations in terms of parade applications.**

2 **They all follow the same process regardless.**

3   Q. Thank you.

4      You testified that Susan

5 Pawlak flagged this application.  My question is

6 -- or is that correct?  Did she flag this

7 application when it was received?

8   **A. She did let me know that this**

9 **application had come in, yes.**

10   Q. Is there a formal policy or any memo

11 reflecting when applications are to be flagged

12 and brought to the special attention of the

13 supervisor?

14   **A. If they are in the Central Business**

15 **District or if she received multiple**

16 **applications for the same event.  So, yeah,**

17 **there are reasons that she would do that.**

18   Q. Are those written in any policy

19 memoranda or anything like that, or are those

20 unwritten customs within CDOT?

21   **A. So it's a policy within CDOT that if**

22 **you're doing anything in the Central Business**

23 **District you should consult with a supervisor.**

24   Q. Thank you.

1          The City received a parade

2  permit application from a group called the Poor

3  People's Army for August 19th, the day after

4  this protest, correct?

5          MR. DIONNE:  Objection, relevance,

6  Judge.

7          HEARING OFFICER FLEMING:  First of

8  all, let him ask the question first.

9          MR. DiCOLA:  Should I restate the

10  question?

11          HEARING OFFICER FLEMING:  Well, it

12  kind of got muddled there, yes.

13  BY MR. DiCOLA:

14     Q.   So the question was, the City received

15  a parade permit application from a group called

16  the Poor People's Army for August 19th, correct?

17          MR. DIONNE:  Objection, relevance.

18          HEARING OFFICER FLEMING:  Now there's

19  an objection.  Okay.  What's the relevancy of

20  that?

21          MR. DiCOLA:  Your Honor, I would like

22  to introduce an exhibit showing that the City

23  denied a parade permit application for the day

24  after the one under consideration here for the

1   exact same proposed route; and, in fact, some of

2   the letter copy and pasted some of the same

3   dates indicating that the response was pat in

4   response to both permit applications.

5            HEARING OFFICER FLEMING:  Well, I'm

6   going to overrule -- I'm going to sustain the

7   objection.  I just became aware of that permit

8   application on this, but the issue that's in

9   front of me is whether the facts in this case

10  weren't what's going on.  And I don't feel that

11  it's necessarily improper, if that is in fact

12  what happened, for it to happen that way.

13            Taking into consideration,

14  again, what's already in the record with the

15  dates and time of this application, what you

16  just told me the date and time of the subsequent

17  application being within the framework of the

18  DNC, I would think that it's -- it's not

19  anything that would seem to be untoward or would

20  impact the credibility of this witness to have

21  another parade application denied for the same

22  reasons.

23            MR. DiCOLA:  Fair.

24            HEARING OFFICER FLEMING:  Okay.  Now,

1  if you would like, if you remind me at the end

2  of the day, if you would like, I certainly will

3  let you make a more detailed offer of proof so

4  that that is part of the record.  But I don't

5  consider it relevant.  But rather than not have

6  it in the record if there is an appeal and a

7  reviewing court feels that it is relevant, it

8  will be there for that reviewing court to look

9  at.

10           MR. DiCOLA:  I appreciate that, Judge.

11  Thank you.

12                No further questions at this

13  time, your Honor.

14           HEARING OFFICER FLEMING:  Any

15  redirect?

16           MR. DIONNE:  Yes, Judge.

17                REDIRECT EXAMINATION

18  BY MR. DIONNE:

19      Q.  Mr. Gallardo, I'm showing you what's

20  been previously admitted as City's Group 1A

21  through C, that's the application from the

22  Petitioner.  Now, you said you recognized that

23  document previously, correct?

24      **A.    Yes.**

1    Q.   All right.  Now, directing your

2  attention to Page 2, 1B on that Line 9, what

3  does that state?

4    **A.   Estimated number of participants,**

5  **1,000 to 3,000 people.**

6    Q.   And the line below it, what does it

7  state by the applicant?

8    **A.   Basis for this estimate, previous**

9  **experience organizing events of this nature.**

10    Q.   All right.  And that was submitted by

11  Mr. Thayer?

12    **A.   Yes.**

13    Q.   Okay.  Now showing you what's been

14  previously entered as City's Group Exhibit 3A

15  through D.  What's this first page of 3A?

16    **A.   So this was a cover letter that was**

17  **provided by the applicant when they resubmitted**

18  **their parade application.**

19    Q.   Okay.  And anywhere in 3A does it

20  mention the Petitioner providing any resources

21  for this proposed parade route?

22    **A.   No, it just notes that they had spoken**

23  **with police special events department.**

24    Q.   All right.  Within Groups 1A through C

1   and as well as 3A through D, is there any

2   mention by the Petitioner/Applicant of providing

3   Jersey walls?

4       **A.    No.**

5       Q.    Marshals for the event?

6       **A.    No.**

7       Q.    Any other resources from the applicant

8   for the proposed parade route?

9       **A.    Not that I'm aware of, no.**

10      Q.    And just to be sure, the date of that

11  proposed and amended proposition is Sunday,

12  August 18th?

13      **A.    Yes.**

14      Q.    All right.  And what else is occurring

15  at or around that time within the city of

16  Chicago?

17      **A.    So that will be the week that we will**

18  **be hosting the Democratic National Convention,**

19  **so there are several events that are going to be**

20  **taking place that week.  We don't have a full**

21  **picture since we're kind of far out from the**

22  **event, but there will be upwards of 50,000**

23  **delegates and attendees to the convention, and**

24  **then possibly thousands of other folks coming**

1  around for various other reasons associated with

2  it.

3      Q.   And is transportation affecting the

4  DNC to affect routes within the city as well

5  during that time period?

6      A.   Yes.  So there will be designated

7  routes to and from various official venues, as

8  well as various hotels.  We don't have that full

9  list at the moment, but there have already been

10 conversations initiated by the Secret Service

11 and the Illinois State Police to try and

12 determine routes for passage for delegates, for

13 the President, for whoever may need them.

14     Q.   And will those potential, I guess,

15 amendments to regular traffic flow, will those

16 also be in effect on August 18th, 2024?

17     A.   They are likely to be going into

18 effect at least a couple days before, at least

19 to some extent, depends on how many people

20 arrive and when they arrive.  But it is a good

21 chance that it will, yes.

22          MR. DIONNE:  Judge, nothing further.

23 We tender the witness again.

24          HEARING OFFICER FLEMING:  Anything on

1    that?

2            MR. DiCOLA:  Just one quick question,

3    your Honor, or possibly two.

4                    RECROSS EXAMINATION

5    BY MR. DiCOLA:

6        Q.   When you instructed Susan Pawlak to

7    call Andy Thayer, did you instruct her to ask

8    him if he or his group would be supplying

9    resources such as marshals or barriers?

10       **A.   No, I did not.**

11           MR. DiCOLA:  Nothing further, your

12   Honor.

13           HEARING OFFICER FLEMING:  Anything on

14   that?

15           MR. DIONNE:  No, Judge.  Nothing

16   further from this witness.  May we excuse this

17   witness, or are they going to be recalled?

18           MR. DiCOLA:  No intent to recall.

19           HEARING OFFICER FLEMING:  Okay.  Thank

20   you, sir.

21           THE WITNESS:  Thank you.

22           HEARING OFFICER FLEMING:  You know

23   what, let me run down the hall real quick and

24   just see if those people have shown up yet.

```
 1                    (WHEREUPON, a brief recess
 2                    was held.)
 3             HEARING OFFICER FLEMING:  All right.
 4    We are back on the record.
 5                    And like I said, I checked
 6    down the hall, they haven't gotten here yet.  So
 7    we will get started as much as we can, and then
 8    I will let you guys decide how you want to do
 9    it, if you want to take a break then or if you
10    want to just -- (inaudible).
11                    I always hate to say, just
12    like you're saying only one question on
13    redirect, it never happens.  I am anticipating
14    it shouldn't take long, but every time I say
15    that I'm sitting there for half an hour, so...
16                    So let's get going the best we
17    can and then we will just see where we're going.
18             MR. DIONNE:  Okay.  Judge, City calls
19    Deputy Daniel O'Connor.
20                    (Witness duly sworn.)
21             DANIEL O'CONNOR,
22    called as a witness herein, having been first
23    duly sworn, was examined and testified as
24    follows:
```

1                  DIRECT EXAMINATION

2   BY MR. DIONNE:

3        Q.   Good morning.  Will you please state

4   your name and spell your last name for the

5   record?

6        **A.   Yes.  Daniel J. O'Connor,**

7   **O-C-o-n-n-o-r.**

8        Q.   Okay.  And who is your current

9   employer?

10       **A.   The Chicago Police Department.**

11       Q.   And how long have you worked for the

12  Chicago Police Department?

13       **A.   Over 22 years.**

14       Q.   And what is your current position at

15  the Chicago Police Department?

16       **A.   I'm a deputy chief in the Bureau of**

17  **Patrol.**

18       Q.   And how long have you held that

19  position?

20       **A.   For over one year.**

21       Q.   And what is your role as deputy chief

22  with the Police Department?

23       **A.   I help oversee the day-to-day**

24  **operations of the entire Bureau, so that**

1  **includes all of the district law enforcement**

2  **officers, other units under our Bureau, and I**

3  **also assist with large event planning logistics**

4  **and emergency response for the Chicago Police**

5  **Department.**

6      Q.   Okay.  Does large event planning

7  include potential parade applications?

8      **A.   Yes, it does.**

9      Q.   All right.  So could you explain

10 generally how the CPD interacts with a parade

11 application request?

12     **A.   Sure.  The parade application is**

13 **submitted to the district commander where the**

14 **parade is being requested.  It's reviewed by the**

15 **commander and subsequently then that it can be**

16 **forwarded up through the chain to my office.**

17     Q.   All right.  And then who sends the

18 application to the district commander from

19 within the City?

20     **A.   The Chicago Department of**

21 **Transportation.**

22     Q.   All right.  And does every application

23 that is received by CPD eventually make it to

24 your desk?

1    **A.    Most do for at least awareness, yes.**

2    Q.    All right.  And once an application is

3    received by CPD, what kind of information

4    gathering occurs?

5    **A.    We review the date of the**

6    **applications, the location, the scope and the**

7    **requested route among other information that is**

8    **included in the application.**

9    Q.    And when you say we, is that you and

10   other people?

11   **A.    It's -- yes, myself and the district**

12   **commander.**

13   Q.    And the district commander could vary

14   depending upon where the proposed application is

15   submitted to?

16   **A.    Yes.**

17   Q.    All right.  And it varies by location

18   and then it would vary by commander?

19   **A.    Correct.  The city is broken up into**

20   **22 separate police districts.**

21   Q.    Okay.  In this initial review of the

22   application, do you determine how many officers

23   would be needed for the proposal?

24   **A.    We do, based on a recommendation from**

1 **the commander and in viewing other events that**
2 **are going on throughout the city, we do review**
3 **how many officers would be allocated for an**
4 **event.**
5     Q.    All right.  Besides actual officers
6 what other types of resources are required from
7 CPD for a parade proposal?
8     **A.    Sure.  So in addition to the physical**
9 **manpower and the officers themselves, we have to**
10 **ensure there is sufficient radios, body-worn**
11 **cameras and transportation for all of the**
12 **officers to get to their -- to any event.**
13     Q.    And what kind of transportation are we
14 talking about here?
15     **A.    Typically, squad cars or for some**
16 **large-scale events in the past we have used CTA**
17 **buses.**
18     Q.    Besides the Department of
19 Transportation, are there any other City
20 departments that you contact when an application
21 for a parade comes in?
22     **A.    Sure.  Depending on the size of the**
23 **event, we contact the Chicago Department of**
24 **Transportation, the Department of Streets and**

1   **Sanitation, Water Department, Chicago Fire**

2   **Department and the Office of Emergency**

3   **Management and Communication, in addition to any**

4   **other impacted City agencies.**

5        Q.   Okay.  Deputy Chief, thank you.

6             I'm showing you what's been

7   previously entered into evidence as City's Group

8   Exhibit 1A through 1C.  Do you recognize this

9   document?  Just give it a view.

10       **A.   Yes.  This is a parade permit**

11  **application.**

12       Q.   All right.  And is that from the

13  Petitioner in this case?

14       **A.   Yes.**

15       Q.   Okay.  Prior to today were you given a

16  copy of this application?

17       **A.   Yes.**

18       Q.   All right.  Do you recall when you

19  were given a copy of this application?

20       **A.   I don't know.**

21       Q.   Okay.  Do you recall who gave you a

22  copy of the application?

23       **A.   I believe it came from CDOT.**

24       Q.   Okay.  Prior to today did you have an

1  opportunity to review this application?

2  **A.    Yes.**

3  Q.    All right.  And what is the proposed

4  date of this parade application to occur?

5  **A.    Sunday, August 18th.**

6  Q.    All right.  And the time of assembly?

7  **A.    Is 5:00 p.m.**

8  Q.    Start time?

9  **A.    6:00 p.m.**

10  Q.    End time?

11  **A.    They disband 9:00 p.m.**

12  Q.    All right.  What about the end time

13  for the actual parade?

14  **A.    Oh, I'm sorry.  It's 8:15.**

15  Q.    Okay.  And approximately how many

16  people are anticipated for this parade route?

17  **A.    One to 3,000.**

18  Q.    Okay.  And did you also have an

19  opportunity to review the proposed route from

20  the applicant on this initial proposal?

21  **A.    Yes, I did.**

22  Q.    All right.  And what is that route?

23  **A.    I think it's on the application.  East**

24  **on Pearson to Michigan; south on Michigan to**

1   **Wacker; west on Wacker to State; south on State**

2   **to Adams; east on Adams to Michigan; south on**

3   **Michigan to 901 South Michigan.**

4       Q.   After receiving this what happened

5   next?

6       **A.   There was -- a request was sent back**

7   **to the organizer by the First District**

8   **requesting a different route.**

9          HEARING OFFICER FLEMING:  Sorry,

10  requesting what?

11         THE WITNESS:  A modified route.

12  BY MR. DIONNE:

13      Q.   Do you know who at the First District

14  contacted the Petitioner?

15      **A.   It was Commander David Harris.**

16      Q.   All right.  And do you recall what

17  exactly or the gist of what Commander Harris

18  told the Petitioner in this case?

19      **A.   I believe the route is -- resources**

20  **would be a significant issue to staff this route**

21  **and the route itself could impact several hotels**

22  **or other venues for the Democratic National**

23  **Convention.**

24      Q.   All right.  And when you mention

1  resources, are those the same resources you

2  mentioned previously as to officers as well as

3  additional physical resources?

4     **A.   Yes.**

5     Q.   Okay.  I am also showing you next

6  what's been previously entered into evidence as

7  City's Exhibit Group A through D.  Directing

8  your attention to Page B, do you recognize this

9  document?

10    **A.   Yes.**

11    Q.   Okay.  And what is this document?

12    **A.   It's a parade application.**

13    Q.   All right.  Is this an amended

14 application from the Petitioner?

15    **A.   Yes, it is.**

16    Q.   All right.  And have you reviewed this

17 amended application prior to today's date?

18    **A.   Yes.**

19    Q.   All right.  And based upon your

20 review, what if anything is different on this

21 amended application?

22    **A.   The route is slightly altered.**

23    Q.   Okay.  And how is the route altered in

24 comparison to the first application?

1          **A.    It was in red on the --**

2               HEARING OFFICER FLEMING:  Excuse me

3     one second.  Can you guys go down -- try 114 and

4     then I will be right down there in a few

5     minutes.

6               MR. DIONNE:  Did you want to take a

7     recess, Judge, and we could --

8               HEARING OFFICER FLEMING:  Yes.  Let me

9     do this and then, you know, we can see where

10    we're at.

11                    (WHEREUPON, a brief recess

12                    was held.)

13               HEARING OFFICER FLEMING:  Okay.  We're

14    back on the record.

15                    Sorry, Deputy.  Proceed,

16    Mr. Dionne.

17               MR. DIONNE:  All right.  Thank you.

18    BY MR. DIONNE:

19         Q.   You were previously shown what's been

20    previously entered into evidence as City's Group

21    Exhibit A through D, and directing your

22    attention to Exhibit 3C, specifically the

23    amended parade route from the applicant, did you

24    have a chance to review that amended route prior

1    to today's hearing?

2        **A.    Yes, I did.**

3        Q.    All right.  When did you review that

4    route?

5        **A.    I don't recall what day.**

6        Q.    All right.  Was it sometime after this

7    application was submitted though?

8        **A.    Yes.**

9        Q.    All right.  And what is the amended

10   route from the applicant?

11       **A.    East on Pearson to Michigan; south on**

12   **Michigan to Ontario; west on Ontario to Wabash;**

13   **south on Wabash to Wacker; west on Wacker to**

14   **State; south on State to Washington Street; and**

15   **then east on Washington to Michigan Avenue; and**

16   **then it would resume southbound on Michigan**

17   **Avenue to 901 South Michigan.**

18       Q.    All right.  Now, to your knowledge, is

19   this the only change from the initial

20   application and the amended application, the

21   route?

22       **A.    Yes.**

23       Q.    Okay.  Thank you.

24                    Now, ultimately, did you and

1    the Chicago Police Department come to a

2    conclusion as to the proposed route submitted by

3    the applicant?

4         **A.    Yes, we did.**

5         Q.    And what was that conclusion?

6         **A.    That the route itself was -- the**

7    **recommended permit would be denied as it was too**

8    **impactful and too much of a resource draw for --**

9    **given the time frame of the DNC.**

10        Q.    All right.  Were you the

11   representative from the Chicago Police

12   Department that made that ultimate

13   determination?

14        **A.    Yes.**

15        Q.    All right.  And did you share that

16   determination with anybody else within the City?

17        **A.    Yes, I did.**

18        Q.    Who did you share that determination

19   with?

20        **A.    Bryan Gallardo from CDOT.**

21        Q.    All right.  And when you made the

22   determination that you would not have the

23   resources, what kind of resources would be

24   required from CPD for a proposal like either the

1   initial or amendment?

2       A.   Significant resources would have to be

3   given both the primary -- or the first route and

4   the secondary route as it winds through city

5   streets and it is close to or next to certain

6   hotels or routes to hotels that may be used by

7   the Democratic National Convention as secure

8   sites.

9               As it wound through the

10  Central Business District, it requires not only

11  the closure of the street that the participants

12  are marching on but also surrounding streets

13  that feed in, like, to those streets to ensure

14  the safety of both the participants, the

15  officers and the general public.

16      Q.   Do you have an approximation of how

17  many officers it would take to secure a route

18  that was proposed?

19      A.   Several hundred.

20      Q.   All right.  And would only the streets

21  that were being proposed have to be closed as a

22  result of this parade request?

23      A.    No.  The streets that feed into these,

24  like downtown is a mix of one-way streets, and

1  it curves with the river, and, like, Wacker

2  Drive we would have to block traffic in a bubble

3  outside of the route as well to ensure the

4  safety of everyone involved.

5      Q.   All right.  And would that take

6  additional officers or is that part of your

7  initial several hundred estimation?

8      A.   The basic route, that would include

9  the several hundred, but given the week that --

10  so August 18th, since it coincides with the DNC,

11  we would have to supply additional officers in

12  anticipation of other factors such as the group

13  could swell in numbers with, like, people who

14  are not anticipated by the application, or it

15  could be groups of counter-protestors whose

16  views don't align with any groups that march.

17  So we would have to have additional resources,

18  like, dedicated that are on top of just the line

19  of march.

20      Q.   Besides -- thank you.

21               Besides physical officers,

22  what other resources does CPD have to provide

23  for the security of these routes?

24      A.   They provide the barricades, the

1    **body-worn cameras for each officer, radios for**

2    **each officer and then the transportation of**

3    **vehicles for all of our officers.**

4        Q.    And would it also require CPD to

5    provide barricades for those streets?

6        **A.    Yes.**

7        Q.    All right.  Now, you mentioned

8    previously in testimony that the Democratic

9    National Convention or DNC would be occurring

10   roughly around the same time.  I want to talk to

11   you about the DNC's affect on the City during

12   this time.

13                    So what is the proposed date

14   that the DNC is to be in Chicago?

15       **A.    It's the week of August 19th.**

16       Q.    And in anticipation of that event,

17   what is CPD being tasked with?

18       **A.    CPD is being tasked with a lot.  We**

19   **are being tasked with the safety and security of**

20   **the city at large, but particular to the DNC for**

21   **security for -- exterior security for all of the**

22   **venues, for all of the hotels and any other**

23   **sites that would be attended by the attendees,**

24   **like, to the DNC.**

1            **In addition, we will have a**
2 **large contingent of elected officials to include**
3 **the President, the Vice President, their**
4 **spouses, and various cabinet level officials,**
5 **members of Congress, and then State and local**
6 **officials from across the country in addition to**
7 **the 50,000 or so delegates and attendees.**
8       Q.   Aside from the 50,000 delegates and
9 attendees that you just mentioned, do you have a
10 rough estimate of how many additional people
11 will be in the city of Chicago during this time
12 period?
13       **A.   Yes.  We anticipate well over a**
14 **million people to come and enjoy the city at**
15 **that time.**
16       Q.   All right.  And who is tasked with
17 protecting not just the delegates but also the
18 additional guests that will be in attendance
19 during this time frame?
20       **A.   That would be the Chicago Police**
21 **Department.**
22       Q.   Okay.  Now, is the Chicago Police
23 Department working alongside any other agencies
24 in anticipation of the DNC?

1     A.   We are.  The DNC is a National Special

2  Security Event as authorized by the Department

3  of Homeland Security, which puts the United

4  States Secret Service in overall command of the

5  event itself.

6               So we will be working with all

7  of our federal partners to include the Secret

8  Service, the FBI, ATF, the DA, the Marshals, and

9  other federal agencies in addition to CPD, other

10  law enforcement agencies from throughout the

11  State that may be called in, and we are

12  contemplating calling in law enforcement

13  officers from other cities in the country to

14  help supplement our resources.

15     Q.   You mentioned some federal agencies.

16  Are there any specific individuals from say

17  Secret Service that CPD is actively working

18  with?

19     A.   Yes, Special Agent Spriggs.

20     Q.   And do you know what a National

21  Special Security Event is?

22     A.   It's a -- it's an event that's

23  designated by the Department of Homeland

24  Security which has the potential for significant

1  **terrorist acts or an event that is so large in**

2  **scale that it requires the assistance of the**

3  **Federal Government.  So the, like, Democratic**

4  **National or the, like, presidential nomination**

5  **conventions are obviously the two ones that are**

6  **upcoming, but it can also include other things**

7  **such as a Superbowl or a presidential**

8  **inauguration.**

9  Q.   So given that the Democratic National

10  Convention is an NSSE, what is your role within

11  CPD in relation to this NSSE designation?

12  **A.   I'm tasked with assisting with the**

13  **logistics and the preparation for, like, the DNC**

14  **and also with the safe operations of the City in**

15  **general during this time frame.**

16  Q.   And who decides which officers and how

17  many resources are going to be assigned to any

18  specific area within the city?

19  **A.   That's dependent on a number of**

20  **factors, but ultimately the Superintendent of**

21  **Police or based on information from myself or**

22  **other individuals will help inform that**

23  **decision.**

24  Q.   All right.  But is that ultimately

1    CPD's decision about where --

2         **A.    Yes.**

3         Q.    -- to allocate the resources?

4         **A.    Yes, it is.**

5         Q.    Okay.  And approximately how many

6    officers are going to be tasked in securing the

7    city of Chicago during this event?

8         **A.    So during this event, all Chicago**

9    **police officers will have their days off**

10   **canceled, and they will be working extended**

11   **tours.  So that would be over 11,000 officers.**

12   **We have restricted our annual vacation segment**

13   **for that time frame, so no officers were allowed**

14   **to take vacation during that time as well.**

15        Q.    All right.  Does this include

16   detectives as well from the Chicago Police

17   Department?

18        **A.    It does.  It includes all members.**

19        Q.    All right.  And where are the two main

20   locations in which the DNC are scheduled to

21   occur?

22        **A.    The two main locations are the United**

23   **Center and McCormick Place.**

24        Q.    Are there additional locations that

1 CPD is tasked with ensuring the safety of?

2 **A.   There are several other locations that**

3 **we will be tasked with ensuring the safety of**

4 **those locations.**

5 Q.   Without getting into specifics of

6 where those locations are, what kind of

7 locations are you tasked with?

8 **A.   Various hotels, various other venues**

9 **that will host some sort of gatherings related,**

10 **like, to the DNC, in addition to the airports**

11 **and the routes to and from all these locations**

12 **for not just motorcades but for the safe passage**

13 **of all the delegates.**

14 Q.   All right.  Will CPD officers be

15 tasked with ensuring those routes of those

16 dignitaries and other event attendees?

17 **A.   Yes.**

18 Q.   All right.  And what will CPD's

19 presence be for Chicago Transit Authority

20 services?

21 **A.   We will increase our number of**

22 **officers on the CTA as well, both in the Central**

23 **Business District and throughout the --**

24 **throughout the system as well to include both**

1    **bus and rail.**

2         Q.   And when will these assignments go

3    into effect date-wise?

4         **A.   The -- it will at the very least be**

5    **the week prior to the DNC.  I don't have a**

6    **specific date yet.**

7         Q.   All right.  Do you have an estimated

8    end time for this enhanced deployment?

9         **A.   It would be through the weekend after**

10   **the DNC.**

11        Q.   And during what hours will the extra

12   deployment services be required?

13        **A.   24 hours, seven days a week.  We still**

14   **have to safeguard the entire city and all of its**

15   **77 neighborhoods, in addition to anything**

16   **related to the DNC.  So it's an all hands on**

17   **deck approach, and it's a 24 hour, seven days a**

18   **week operation.**

19        Q.   All right.  And who else besides

20   Secret Service are you contacting to coordinate

21   all these requirements?

22        **A.   All the federal agencies that I**

23   **previously mentioned, in addition to our city**

24   **agencies which I mentioned as well; CDOT, Water,**

1    **Streets and San, Fire, OEMC and other impacted**

2    **agencies.**

3        Q.   Are you also speaking with any

4    representative from any military or other

5    policing agencies?

6        **A.   Yes.**

7        Q.   Which ones?

8        **A.   The -- through the Department of**

9    **Homeland Security we are -- I don't know the**

10   **designation, but we do have a military contact,**

11   **and we are making contact with the US Military.**

12       Q.   What about Illinois State Police?

13       **A.   Yes, and the Illinois State Police and**

14   **the Cook County Sheriffs Office.**

15       Q.   All right.  Will they also be deployed

16   as part of this NSSE event within the city of

17   Chicago during this time?

18       **A.   Yes, they will.**

19       Q.   Are there any events that occur in the

20   city of Chicago that have a similar resource

21   requirement as the Democratic National

22   Convention?

23       **A.   We haven't seen an event this big in**

24   **-- the two off the top of my head are the 1996**

**DNC and the 2012 NATO Summit, but this is even**
**larger in scale than those two events.**

Q.   All right.  And what was the resource
requirement of those previous events in
comparison to this one?

**A.   It was -- for the NATO event, it was**
**an all hands on deck approach as well, but we**
**did not have to modify our annual vacations at**
**that time.**

Q.   So it's only in this event that you
have had to modify time off requests?

**A.   Yes.**

Q.   Are you aware of a proposed alternate
route that was provided to the applicants in
this instance?

**A.   Yes, I am.**

Q.   All right.  And do you recall what
that route is?

**A.   It's on Columbus Avenue from Roosevelt**
**to Jackson.**

Q.   All right.  Did you have any role, or
if you know, did CPD have any role in suggesting
that alternate route?

**A.   Yes.  That was the suggestion of CPD.**

1    Q.    All right.  Do you know who suggested

2  that?

3    **A.    I did.**

4    Q.    Okay.  And why did you suggest that

5  route?

6    **A.    I believe it's a reasonable**

7  **alternative to the very impactful routes that**

8  **were proposed earlier.  It still gives**

9  **visibility to the requesters.  It is in the**

10 **Central Business District, and it will hopefully**

11 **not impact any of the motorcades or hotels,**

12 **which we don't know where they're at yet, or any**

13 **other venues that we have to secure, both the**

14 **venue itself and the routes to and from.  And**

15 **it's -- it's easier to secure as it is a**

16 **straight line road with less ancillary streets**

17 **that feed into it.**

18   Q.    For this amended route, would CPD have

19 to close any adjacent or adjoining streets?

20   **A.    Yes, we would.**

21   Q.    All right.  And do you have an

22 estimation upon the personnel requirement that

23 would be required to secure the proposed

24 alternate route?

1     **A.   Yes.  It would still be several**

2    **hundred officers in addition to -- like I**

3    **mentioned earlier, we would have to anticipate**

4    **people who are not as thoughtful as Mr. Thayer**

5    **who applied for a permit to join any sort of**

6    **parades or marches that occur during that time**

7    **frame, and then we have to anticipate the groups**

8    **that may want to counter-protest, like, those**

9    **parades as well.**

10    Q.   All right.  And will this resource

11   requirement be less or more than the

12   Petitioner's requested route from CPD?  Would

13   the resources be fewer or more than the proposed

14   routes from the Petitioner in this case?

15     **A.   It would be more.**

16    Q.   For the amended route that you're

17   proposing, that would be more or less?

18     **A.   For the route that CPD -- the**

19   **alternate route?**

20    Q.   Yes, the alternate route.

21     **A.   I'm sorry.  The alternate route would**

22   **require less resources than the proposed route.**

23    Q.   Now, are you aware of any events or

24   occurrences within the City of Chicago that have

1   had to have been moved as a result of the DNC

2   coming to Chicago?

3      **A.   Yes, the annual and historic Chicago**

4   **Air and Water Show had to be rescheduled from**

5   **August 18th to August 10th and 11th.**

6      Q.   All right.  And do you know why that

7   had to be rescheduled?

8      **A.   We cannot adequately provide the**

9   **resources that are required for that event to**

10   **safely take place.**

11      Q.   And when you say we, you mean?

12      **A.   The Chicago Police Department.**

13      Q.   Okay.  And what kind of resources

14   would be required for that event ordinarily by

15   Chicago Police Department?

16      **A.   The same resources that we would have**

17   **dedicated to the parade to include officers,**

18   **radios, body worn cameras and transportation and**

19   **other -- like police barricades, and then, like,**

20   **obviously the other City agencies also supply**

21   **their resources as well.**

22      Q.   Are there any additional events or

23   occurrences from the City that have had to have

24   been rescheduled as a result of the DNC?

1    **A.   Sure.  At the request of the Chicago**

2  **Police Department, the Chicago Public Schools**

3  **have agreed to push back the start date of**

4  **school so that they can de-conflict with the DNC**

5  **and so we could then, like, provide them the**

6  **resources that they, like, request for their**

7  **first week of school.**

8    Q.   All right.  And what kind of resources

9  are ordinarily required for the first week of

10  school from CPD?

11   **A.   We conduct our what's called safe**

12  **passage routes, which we ensure the routes to**

13  **various schools throughout the city, and that**

14  **includes sworn officers, radios, body-worn**

15  **cameras, vehicles and other resources similar to**

16  **what a parade would need.**

17   Q.   In your estimation, would CPD be able

18  to provide these services for the start of

19  school while the DNC is in Chicago?

20   **A.   No, we would not.**

21    MR. DIONNE:  Judge, the City has

22  nothing further at this point.  We tender the

23  witness.

24    HEARING OFFICER FLEMING:  Ready for

1   cross?

2           MR. DiCOLA:  Thanks, your Honor.

3                   CROSS-EXAMINATION

4   BY MR. DiCOLA:

5       Q.   Deputy Chief O'Connor, hi.  My name is

6   Joe DiCola.  I represent Andy Thayer.

7                   You testified that it would

8   take several hundred officers from the Chicago

9   Police Department to safely police the amended

10  route as requested by Andy Thayer, right?

11  Several hundred, was that your testimony?

12      **A.   Which route are you referring to?**

13      Q.   So after Andy Thayer changed the route

14  on January 8th, so the one that goes out to

15  Ontario as opposed to -- to police that route,

16  would that take several hundred officers?

17      **A.   It would take at a minimum several**

18  **hundred officers, but likely more given how it**

19  **zig-zags through the city streets.**

20      Q.   And can you tell me, several hundred,

21  is that greater than 500?

22      **A.   For the amended route that Mr. Thayer**

23  **would propose, it would be over 500, yes.**

24      Q.   Is it over 600?

1    **A.    Again, I haven't, like, mapped it out**
2    **street by street but it would be -- I'm**
3    **comfortable saying it would be over 500.**
4    Q.    Could it be, give or take, 50
5    officers?
6    **A.    50 officers?**
7    Q.    In terms of your estimation for how
8    many would be required.  I'm curious about the
9    margin of error in your estimate of 500.
10    MR. DIONNE:  Objection, Judge.  This
11    calls for speculation.
12    HEARING OFFICER FLEMING:  Overruled.
13    You can answer how you came to --
14    THE WITNESS:  Sure.  I don't have a
15    margin of error.  I would have to review it more
16    thoroughly.
17    BY MR. DiCOLA:
18    Q.    And there is a cost attached to the
19    time each officer spends on duty, correct?  Each
20    officer is paid for their time?
21    **A.    They are.**
22    Q.    And so a difference of 50 officers is
23    50 officers' pay for that period policing the
24    march --

1      MR. DIONNE:  Objection.

2 BY MR. DiCOLA:

3      Q.   -- required to be allocated for this

4 event, correct?

5           HEARING OFFICER FLEMING:  First of

6 all, you have to let him finish the question.

7 So rephrase your question so we have it clear on

8 the record.

9 BY MR. DiCOLA:

10     Q.   My question is, is there a cost

11 difference for the Chicago Police Department in

12 staffing -- we're now talking about 50

13 additional officers on top of 500 for this

14 event.  Does it cost more to send 50 officers?

15     **A.   More officers --**

16          MR. DIONNE:  Objection as to relevance

17 and improper hypothetical.

18          HEARING OFFICER FLEMING:  All right.

19 First of all, what's the relevance.  We're all

20 aware of the fact that the police officers are

21 being paid.

22          MR. DiCOLA:  I would like to -- I

23 would like to get --

24          HEARING OFFICER FLEMING:  Let me

1   just --
2           MR. DiCOLA:  Sorry.
3           HEARING OFFICER FLEMING:  -- make my
4   ruling on it because I don't believe at this
5   point that the deputy superintendent mentioned
6   cost as a determination in the factor of the
7   number of officers.
8           MR. DiCOLA:  Understood, your Honor.
9   The deputy did testify to radios and police
10  vehicles, and I'm trying to establish between --
11  several hundred is not an exact number.
12          HEARING OFFICER FLEMING:  That's not a
13  cost.
14          MR. DiCOLA:  It costs in terms of an
15  allocated resource --
16          HEARING OFFICER FLEMING:  It's a
17  resource that has to be provided, as with the
18  transportation and matters like that.  But your
19  question was directly relative to -- it seemed
20  to be directly relative as to, you know, money
21  costs.
22          MR. DiCOLA:  I can rephrase the
23  question so they're not addressing line items.
24          HEARING OFFICER FLEMING:  Yes, do it

1    that way and then we will see where we go.

2                    Again, it's clear if you have

3    less officers you have -- if you have ten less,

4    you have ten less cameras that you have to

5    bring, ten less people that you have to

6    transport.  But, again, based upon the deputy's

7    testimony, he's indicated 500 minimum, maybe

8    more, so I don't know that it's really relevant

9    until you get him to budge off that figure.

10                   MR. DiCOLA:  Understood, your Honor.

11   Thank you.

12   BY MR. DiCOLA:

13        Q.   Deputy, you testified that the

14   alternative route that you proposed would also

15   take several hundred officers to police,

16   correct?

17        **A.   Yes.**

18        Q.   You do not have a specific number of

19   police vehicles and radios required to police

20   the alternative route, correct?

21        **A.   Not at this time, no.**

22        Q.   And you do not have that same number

23   for the amended route as submitted on January

24   8th, correct?

1      **A.    Not at this time, no.**

2      Q.    And so without exact numbers, is it

3  fair to say that there are -- strike that.

4              You testified that you were a

5  police officer and worked as an officer at the

6  DNC in 1996; is that correct?

7      **A.    I did not say that I worked at a DNC**

8  **in 1996.**

9      Q.    You were not -- were you not an

10  officer in '96?

11     **A.    I was not.**

12     Q.    My mistake.  Were you at NATO in 2012?

13     **A.    I was.**

14     Q.    And NATO was an NSSE, right?

15     **A.    I don't specifically recall.**

16     Q.    The NATO Summit, it was not a National

17  Special Security Event?

18              MR. DIONNE:  Objection, misstates

19  testimony.

20              HEARING OFFICER FLEMING:  Well, that

21  assumes he was in a position to know what it was

22  in 2012, so...

23              You can ask him if he knew

24  what it was in 2012.

BY MR. DiCOLA:

     Q.    Deputy, were you aware of what a
National Security Special Event -- or National
Special Security Event was in 2012?

     **A.    I was not, no.**

     Q.    Were you assigned to police the NATO
Summit?

     **A.    No, I was not.**

     Q.    Have you ever policed a protest?

     **A.    Yes.**

     Q.    When the DNC was announced for
Chicago, did you anticipate that it would bring
protest activity?

     **A.    Yes.**

     Q.    Did you communicate to your -- to the
superintendent or anyone higher above you in the
chain of command that additional resources would
be needed to accommodate inevitable First
Amendment activity at the DNC?

     **A.    I believe that that is an**
**understanding that the Department had based on**
**the convention.**

     Q.    And when you say that understanding,
you mean the understanding that CPD would need

1   to prepare for First Amendment activity at the

2   DNC?

3       **A.    In addition to the large scale**

4   **security event, yes.**

5       Q.    Part of that large scale security

6   event, however, is that it's a political

7   convention that's likely to draw political

8   demonstrations; is that right?

9       **A.    Yes.**

10      Q.    Does Chicago have sufficient resources

11  to host an event like the DNC and allow for

12  First Amendment expression in opposition to that

13  event?

14      **A.    Can you repeat that?**

15      Q.    Does Chicago have the sufficient

16  resources to host the DNC and allow for First

17  Amendment activity?

18          MR. DIONNE:  Objection as to vagueness

19  and foundation.

20          HEARING OFFICER FLEMING:  And

21  relevancy coming from the deputy.  I'm not sure

22  that he's in a position to render such an

23  opinion.

24          MR. DiCOLA:  Concerning the Police

1    Department's resources, your Honor?

2              HEARING OFFICER FLEMING:  Yes.  I

3    mean, you're asking kind of -- it is speculation

4    in term of that.  The fact of the matter is we

5    have the DNC.  The fact of the matter is there

6    is going to be First Amendment protests.  So

7    that's a given.

8              So whether the deputy feels

9    one way or another, the deputy is going to be

10   working in conjunction with his superiors, as

11   well as the other agencies that he's referred

12   to, to do their best to ensure that Chicago

13   utilizes the resources it has as best it can to

14   allow the DNC and to allow the First Amendment

15   protests to continue.  But asking him does he

16   think there is enough or not, I don't see the

17   relevancy to that.

18             MR. DiCOLA:  I believe that he's

19   testified that his job was to review this permit

20   -- the deputy testified that it was his job to

21   review the permit application and assess whether

22   the City had adequate resources to preserve --

23   secure safety at this event.  And so because

24   this event is First Amendment activity occurring

1   at the National Security Event of the DNC, I'm
2   asking the deputy if generally the Police
3   Department is prepared to allow people to
4   protest and also have the DNC.
5            HEARING OFFICER FLEMING:  Okay.  And,
6   again, respectfully, that's not the issue that's
7   in front of me.  The issue that's in front of me
8   is this particular permit application.
9            MR. DiCOLA:  Okay.
10           HEARING OFFICER FLEMING:  And that's
11  what the officer -- the deputy is testifying to.
12  That's the relevant issue.
13           MR. DiCOLA:  Thank you, your Honor.
14  BY MR. DiCOLA:
15       Q.   Deputy, you testified that there will
16  be over 11,000 sworn Chicago police officers on
17  duty during the DNC; is that correct?
18       **A.   That's the anticipated.**
19       Q.   And you will have about that number,
20  about 11,000 or more working on August 18th, the
21  date of this parade permit application, correct?
22  Or the requested date of this parade.
23       **A.   Yes.**
24       Q.   And how did you determine when

1 reviewing this application that you were unable
2 to spare several hundred, call it 500, officers
3 to safely police this event at that time knowing
4 that you have at least 11,000?

5 **A. As I said, we are tasked with securing**
6 **two main venues for the DNC in addition to**
7 **several undisclosed hotels and other venues, and**
8 **in addition we have to secure the entire city.**
9 **Our operations don't cease for the DNC.**

10 **So those numbers will be used**
11 **to answer over -- you know, 911 gets over 20,000**
12 **calls per day on a -- you know, on a routine**
13 **summer day. So we still would have to respond**
14 **for calls of service throughout the city in**
15 **addition to the enormous resources requested as**
16 **asked for the DNC.**

17 Q. Thank you.

18 Deputy Chief, you testified
19 that CPD was contemplating bringing in law
20 enforcement officers from other police
21 departments within the State; is that correct?

22 **A. Yes.**

23 Q. And possibly from outside the state of
24 Illinois?

1    **A.    That's a possibility.**

2    Q.    To your knowledge, have Chicago Police

3    Department officers ever performed a similar

4    function for another city's DNC?  Have they ever

5    left town to support the police in another city

6    hosting the DNC?

7         MR. DIONNE:  Objection, relevance.

8         HEARING OFFICER FLEMING:  What's the

9    relevance?

10        MR. DiCOLA:  The customariness of this

11   practice, the likelihood that the City can

12   expect that this is going to happen, that they

13   have a familiarity with reassigning officers in

14   this way, and they might have an ability to

15   assess how many they will have through these

16   kind of departmental sharing agreements.

17        HEARING OFFICER FLEMING:  I'll

18   overrule it and let you answer it if you know.

19        THE WITNESS:  I don't know for what

20   specific events, but CPD officers have gone to

21   other cities to help secure other events.

22   BY MR. DiCOLA:

23        Q.    And at this time do you know how many

24   law enforcement officers from other police

1   departments across the State or the country will

2   be coming to Chicago?

3       **A.   At this time, no.**

4       Q.   So you don't know whether or not you

5   could find a spare 500 officers to police this

6   parade in another city in Illinois or somewhere

7   else from the country?

8           MR. DIONNE:  Objection, argumentative.

9           HEARING OFFICER FLEMING:  Sustained.

10  Also, there's no foundation there because what I

11  have been told is that there is contemplation of

12  such an action, there is no testimony in front

13  of me that, in fact, there has been confirmation

14  of some sort of -- some sort of plan.  So I

15  think it becomes too speculative at that point

16  in time.

17          MR. DiCOLA:  Thank you, your Honor.

18  BY MR. DiCOLA:

19      Q.   Deputy Chief, are you familiar with a

20  statute that empowers -- a City of Chicago

21  statute that empowers the Superintendent to --

22  of the police to enter into task force

23  agreements with other law enforcement agencies?

24      **A.   I'm aware that CPD does have task**

1    **force officers.**

2         Q.    And so you're aware that the

3    Superintendent is empowered to enter into task

4    forces with federal and state law enforcement

5    agencies?

6         **A.    Yes.**

7         Q.    Have -- to your knowledge, has the

8    Superintendent entered into any such agreement

9    in anticipation of the DNC?

10        **A.    As I said earlier, I don't know.**

11        Q.    Would that information be relevant for

12   you determining how much personnel you will have

13   available to police this particular parade

14   permit?

15             MR. DIONNE:  Objection, speculation.

16             HEARING OFFICER FLEMING:  Again, it's

17   speculation at this point in time.  Sustained.

18   BY MR. DiCOLA:

19        Q.    Is the number of officers that you

20   have available to police this event relevant to

21   your determination about this permit

22   application?

23        **A.    Say that one more time.**

24        Q.    Did you deny -- I'll rephrase the

1    question.

2                    Did you deny this permit

3    application or recommend its denial based in

4    part on the lack of available CPD personnel?

5        **A.    In part, our personnel and our**

6    **resources.**

7        Q.    And so you would agree that the number

8    of personnel is relevant to your determination

9    about this application?

10       **A.    The number of the personnel that we**

11   **would have to dedicate to it is a factor, yes.**

12       Q.    And so -- and you would also agree

13   that that number may grow if the Superintendent

14   enters into one of these task force agreements

15   and other officers are brought to the city?

16                MR. DIONNE:  Objection, calls for

17   speculation.

18                HEARING OFFICER FLEMING:  Well, again,

19   it's calling for speculation at this point in

20   time.  You can certainly make argument with it,

21   but when we get down to it, at this point in

22   time, the time the decision was made on this

23   particular application, there is no evidence in

24   front of me that there were any task force

1  agreements with the feds.  And therefore, it

2  would be impossible for the witness to speculate

3  as to, number one, whether there will be a task

4  force agreement of some sort, whether there will

5  be an agreement with other police agencies, what

6  is the scope of such an agreement?

7              At this point the issue is

8  based upon the information that was presented to

9  the City, was it appropriate for this permit at

10 this time to be denied?

11     MR. DiCOLA:  Thank you, your Honor.

12 BY MR. DiCOLA:

13     Q.   Deputy Chief, you testified about

14 counter-protesters.  Could you please describe

15 the role of the possible presence of

16 counter-protesters plays in your assessment of

17 whether you can safely police a parade?

18     **A.   Sure.  For the safety and security of**

19 **all involved, including the permitted and the**

20 **non-permitted and the officers, it's prudent for**

21 **us to anticipate that there may be, like,**

22 **counter-protesters to whatever organizations are**

23 **present.**

24     Q.   And so you might deny a route or

1  request an amendment to a route on that basis?

2      **A.    Not on that basis alone, but it would**

3  **go into our resource allocation for any**

4  **requested permit.**

5      Q.   And what knowledge do you have about

6  counter-protesters that would come to this

7  particular parade?

8      **A.    At this time I don't have specific**

9  **knowledge of anyone looking to protest this**

10 **parade.  But in my training and experience, the**

11 **counter-protesters are an issue that we have to**

12 **deal with.**

13     Q.   And -- but at this point you're

14 speculating because you don't know -- you're

15 speculating that counter-protesters will arrive

16 at this parade and affect your personnel needs;

17 is that right?

18                     Based on your experience

19 you're speculating that?

20     **A.    I'm not -- I don't have direct**

21 **knowledge of any of the counter-protesters for**

22 **this event, but in our planning process we have**

23 **to anticipate and we have to arrange for the**

24 **fact that that is a possibility.**

1      Q.    Thank you.

2            MR. DiCOLA:   Sorry, just a moment,

3      please.

4                        (Brief pause.)

5      BY MR. DiCOLA:

6      Q.    Deputy, you testified that this route

7      would be too impactful; is that correct?  Did

8      you use that term?

9      **A.    Which route?**

10     Q.    The amended route as requested on

11     January 8th.

12     **A.    Yes.**

13     Q.    When you're making that determination,

14     is there a balancing analysis that you perform

15     between the resources required to police the

16     event versus the First Amendment interests of

17     the people requesting the parade?

18     **A.    It's -- I always attempt to ensure the**

19     **First Amendment rights of, you know, of all the**

20     **people who request a permit, but in the -- for**

21     **this particular permit, given the streets that**

22     **it was requested to go through and the location**

23     **to several hotels that may or may not be**

24     **utilized for the DNC, and the amount of the**

1  **personnel that it would require, given all of**

2  **the turns in the route like that it has, that's**

3  **one of the factors that I used to help make that**

4  **determination.**

5  Q.   As Deputy Chief of Bureau of Patrol,

6  have you had to respond to spontaneous or

7  unplanned protests?

8  **A.   Yes.**

9  Q.   And do you feel you're able to safely

10  accommodate -- or safely police those events

11  when they occur?

12  MR. DIONNE:  Judge, I'm going to

13  object to the relevance.  This has nothing to do

14  with parade permits.

15  HEARING OFFICER FLEMING:  What's the

16  relevancy of the spontaneous demonstration as

17  opposed to one in which -- that's not

18  spontaneous but set up according to the City

19  ordinance?

20  MR. DiCOLA:  Sure, your Honor.  To my

21  knowledge and experience, CPD is able to rise to

22  the occasion and muster personnel in police

23  protests that were not planned and that marched

24  down streets against traffic without any

1  anticipated route.  And I --

2          HEARING OFFICER FLEMING:  Well, what's

3  the relevancy again to this situation?  Were

4  those spontaneous --

5          MR. DiCOLA:  I was just getting there,

6  your Honor.

7          HEARING OFFICER FLEMING:  --

8  spontaneous matters done during the midst of the

9  Democratic National Convention, except in 1968.

10         MR. DiCOLA:  Well, my point is that

11  where CPD is able to do it without any notice,

12  with eight months' notice I am trying to probe

13  why they're -- why they could not possibly

14  police this event, whereas the same event might

15  happen -- someone might follow the same route

16  spontaneously, the police spring into action and

17  police that event safely.

18         HEARING OFFICER FLEMING:  Okay.  But,

19  again, I think you're getting too speculative on

20  that question so the objection is sustained.

21         MR. DiCOLA:  Okay, your Honor.  Thank

22  you.

23              Your Honor, could I take a

24  break for just two minutes, please?

```
 1              HEARING OFFICER FLEMING:  Take
 2   whatever you need.  Don't just limit yourself to
 3   two.  If you want to take five then -- how much
 4   more do you have going?
 5              MR. DiCOLA:  Not much.
 6              HEARING OFFICER FLEMING:  Okay.
 7                   (WHEREUPON, a brief recess
 8                   was held.)
 9              HEARING OFFICER FLEMING:  Okay.  We're
10   back on.
11              MR. DiCOLA:  Thank you, your Honor.
12                   You know, no further questions
13   for this witness, your Honor.
14              HEARING OFFICER FLEMING:  Okay.
15   Redirect?
16              MR. DIONNE:  No redirect, Judge.
17              HEARING OFFICER FLEMING:  All right.
18   Thank you, Deputy.
19              MR. DIONNE:  Can we excuse this
20   witness or do you --
21              MR. DiCOLA:  Yes.
22              MR. DIONNE:  Okay.
23              THE WITNESS:  Thank you.
24              HEARING OFFICER FLEMING:  City, are
```

1  there any additional exhibits?

2       MR. DIONNE:  No, Judge.  City just has

3  what's been previously marked and admitted as

4  City's Group Exhibit 1, 2, Group Exhibit 3, 4,

5  5 -- Group Exhibit 5, 6 and 7.

6            And with that, Judge, the City

7  has nothing further at this point.

8       HEARING OFFICER FLEMING:  City rests?

9       MR. DIONNE:  Yes, Judge.

10      MR. DiCOLA:  Well, your Honor, just in

11 terms of -- do you mind if we go off the record

12 for just one moment?

13            (WHEREUPON, a brief recess

14            was held.)

15      HEARING OFFICER FLEMING:  Are you

16 ready?

17      MR. DIONNE:  Judge, before we

18 reconvene, it's come to both counsels attention

19 that we don't believe that the first two

20 witnesses from the City were ever sworn in prior

21 to giving testimony.

22      HEARING OFFICER FLEMING:  I realized

23 that myself when I was sitting here.

24      MR. DIONNE:  So we have spoken to

1  Counsel and we have no objection if we want to

2  make a stipulation that they were sworn in, and

3  that all the testimony that you provided was

4  sworn testimony.

5          HEARING OFFICER FLEMING:  So

6  stipulated, Counsel?

7          MR. DiCOLA:  Yes, your Honor.  No

8  objection.

9          HEARING OFFICER FLEMING:  That was my

10 bad, you know.

11         MS. HAKE:  No, no.

12         HEARING OFFICER FLEMING:  I think I

13 got shocked by the witnesses I didn't know.  I

14 was trying to think -- (inaudible).  So the

15 parties stipulate that the testimony that was

16 given was by my error, not maybe under oath,

17 will be accepted in the record as if it were

18 under oath.

19         MR. DiCOLA:  Should we have that on

20 the record?  I understand we all agree and

21 understand -- oh, is it recording now, your

22 Honor?

23         HEARING OFFICER FLEMING:  Yes, it's

24 recording now.

1          MR. DiCOLA:  Oh, great.  Thank you so
2   much.
3          HEARING OFFICER FLEMING:  I mean,
4   look, it was my bad.  I own up to it.  Everyone
5   should have picked up on it, but what I'm saying
6   is we had to do it on the record because --
7          MR. DiCOLA:  Of course.
8          HEARING OFFICER FLEMING:  -- if it
9   does become an issue somewhere up there, then
10  we're getting into, you know, something there.
11  I prefer to let it go and then if a Judge were
12  to admonish me later because I did something, I
13  take the rap for it.  But you guys have agreed
14  to it professionally between yourselves.
15         MR. DiCOLA:  Thank you, your Honor.
16         HEARING OFFICER FLEMING:  I realized
17  that after I swore the last witness.
18         MR. DIONNE:  That's when the City
19  realized as well.
20         HEARING OFFICER FLEMING:  So, okay.
21  All right.  Anything else we need to address?
22         MR. DIONNE:  Not from the City's point
23  of view, no.
24         HEARING OFFICER FLEMING:  Okay.  You

1   can call your first witness.

2         MR. DiCOLA:  Okay.  Your Honor, I

3   would like to reserve argument for after the end

4   of the witness testimony.

5         HEARING OFFICER FLEMING:  You can

6   reserve argument.  You also have an opening.

7   You reserved opening.  If you want to do an

8   opening, you can certainly do that as well.

9         MR. DiCOLA:  Well, briefly, your Honor

10   in opening I would say that the City's case in

11   chief I believe failed to show that they

12   performed the adequate investigation as required

13   under Subsection F of the statute, and also

14   failed to show a sound, factual basis for the

15   denial under Sections G1 and G2.

16         Specifically, that we do not

17   have empirical data in the record to show that

18   the proposed parade would substantially and

19   unnecessarily interfere with traffic in the area

20   contiguous to the activity.  We do not have the

21   facts or evidence in the record to show that the

22   personnel required to mitigate the disruption

23   are not available.

24         Similarly, based on the -- on

1  Deputy Chief O'Connor's testimony, we have been
2  told that an approximate several hundred
3  officers required to police the amended route
4  submitted on January 8th, and Deputy Chief
5  O'Connor used the same phrase, several hundred
6  officers will be required to police the
7  alternative route as required by CPD, by those
8  admissions Respondent argues that the police
9  have failed to show, or the City has failed to
10 show that there are not sufficient on-duty
11 police officers or other City employees
12 authorized to regulate traffic, police the
13 public and protect parade participants and
14 non-participants in the route area.
15                    I think that the evidence is
16 going to show that the City denied this permit
17 without the necessary review, and that doing so
18 impinges on my client's First Amendment right to
19 protest.
20            HEARING OFFICER FLEMING:  Okay.
21            MR. DiCOLA:  But with that, I would
22 call Andy Thayer.
23                    (Witness duly sworn.)
24

1                    ANDREW THAYER,

2     called as a witness herein, having been first

3     duly sworn, was examined and testified as

4     follows:

5                    DIRECT EXAMINATION

6     BY MR. DiCOLA:

7          Q.    Mr. Thayer, can you please state and

8     spell your name for the record?

9          **A.    Andrew Thayer, A-n-d-r-e-w, Andy, last**

10    **name, T-h-a-y-e-r.**

11         Q.    And are you a member of Bodies Outside

12    of Unjust Laws?

13         **A.    I am.**

14         Q.    And is Bodies Outside of Unjust Laws

15    the same as the -- forgive me, as the Coalition

16    for Reproductive Rights and LGBTQ-plus

17    liberation?

18         **A.    It is indeed.  It's one organization.**

19         Q.    And it has that full name?

20         **A.    Yes, it does.**

21         Q.    How long have you been a member of

22    Bodies Outside of Unjust Laws?

23         **A.    Our coalition, which I helped form,**

24    **formed I believe in November of last year.**

1    Q.    November of 2023?

2    **A.    Yes.**

3    Q.    Have you ever interacted with the City

4    of Chicago in your official capacity as a member

5    of Bodies Outside of Unjust Laws on matters

6    related to demonstrations during the Democratic

7    National Convention scheduled to occur in August

8    2024?

9    **A.    Yes.**

10    Q.    And did one such interaction involve

11    the preparation and submission on January 2nd,

12    2024, of a parade permit application for a

13    protest march on August 18th, 2024?

14    **A.    Yes.**

15    Q.    Mr. Thayer, I am going to show you

16    what was previously entered into evidence as the

17    City's Exhibit 1A, B and C.  Do you recognize

18    this document, Mr. Thayer?

19    **A.    Yes, I do.**

20    Q.    Is that a true and correct copy of the

21    parade permit you submitted to the Department of

22    Transportation on January 2nd on behalf of

23    Bodies Outside of Unjust Laws?

24    **A.    Yes, it is.**

1    Q.   And while we have a map in evidence,
2  Respondent also has a map.  So, Mr. Thayer, I am
3  going to show you a document.  Do you recognize
4  what that is?
5           MS. HAKE:  You have to provide it.
6           MR. DiCOLA:  Oh.
7           THE WITNESS:  Yes, it appears to be
8  the march route that we originally applied for
9  on January 2nd.
10          HEARING OFFICER FLEMING:  Is that City
11 Exhibit 2 or is that separate?
12          MR. DiCOLA:  Your Honor, this is
13 actually Respondent's Exhibit 1.
14          HEARING OFFICER FLEMING:  Okay.
15 BY MR. DiCOLA:
16   Q.   And so this is an accurate map
17 rendering of the route you requested on January
18 2nd?  You can take a moment to review it.
19   **A.   It is indeed.**
20          MR. DiCOLA:  Your Honor, at this time
21 Respondent would like to enter into evidence
22 Respondent's Exhibit 1.  It's the color map of
23 the parade route.
24          HEARING OFFICER FLEMING:  Any

1    objection?

2              MS. HAKE:  No objection, Judge.

3                    For the record, Deputy

4    Corporation Counsel Christine Hake, H-a-k-e, on

5    behalf of the City.

6              HEARING OFFICER FLEMING:  Okay.

7                        (WHEREUPON, Respondent's

8                        Exhibit No. 1 was admitted

9                        into evidence.)

10   BY MR. DiCOLA:

11        Q.   Why did you apply for a parade permit

12   for August 18th along this route?

13        **A.   Because we wanted to greet the**

14   **incoming DNC delegates, their entourages and the**

15   **media with our First Amendment messages.**

16        Q.   And why did you choose -- what time

17   did you choose for August 18th for -- in your

18   January 2nd application?

19        **A.   Assembly at 5:00 p.m. with the march**

20   **kickoff at 6:00 p.m.**

21        Q.   And why did you choose that time?

22        **A.   We knew that per previous conventions**

23   **in the City, big events like this, that there**

24   **would be formal and informal gatherings of the**

1    delegates as they went to their hotels, as they

2    attended various functions the evening before

3    the convention itself began the next day and we

4    wanted to send messages to them.

5         Q.   So would this route -- would this

6    route for the parade take it within the sight

7    and sound of the delegates arriving for the DNC?

8         A.   Yes, that was our assumption based

9    upon previous events of this sort.

10         Q.   When you say previous events of this

11    sort, what are you referring to?

12         A.   Well, I had marched against the

13    Democratic National Convention back in 1996.  I

14    also had experience with the 2012 NATO

15    convention here.  I helped organize a march for

16    that latter event.

17         Q.   Was the 1996 -- strike that.

18                   Was the NATO 2012 summit an

19    NSSE to your knowledge?

20         A.   It was, yes.

21         Q.   Did you have a permit to march at the

22    NATO 2012 summit?

23         A.   We eventually did get a permit roughly

24    along the lines that we applied for, yes.

1    Q.   When you say we, who is we who
2  requested a permit in 2012?
3    **A.   It was a coalition with the acronym**
4  **CANG8, Coalition Against NATO G8, G8 latter --**
5  **later was off the agenda and we had a march that**
6  **we got a permit for.**
7    Q.   And to the best of your recollection,
8  did that march occur on Michigan Avenue?
9    **A.   It did indeed, yes.**
10    Q.   Did the march -- did any of the march
11  take place on State Street?
12    **A.   No, it did not.**
13    Q.   What was the route, to the best of
14  your recollection?
15         MS. HAKE:  Judge, I object at this
16  point to the relevance of this with regards to
17  the previous routes.  It doesn't have to do with
18  this parade route.
19         HEARING OFFICER FLEMING:  Well, what
20  is the relevance of the application in 2024 to a
21  permit that was allowed in 2012?
22         MR. DiCOLA:  I can move on, your
23  Honor, but the relevance as I understand it is
24  it was another National Security Special Event.

1 The City did authorize the group to march on

2 Michigan Avenue, and it also speaks to Mr.

3 Thayer's experience with these events.

4                     It's been -- I believe Mr.

5 Gallardo testified that the parade permit

6 requester's experience and ability to organize

7 their own event is relevant and so I am trying

8 to establish Mr. Thayer's experience in that

9 regard.

10             HEARING OFFICER FLEMING:  Well, I

11 respectfully sustain the objection.

12             MR. DiCOLA:  I will move on, your

13 Honor.  Thank you.

14 BY MR. DiCOLA:

15     Q.   Do you have experience planning large

16 demonstrations in downtown Chicago, Mr. Thayer?

17     **A.   Yes.**

18     Q.   And do other members of your group, to

19 your knowledge, have similar experience?

20     **A.   Yes, they do.**

21     Q.   How did your experience planning and

22 participating in demonstrations in downtown

23 Chicago inform this particular parade permit

24 request?

1    **A.    Well, we knew that this particular**
2    **route would allow us to reach not just the**
3    **delegates but also the major media.  I have**
4    **organized dozens of large marches over the years**
5    **in the Central Business District, as well as**
6    **areas contiguous to it.  And I have been the**
7    **applicant for any number of parade permits in**
8    **the past years.**
9        Q.    How did you submit the application on
10   January 2nd?  Was it by email or in person?
11       **A.    We went in person to the Department of**
12   **Transportation.  It was the first possible day**
13   **we could apply.**
14       Q.    And what day of the week was January
15   2nd?
16       **A.    It was Tuesday.**
17       Q.    After you submitted the January 2nd
18   application, did anyone from the City of Chicago
19   contact you regarding the application?
20       **A.    Yes, a person that -- who represented**
21   **themselves as being from the First District**
22   **police gave me a call the next day.**
23       Q.    Do you remember their name?
24       **A.    Unfortunately, I do not.**

1    Q.   And what did the representative from

2  the First District police -- from the Chicago

3  Police Department First District say on the

4  phone?

5    **A.   She said that they never give permit**

6  **-- permits for marches in the street.  I knew**

7  **that that was utterly false, that the permit**

8  **application and the permit ordinance itself, you**

9  **know, asks the applicant to request what**

10  **particular lanes of traffic and/or the sidewalk**

11  **you were going to occupy.  It was not a very**

12  **fruitful conversation because I felt she was**

13  **being pretty belligerent, frankly.**

14          MS. HAKE:  Judge, I would object to

15  the term "belligerent", and I would also object

16  to this all being hearsay.  I think the proper

17  foundation has not been laid for it.  I

18  understand that hearsay can come in in these

19  hearings; however, Mr. Thayer doesn't even know

20  who he spoke with.

21          HEARING OFFICER FLEMING:  Well,

22  again -- (inaudible) -- allow hearsay.  It's

23  already in the record, so...

24          MS. HAKE:  But I would also object to

1  the term "belligerent" being included in the

2  record.

3           HEARING OFFICER FLEMING:  I look at

4  belligerent as a scale, what some people might

5  consider belligerence other people may consider

6  normal.  So overruled.

7           MS. HAKE:  Thank you, Judge.

8           HEARING OFFICER FLEMING:  Sustained on

9  that still.

10  BY MR. DiCOLA:

11      Q.   Did the Chicago Police Department

12  representative suggest an alternative route on

13  that phone call?

14      **A.   No, she did not.**

15      Q.   Did the Chicago Police Department

16  representative say anything to you to the effect

17  that motorcades for the DNC attendees would

18  create significant traffic impediments that

19  would be exacerbated by your parade?

20      **A.   She did not mention motorcades.  She**

21  **did mention traffic.**

22      Q.   And what did she say specifically

23  about traffic, to the best of your knowledge?

24      **A.   Just that it would -- that there was a**

1    lot of traffic.

2         Q.    Did you receive any other calls from

3    anyone at the City of Chicago regarding your

4    parade permit application after January 2nd?

5         **A.    Yes, I did.**

6         Q.    When was the next call?

7         **A.    The next call was on the Thursday,**

8    **which would have been the 4th of January.**

9         Q.    And who called you on January 4th?

10        **A.    That was a person who represented**

11   **themselves from being with the special events**

12   **department, which I gathered later was the**

13   **special events department of the CPD.**

14        Q.    And what -- was that person male or

15   female?

16        **A.    That was a male.**

17        Q.    Do you recall their name?

18        **A.    I do not.**

19        Q.    What did the person who identified

20   themselves as from the special events department

21   say to you on January 4th?

22        **A.    They intimated that without any**

23   **modifications to our permit application it was**

24   **probably going to be denied.  It was a more**

1  **friendly conversation than I would characterize**
2  **the first one.**
3  Q.   Did they suggest -- did that person on
4  the phone suggest that you modify your
5  application in any way?
6  **A.   They intimated it.  They didn't**
7  **directly say you should put in.**
8  Q.   Did you receive any other calls from
9  the City of Chicago about the January 2nd
10  application?
11  **A.   Yes.  On Friday the 5th, I received a**
12  **call from Susan whom I have known over the years**
13  **at the Chicago -- Chicago Department of**
14  **Transportation.**
15  Q.   Is that Susan Pawlak?
16  **A.   I didn't know her last name at the**
17  **time, but I gather it's the same person.  Yes.**
18  Q.   And what did Ms. Pawlak say when she
19  called you on Friday the 5th?
20  **A.   She said that we should really be**
21  **flexible in our permit application, and she**
22  **suggested that we might want to put in an**
23  **amended version of it.**
24  Q.   Were you given a specific -- strike

1  that.

2            Did Ms. Pawlak give you any

3  concrete idea of what being flexible would mean?

4       **A.   She didn't, but I had my ideas along**

5  **those lines.**

6       Q.   Did you -- did Ms. Pawlak propose an

7  alternative route on that phone call?

8       **A.   She did not.**

9       Q.   Did you propose another route?  Did

10  you suggest alterations on that call?

11       **A.   No.**

12       Q.   Following that call did you confer

13  with your group, Bodies Outside of Unjust Laws,

14  about amending your application to suggest a

15  route more amenable to the City?

16       **A.   Yes.  Our safety logistics**

17  **subcommittee had a meeting at 5:00 p.m. that**

18  **evening via Zoom, and we discussed amending our**

19  **proposal to make it more amenable to the City.**

20       Q.   How did you decide on the specific

21  amendments?

22       **A.   Well, I know from previous permit**

23  **applications that the City, particularly the**

24  **CPD, really dislikes marches that go in the**

1 **opposite direction of one-way traffic.  So, for**
2 **example, a typical route for the City is to go**
3 **northbound on Dearborn because that's with**
4 **traffic; they wouldn't want you going**
5 **southbound.  I also knew that they were**
6 **sensitive to prolonged presence on Michigan**
7 **Avenue north of the river, and so I suggested an**
8 **alternate --**
9          MS. HAKE:  Judge, I'm sorry to
10 interrupt the witness.  I would object based on
11 what CPD knows I think he's speculating and
12 basis of knowledge.  And I would ask that his
13 testimony be stricken in regards to this
14 question.
15          HEARING OFFICER FLEMING:  Yes.  Well,
16 I'll overrule the objection for this.
17 BY MR. DiCOLA:
18      Q.   Mr. Thayer, did you submit a letter
19 and modifications to your January 2nd permit?
20      **A.   I did.**
21      Q.   And when did you do that?
22      **A.   We did that on the Monday the 8th of**
23 **January.**
24      Q.   Thank you.  Just one moment, please.

1          (Brief pause.)

2          This was previously entered
3    into evidence as the City's Exhibit 3A through
4    D.  Mr. Thayer, just quickly, is that a true and
5    correct copy of the letter you submitted on the
6    first page?

7          **A.    Yes.**

8          Q.    And the letter is addressed to the
9    Chicago Department of Transportation?

10         **A.    That is correct.**

11         Q.    And on the -- in the letter you sent,
12    did you state per your request, modifications to
13    parade permit application submitted January 2nd,
14    2024?

15         **A.    I did.**

16         Q.    And so was it your understanding that
17    the City was requesting these modifications from
18    you?

19         **A.    Yes, particularly per my phone**
20    **conversation with Susan.**

21         Q.    Did any of the City employees who
22    called you mention the issue of moving with the
23    flow of traffic as opposed to against?

24         **A.    No, they did not.**

1    Q.   So special -- so the Chicago Police
2  Department and the Department of
3  Transportation -- excuse me.  Strike that.
4                    Mr. Thayer, I am going to show
5  you a document.  Do you recognize what this is,
6  Mr. Thayer?
7    **A.   Yes.  This is a map of our alternative**
8  **route that we proposed with the amended**
9  **application on January 8th.**
10            MS. HAKE:  And just for the record for
11  marking, I know you're identifying it, is it
12  Respondent's Exhibit No. 2?
13            MR. DiCOLA:  Yes.
14  BY MR. DiCOLA:
15    Q.   And so, Mr. Thayer, this map
16  accurately reflects the route you requested in
17  your modified application?
18    **A.   That is correct, yes.**
19            MR. DiCOLA:  Your Honor, at this time
20  I would like to enter Respondent's Exhibit 2
21  into evidence.
22            HEARING OFFICER FLEMING:  Any
23  objection?
24            MS. HAKE:  No objection, Judge.

1          HEARING OFFICER FLEMING:  Allowed

2     without objection.

3                    (WHEREUPON, Respondent's

4                    Exhibit No. 2 was admitted

5                    into evidence.)

6     BY MR. DiCOLA:

7          Q.   After you received -- after you

8     submitted the -- excuse me.

9                    How did you deliver the

10    modified application to Department of

11    Transportation?

12         **A.   I personally delivered it to the 7th**

13    **Floor Transportation Department office at City**

14    **Hall.**

15         Q.   After you delivered it, did you have

16    any conversations with Department of

17    Transportation employees right there in the

18    building?

19         **A.   Just friendly chitter chatter with**

20    **Susan.**

21         Q.   Did you -- after you delivered it, did

22    you receive any phone calls from anyone at a

23    City agency regarding the January 8th

24    modification?

1     **A.   No, I did not.**

2     Q.   What was the next communication you

3 received from the City regarding the

4 application?

5     **A.   The next communication received was a**

6 **note from the Post Office indicating that I had**

7 **missed delivery of a certified mail return**

8 **receipt requested signature required envelope**

9 **from the City.  I set up with the Post Office to**

10 **get that at the Post Office near my apartment**

11 **the following Monday.**

12     Q.   So when did you actually receive the

13 City's denial letter?

14     **A.   I received it on -- I don't have a**

15 **calendar in front of me, but I believe it would**

16 **be Monday the 22nd of January.**

17     Q.   Thank you.

18               And when you submitted your

19 application, did you include an email address

20 that you could be reached at?

21     **A.   I did, as well as my phone number,**

22 **which is a requirement of permits.**

23     Q.   Did you receive a copy of the denial

24 letter to your email?

1     **A.    I did not.**

2     Q.    Just a moment, please.

3                    (Brief pause.)

4                    Mr. Thayer, I am going to show

5     you what has previously been entered into

6     evidence as the City's Exhibit 5A through C.  Do

7     you recognize this document?

8     **A.    Yes, I do.**

9     Q.    Is that Bryan Gallardo's denial letter

10    regarding your parade permit applications?

11    **A.    It is indeed.**

12    Q.    Does the City's letter state that you

13    should consider it a response to the January 2nd

14    application as well as the January 8th route

15    modification?

16    **A.    It references the application on the**

17    **2nd as well as the modified on the 8th, and per**

18    **the requirement of the City ordinance, it gave a**

19    **so-called comparable alternative.**

20    Q.    What is the alternative route offered

21    by the City?

22    **A.    The alternative route is to begin on**

23    **the corner of Roosevelt Road and Columbus Drive**

24    **and to march north on Columbus to Jackson**

1 **Boulevard.**

2  Q. All right. Mr. Thayer, I am going to

3 show you a document. Do you recognize what this

4 is?

5  **A. Yes, this is a -- the march route of**

6 **the proposed City's alternative.**

7  MR. DiCOLA: This is -- your Honor,

8 this will be marked as Respondent's Exhibit 3,

9 and I would like to enter it into evidence at

10 this time.

11  HEARING OFFICER FLEMING: Any

12 objections?

13  MS. HAKE: No objection, Judge.

14  HEARING OFFICER FLEMING: Allowed

15 without objection.

16  (WHEREUPON, Respondent's

17  Exhibit No. 3 was admitted

18  into evidence.)

19 BY MR. DiCOLA:

20  Q. And, Mr. Thayer, just to be clear, the

21 map shows the alternate proposed route in

22 yellow, correct?

23  **A. That is correct, yes.**

24  Q. How does this route differ from the

1 one you requested?

2     **A.   It has literally no buildings around**

3 **it.  It has zero bus routes that people passing**

4 **by might see the event.  It's nowhere near any**

5 **of the hotels or the media outlets that we would**

6 **have been marching past on either of our**

7 **proposed routes.**

8     Q.  Does the alternative route proposed by

9 the City, would it achieve the same goals you

10 described earlier in terms of reaching delegates

11 and media arriving for the DNC?

12     **A.   Absolutely not.**

13     Q.  Did you have any conversations with

14 Bryan Gallardo or any of the City employees you

15 have previously referred to after you received

16 the denial letter?

17     **A.   No, I did not except for the denial**

18 **letter itself.**

19     Q.  Now, in any of your calls with the

20 First District police, the special events

21 department or the Department of Transportation,

22 did any of those City employees mention that

23 they had been in communication with the US

24 Secret Service about or otherwise knew the

1   number of motorcades that would be required on

2   August 18th?

3        **A.    No, they did not mention that.**

4        Q.    Did any of the City employees you

5   spoke with make any representations that they

6   had been in communication with the Secret

7   Service about the times and routes of motorcades

8   on August 18th?

9        **A.    No, they did not.**

10       Q.    Did any of the City employees you

11  spoke with make any reference to historical

12  studies or records of traffic patterns downtown?

13       **A.    No.**

14       Q.    Did any of the City employees you

15  spoke with refer to empirical data reflecting

16  the amount of police personnel available on

17  August 18th?

18       **A.    No, they did not.**

19       Q.    In your conversations did any of those

20  City employees refer to empirical data

21  reflecting the amount of traffic control

22  personnel not authorized to make arrests but

23  able to issue citations that would be available

24  on August 18th?

1     **A.   No, they did not.**

2     Q.   In your conversations did any of those

3 City employees cite any contracts or agreements

4 with other law enforcement agencies such as

5 Federal, State, County or Municipal Departments

6 besides the CPD that would increase their

7 personnel available on August 18th?

8     **A.   No, they did not.**

9     Q.   Did anyone from the City tell you that

10 they had a concern that this route would drain

11 police resources on the eve of the convention of

12 the DNC in those phone calls?

13        MS. HAKE:  Judge, I would object to

14 leading.  I was being a little lateral, but it's

15 completely leading at this point.

16        MR. DiCOLA:  I can withdraw the

17 question, your Honor.

18        HEARING OFFICER FLEMING:  All right.

19 Withdrawn.

20 BY MR. DiCOLA:

21     Q.   In any of those phone calls, did

22 anyone from the City ask you about resources

23 your group would be able to provide in terms of

24 marshals or other materials required to

1 facilitate the parade?

2     **A.**   **No, they asked no such questions.**

3     Q.   And what is the message and content

4 for your protest at the DNC?

5     **A.**   **Our message is that --**

6     MS. HAKE:  Judge, I would object.

7 It's not relevant.

8     HEARING OFFICER FLEMING:  What is the

9 relevancy of what the message is?

10     MR. DiCOLA:  While I understand, your

11 Honor, that this Court isn't ruling on ultimate

12 First Amendment issues, in the event of an

13 appeal, I would like to preserve the record of

14 what the content of the expression is, if it

15 could be later shown that the City's denial of

16 the permit were based on, for example, viewpoint

17 discrimination or something related to the

18 content of the group.

19     HEARING OFFICER FLEMING:  I am not

20 going to -- we're not going to go that far.  The

21 objection is sustained.

22     MR. DiCOLA:  Thank you, your Honor.

23           Well, at this time I have

24 reached the end of my examination of this

1   witness, other than the offer of proof we

2   discussed or that your Honor had mentioned

3   related to an exhibit of the denial of another

4   parade permit application.

5            HEARING OFFICER FLEMING:  Well, I

6   think we may as well do cross first.

7            MS. HAKE:  Okay.

8            HEARING OFFICER FLEMING:  And then do

9   you have another witness?

10            MR. DiCOLA:  We have --

11            HEARING OFFICER FLEMING:  I would

12   prefer if we could do -- I think the City wants

13   to be heard more on that as well if we could get

14   through the witnesses first.

15            MR. DiCOLA:  If I could just reserve

16   then, one more minute of direct before --

17            HEARING OFFICER FLEMING:  Absolutely.

18            MR. DiCOLA:  Thank you.

19   BY MR. DiCOLA:

20      Q.   Mr. Thayer, can you tell me, is your

21   group able to provide marshals for this event?

22            MR. DIONNE:  Judge, can we have him

23   approach the microphone?  I'm not sure if the

24   microphone is going to be able to pick up.

1      MR. DiCOLA:  Sorry.  I can repeat the
2  question.
3  BY MR. DiCOLA:
4      Q.   It was, is your group able to provide
5  marshals for this event?
6      **A.   Yes, based on past organizing**
7  **experience we would.  Yes.**
8      Q.   Would you be able to provide barriers
9  for the event?
10          MS. HAKE:  Judge, I would object to
11  this line of questioning.  It's actually moot at
12  this point, so I would argue that it's been
13  denied at this point and it's not relevant.
14          HEARING OFFICER FLEMING:  Well, I am
15  going to sustain the objection.  At this point
16  in time, the City -- (inaudible).  So the
17  objection is sustained.
18          MR. DiCOLA:  Thank you, your Honor.
19  No further questions at this time.
20          HEARING OFFICER FLEMING:  All right.
21  Do you want -- do you need a minute?
22          MS. HAKE:  No, Judge, I'm ready.  I'm
23  sorry, I'm going to stand because I'm going to
24  be showing the witness some exhibits.

1                    CROSS-EXAMINATION

2    BY MS. HAKE:

3         Q.    Good afternoon, Mr. Thayer.

4         **A.    Hello.**

5         Q.    You said you have experience with

6    large demonstrations, correct?

7         **A.    Yes.**

8         Q.    In fact, you have acted with the City

9    of Chicago previously in parade demonstrations;

10   is that right?

11        **A.    That is correct, yes.**

12        Q.    You have actually provided the City

13   with parade permit applications before?

14        **A.    Yes.**

15        Q.    So you are familiar what is required

16   with the parade permit and what is required via

17   the ordinance that directs it; isn't that

18   correct?

19        **A.    That is correct.**

20        Q.    And, in fact, you do know that the

21   ordinance 10-8-330 comes from the Commissioner

22   of CDOT; is that correct?

23        **A.    Well, the CDOT Commissioner did not**

24   **author it.  It was the City Council that did it.**

1    Q.   And you're familiar though that the
2  Commissioner of CDOT is in charge of granting an
3  application or denying a parade permit
4  application; isn't that correct?
5    **A.   That's formally the case, but it's the**
6  **CPD who actually calls the shots, has been my**
7  **experience.**
8    Q.   And the ordinance though states that
9  the Commissioner of CDOT shall issue a grant or
10 denial, correct?
11   **A.   That's what the ordinance states, yes.**
12   Q.   Thank you.  Now, in your experience
13 previously you wanted -- strike that.
14              For this parade, in fact, I
15 think it was your testimony that you wanted to
16 greet the delegates; is that right?
17   **A.   That is correct.**
18   Q.   I am going to approach with
19 Respondent's Exhibit No. 1.
20              Mr. Thayer, Respondent's
21 Exhibit No. 1 was the first parade route that
22 you applied for on January 2nd of 2024; isn't
23 that correct?
24   **A.   That is correct.**

1    Q.   And this parade route you felt would

2    be able to greet the delegates; isn't that

3    right?

4        **A.   That is correct.**

5    Q.   Hotels would be on that route that the

6    delegates would be staying in?

7        **A.   Yes.**

8    Q.   Motorcades would be traveling down

9    that route?

10       **A.   Motorcades, no.  I have no knowledge**

11   **about that, and no one does at this point.**

12   Q.   But you anticipated that the delegates

13   would use this route; isn't that correct?

14       **A.   Delegates, the media, their**

15   **entourages, they've got a place -- they would**

16   **have to stay in hotels someplace.**

17   Q.   So many members from the Democratic

18   National Convention, as well as federal

19   authorities, would be needing to use these

20   streets to go back and forth on that route;

21   isn't that correct?

22       **A.   I don't know about federal authorities**

23   **but certainly the delegates would need some**

24   **place to say.**

1 Q. And they would be using and traversing
2 these routes, correct?
3 **A. Yes.**
4 Q. Now, you had a conversation with
5 someone who you don't even know at CPD, correct?
6 You don't know the person's name?
7 **A. I got a call out of the blue from**
8 **them, yes.**
9 Q. And do you even know if that
10 individual was a Chicago police officer?
11 **A. They identified themselves as being**
12 **from the First District.**
13 Q. Did they identify themselves as a
14 police officer?
15 **A. Yes, they did.**
16 Q. Did they identify themselves as the
17 authority to make the decision on this parade
18 route?
19 **A. No, they did not.**
20 Q. Now, after speaking with that
21 individual, you then had another conversation
22 with somebody that you said on January 4th,
23 2024, that was a person who is special events
24 from the Chicago Police Department; is that

1    correct?

2         **A.    Again, they called me during the**

3    **workday, caught me unawares.  I picked up the**

4    **phone and I talked with them.**

5         Q.    Do you know that person's name?

6         **A.    I do not.**

7         Q.    Do you know if they were a Chicago

8    police officer?

9         **A.    They identified themselves as being**

10   **with the special events department, which I**

11   **understand can sometimes mean not CPD and**

12   **sometimes yes CPD, and I found out subsequent**

13   **yes, CPD.**

14        Q.    And, in fact, you stated this was a

15   friendly conversation, correct?

16        **A.    It was more friendly, yes.**

17        Q.    And at this time -- and at that time,

18   did that person say they had the authority to

19   deny your parade permit application?

20        **A.    They did not say that they personally**

21   **had that authority.**

22        Q.    Thank you.

23                    And you spoke with Susan

24   finally from CDOT; is that correct?

1     A.    Yes.

2     Q.    Susan Pawlak?

3     A.    Yes.

4     Q.    You had experience with Susan Pawlak

5  before?

6     **A.    That's correct.**

7     Q.    Do you know what Susan Pawlak does for

8  the Chicago Department of Transportation?

9     **A.    She's the one who receives the parade**

10  **permits whenever I go to the 7th Floor**

11  **Transportation Department, and I just speak with**

12  **whoever is at the front desk there.  They**

13  **immediately push me over to Susan, and so we**

14  **have known each other over the years.**

15     Q.    So she received the applications,

16  correct?

17     **A.    She received it.  She time dated it.**

18  **I paid the 50 bucks.**

19     Q.    And you know that Susan then forwards

20  those parade applications on to somebody that

21  makes that authority, correct?

22     **A.    Yes, it's part of the permit**

23  **ordinance.**

24     Q.    And it's not Susan's job to authorize

 1   whether or not you get this parade permit denial

 2   or approval?

 3        **A.    That is correct, yes.**

 4        Q.    But after those conversations with

 5   those people you, in fact, wanted to be

 6   flexible?

 7        **A.    Yes.**

 8        Q.    And you modified your route?

 9        **A.    Per their suggestions, yeah.  We**

10   **modified the route.**

11        Q.    Okay.  And you submitted the modified

12   application on what date?  I'm sorry.

13        **A.    It was Monday, January 8th.**

14        Q.    I am going to approach with

15   Respondent's Exhibit No. 2.

16                    And, in fact, Mr. Thayer, that

17   flexibility you said that you showed was just

18   changing of one street; is that correct?

19        **A.    No, that's incorrect.**

20        Q.    What did you change?

21        **A.    We changed three streets.**

22        Q.    Still on Michigan Avenue, correct?

23        **A.    Part -- less of the time.**

24        Q.    And still on State Street?

1  **A.   You're missing the middle part.**

2  Q.   I'm just asking you about those

3  streets.  Can you answer my question?

4  **A.   On State Street we're on less of State**

5  **Street.**

6  Q.   That's not my question.

7  You still were marching on

8  Michigan Avenue, correct?

9  **A.   For a lesser portion, yes.**

10  Q.   You still were marching on State

11  Street; is that correct?

12  **A.   For a lesser portion, yes.**

13  Q.   And those are main thoroughfares

14  within the city of Chicago?

15  **A.   Yes, they are.**

16  Q.   Now, eventually you received, as you

17  spoke of, the January 16, 2024 denial letter; is

18  that right?

19  **A.   The letter was dated the 16th.  It was**

20  **postmarked the 17th.  I received it on the 22nd.**

21  Q.   You received the denial, correct,

22  eventually?

23  **A.   Yes, I did.**

24  MS. HAKE:  And I believe this is

1  marked Respondent's Exhibit No. -- or City's

2  Exhibit No. 6.

3           MR. DIONNE:  That's 5.

4           MS. HAKE:  5, okay.

5  BY MS. HAKE:

6      Q.   I am going to approach you, Mr.

7  Thayer, with City's Exhibit No. 5.  I would ask

8  you to turn to the back page -- sorry, that's

9  your letter, but second to back page.  Thank

10  you.

11     **A.   Yes.**

12     Q.   Who is the letter actually signed by?

13     **A.   It's signed by Bryan Gallardo who**

14  **testified earlier.**

15     Q.   Okay.  And -- thank you.

16              And that was authored by Bryan

17  Gallardo, correct?

18     **A.   I assume it was.**

19     Q.   And, in fact, you heard him testify he

20  is actually a deputy at the Chicago Department

21  of Transportation, correct?

22     **A.   That's my understanding, yes.**

23     Q.   Through all these applications, and

24  even your modification, your several phone calls

1  with City employees that you said you spoke to,

2  you never spoke to Bryan Gallardo before this

3  denial went out, correct?

4  **A.  No, he didn't reach out to me.  I**

5  **didn't reach out to him.**

6  Q.  You never spoke with Deputy Chief

7  O'Connor; is that correct?

8  **A.  No, I did not speak to Deputy Chief**

9  **O'Connor, to my knowledge.**

10  Q.  And, in fact, you never spoke with

11  anybody from the Secret Service, correct?

12  **A.  Not on this particular occasion.**

13  Q.  With regards to this permit.

14  **A.  Not regarding this permit.**

15  Q.  Okay.  The alternate route provided is

16  in the Central Business District?

17  **A.  It's in the park contiguous to the**

18  **Central Business District.**

19  Q.  And are you aware that it is one

20  street east of Lake Shore Drive, correct?

21  **A.  I am aware of that, yes.**

22  Q.  And Lake Shore Drive is a major

23  thoroughfare for the city of Chicago?

24  **A.  I understand that, yes.**

1        MS. HAKE:  May I have one moment?

2        HEARING OFFICER FLEMING:  Take your

3    time.

4                (Brief pause.)

5        MS. HAKE:  I have nothing further.

6        HEARING OFFICER FLEMING:  Redirect?

7        MR. DiCOLA:  Just one moment, your

8    Honor.

9        HEARING OFFICER FLEMING:  Take your

10    time.

11                (Brief pause.)

12        MR. DiCOLA:  Your Honor, while Mr.

13    Thayer is still sworn and testifying, there are

14    other exhibits I would like to enter into

15    evidence.  I understand the City is likely to

16    object, but perhaps we should handle that now.

17                I have no further questions on

18    redirect other than establishing the foundation

19    for these documents.

20        HEARING OFFICER FLEMING:  Do you need

21    Mr. Thayer to document --

22        MR. DiCOLA:  Yes.

23        HEARING OFFICER FLEMING:  -- them or

24    just --

1        MR. DiCOLA:  They are FOIA requests

2  that he sent and responses that he received, and

3  then another is a document that he received.

4        MS. HAKE:  Judge, I would just object

5  that it's beyond the scope at this point.  I

6  know that he reserved with regards to the other

7  application; however, this FOIA material wasn't

8  brought up within the questioning.  So I would

9  object to that being asked upon redirect,

10  entering the exhibits of FOIA.  I also don't

11  find them relevant as well.  So I renew my -- I

12  would place that objection on those documents as

13  well.

14        HEARING OFFICER FLEMING:  As you know,

15  strict rules of evidence don't apply in here,

16  but you are correct on this point that it's

17  beyond the scope of your cross examination.

18              But may I see what they have

19  there before I go any further with it?  Have you

20  seen those?

21        MR. DiCOLA:  Of course.

22        MS. HAKE:  I have seen them prior to

23  the hearing.  I just wanted to look at them

24  again.

1          HEARING OFFICER FLEMING:  Take
2   whatever time you need to look at them.
3          MS. HAKE:  Thank you, Judge.
4          MR. DiCOLA:  Give me one second to
5   mark them, please.
6                (Brief pause.)
7                Your Honor, these are
8   Respondent's Exhibits 4 through 8.
9          MS. HAKE:  Once you have them, your
10  Honor, I just want to address them separately,
11  if I could.
12         HEARING OFFICER FLEMING:  All right.
13               Okay.  City, you wanted to
14  address them?
15         MS. HAKE:  Yes, Judge.  I will address
16  them in kind.
17               Respondent's Exhibit No. 8,
18  you already ruled that it was not relevant.  We
19  are still maintaining that objection.  I know
20  that he may make an offer of proof to that, so I
21  will let that one be for now.
22               But as to Respondent's Exhibit
23  4, 5, 6, and 7, this bears no relevance on this
24  hearing whatsoever.  We feel that FOIA requests

1    coming in with regards to -- and responses from
2    local city -- our City departments with regards
3    to these FOIA requests have no bearing on
4    whether or not this parade permit application
5    was denied or approved.  So there is no
6    relevance whatsoever as to these exhibits, and
7    we are asking them not be.
8                       And I will say my colleague
9    has pointed out the responses as to Respondent's
10   Exhibit No. 4, 5 and Exhibit No., excuse me, 7
11   are not signed.
12            MR. DiCOLA:  Counsel, forgive me, the
13   response letters are not signed?
14            MS. HAKE:  No.
15            MR. DiCOLA:  So Mr. Rubenstein from
16   the Chicago Police Department -- I'm so sorry.
17   Mr. Rubenstein from the CDOT didn't sign that
18   letter or Mr. Ernshaw (phonetic)?
19            MS. HAKE:  There is no signature on
20   Mr. Ernshaw's response, and there is no
21   signature on Mr. Rubenstein's response.
22            MR. DiCOLA:  I mean, ordinarily when
23   you use the City of Chicago's FOIA submission
24   portal you -- everything happens electronically

1 and you don't receive an ink signature on FOIA

2 responses.

3        HEARING OFFICER FLEMING:  All right.

4 More important than that, what is the relevance,

5 first of all, for 4 and 6 that FOIAs were filed?

6        MR. DiCOLA:  Your Honor, the -- so the

7 FOIAs were filed requesting records, emails and

8 communications that would have been generated

9 through the course of what the City's witnesses

10 have testified to, that they held meetings, that

11 there were email communications with CDOT, CPD,

12 the Secret Service.  The FOIA requests -- but

13 more importantly, the denial or the City's

14 statement that no such records exist are

15 probative of the fact that the City did not

16 conduct the requisite investigation; otherwise,

17 emails and other records indicating that the

18 City responded to this permit application would

19 have existed.

20        HEARING OFFICER FLEMING:  Well, as I

21 understand it, dealing with FOIA, isn't there a

22 procedure that needs to be followed when one

23 feels that a FOIA request was improperly denied?

24        MR. DiCOLA:  There is, your Honor, and

1 admittedly we are not in the Chancery Division.

2 This is not a FOIA lawsuit, but just to whatever

3 extent the FOIA denials and assertions from the

4 City that no such records exist are probative of

5 the fact that the City did not conduct the

6 required investigation, that's why Respondent

7 believes they are relevant.

8              HEARING OFFICER FLEMING:  Well, as to

9 -- when I looked at 5, what the response is,

10 that the CPD is just telling you that they're

11 not a keeper of records and go look elsewhere.

12 Again, 6 you're directing to CDOT.  CDOT

13 responded, according to this, with whatever

14 information they seem to have there.

15                  So that our record is clear, I

16 don't know if we put it in there, but

17 Respondent's 4 is a letter dated January 8th,

18 2024, to the Chicago Police Department seeking

19 freedom of information.

20                  Respondent 5 is a notice of

21 response to FOIA request, FOIA Request P910847.

22                  Respondent 6 is the FOIA

23 request to the Department of Transportation.

24                  And R7 is the response from

1  CDOT.  So they -- I mean, they responded.  The
2  response does not, in my mind, give me the
3  opportunity to infer that based upon what's in
4  that response there was any attempt by the City
5  to hide anything.
6                    So those are noted for the
7  record.  I will return them to you.  They are
8  not going to be admitted.
9            MR. DiCOLA:  Thank you, your Honor.
10            HEARING OFFICER FLEMING:  Now, do we
11  want to address R8 at this point or do we want
12  to do the witnesses?
13            MR. DiCOLA:  I would like to address
14  it at this point if possible, your Honor.
15            MS. HAKE:  And, Judge, just so the
16  record is clear, this is just for an offer of
17  proof.
18            HEARING OFFICER FLEMING:  This is just
19  for an offer of proof.
20            MS. HAKE:  And it will not be --
21            HEARING OFFICER FLEMING:  It's not
22  considered evidence.
23            MS. HAKE:  Thank you.
24            HEARING OFFICER FLEMING:  And I will

1  allow that only because there is the possibility

2  that someone reviewing it might turn around and

3  say they want to see it.  But, again, from my

4  perspective we only had to address here is the

5  issuance of this particular permit.

6              One can infer, one might

7  assume that at the hearing for this permit --

8  parade permit or any other parade permit

9  relative to the DNC whoever sitting up here

10  might be listening to the very same witnesses

11  from Secret Service, from CDOT and/or CPD; but I

12  can't guess that.  I don't know what they're

13  going to say.  By the time those hearings may or

14  may not come around, there might be additional

15  information that's come through.  They may have

16  some sort of agreement with different agencies.

17              So each case I have to look at

18  as separate.  So that's the basis for my ruling,

19  but, like I say, I will let you make your offer

20  of proof as to what you think the materiality

21  and the relevancy would be.

22        MS. HAKE:  Thank you, Judge.  And

23  after that offer of proof --

24        HEARING OFFICER FLEMING:  And you will

1  be able to respond also as well saying why you

2  don't think it has any relevancy or materiality.

3           MS. HAKE:  Yes.  And just so it's

4  clear, because you have already ruled that it is

5  not coming into evidence, after the offer of

6  proof I ask that the Counsel not use it as any

7  exhibit with any witnesses.

8           MR. DiCOLA:  So stipulated.

9           MS. HAKE:  Okay.

10          HEARING OFFICER FLEMING:  Okay.

11          MR. DiCOLA:  Your Honor, Respondent's

12  Exhibit 8 is a letter from the Department of

13  Transportation dated January 24th, 2024, to the

14  Poor People's Economic Human Rights Campaign

15  care of Sherry H-o-n-k-a-l-a is her last name.

16  Mr. Thayer, if he were to be testifying about

17  this document, would establish that he received

18  it from Ms. Honkala's attorney.

19                    And this letter denies a

20  permit -- parade permit application for August

21  19th, the day after Mr. Thayer's requested

22  parade.  It offers the same route, the straight

23  line down Columbus Drive from Roosevelt to

24  Jackson, and at several instances the -- this

1   letter refers to a January 8th application;

2   whereas, at the top of the letter it indicates

3   that the Poor People's Campaign -- Poor People's

4   Army's application was submitted January 10th.

5   Mr. Thayer's application was submitted January

6   8th.

7              So to whatever extent this

8   letter shows a copy/paste response, we believe

9   it's relevant to -- I mean, not only on that

10  basis, but we believe that's relevant to showing

11  that the City did not conduct a fulsome

12  investigation of the facts underlying this

13  application, and that they denied it improperly,

14  and that its response to this parade permit

15  application --

16             Furthermore, your Honor, the

17  Monday of the DNC is likely to require

18  differential resources from the Sunday of the

19  DNC, and the inference that the City responded

20  to both parade permits the same way indicates a

21  knee jerk denial of permits to marching through

22  the Loop or marching at all through the DNC.

23             Thank you, your Honor.  That's

24  what Respondent's 8 would show.

1          HEARING OFFICER FLEMING:  Okay.

2  Response?

3          MS. HAKE:  Judge, I just renew my

4  objection to relevance.

5          HEARING OFFICER FLEMING:  Again, I let

6  it in.  I don't think it's relevant.  I think

7  that one might expect that with the number of

8  permit applications that we could be seeing,

9  we're going to see similar or comparable type

10  denials on a lot of those.  So I don't think --

11  one of the other reasons that I don't find it

12  relevant is I would have to make that decision

13  based on just showing me a letter.

14                So it's allowed in -- it's not

15  allowed in evidence.  It's allowed in the record

16  solely as an offer of proof.

17          MR. DiCOLA:  Thank you, your Honor.

18          HEARING OFFICER FLEMING:  Okay.

19          MR. DiCOLA:  No further questions for

20  Mr. Thayer on redirect, your Honor.

21          HEARING OFFICER FLEMING:  All right.

22  Mr. Thayer -- now whoever is coming up next can

23  probably switch places so they're seated next to

24  the microphone.  Let me know --

1    MR. DiCOLA:  Your Honor, I think we're

2    in the home stretch.

3    HEARING OFFICER FLEMING:  Have a seat.

4    Try to get as comfortable as you can.

5    THE WITNESS:  Thank you.

6    (Witness duly sworn.)

7    LINDA LOEW,

8    called as a witness herein, having been first

9    duly sworn, was examined and testified as

10   follows:

11   DIRECT EXAMINATION

12   BY MR. DiCOLA:

13   Q.   Can you please state and spell your

14   name for the record?

15   **A.   Linda, L-i-n-d-a, Loew, L-o-e-w.**

16   Q.   Ms. Loew, are you a member of Bodies

17   Outside of Unjust Laws?

18   **A.   Yes, I am.**

19   Q.   And how long have you been a member?

20   **A.   Since November when our inception was.**

21   Q.   Have you been a part of planning a

22   Bodies Outside of Unjust Laws demonstration for

23   August 18th, 2024, the night before the DNC

24   starts?

1    A.    Yes.

2    Q.    Have you planned large demonstrations
3    in downtown Chicago in the past?

4    A.    Yes, I have.

5    Q.    How long have you been organizing
6    demonstrations in Chicago?

7    A.    Well, for as long as I have been here,
8    so that's about 40 years and change.

9    Q.    What was the first demonstration you
10   organized?

11   A.    The first substantial one in size was
12   in April of 1978 and it was around the issue of
13   ratification of the Equal Rights Amendment.

14   Q.    Can you give me a recent example of a
15   demonstration that you organized?

16   A.    Well, among the several was on June
17   24th, 2022, on the day the Dobbs decision came
18   down from the US Supreme Court and Roe v. Wade
19   was overturned.

20   Q.    And on June 24th, 2022, you organized
21   a march in Chicago?

22   A.    Yes.  It was a rally beginning in
23   federal plaza and followed by a march that
24   returned to federal plaza.

1    Q.   And did that event proceed safely?

2    **A.   It absolutely did.**

3    Q.   Were there elected officials in

4  attendance at that event?

5         MS. HAKE:  Judge, I'm going to object.

6  I think she's laid a foundation enough to

7  qualify her as putting on demonstrations before;

8  however, I don't find any of this material

9  relevant in this line of questioning at this

10  point.

11         HEARING OFFICER FLEMING:  Well, I will

12  give them some length because I think they are

13  going to say that there were elected officials

14  at that march, there's going to be elected

15  officials at this march and there's no problem.

16         MS. HAKE:  Thank you.

17         HEARING OFFICER FLEMING:  I mean, I

18  understand the distinction, but there is

19  arguably some relevance to that.

20         MS. HAKE:  Thank you.

21         THE WITNESS:  Can I respond?

22         HEARING OFFICER FLEMING:  Yes.

23         THE WITNESS:  Governor Pritzker spoke,

24  and at one shortly before that, a similar sized

1    march, also in federal plaza, Juliana Stratton,

2    the Lieutenant Governor, spoke.  So, yes, they

3    were -- had both been in attendance numerous

4    times.

5    BY MR. DiCOLA:

6         Q.    Have you ever acted as a marshal at a

7    protest demonstration?

8         **A.    Yes, I have.**

9         Q.    Can you please explain for the record

10   what the function of a marshal is?

11        **A.    A marshal wants the march to proceed**

12   **in a way that it's effective and visible and**

13   **safe for all parties concerned.  That includes**

14   **the participants as well as the pedestrians,**

15   **bystanders, anyone within range of watching and**

16   **participating in the march.  And to arrive at**

17   **its conclusion in the same orderly, safe and**

18   **effective way.**

19              MR. DIONNE:  Judge, I'm going to

20   object to the answer in this line of

21   questioning.  These are not relevant.  The

22   witness just testified that these were marches

23   and not parades, and parades are at issue today

24   not marches.

1          HEARING OFFICER FLEMING:  Well, I will
2   let them move on -- (inaudible).
3          MR. DiCOLA:  Your Honor, to whatever I
4   -- semantically, I don't believe it's -- I think
5   it's a distinction without a difference.  I
6   regret for slipping into the word "march";
7   whereas, I intended parade.
8          HEARING OFFICER FLEMING:  Proceed.
9          MR. DiCOLA:  Thank you.
10  BY MR. DiCOLA:
11      Q.   Is Bodies Outside of Unjust Laws
12  planning to have marshals at the August 18th
13  parade?
14      **A.   Absolutely.**
15      Q.   Ms. Loew, I am going to show you
16  what's previously been entered as Respondent's
17  Exhibit 2.  Do you recognize this?  Do you know
18  what it is?
19      **A.   Yes, I do.**
20      Q.   And what is it?
21      **A.   It is the route -- it looks like the**
22  **amended route that was submitted by our**
23  **coalition for the parade on August 18th.**
24      Q.   Thank you.

1            Did you help select the
2  modified route?
3       **A.    Yes.**
4       Q.   Can you explain the rationale for --
5            Well, first of all, what were
6  the modifications made to the route?
7       **A.    Well, rather than being on Michigan**
8  **Avenue, all the way down Michigan Avenue, or**
9  **further down Michigan Avenue, it goes down**
10 **Wabash for a portion, over the river, over to**
11 **State Street, and then it goes in the direction**
12 **that traffic would be flowing on Washington,**
13 **back over to Michigan Avenue and down to its**
14 **conclusion.**
15      Q.   Thank you.
16            And what was the rationale for
17 the modifications made to the original route?
18      **A.    We wanted to cooperate with the City**
19 **and be flexible on being able to do this**
20 **effectively and show a willingness to do that.**
21      Q.   Are you familiar with the location of
22 -- are you aware that the City denied the
23 application?
24      **A.    Yes, of course.**

1      Q.    And are you familiar with the location

2   of the City's proposed alternative route?

3      **A.    Yes, I am.**

4      Q.    What is that route?

5      **A.    It would begin on Roosevelt Road and**

6   **go up Columbus Drive and conclude at Jackson.**

7      Q.    Does that -- does the City's proposed

8   alternative route, does it accommodate your

9   group's needs?

10      **A.    It does not.**

11      Q.    And why not?

12      **A.    The whole purpose of the route is to**

13  **be able to reach, with our voice, the people**

14  **that will be attending as delegates, and guests,**

15  **and the public and the media around this**

16  **Democratic Party National Convention.  That**

17  **means people will be coming to the city,**

18  **engaging with the beautiful features that**

19  **Chicago has.**

20                  **And we believe that in order**

21  **to have them hear our message they have to see**

22  **us, and we have to see them.  And we believe**

23  **there are far -- I believe there are far fewer**

24  **people that will be walking along Columbus Drive**

1  **on the evening before the convention than will**
2  **be going to the different possible locations and**
3  **venues and landmarks that are along the route --**
4  **amended route that we proposed.**
5             MR. DiCOLA:  Thank you.
6                   No further questions for this
7  witness.
8             HEARING OFFICER FLEMING:  Cross?
9             MR. DIONNE:  No cross based on that,
10 Judge.
11            HEARING OFFICER FLEMING:  Okay.  Thank
12 you.
13                   Please raise your right hand
14 to be sworn.
15                   (Witness duly sworn.)
16          KRISTI KEORKUNIAN-RIVERS,
17 called as a witness herein, having been first
18 duly sworn, was examined and testified as
19 follows:
20                   DIRECT EXAMINATION
21 BY MR. DiCOLA:
22     Q.   Can you please state and spell your
23 name for the record?
24     **A.   Yes, my name is Kristi**

1  **Keorkunian-Rivers, K-r-i-s-t-i,**

2  **K-e-o-r-k-u-n-i-a-n, hyphen, R-i-v-e-r-s.**

3         MS. HAKE:  And, Judge, just for the

4  record, we have no objection to Ms. Loew sitting

5  in the gallery at this time.

6         HEARING OFFICER FLEMING:  All right.

7  Kristi, give me that spelling again.

8         THE WITNESS:  Yes.  It's K-r-i-s-t-i,

9  K-e-o-r-k-u-n-i-a-n, hyphen, Rivers,

10  R-i-v-e-r-s.

11        HEARING OFFICER FLEMING:  Okay.

12  BY MR. DiCOLA:

13     Q.   Are you a member of Bodies Outside of

14  Unjust Laws?

15     **A.   I am, yes.**

16     Q.   And how long have you been a member?

17     **A.   Since November 2023.**

18     Q.   Have you been a part of planning a

19  Bodies Outside of Unjust Laws demonstration for

20  August 18th, 2024, the night before the DNC

21  starts?

22     **A.   Yes.**

23     Q.   And have you planned large

24  demonstrations in downtown Chicago in the past?

1    A.    I have.

2    Q.    Can you -- how long have you been

3 organizing demonstrations in Chicago?

4    **A.    Since early 2003.**

5    Q.    What was the first demonstration you

6 organized?

7    **A.    In 2003 I was part of the planning**

8 **process for the March 20th anti-war protests**

9 **against the invasion of Iraq.**

10    Q.    Can you give a recent example of a

11 demonstration you organized?

12    **A.    A very recent example would be the**

13 **March 18th Trans Day of Resistance, which took**

14 **place at the intersection of Michigan Avenue and**

15 **Ida B. Wells.**

16    Q.    And did those events proceed safely?

17    **A.    Yes.**

18    Q.    How has your experience organizing

19 demonstrations informed your planning for this

20 particular event that the parade permit was

21 requested for?

22    **A.    Yeah.  So the previously**

23 **aforementioned event that I organized in March**

24 **of last year was -- took place along our**

1    proposed march route, so I am very familiar with
2    the area and how desirable it is in terms of
3    foot traffic and how many onlookers and
4    potential participants there are.  And it
5    also --
6                    I organized this under Stop
7    Trans Genocide, which is the group that I
8    cofounded, and we do a lot of deescalation and
9    conflict resolution with groups that promote a
10   lot of anti-trans hateful rhetoric.  So I have a
11   lot of experience with any potential points of
12   conflict with any participation.
13        Q.   Have you acted as a marshal at protest
14   demonstrations in the past -- at parades in the
15   past?
16        A.   Yes.
17        Q.   And what is the function of a marshal
18   as you understand it?
19        A.   So a marshal is a very essential
20   responsibility that is for communication, acting
21   as a conduit for communication and -- sorry.
22   And -- sorry.
23        Q.   It's all right.
24                    Can you tell me, is Bodies

1  Outside of Unjust Laws planning to have marshals
2  at the August 18th parade?

3      **A.   Yes.**

4      Q.   And so what would -- so based on the
5  answer you just gave, what will they be doing
6  specifically on August 18th?

7      **A.   So, essentially, what we will be doing**
8  **would be to ensure all the participants are safe**
9  **and feeling good and having a good time.  And if**
10 **there is any potential for conflict escalation,**
11 **that we act as a buffer between any parties that**
12 **might do that and seek to deescalate that.**
13 **Safety is our number one priority.**

14     Q.   I am going to show you an exhibit.
15 It's actually right in front of you.  This is
16 Respondent's Exhibit 2.  Do you recognize this?

17     **A.   Yes.**

18     Q.   And what does the document show?

19     **A.   This is the alternative route.**

20     Q.   The alternative route that you
21 proposed?

22     **A.   To our original -- yeah, the route**
23 **that we proposed.**

24     Q.   And did you help select the

1 alternative route, the -- this modified route?

2     **A.   Uh-huh.**

3     Q.   What changed -- what were the

4 modifications?

5     **A.   So we wanted to ensure that we had a**

6 **very similar level of visibility and relevance**

7 **without sacrificing safety or any of the things**

8 **that might have been with the City's proposed**

9 **route.**

10     Q.   So what specifically did you change

11 between the two routes?

12     **A.   We changed the streets that we were**

13 **going to be turning down, and we changed -- I**

14 **think, yeah, as far as I recall that was what we**

15 **changed.  The length I think is still the same.**

16     Q.   Would the modified route as submitted

17 on January 8th have satisfied the group's goals

18 for the demonstration?

19     **A.   Yes.**

20     Q.   Does this route follow along notable

21 landmarks that people who visit Chicago tend to

22 visit?

23     **A.   Yes.**

24     Q.   Are you familiar with the -- are you

1  aware that the City has denied the parade permit

2  application here?

3  **A.  Yes.**

4  Q.  And you are aware that they -- sorry,

5  strike that.

6  Are you familiar with the

7  location of the City's proposed alternative

8  route?

9  **A.  Yes.**

10  Q.  And what is the alternative route

11  proposed by the City?

12  **A.  It was Columbus from Roosevelt to**

13  **Jackson.**

14  Q.  Does the City's proposed route

15  accommodate your group's needs?

16  **A.  No.**

17  Q.  And why not?

18  **A.  It is not even within or adjacent to**

19  **the commercial or entertainment districts of the**

20  **Loop.  It's essentially park land from what I**

21  **can tell, and only foot traffic from people who**

22  **would be visiting the park might happen upon our**

23  **group to receive our message.**

24  MR. DiCOLA:  Thank you, Ms.

1    Keorkunian-Rivers.  Really appreciate it.

2                     Nothing further for this

3    witness, your Honor.

4            HEARING OFFICER FLEMING:  Any

5    questions?

6            MR. DIONNE:  Briefly, Judge.

7                 CROSS-EXAMINATION

8    BY MR. DIONNE:

9        Q.   Good afternoon.

10                    You just mentioned under

11   direct that safety is one of your top concerns

12   for these parades; is that right?

13       **A.    Yes.**

14       Q.   And there would be marshals?

15       **A.    Yes.**

16       Q.   All right.  But marshals don't have

17   policing power, do they?

18       **A.    No.**

19           MR. DIONNE:  Nothing further, Judge.

20           HEARING OFFICER FLEMING:  Okay.

21   Respondent rest?

22           MR. DiCOLA:  Well, by way of closing

23   argument, your Honor?

24           HEARING OFFICER FLEMING:  No, resting

1  your testimony.  Do you have any more witnesses

2  or testimony?

3          MR. DiCOLA:  No, no more witnesses to

4  call, your Honor.

5          HEARING OFFICER FLEMING:  Any

6  rebuttal?

7          MS. HAKE:  No, Judge.

8          HEARING OFFICER FLEMING:  Okay.  You

9  ready to proceed or do you need time to put your

10  thoughts together?

11          MR. DiCOLA:  I'm ready to proceed.

12          HEARING OFFICER FLEMING:  Okay.  You

13  guys?

14          MR. DIONNE:  Judge, what this hearing

15  essentially boils down to is facts versus

16  feelings.  The City has presented numerous facts

17  as to why this parade and amended parade

18  application were denied.

19                  Looking at City's Exhibit No.

20  5, the letter of denial which specifically and

21  explicitly states two bases for denial under

22  Municipal Code of Chicago 10-8-330 G1, as well

23  as 10-8-330 G2.  G1 specifying that the proposed

24  route from the applicants would substantially

1    and unnecessarily interfere with the traffic in

2    the area contiguous to the activity, and there

3    are not available, at the time of the parade,

4    sufficient City resources to mitigate

5    disruption.

6                    We have heard from Secret

7    Service Agent Spriggs who has designated -- or

8    who has stated this is a designated National

9    Special Security Event, or NSSE, and due to the

10   DNC coming into town at or around the time of

11   this proposed parade, the entire city is on

12   heightened alert.  And part of that is requiring

13   effectively every single officer from patrol

14   person all the way up to detective to be called

15   in to active duty just to accommodate the

16   grandiose in nature and extent.

17                   We heard from Deputy O'Connor

18   that this city, in his time of service, never

19   put on an event of this magnitude.  It's bigger

20   than NATO.  And more of the reasons why is

21   because we have over 50,000 delegates alone with

22   family, with other high political figures.

23   We've got the President of the United States

24   attending, the Vice President of the United

1 States attending and anticipated over 1,000
2 other just people coming into the city in order
3 to attend and participate in this event.
4                    This is a special time.  It's
5 a special time that has large amounts of people
6 that all of CPD is being tasked to protect, that
7 all of CPD is not only tasked to protect the
8 people that are attending but the residents and
9 people that we already have here in Chicago.
10 Ordinarily, under normal circumstances, that's a
11 monumental task in a City this large with this
12 many people.  Throw on top of that just the
13 sheer volume of people that are coming and the
14 disruption that they're anticipating.
15                    This event has been in
16 planning since April of 2023 and continues to be
17 in planning.  And they know, the Secret Service,
18 CPD, Transportation and everybody involved in
19 the planning of this event, that just the
20 traffic alone is going to have substantial
21 interference in the normal traffic scheme.
22                    We have heard from Director --
23 sorry, Mr. Gallardo who specified that if the
24 City were to grant the routes requested, we

1  would have at least a dozen bus routes on

2  Michigan Avenue alone to have to be redirected.

3  And where did he say they would have to be

4  redirected to?  State Street.  However, the

5  application from the parade also specifies they

6  want to march on State Street, so that's not a

7  viable option either.

8              So they're basically asking to

9  redirect traffic from Michigan, its adjoining

10  streets, to the past -- rather the ordinarily

11  accommodating street of State Street even

12  further.

13              With the amount of resources

14  that would be required to reroute that much

15  traffic just for CTA and then all the ordinary

16  and regular flow of just vehicular vehicles on

17  those pathways and foot traffic during this

18  heightened security event time with all the

19  other people in the City of Chicago during this

20  time, it's simply not possible.

21              The Petitioners in this matter

22  have provided no evidence to rebut that

23  testimony.  So we've got live testimony here

24  from multiple witnesses that have given larger

1  context as to Point 1 as denial, and as I

2  stated, that's been completely unrebutted.

3            We go into Subsection 2 now,

4  which states that the Commissioner finds that

5  there are not available at the time of the

6  parade sufficient number of on-duty police

7  officers or other City employees authorized to

8  regulate traffic, to police the public and to

9  protect the parade participants and the

10  non-participants from traffic-related hazards

11  because of the other requirements from police

12  protection during the time of the proposed

13  parade.

14            We have further context from

15  Deputy O'Connor who, once again, like I said,

16  over 11,000 officers are going to be tasked in

17  active deployment duty, and that's going to be

18  24/7 as testified.  And it's going to start at

19  least two days prior, likely a week prior to the

20  event, which would be much before the proposed

21  time of this parade permit application.

22            The City simply does not have

23  the resources either in manpower nor in other

24  logistical items such as, as was mentioned, dash

1  -- sorry, body worn cameras, vehicles, various

2  communication devices, including walkie-talkies,

3  or other modalities of communication that would

4  be needed to accommodate this request.  They

5  simply don't have the manpower or the resources

6  available to accommodate the various bends,

7  twists and turns of the applicant's proposed

8  parade route.

9                    However, the City is not

10  saying that they can't parade.  In fact, the

11  City said you can parade and we will accommodate

12  this route.  And the route that was proposed was

13  from Roosevelt to Jackson, a straight route on

14  Columbus Drive.

15                    And even though it would still

16  take many police officers and many resources

17  outside of the personnel, the City can make this

18  accommodation.  It is right by Grant Park, right

19  by Lake Shore Drive, similarly situated within a

20  business district of downtown Chicago.

21                    It's the Petitioners simply

22  feel like this is not enough, but the facts

23  provide that this is a reasonable accommodation

24  given everything that's occurring in the city at

1   this time.  This is a unique event within the
2   city of Chicago, a magnitude of which we have
3   not seen in decades, and it is because of those
4   reasons that the City simply does not have the
5   resources to adequately accommodate what the
6   Petitioners in this matter are seeking.
7                   Judge, for these reasons the
8   City is asking that you uphold the denial
9   because the City has complied with the ordinance
10  in question here at every step of the way, and
11  we believe that the determination should be
12  affirmed.  Thank you.
13          MR. DiCOLA:  Your Honor, Counsel just
14  referred to numerous facts that are argued to
15  support the City's position, but from the City's
16  witnesses we didn't hear very many facts.
17                  Deputy Chief O'Connor
18  estimated several hundred officers would be
19  required to police the modified route as
20  requested, and he repeated the same phrase that
21  several hundred officers would be required to
22  police the alternative route.  We have heard
23  nothing in the form of empirical data reflecting
24  of those 11,000 officers why, which is -- there

1  is not a sufficient number to police this
2  parade, cannot be deployed.
3                    Deputy Chief O'Connor
4  testified that the City does not yet know how
5  many out-of-town law enforcement will be
6  deputized or contracted with and brought into
7  the city.  The City simply doesn't know what its
8  personnel requirements are.  Without the
9  denominator of the fraction, they can't state
10 that they have insufficient resources to police
11 the traffic to keep -- forgive me, your Honor --
12 to protect the public and to protect the parade
13 participants.
14                    Deputy Chief O'Connor did not
15 speak in concrete numerical terms.  Both he and
16 Mr. Gallardo repeatedly used the word
17 "impactful", which is an interesting concept
18 because the intent of the march is to have an
19 impact.  It's to make a message -- make a
20 message heard and seen.  The witnesses from
21 Bodies Outside of Unjust Laws testified that
22 they hope their message would be heard by the
23 delegates and policymakers and very important
24 people, including the President, who will be

1 coming to the city of Chicago.

2 　　　　　　In fact, the DNC, a critically

3 important political event, coming to the city of

4 Chicago implies that Chicago's residents would

5 have every right and every expectation that they

6 would exercise their First Amendment rights in

7 connection with the DNC.

8 　　　　　　First Amendment activity

9 occurring at this time is not superfluous or

10 extraneous or shouldn't be considered an

11 externality to the City's plans, but should be

12 fully baked in such that they can accommodate a

13 march through downtown that would pass human

14 beings and not -- over the course of about 2.4

15 miles as opposed to a straight shot in Grant

16 Park for less than a mile where there are no

17 businesses located and where people will not

18 hear their message.

19 　　　　　　The City did not meet its

20 burden to show that sufficient facts establish

21 that their denial was proper under Section G1

22 and G2.

23 　　　　　　Agent Spriggs from the Secret

24 Service did not know where the motorcades will

1  be.  It's been established that no one knows
2  exactly where the motorcades will be.  He could
3  -- Agent Spriggs testified that the primary
4  venues of the NSSE are at McCormick Place and
5  the United Center, neither of which are near
6  this parade route.
7                    Whether the City will expand
8  its notional perimeter somewhere in the Loop has
9  yet to be determined.  So at this point, the
10 City doesn't have the data or the information
11 that could satisfy the standard of showing that
12 they don't have enough personnel to handle this
13 parade.
14                    The witnesses from Bodies
15 Outside of Unjust Laws have fundamental First
16 Amendment rights to make their message heard.
17 The City is constitutionally obligated, and
18 while that's not the call of this particular
19 hearing, the First Amendment does call for a
20 narrow tailoring between the interest of the
21 applicants --
22                    MS. HAKE:  Judge, I am going to object
23 to this form of argument.  There is nothing in
24 evidence with regards to this.

1          HEARING OFFICER FLEMING:  It's
2  argument.  Proceed.
3          MR. DiCOLA:  To the extent that the US
4  Constitution and the Illinois Constitution are
5  relevant to this proceeding, the -- we have not
6  seen evidence to narrow tailoring but rather the
7  depositing of these -- the particular parade
8  requesters in Grant Park where people will not
9  see them.
10          The City did not conduct a
11  fulsome investigation as required under
12  Subsection F of the statute, and we would ask
13  that the denial be overturned.
14          HEARING OFFICER FLEMING:  Any final
15  word?
16          MS. HAKE:  Judge, no rebuttal.
17          HEARING OFFICER FLEMING:  Okay.  So I
18  -- looking at this, I have, I believe, 48 hours
19  to get something to you guys in writing on that,
20  so...
21          Interestingly on that, my
22  typing class was at St. Ignatius College Prep in
23  1965 before there was even electric typewriters.
24  It could be a long couple nights, but I will do

1    my best to get everything to you.

2                And I am assuming that the way

3    I will do it is that I will email it to the --

4    Mr. Rizzo, the Deputy Director who was here

5    earlier this morning, and he in turn will email

6    it out to Counsel.

7           MR. DiCOLA:  Counsel has my email.

8           HEARING OFFICER FLEMING:  Mr. Thayer,

9    I think we have yours, so we'll get that out to

10    you.  So maybe at the close of business on

11    Thursday.

12                Do you guys remember when we

13    got the original new White Sox stadium with

14    Madigan and Thompson and what they had to do to

15    get the vote in on time.  We had to stop the

16    clock in the General Assembly to keep the vote

17    going before midnight, even though it was about

18    1:00 in the morning.  I may be pushing -- you

19    may be working like that clock.

20                (Laughter.)

21               Now, I was just going to go

22    over my notes and my spellings.  Mr. Spriggs, is

23    it Spriggs, S-p-r --

24           MR. DIONNE:  S-p-r-i-g-g-s.

1         HEARING OFFICER FLEMING:  Okay.  And

2  then the deputies were Deputy Stevens and Deputy

3  O'Connor, correct?  In the conversations with

4  Gallardo.

5         MR. DIONNE:  Yes, Jill Stevens.

6         HEARING OFFICER FLEMING:  Jill Stevens

7  and O'Connor.

8         MR. DIONNE:  And O'Connor, yes,

9  Daniel.

10         HEARING OFFICER FLEMING:  I think I

11  got that, but if I do misspell something, I

12  apologize in advance.  Like I said, I'm getting

13  it out in 48 hours, don't expect perfection.

14             All right.  Thank you,

15  everyone.

16         MR. DiCOLA:  Thank you very much,

17  Judge.

18         MR. THAYER:  Your Honor, what is the

19  procedure for getting a transcript of the

20  proceeding?

21         HEARING OFFICER FLEMING:  As I

22  understand it, you would be going on the other

23  side to the Sedgwick entrance on the second

24  floor, and I don't know if they have you fill

1  out a Freedom of Information Act or if it's a

2  separate form.  But, you know, it's -- because

3  it's done this way, it's not like a court

4  reporter sitting here.  They're not going to

5  have something ready, you know, by the time you

6  get my decision.

7          MR. THAYER:  I understand that.

8          HEARING OFFICER FLEMING:  That's where

9  you would go.  They will direct you there.

10         Thanks, everyone.

11

12         (WHEREUPON, the hearing was

13         concluded.)

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS   )
                        ) ss:
2   COUNTY OF C O O K   )

3

4

5

6              I, DONNA WADLINGTON SHAVERS, a

7   Certified Shorthand Reporter, doing business in

8   the State of Illinois, do hereby certify that I

9   transcribed the audio-recorded proceedings in

10  the above entitled cause.

11             I further certify that the

12  foregoing is a true and correct transcript of

13  said audio-recorded proceedings, transcribed to

14  the best of my ability, on the 1st of February,

15  2024.

16

17

18  _____

19  DONNA WADLINGTON SHAVERS
    CSR #084-02443

20

21

22

23

24

# Exhibit H

# CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS

## MUNICIPAL DIVISION

In re the denial of Parade Permit Application of  )

Bodies Outside of Unjust Laws: Coalition for  )  24 PA 00001

Reproductive Justice and LGBTQ+ Liberation  )

## BACKGROUND –

This matter comes before this Administrative Law Judge on Applicant's appeal from the denial of its application for a parade permit on behalf of Bodies Outside of Unjust Laws: Coalition for Reproductive Justice and LGBTQ+ Liberation.

On January 2, 2024, an application for a Parade Permit was filed by Andy Thayer on behalf of Bodies Outside of Unjust laws: Coalition for reproductive Justice + Liberation. The date for the requested permit was August 18, 2024. The parade would assemble at 5:00pm, start at 6:00pm, end at approximately 8:15pm and disband at 9:00pm. The proposed route would start on Pearson east of Michigan Avenue to Michigan Avenue; south on Michigan Avenue to Wacker Drive; west on Wacker Drive to State Street; south on State street to Adams Street; east on Adams to Michigan Avenue; south on Michigan avenue to 9th street and ending at 901 S. Michigan Avenue.

On January 8, 2024, the applicant voluntarily submitted an amendment to this application with respect to the proposed route. This amended route would lessen the length on Michigan Avenue and State Street that the marchers would walk. This amendment also had the marchers going with the flow of traffic on all portions of the route, including one-way streets.

On January 16, 2024, the commissioner of the Chicago Department of Transportation denied this Parade Permit Application for these two reasons:

1. Under Section 10-8-330(g)(1) of the Code, the Commissioner finds that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city services to mitigate the disruption.

2. Under Section 10-8-330(g)(2), the Commissioner finds that there are not available at the time of the parade a sufficient number of on-duty police officers or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of the other requirements for police protection during the time of the proposed parade.

Also included in this Denial Letter was a proposed alternate parade route for the same date and start-off time. That proposed route would assemble on Columbus Drive south of Roosevelt Road

and proceed north on Columbus Drive from Roosevelt Road ending at Jackson Drive. The Applicants did not accept this proposed alternate route.

The Applicant file a timely appeal at the Department of Administrative Hearings. This case proceeded to hearing on January 30, 2024.

Summarizing the testimony from this hearing may help one better understand the bases for this Decision.

Secret Service Agent Briggs is a Deputy Coordinator for the Democratic Convention scheduled in Chicago on August 19 through August 22, 2024. He is responsible for the implementation and coordination of security for the convention. In that role he plans and works with eighteen local and federal agencies including the Chicago Police Department. He explained that this Convention and all such Nominating Conventions are designated as a National Special Security Event. This allows the full resources of the Federal Government to be brought to bear in the development of event security and incident management plans to ensure the safety of all participants. At this point this Directive will go into effect 48 hours prior to the Convention.

Agent Briggs stated the Democratic National Convention will bring 6000 delegates, 12-15,000 media personnel and over 50,00 visitors to Chicago. At present, McCormick Place and the United Center are the two principal venues. Additional venues needing updated security such as delegate hotels and motorcade routes will be identified later.

Agent Spriggs is aware of this Parade Permit Application but makes no recommendation on approval of the route. The proposed amended route would be more feasible, but he defers to local authority.

On cross-examination, Agent Spriggs repeated that planning for First Amendment Zones is not done by the Secret Service. The Secret Service establishes perimeters and the locals set up the First Amendment Zones. The exact motorcade routes have not yet been established. He explained that McCormick Place and the United Center are primary sites which will have massive security. Perimeter sites such as Delegate Hotels will not be as secure. They will not have exterior fencing. He does work with the CPD but does not make permit recommendations.

Bryan Gallardo is the Assistant Commissioner of the City of Chicago's Derpartment of Transportation's Public Way Permit Office. His unit processes all public Way Applications including Parade Permit Applications. Since this Parade Permit Application sought to parade in the Central Business District at the time of the Democratic Convention, he responded to it.

Mr. Gallardo identified City Group Exhibit 1, A through C, as the Application For a Parade Using the Public Way submitted by Andy Thayer on January 2, 2024. It stated the parade would assemble at 5:00 pm, start at 6:00pm, end at 8:15pm and disperse at 9:00pm. It listed the requested route and estimated a group of 1000-3000 marchers,

Mr. Gallardo identified City Exhibit 2 as a Google map of the original proposed parade route and City Group Exhibit 3, A through D, as the Amended Application filed by Mr. Thayer with an amended route on January 8, 2024. City Exhibit 4 was identified as a Google Map of the

proposed amended parade route. Mr. Gallardo explained CDOT looks at transportation issues and conflicts with other permits. Copies of the original and amended Applications were sent to other city departments such as the CPD, OEMC, Special Events and Streets and Sanitation.

Mr. Gallardo had an initial phone conversation with Deputy Superintendent Stevens and a later TEAMS meeting with her and Deputy Superintendent O'Connor. In the conversation with Deputy Stevens, she expressed concern that the proposed route contained impactful streets like Michigan Avenue, Wacker Drive and State Street. At the TEAMS meeting the police raised concerns about the resources needed for this Parade due to the Democratic National Convention. Concern about the Parade's impact on multiple bus lines was also discussed.

With the help of the Law Department Mr. Gallardo wrote the denial letter and sent it to Mr. Thayer by e-mail and certified mail. The Application was denied for two reasons. The denial letter contained an Alternate Route for the same date and time.

Mr. Gallardo stated the streets on the proposed routes are heavily trafficked. He used traffic data to determine the businesses and residences that would be affected. The CTA informed him it would need to redirect 13 bus routes using Michigan Avenue, 3 bus routes on Wacker Drive, 8 routes using State Street and 11 bus routes using Washington. Redirecting could be impossible since both Michigan Avenue and State Street would be impacted. Both streets would need to be closed for safety reasons to protect the 1000 to 3000 marchers. CDOT could not provide the resources to handle this proposed parade.

Mr. Gallardo there was an insufficient number of police to handle this parade. The CPD stated there would be traffic in vehicular lanes needing protection and the City needs personnel to protect pedestrians as well as the marchers. That needed police personnel would not be available due to the Democratic National Convention.

Mr. Gallardo explained he did provide a Proposed Alternate Router for the same date and time. This route would start at Roosevelt Road and proceed north to Jackson Boulevard on Columbus Drive. This route would have less impact on traffic and pedestrians but would keep the parade in the Central Business District. Fewer bus routes would be impacted using this route.

On cross-examination, Mr. Gallardo stated he reviewed traffic data from the State of Illinois detailing the number of vehicles on a street. CDOT is striving to minimize impact, not eliminate impact. Acceptable impact is the least amount of impact. He admitted CDOT issues parade permits for Michigan Avenue such as the Festival of Lights Parade which does impact traffic. He pointed out those organizers provide security, jersey walls, marshalls and detour signs. He had no contact with the Secret Service with respect to this application.

On re-direct, Mr. Gallardo testified neither the original application nor the amened application submitted by Mr. Thayer contained any information that his group would provide marshalls, jersey walls or other resources. He repeated that the Democratic National Convention was starting the next day. The city would see up to 50,000 delegates, attendees and visitors. This will affect traffic to hotels and other locations. Traffic will also be impacted by VIP routes.

Daniel O'Connor is the CPD Deputy Chief of Patrol in charge of Large Event Planning which includes Parade Applications. Parade applications are sent to the District Commander and up the chain of command. The date, location, scope and route of each proposed parade are reviewed. CPD then determines how many officers need to be allocated to this parade as well as how many other resources would be needed. These resources include radios, body cameras and means of transportation.

Deputy O'Connor received this Permit Application from CDOT. The parade was scheduled for August 18, 2024, Assembly would start at 5:00 pm, Start at 6:00 pm, end at 8:15 pm and disburse at 9:00 pm. After the original application was reviewed Commander Harris requested an alternate route. An alternate route was provided by the applicant, but the proposed changes were insufficient.

Deputy O'Connor made the decision that the alternate route was too impactful and too great a draw on resources. Thes resources would include significant manpower next to routes that would be used by people from the Democratic National Convention. It would require several hundred officers to close the streets and to affect traffic from streets feeding into the parade route. With the Convention starting, additional officers may be needed to at the parade if the group increases in size. Other resources needed would include radios, barricades, body cameras and means of transporting the officers.

The CPD is tasked with the safety and security of the entire city during the Convention as well as the exterior security for the venues, hotels and delegate meetings. Security will be needed for VIPs and cabinet members. CPD is responsible for the security of 50,000 expected delegates, media personnel and attendees. Other Federal and local law enforcement agencies are working with the CPD, but the CPD allocates the officers. The 11,000 members of the CPD will be working extended hours with no time off and no vacations. The United Center and McCormick Place are the main locations, but the CPD will secure hotels, venues with events, motorcade routes, the airports and the CTA while doing regular patrol in the Districts.

The Deputy stated the alternative route on Columbus from Roosevelt Road to Jackson Boulevard is a reasonable alternative. It gives the marchers visibility in the Central Business District and would require less resources than the proposed alternate route.

On cross-examination, Deputy O'Connor estimated it would take over 500 officers at a minimum to staff the amended alternate route.

Andy Thayer testified his organization's goal in seeking this Parade Permit was to greet the incoming delegates, media and entourage with their First amendment rights. He testified that the proposed alternate route would not allow the Organization to reach its original goals. This route was not near the hotels or the media markets.

The other two witnesses for the applicant, Ms. Lowe and Ms. Keorkunian-Rivers, also expressed their belief the proposed alternate route did not meet the Organization's needs to reach out to people here for the Democratic National Convention and the media. Fewer people would be on that route as it is not adjacent to the loop and is parkland.

**DISCUSSION -**

The Applicant contends that its permit application was wrongfully denied because the proposed alternated route was not comparable in public visibility and route to the amended route it submitted. That is not what is required under the Ordinance. Section 10-8-330(i) states, "The alternate route shall to the extent practicable authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed event." When one examines what options are practicable in this case, it must be examined under the fact that the city is dealing with the fact that the Democratic National Convention will start the day after the proposed parade. With the Convention will come the estimated 50,000 delegates, media personnel and visitors. With the Convention comes the heightened security concerns that the CPD must take into consideration. The original proposed route and the amended proposed route would take this parade through what is possibly the most visible area of the city. It can be argued that no other proposed route could match the amended route for the visibility the applicant seeks. Under these facts allowing a parade to travel at the same date and time from Roosevelt Road to Jackson boulevard down Columbus Drive in the Central Business District is a similar route with comparable visibility to the extent practicable.

The evidence presented from Bryan Gallardo with respect to traffic was credible. It established based on the amount of traffic and the bus disruptions that would flow from the parade that his proposed parade would substantially and unnecessarily interfere with traffic in the area contiguous the activity. His testimony also credibly established there would not be at the time of the proposed parade sufficient city resources to mitigate the disruption.

The evidence presented by Deputy Commissioner O'Connor with respect to the availability of on-duty police officers or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants, from traffic-related hazards because of other requirements for police protection during the time of the proposed parade was credible.

It is necessary to again note that the proposed parade, while not taking place during the Democratic National Convention, is scheduled for the night before the start of the Convention. It is reasonable to assume that most of the 50,000 people descending to Chicago will have arrived. The protocols from this event being a National Special Security Event will have been implemented. The 11,000 members of the CPD will be working extended hours. This is an extraordinary situation.

The testimony from the Applicant's witnesses addressed their experience in running large protest parades over a number of years. Their testimony did not address the factual bases set forth in the Denial Letter. To that end the city's testimony on why the parade permit should be denied was not challenged.

**FINDINGS –**

Applicant had due and adequate notice of the date, time and location of the requested hearing and of the reasons the Commissioner of Transportation denied this Parade Permit Application.

The City of Chicago met its burden of proof by a preponderance of the evidence that the issuance of this Parade Permit would substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and that there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption pursuant to Section 10-8-330(g)(1) of the Chicago municipal Code.

The City of Chicago met its burden of proof by a preponderance of the evidence that there are not available at the time of this parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-relater hazards because of the other requirements for police protection during the time of the proposed parade pursuant to Section 10-8-330(g)(2).

## DECISION –

The Findings of the Commissioner of Transportation denying the issuance of this Parade Permit are AFFIRMED.

Dennis Michael Fleming                    Dated: February 1, 2024

Administrative Law Judge

# Exhibit I



# CHICAGO DEPARTMENT OF TRANSPORTATION

## CITY OF CHICAGO

January 22, 2024

March on the DNC 2024
C/O Kobi Guillory
6227 S Langley
Chicago, IL 60637

Dear Mr. Guillory,

Pursuant to subsection 10-8-330(g) of the Municipal Code of Chicago ("Code"), your application dated January 8, 2024, for a parade on August 19, 2024, is denied for the following reasons:

1. Under section 10-8-330(g)(1) of the Code, the Commissioner finds that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption.

2. Under section 10-8-330(g)(2) of the Code, the Commissioner finds that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of the other requirements for police protection during the time of the proposed parade.

The Commissioner's decision is based on a number of factors, including, but not limited to the following: on the week in question, Chicago will host the 2024 Democratic National Convention (DNC), a large presidential nominating convention that will involve the attendance of delegates from all 50 states, the District of Columbia, and U.S. territories. Additionally, many high-level protectees, including President Biden, and other political leaders will attend the convention. Motorcades for DNC attendees will create significant traffic impediments and safety issues that will not permit the proposed parade route to occur. Moreover, the proposed parade route winds through the city center on a day many attendees are expected to arrive and would create significant traffic concerns and a drain on existing police resources. Movement of up to 50,000 delegates, staff, public officials, and high-level protectees from various locations, including the city center, to McCormick Place and the United Center (the sites of the event) and the associated entry to the event sites on this date will require heightened security, traffic rerouting, and security checkpoints and will demand large numbers of police and other city resources. In addition to covering the entire downtown area, including the hotel zone and business district, and routing of traffic near and to McCormick Place and the United

Center, police and other city resources will also be required to provide protection and services to the rest of the city. Thus, sufficient city resources are not available to mitigate the traffic disruption that would be caused by the proposed parade, or to police and protect parade participants and non-participants in light of these other demands. Although your application for a parade is denied as to the precise terms of your January 8th, 2024, application, pursuant to Section 10-8-330(k) of the Municipal Code, your group is authorized to conduct a parade under the following conditions:

Date: August 19, 2024
Assembly time: 12:00pm
Step-off time: 2:00pm
Disband time: 4:00pm
Assembly area: Assemble on Columbus Dr. north of Roosevelt Rd.
Disbanding area: Jackson Dr. between Michigan and Columbus.
Route: Proceed north along Columbus Dr. from Roosevelt Rd. ending at Jackson Dr.

Pursuant to Section 10-8-330(o)(2) of the Municipal Code , "Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodations to increase the portion of the right of way made available in order to preserve public health and safety. Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present."

This alternate permit only authorizes the use of the public way. To the extent your proposed event may desire to utilize the property of the Chicago Park District, another governmental entity, or a private owner, authorization of such locations must be sought directly from the affected entity.

If you wish to accept this alternate parade permit subject to the above indicated specifications, Section 10-8-330(k) of the Municipal Code requires that you file a written notice of acceptance with the Commissioner of the City of Chicago Department of Transportation, Public Way Permit Office, 121 N. La Salle Street, Room 905, Chicago, Illinois, 60602 or email address CDOTPermitsupport@cityofchicago.org, within 5 business days of the date of this notification. Failure to provide such notice within the time provided will result in the authorization for the alternate parade permit being rescinded.

The Department of Transportation reserves the right to modify or condition any issued parade permit in light of developing circumstances and information surrounding the DNC, including circumstances outside of the City of Chicago's control, such as the logistical or security needs or plans connected with the DNC.

If you believe your application is being wrongfully denied, you may appeal this decision by filing and appeal with the Department of Administrative Hearings. Your appeal should be filed with the Director of the Department of Administrative Hearings, 740 N. Sedgwick Street, 6th Floor, Chicago, Illinois 60654. If no appeal is filed with the

Department of Administrative Hearings within five business days of notice of this decision, this decision shall be deemed final.

If you have any questions regarding this letter, you may contact Bryan Gallardo at 312-744-4652

Sincerely,

Bryan Gallardo
Assistant Commissioner
Public Way Permit Office
CDOT Division of Infrastructure Management

CC:   Chief Devries
Deputy Chief Stevens
Cmdr. Harris
Cmdr. Barz
J. Kalayil
M. Imparato
T. Carney
A. Owens
J. Tirado
C. Pettineo
M. Peterson
T. Doran
M. Siegel
C. Hake

# Exhibit J



# CHICAGO DEPARTMENT OF TRANSPORTATION

## CITY OF CHICAGO

January 24, 2024

Poor People's Economic Human Rights Campaign
C/O Cheri Honkala
3074 Kensington Ave
Philadelphia, PA 19134

Dear Cheri Honkala,

Pursuant to subsection 10-8-330(g) of the Municipal Code of Chicago ("Code"), your application dated January 10, 2024, for a parade on August 19, 2024, is denied for the following reasons:

1.      Under section 10-8-330(g)(1) of the Code, the Commissioner finds that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption.

2.      Under section 10-8-330(g)(2) of the Code, the Commissioner finds that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of the other requirements for police protection during the time of the proposed parade.

The Commissioner's decision is based on a number of factors, including, but not limited to the following:  on the week in question, Chicago will host the 2024 Democratic National Convention (DNC), a large presidential nominating convention that will involve the attendance of delegates from all 50 states, the District of Columbia, and U.S. territories. Additionally, many  high-level protectees, including President Biden, and other political leaders will attend the convention. Motorcades for DNC attendees will create significant traffic impediments and safety issues that will not permit the proposed parade route to occur. Moreover, the proposed parade route winds through the city center on a day many attendees are expected to arrive and would create significant traffic concerns and a drain on existing police resources. Movement of up to 50,000 delegates, staff, public officials, and high-level protectees from various locations, including the city center, to McCormick Place and the United Center (the sites of the event) and the associated entry to the event sites on this date will require heightened security, traffic rerouting, and security checkpoints and will demand large numbers of police and other city resources. In addition to covering the entire downtown area, including the hotel zone and business district, and routing of traffic near and to McCormick Place and the United Center, police and other city resources will also be required to provide protection and services to the rest of the city. Thus, sufficient city resources are not available to mitigate

the traffic disruption that would be caused by the proposed parade, or to police and protect parade participants and non-participants in light of these other demands. Although your application for a parade is denied as to the precise terms of your January 8th, 2024, application, pursuant to Section 10-8-330(k) of the Municipal Code, your group is authorized to conduct a parade under the following conditions:

Date: August 19, 2024
Assembly time: 4:30pm
Step-off time: 5:00pm
Disband time: 7:00pm
Assembly area: Assemble on Columbus Dr. north of Roosevelt Rd.
Disbanding area: Jackson Dr. between Michigan and Columbus.
Route: Proceed north along Columbus Dr. from Roosevelt Rd. ending at Jackson Dr.

Pursuant to Section 10-8-330(o)(2) of the Municipal Code , "Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodations to increase the portion of the right of way made available in order to preserve public health and safety. Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present."

This alternate permit only authorizes the use of the public way. To the extent your proposed event may desire to utilize the property of the Chicago Park District, another governmental entity, or a private owner, authorization of such locations must be sought directly from the affected entity.

If you wish to accept this alternate parade permit subject to the above indicated specifications, Section 10-8-330(k) of the Municipal Code requires that you file a written notice of acceptance with the Commissioner of the City of Chicago Department of Transportation, Public Way Permit Office, 121 N. La Salle Street, Room 905, Chicago, Illinois, 60602 or email address CDOTPermitsupport@cityofchicago.org, within 5 business days of the date of this notification. Failure to provide such notice within the time provided will result in the authorization for the alternate parade permit being rescinded.

The Department of Transportation reserves the right to modify or condition any issued parade permit in light of developing circumstances and information surrounding the DNC, including circumstances outside of the City of Chicago's control, such as the logistical or security needs or plans connected with the DNC.

If you believe your application is being wrongfully denied, you may appeal this decision by filing and appeal with the Department of Administrative Hearings. Your appeal should be filed with the Director of the Department of Administrative Hearings, 740 N. Sedgwick Street, 6th Floor, Chicago, Illinois 60654. If no appeal is filed with the Department of Administrative Hearings within five business days of notice of this decision, this decision shall be deemed final.

If you have any questions regarding this letter, you may contact Bryan Gallardo at 312-744-4652

Sincerely,

Bryan Gallardo
Assistant Commissioner
Public Way Permit Office
CDOT Division of Infrastructure Management

CC:     Chief Devries
        Deputy Chief Stevens
        Cmdr. Harris
        Cmdr. Barz
        J. Kalayil
        M. Imparato
        T. Carney
        A. Owens
        J. Tirado
        C. Pettineo
        M. Peterson
        T. Doran
        M. Siegel
        C. Hake

# Exhibit K



# CHICAGO DEPARTMENT OF TRANSPORTATION
## CITY OF CHICAGO

March 7, 2024

March for the People's Agenda
C/O John W. Metz
600 S Dearborn St apt 412
Chicago, IL 60605

Dear Mr. Metz,

Pursuant to Section 10-8-330 (g) of the Municipal Code of Chicago ("Code"), your application dated February 29, 2024, for a parade on August 22, 2024, is denied for the following reasons:

1.      Under Subsection 10-8-330(g)(1) of the Code, the Commissioner finds that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption.

2.      Under Subsection 10-8-330(g)(2) of the Code, the Commissioner finds that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of the other requirements for police protection during the time of the proposed parade.

The Commissioner's decision is based on several factors, including, but not limited to the following: on the week in question, Chicago will host the 2024 Democratic National Convention (DNC), a large presidential nominating convention that will involve the attendance of delegates from all 50 states, the District of Columbia, and U.S. territories. Additionally, many high-level protectees, including President Biden, and other political and governmental leaders will attend the convention. Motorcades and other transportation for DNC attendees will create significant traffic impediments and safety issues that will not permit the proposed parade route to occur. Moreover, the proposed parade route winds through the city center on a day many attendees are expected to arrive and would create significant traffic concerns and a depletion of existing police resources needed because of the DNC. Movement of up to 50,000 delegates, staff, public officials, and high-level protectees from various locations, including the city center, to McCormick Place and the United Center (the sites of the event) and the associated entry to the event sites on this date will require heightened security, traffic rerouting, and security checkpoints and will demand large numbers of police and other city resources. In addition to covering the entire downtown area, including the hotel zone and business

district, and routing of traffic near and to McCormick Place and the United Center, police and other city resources will also be required to provide protection and services to the rest of the city. Thus, sufficient city resources are not available to mitigate the traffic disruption that would be caused by the proposed parade, or to police and protect parade participants and non-participants in light of these other demands. Although your application for a parade is denied as to the precise terms of your February 29, 2024, application, pursuant to Section 10-8-330(k) of the Municipal Code, your group is authorized to conduct a parade under the following conditions:

Date: August 22, 2024
Assembly time: 5:00pm
Step-off time: 6:00pm
Disband time: 8:00pm
Assembly area: Assemble on Columbus DR north of Roosevelt Rd.
Disbanding area: Jackson Dr between Michigan and Columbus.
Route: Proceed north along Columbus Drive from Roosevelt Rd ending at Jackson Dr

Pursuant to Subsection 10-8-330(o)(2) of the Municipal Code, "Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodations to increase the portion of the right of way made available in order to preserve public health and safety. Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present."

This alternate permit only authorizes the use of the public way. To the extent your proposed event may desire to utilize the property of the Chicago Park District, another governmental entity, or a private owner, authorization of such locations must be sought directly from the affected entity.

If you wish to accept this alternate parade permit subject to the above indicated specifications, Section 10-8-330(k) of the Municipal Code requires that you file a written notice of acceptance with the Commissioner of the City of Chicago Department of Transportation, Public Way Permit Office, 121 N. La Salle Street, Room 905, Chicago, Illinois, 60602 or email address CDOTPermitsupport@cityofchicago.org, within 5 business days of the date of this notification. Failure to provide such notice within the time provided will result in the authorization for the alternate parade permit being rescinded.

The Department of Transportation reserves the right to modify or condition any issued parade permit in light of developing circumstances and information surrounding the DNC, including circumstances outside of the City of Chicago's control, such as the logistical or security needs or plans connected with the DNC.

If you believe your application is being wrongfully denied, you may appeal this decision by filing and appeal with the Department of Administrative Hearings. Your appeal should be filed with the Director of the Department of Administrative Hearings, 740 N. Sedgwick Street, 6th Floor, Chicago, Illinois 60654. If no appeal is filed with the

Department of Administrative Hearings within five business days of notice of this decision, this decision shall be deemed final.

If you have any questions regarding this letter, you may contact Bryan Gallardo at 312-744-4652

Sincerely,

Bryan Gallardo
Assistant Commissioner
Public Way Permit Office
CDOT Division of Infrastructure Management

CC:    Chief Devries
        Deputy Chief Stevens
        Cmdr. Harris
        Cmdr. Barz
        Cmdr. Giltmier
        J. Kalayil
        M. Imparato
        T. Carney
        A. Owens
        J. Tirado
        C. Pettineo
        M. Peterson
        T. Doran
        M. Siegel
        C. Hake

# Exhibit L



# CHICAGO DEPARTMENT OF TRANSPORTATION
## CITY OF CHICAGO

March 7, 2024

Students for a Democratic Society at UIC
C/O Henry Rathburn
6324 S Kimbark Ave apt 401
Chicago, IL 60637

Dear Mr. Rathburn,

Pursuant to Section 10-8-330 (g) of the Municipal Code of Chicago ("Code"), your application dated February 29, 2024, for a parade on August 19, 2024, is denied for the following reasons:

1.      Under Subsection 10-8-330(g)(1) of the Code, the Commissioner finds that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption.

2.      Under Subsection 10-8-330(g)(2) of the Code, the Commissioner finds that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of the other requirements for police protection during the time of the proposed parade.

The Commissioner's decision is based on several factors, including, but not limited to the following: on the week in question, Chicago will host the 2024 Democratic National Convention (DNC), a large presidential nominating convention that will involve the attendance of delegates from all 50 states, the District of Columbia, and U.S. territories. Additionally, many high-level protectees, including President Biden, and other political and governmental leaders will attend the convention. Motorcades and other transportation for DNC attendees will create significant traffic impediments and safety issues that will not permit the proposed parade route to occur. Moreover, the proposed parade route winds through the city center on a day many attendees are expected to arrive and would create significant traffic concerns and a depletion on existing police resources needed for the DNC. Movement of up to 50,000 delegates, staff, public officials, and high-level protectees from various locations, including the city center, to McCormick Place and the United Center (the sites of the event) and the associated entry to the event sites on this date will require heightened security, traffic rerouting, and security checkpoints and will demand large numbers of police and other city resources. In addition to covering the entire downtown area, including the hotel zone and business

district, and routing of traffic near and to McCormick Place and the United Center, police and other city resources will also be required to provide protection and services to the rest of the city. Thus, sufficient city resources are not available to mitigate the traffic disruption that would be caused by the proposed parade, or to police and protect parade participants and non-participants in light of these other demands. Although your application for a parade is denied as to the precise terms of your February 29, 2024, application, pursuant to Section 10-8-330(k) of the Municipal Code, your group is authorized to conduct a parade under the following conditions:

Date: August 19, 2024
Assembly time: 4:30pm
Step-off time: 5:00pm
Disband time: 7:00pm
Assembly area: Assemble on Columbus DR north of Roosevelt Rd.
Disbanding area: Jackson Dr between Michigan and Columbus.
Route: Proceed north along Columbus Drive from Roosevelt Rd ending at Jackson Dr

Pursuant to Subsection 10-8-330(o)(2) of the Municipal Code, "Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodations to increase the portion of the right of way made available in order to preserve public health and safety. Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present."

This alternate permit only authorizes the use of the public way. To the extent your proposed event may desire to utilize the property of the Chicago Park District, another governmental entity, or a private owner, authorization of such locations must be sought directly from the affected entity.

If you wish to accept this alternate parade permit subject to the above indicated specifications, Section 10-8-330(k) of the Municipal Code requires that you file a written notice of acceptance with the Commissioner of the City of Chicago Department of Transportation, Public Way Permit Office, 121 N. La Salle Street, Room 905, Chicago, Illinois, 60602 or email address CDOTPermitsupport@cityofchicago.org, within 5 business days of the date of this notification. Failure to provide such notice within the time provided will result in the authorization for the alternate parade permit being rescinded.

The Department of Transportation reserves the right to modify or condition any issued parade permit in light of developing circumstances and information surrounding the DNC, including circumstances outside of the City of Chicago's control, such as the logistical or security needs or plans connected with the DNC.

If you believe your application is being wrongfully denied, you may appeal this decision by filing and appeal with the Department of Administrative Hearings. Your appeal should be filed with the Director of the Department of Administrative Hearings, 740 N. Sedgwick Street, 6th Floor, Chicago, Illinois 60654. If no appeal is filed with the

Department of Administrative Hearings within five business days of notice of this decision, this decision shall be deemed final.

If you have any questions regarding this letter, you may contact Bryan Gallardo at 312-744-4652

Sincerely,

Bryan Gallardo
Assistant Commissioner
Public Way Permit Office
CDOT Division of Infrastructure Management

CC:    Chief Devries
Deputy Chief Stevens
Cmdr. Harris
Cmdr. Barz
Cmdr. Giltmier
J. Kalayil
M. Imparato
T. Carney
A. Owens
J. Tirado
C. Pettineo
M. Peterson
T. Doran
M. Siegel
C. Hake

# Exhibit M

**IN THE CITY OF CHICAGO, ILLINOIS**
**DEPARTMENT OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| **In Re the Denial of the Application for a Parade Permit of** ) | |
| ) | |
| **March On the DNC 2024 08/22/24** ) | **Docket:  24PA000003** |
| **Kobi Guillory, Organizer/Applicant** ) | |
| ) | |

# <u>FINDINGS, DECISION, & ORDER</u>

This matter, coming for Hearing upon Applicant's Appeal of the Denial of its Application for a Parade Permit, notice given, and the Administrative Body advised in the premises, having considered any Motions, evidence, and arguments presented, this Administrative Body finds by a preponderance of the evidence and rules as follows:

**Background:**

On January 10, 2024, an application for a parade permit (City Ex 1) was filed by Kobi Guillory with the name of the parade indicated as "March On the DNC 2024" and sponsored by Chicago Alliance Against Racist and Political Repression. (hereinafter "Alliance") The requested parade date was 08/19/2024 and was to start at 2:00 pm and end at 4:00 pm with an assembly time of 12:00 pm and a disband time of 4:30 pm. The assembly and the disband areas were the same location - Union Park, 1501 W Randolph St, Chicago, IL 60606.

The proposed parade route is described as: "At 2:30 we will exit Union Park on the Ashland side and walk down Ashland to Adams. We will then turn right (west) on Adams and walk to Damen, turning right (north) onto Damen we will walk to Washington and turn right (east) onto Washington, entering Park #578, arriving around 3:00pm. At 3:30 pm, we will exit Park #578 onto Wolcott, walk south to Washington, turn left (east) on Washington, and walk east on Washington to 1412 W Washington Blvd., Chicago, Il 60607. After a brief stop, we will turn around and head west down Washington back to Union Park. We will Disperse from Union Park at 4:30 pm."

The estimated participants are 1,000+ and the number of units in the parade for Floats is "0", for Vehicles "0", and for Marching Groups is "0".

This application for permit was Denied by letter to the applicant dated January 22, 2024. (City Ex 2) The Denial of this application was not appealed to the Department of Administrative Hearings.

On January 30, 2024, an application for a parade permit (City Ex 3) was filed by Kobi Guillory with the name of the parade indicated as "March on the DNC 2024 08/22/24" and sponsored by the "Alliance". The requested parade date was 08/22/24 and was to start at 2:00 pm and end at 4:00 pm with an assembly time of 12:00 and a disband time of 4:30. The assembly and the disband areas were the same location – Union Park 1501 W Randolph St., Chicago, IL 60606.

The proposed parade route is described as: "At 2:30 we will exit Union Park on the Ashland side and walk down Ashland to Adams. We will then turn right (west) on Adams and walk to Damen, turning right (north) onto Damen we will walk to Washington and turn right (east) onto Washington, entering Park #578, arriving around 3:00pm. At 3:30 pm, we will exit Park #578 onto Wolcott, walk south to Washington, turn left (east) on Washington, and walk east on Washington to 1412 W Washington Blvd., Chicago, Il 60607. After a brief stop, we will turn around and head west down Washington back to Union Park. We will Disperse from Union Park at 4:30 pm."

The estimated participants are 1,000+ and the number of units in the parade for Floats is "0", for Vehicles "0", and for Marching Groups is "0".

This application for permit was Denied by letter to the applicant dated February 1, 2024. (City Ex 4) The February 1, 2024, letter to the applicant states that "Pursuant to subsections 10-8-330(d)(1), 10-8-330(d)(3) and 10-8-330(d)(4) of the Municipal Code of Chicago, your application dated January 30, 2024, for a parade on August 22, 2024, is disregarded and denied for the following reasons:"

The letter then lists the above code sections and provides a word for word copy of the language for each code section.

The Denial of this application was appealed to the Department of Administrative Hearings and is the subject of this hearing.

**Authority:**

The Department of Administrative Hearings has the authority to hear this matter pursuant to Municipal Code Section 10-8-330(l)(1). An application for a parade permit was filed with the Department of Transportation on January 30, 2024. (City Ex 3) The Department of Transportation denied the application and provided notice of that action to the applicant on February 1, 2024. (City Ex 4) An appeal of the denial was timely filed with the Department of Administrative Hearings on February 7, 2024 and therefore authority to hear the matter is properly established.

**Hearing:**

The hearing on this matter was conducted on February 14, 2024.

At the beginning of the hearing counsels for each party identified themselves for the record. Assistant Corporation Counsel Matthew Spahr and Assistant Corporation Counsel Christopher Dionne for the City and Daniel Massoglia, Madelin Townsend, and Jacqueline Spreadbury for the applicant.

**Preliminary matters:**

Counsel for the applicant indicated that the City served a Notice of Motion and Motion to Limit the Scope of the Hearing late in the afternoon on February 13, 2024, and that because of that they would move for a continuance to respond and prepare in a different manner. The City's Motion was not presented at the hearing, rather as the Procedural Rules for the Conduct of Administrative Hearings limits prehearing motions to motions for Discovery, Subpoenas, and Continuances, the City was asked to give a summary of the Motion and the applicant provided a response. The City indicated that it wanted clarification that the hearing was only going to address the denial of the January 30, 2024, application and not the basis of the denial of the January 10, 2024, application because in the request for hearing the applicant attached both

applications and both denial letters. The applicant was asked to clarify which denial was being appealed and the applicant answered that it knew that the date to appeal the January 22, 2024, denial was passed and acknowledged that the appeal was for the February 1, 2024, denial. However, the applicant expressed concern that it had to alter its strategy based on the City's Motion and that it would need a continuance if the City's motion was Granted.

Based on the clarification the City's Motion was not considered.

The Applicant then moved for a continuance based on Good Cause. Applicant provided oral reasons to establish Good Cause. The City responded. The reasons were considered, and it was determined that good cause was not established and the Motion to Continue was Denied.

The Applicant made an oral motion for subpoenas for certain individuals to testify and ruling on that motion was reserved pending testimony of present witnesses.

**Opening Statements presented.**

**Testimony:**

The City's only witness in this matter was Bryan Gallardo. Mr. Gallardo is the Assistant Commissioner of the City of Chicago Department of Transportation Public Way Permitting Office and has held that office since October 2017. His job duties include reviewing parade applications. He identified applications received from the applicant and the notice letters sent in response. The applications and letters were admitted into evidence without objection from applicant.

Mr. Gallardo testified that he compared the applications dated January 10, 2024, and January 30, 2024 and noticed that other than the date and a slight change to the name everything appeared to be the same on both applications.

Under cross examination Mr. Gallardo testified that the January 30, 2024, application was denied because it was duplicative of a prior application. Counsel inquired whether Mr. Gallardo did an analysis of traffic data for the two dates in his determination of the duplicative nature of the applications. The City objected to the question based on it not being within the scope of direct examination and relevance and the objection was sustained. Mr. Gallardo testified that the second application was denied because it was duplicative of the first application.

Questions were asked concerning the three listed grounds for denial contained in the denial letter. Mr. Gallardo testified that the reasons listed are what is provided for in the code and that he is required to apply the code. Mr. Gallardo was questioned about his interpretation of the terms "similar in theme or units" in determining whether an application is duplicative. He provided a description of different parade "themes" and examples of "units". Mr. Gallardo stated that he did not reach out to the applicant to ask whether the second application was for a different theme.

Several questions were asked concerning the basis of the denial of the first application that were objected to and sustained. For reasons of judicial efficiency, it was agreed that all questions concerning the denial of the first application would have a standing objection and would have a standing ruling of sustained. Counsel for the applicant was given an opportunity to make a record concerning the basis for constitutional violations for void for vagueness, as applied, and criminal penalties.

Counsel for applicant renewed his motion for subpoenas and was asked to establish the relevance of the anticipated testimony. Motion for subpoenas denied as testimony would not be relevant.

After several additional questions concerning the review process for hypothetical applications or past applications, cross examination was concluded. The witness was dismissed subject to recall.

The City rested.

Applicant called its first witness Kobi Guillory.

Mr. Guillory stated that he is a member of the "Alliance". He is also involved with the coalition for the March on the DNC. Mr. Guillory testified about the issues supported by the coalition and the "Alliance". He testified that he submitted the application for the parade permit for a parade on August 19, 2024. He also submitted the application for the August 22, 2024 parade. Mr. Guillory stated that he wanted the parade on August 19, 2024, so that his coalition could make their seven demands known to the DNC. The witness answered additional questions concerning the application dated January 10, 2024 and discussions with the Department of Transportation about that application. The police did not contact him about that application. The application for the August 22, 2024 parade was presented to the witness and he stated that the decision to march during the week of the Convention was made around November 19, 2024, and that the decision was made to march on both dates as two separate protests. Mr. Guillory testified that he did not know that the permit to march on August 19, 2024 was denied when the application for the August 22, 2024 permit was filed and that he intended to March on both dates. When asked if the intended message to be conveyed at both parades was to be the same, Mr. Guillory testified that they were assuming, based on the way the Democratic Party has responded to marches that have occurred before, that the demands would not have been met between the 19th and the 22nd so they would be refreshing those demands and also it would be after four days of discussion so they would have some updates.

Two additional questions concerning the penalty provisions in section (s) were objected to and the objections were sustained.

Counsel then offered an affidavit from a witness that was not present. The City objected. The affidavit was allowed into the record but not admitted into evidence and not considered in this decision.

Additional questions concerning the application to the Park District for permits were asked and answered and then the direct examination was concluded.

Cross examination was conducted concerning the date of the denial of the January 10, 2024 application and the filing of the January 30, 2024 application. The witness testified that he did not know of the denial of the January 10, 2024, application at the time of the January 30, 2024, application. Cross examination was concluded.

Mr. Guillory was recalled by applicant.

On recall Mr. Guillory was asked about a permit application in 2023. He was shown City's Ex 1 and verified that the date on the application was August 7, 2023. He was then asked about applications filed in January. He testified that applications for parades in the next year can not be filed in the current year unless they are for a parade in January. Applications for dates later than January must be filed in the current year. Applications are considered on a first come first served basis. Examination was concluded.

Applicant next called Joe Iosbaker.

He stated that he is a member of "Alliance". He has been a member for ten years. Mr. Iosbake is a member of the decision-making process for the coalition. He testified that the coalition did not intend to only march on one day. They intended to march on multiple days but initially they intended to march on only one day but as the events developed in Gaza they decided to march on a second day. He believes that the August 22, 2024, parade was not permitted because it was duplicative, but he doesn't really understand what that means. He states that the coalition intended to also march on August 22, 2024 and that the August 22, 2024 march was not a repeat of the August 19, 2024 march.

He stated that he has experience with marches and parades. He stated that he wanted a parade permit to ensure safety and to make the event family friendly.

Direct examination concluded. No cross examination.

Counsel for applicant stated that they want to introduce evidence that the Police did not talk to their client and that the Police have talked to other applicants. City objected. Objection sustained.

**Closing arguments presented.**

**Discussion:**

The City asserts that the denial of the application dated January 30, 2024 was proper pursuant to section 10-8-330(d)(4).

Section 10-8-330(d)(1) establishes the behavior or conduct that is prohibited.

No person or organization may submit more than one application for the same parade date and route, or for a parade substantially similar in theme or units described but requesting an alternate date or route, whether using the same name, different names, or different affiliations that the person or organization may control or be a member of.

Section 10-8-330(d)(3) describes the consequences to a person or organization that violates section 10-8-330(d)(1).

Where a person or organization submits multiple applications for the same parade date and route or for a parade substantially similar in theme or units described but requesting an alternate date or route, whether by using one name or multiple names, that person or organization shall not be eligible for such a permit and shall be in violation of this ordinance.

Section 10-8-330(d)(4) authorizes the commissioner to take certain actions to enforce section 10-8-330(d) and establishes the applicant's right to appeal the commissioner's actions thereunder.

The commissioner is authorized to disregard any such multiple applications and to deny any permit on the basis of a violation of this subsection (d). Any applicant who disagrees with the commissioner's actions hereunder may appeal, in the manner set forth in subsection (l).

The City's argument is that if a side-by-side comparison of applications submitted by the same person or organization shows that the parades are substantially similar in theme or units described even if requesting different dates or routes or using different names the commissioner is authorized the disregard the application and deny the permit.

The City's Assistant Commissioner for the Department of Transportation Public Way Permitting office testified that he conducted such a comparison of applications and determined that they were for parades that were substantially similar in theme and units because they were both protest parades; they had very similar names with only a slight change by adding the date 08/22/24 on the second application; that the sponsoring organization was the same; that the parade routes were identical; and that the estimated participants was also identical. A review of City exhibits 1 and 3 discloses that the parade organizer / applicant on both is Kobi Guillory; that the parade assembly, disbandment, start, and end times are identical; that the assembly and disband location is identical; and that the participating units are described in each as "0".

The applicant contends that the City violated its Constitutional rights by denying the parade permit because the ordinance is unenforceable due to vagueness; that the denial was based on content rather than objective standards; that its due process rights were violated because the City did not follow its own procedures; and for other reasons that were presented. The applicant was provided wide latitude to establish a record of the grounds for its constitutional arguments, however, as the Administrative Law Judge does not have the authority to declare an ordinance unconstitutional either on its face or as applied, the determination here is not based on those grounds.

Constitutional issues aside, the applicant contends that the denial was not proper because the City failed to conduct an investigation as required in section 10-8-330(f) or provide the reasons for the denial as contained in section 10-8-330(g) after conducting such an investigation. The applicant contends that its intention was to conduct two marches on separate dates with different themes and that the applications for each parade should have been investigated individually.

Section 10-8-330(f) requires the commissioner to investigate the facts in an application.

The Commissioner shall investigate the facts set out in the application in consultation with the police department, which shall be sent copies of the application immediately upon receipt. Where the commissioner determines that additional information the factors set forth in subsection (g)(1) – (5) is required, copies of the application and a request for such information also shall be sent to any appropriate city department...

Section 10-8-330(g) requires the commissioner to issue a permit when the investigation establishes certain conditions.

After such investigation, the commissioner shall issue a permit when the commissioner finds that:

1. The parade will not substantially or unnecessarily interfere with traffic in the area...
2. Ther are available at the time of the parade a sufficient number of on-duty police officers to police and protect participants and non-participants...
3. The concentration of persons, animals, vehicles or other things at the assembly and disbanding areas and along the parade route will not prevent proper fire and police protection or ambulance service
4. The parade will not interfere with the use of the requested area by another party to whom a valid permit has been issued...

5. The parade will not be conducted for any purpose or in any manner made unlawful elsewhere in the code or by any other local, state, or federal law
6. The application contains sufficient information about the person or organization applying for the permit, the parade organizer, and the purposed date, time, location, route and number of participants

The facts in this matter are not at issue.

The applicant filed an application on January 10, 2024, and a second application on January 30, 2024. The City denied the first application on January 22, 2024, and the second application on February 1, 2024. The second application was denied as being substantially similar in theme or units described as in the first application in violation of 10-8-330(d).

A determination of this matter depends on the interpretation of section 10-8-330.

A review of section 10-8-330 discloses that definitions are provided in subsection (a); that a permit is required for a parade on any portion of the public way in subsection (b); and that when such applications shall be filed is established in subsections (c). The next subsection (d) establishes restrictions on the number of applications that can be filed by a person or organization for the same parade date and route or for parades that are substantially similar in theme or units described. Subsection (e) concerns the contents of the application. Subsections (f) and (g) establish that the commissioner shall investigate the facts of an application and that a permit shall be issued when certain conditions are determined. Subsection (h) describes when applications shall be processed. Subsection (i) deals with "traditional parades". Subsection (j) provides noticing requirements; subsection (k) requires that when an application is denied an alternate permit shall be authorized; and subsection (l) establishes an appeal process for applicants when their application is denied. Subsections (m), (n), (o), (p), (q), and (r) deal with technical issues of an issued permit. Finally, subsection (s) establishes penalties for violations of any provision of the section.

Based on a review 10-8-330, it is my interpretation of the law that if the Department of Transportation, after a review of applications for parade permits determines that on their face they are for the same date and route or are substantially similar in theme or units described, then that is a violation of subsection (d)(1) and therefore under subsection (d)(4) the commissioner is authorized to disregard the applications and deny any permit.

It is also my interpretation of the law in subsection (d)(4) that to "disregard" the application and to "deny" any permit means that the investigation pursuant to subsection (f) and the issuance of a permit pursuant to subsection (g) are not required for applications that are in violation subsection (d)(1).

**Findings:**

It is my finding that the City of Chicago Department of Transportation reviewed the applications filed on January 10, 2024, and on January 30, 2024, and properly determined that they were substantially similar in theme or units described. Therefore, based on my interpretation of the law, the denial of the application filed on January 30, 2024, was proper.

Further, the applicant's contention that the parades were for two separate marches with different themes is contradicted by its own witness. When asked if the intended message to be conveyed at both parades was to be the same, Mr. Guillory testified that they were assuming, based on the way the Democratic Party has responded to marches that have occurred before, that the demands would not have been met between the 19th and the 22nd so they would be refreshing those demands and also it would be after four days of discussion so they would have some updates. This clearly establishes similar themes for both parades. Also, City's exhibits 1 and 3, the applications that were filed, clearly indicate that the units participating in the parade were not only similar but were identical.

I find that the City of Chicago has established by a preponderance of the evidence that the application for a parade permit filed January 30, 2024, was properly denied.

**Decision:**

**The Denial of the application for a parade permit by the Department of Transportation is AFFIRMED.**

Entered:     *Frank Lombardo*
Administrative Law Judge
Frank Lombardo

February 16, 2024
Judge #49

# Exhibit N

**CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS**

**MUNICIPAL DIVISION**


In Re the Denial of the Parade Permit Application of

the March for the People's Agenda.                    24 PA 000004



**BACKGROUND –**

On February 29, 2024, John Metz from the Sponsoring Organization, the Anti-War Committee Chicago, filed an application for a parade permit for the March for the People's Agenda Parade. The requested date for this parade was August 22, 2024. The parade would begin to assemble at 5:00pm at Adams Medill park at 1403 E. 14th Street. The parade would start at 6:00pm and would begin to disband at Adams Merrill Park at 9:00pm. The parade would travel northbound on Ashland, head west on Adams, turn south on Damen, head east on Roosevelt Road back to Adams Merrill park. It was estimated that there would be 1000 marchers.

On March 7, 2024, the Commissioner of the Chicago Department of Transportation denied this parade permit application for these reasons:

1. Under Section 10-8-330 (g)(1) of the Chicago Municipal Code, the Commissioner found that the proposed parade will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption,

2. Under Section 10-8-330(g)(2) of the Chicago Municipal Code, the Commissioner found that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to protect the public, and to protect parade participants and non-participants from traffic-related hazards because of other requirements for police protection during the time of the proposed parade.

Also included in this denial letter was a proposed alternate route for the same date and start off time. The alternate route would have an assembly time of 5:00pm at on Columbus Drive north of Roosevelt Road. The parade would step-off at 6:00pm and proceed north on Columbus Dr. from Roosevelt Road ending at Jackson Drive. The parade would disband at 8:00pm on Jackson drive between Michigan Avenue and Columbus Drive. The Applicant did not accept this alternate route.

The Applicant filed a timely appeal on March 11, 2024. The Hearing was held on March 18, 2024.


**SUMMARY OF THE PROCEEDING –**

Bryon Gallardo is the Assistant Commissioner in charge of the Public Way Permit office for the Chicago Department of Transportation. Part of his duties include reviewing Parade Permit Applications. Once a parade permit is filed in his office it is e-mailed to the CPD, OEMC, Streets and Sanitation and Special Events. This is to ascertain if these Departments felt there might be a conflict or a problem with resources with respect to the application. He personally reviewed this Application as it was a high-profile application due to the Democratic National Convention

The Democratic National Convention will proceed this August 19 through 22. The main sites are the United Center and McCormick Place. It is estimated 50,000 delegates and others will be in attendance. The proposed date for this parade is August 22, 2024, which is during the convention. He reviewed this Application for traffic conflicts.

The first traffic conflict is that the parade would proceed during the Democratic National Convention. The Convention in itself will present traffic problems which would be exacerbated by this parade.

This parade route would require the closing of Ashland Avenue. Ashland Avenue is the emergency access to the three hospitals located in the Illinois Medical District. Closing Ashland Avenue will impact the ability of emergency vehicles to transport patients to these hospitals. Other cross-streets would also need to be closed, which will push traffic onto other routes. These were the factors for the denial of the permit under Section 10-8-330(g)(1).

He reviewed the response from the Chicago police Department which stated the Chicago Police department had insufficient resources to handle this event. This was the basis for the denial for the permit under Section 10-8-030(g)(2)

The Proposed Alternate Route was scheduled for the same day and time as on the application. It was chosen because it would have a manageable traffic impact.

On cross-examination Mr. Gallardo stated the proposed alternate route was a highly visible route in the Central Business District. It would have less of a traffic impact and the Chicago Police Department could provide the needed support at this location. He received communication from the 12th District Commander objecting to the issuance of this permit. He did consider other locations close to the United Center. The problem with these locations is that the Secret Service will be setting a security footprint outside of the United Center. That footprint has not been announced yet, but it is believed it will be at least a couple of blocks from the United Center. The locations he considered would have been in that security footprint.

Gabriella Shemash is the Area 3 Deputy Chief of Patrol for the Chicago Police Department. She is responsible for patrol operations in Area 3 which includes the 12th district which includes the United Center. While she has overseen large events like the Pride Parade and the Puerto Rican Day Parade, the Democratic National Convention will be larger than anything she has previously managed. The CPD will be responsible for all security outside the security perimeter of the United Center and McCormick Place. This will start about one week prior to the start of the convention.

Thousands of Chicago Police Officers will be assigned to the convention security detail. There are no furloughs and all days off and training sessions have been cancelled during the convention. The CPD is working with the Illinois State Police, the Sheriff's Police and some suburban police departments to coordinate their security efforts. It is anticipated the convention will bring one million people to Chicago. There will be thousands of delegates and their staff, heads of state and the President and Vice-President in attendance.

She received a copy of this Parade Application from the CPD's Special Events Office. Her job was to review and assess what resources would be needed from the CPD. That would include police personnel as well as equipment such as vehicles, radios, cameras and barricades. This would be discussed with the District Commander. She is familiar with the proposed route since she was previously the Commander of the 12th District. The route is within a couple of blocks from the United Center at its closest point. The Illinois Medical district is within the proposed route. It would require hundreds of police officers as well as accompanying resources to close the route. She recommended denial of this application. With the DNC, there was already police personnel and resources assigned. The security perimeter will likely extend to the route. It would require closing three main streets, Asland, Damen and Roosevelt, that lead to the hospital. The time of the parade is a rush hour on a Thursday afternoon that has heavy traffic. This information was discussed with the 12th District Commander who sent the Department of Transportation. The CPD cannot accommodate this route.

On cross, the witness testified there are between 11,000 to 13,000 police officers. She had no input into the alternate proposed route. The alternate route would require less police officers.

The City rested its case.

John Metz is the Co-Chair of the Anti-War Committee, Chicago, who applied for this Parade permit in the name of the March for the People Agenda. It was entitled a march because the people will be moving as they present their political message. Their goal is to present a message against Biden and his policies within the sights and sounds of the Democratic Convention to ensure the federal officers who will be present at the convention to hear their message of opposition to the war in Gaza. He has no previous experience with this type of march but his Co-Chair, Joe Iosbaker, has that experience.

Mr. Metz testified the proposed alternate route is not acceptable since it does not allow the group to convey its political message. It is three miles form the United Center. The President, delegates and federal officers are not in sight or sound The demonstration will not be seen by the people they want to see it.

**DISCUSSION -**

The testimony of Bryan Gallardo with respect to the traffic problems was credible**.** The inherent traffic problems that will arise from the operation of the convention would be exacerbated by issuing this parade permit. Ashland Avenue is the emergency access route for emergency vehicles transporting patients to three different hospitals in the Illinois Medical District. Access to non-emergency hospital patients would also be impacted.

Mr. Gallardo's testimony concerning his investigation of this parade permit was also credible. He followed his usual investigative procedure by notifying the CPD, OEMC, Streets and Sanitation and other city agencies of this parade permit application and sought out their opinion on the issuance of this permit. It was through this investigation that Mr. Gallardo received the email from the 12th District Commander objecting to the issuance of this permit.

The testimony of Gabriella Shemash was also credible. She has a unique perspective on the issuance of this parade permit based on her experience in managing previously the Pride parade and the Puerto Rican Day Parade as well as her being the Commander of the 12th District. She explained the duties of the Chicago Police Department with respect to providing security for the convention while continuing to patrol the city's police districts. She explained that the required resources for this parade would include several hundred police officers as well as the equipment these officers would need. She also reiterated the impact on traffic to the Medical District and the area in general should this route be approved. Her opinion that the CPD would not have the resources to handle this route was uncontradicted.

Both city witnesses testified the proposed alternate route, to the extent practicable, had comparable visibility and had a similar rout, location and date to the proposed parade. This route is in the Central Business District and is a route that the CPD could provide the needed resources.

John Metz is the Co-Chair of the Anti-War Committee and is the person who filed this Parade Permit Application. His organization wants to march against President Biden's policies within the sights and sounds of the Democratic National Convention. The federal officials and elected officials that designed these policies will be present at the United Center and his group wants these officials to hear their message. He rejected the alternative route because it is three miles from the United Center on a tree-lined street. The President and the other officials will not be present in this area. They will not be seen, and their message will not be heard by the President and the other officials and delegates.

The reality of this situation is that the Secret Service will be establishing a security perimeter that will not allow this group or any group to be within the sight and sound of the United Centers that the delegates, the elected officials, other federal officials and the President will see and hear them. It is also unlikely that if this route was approved, those federal officials, delegates, elected officials and the President would be in a location where they could see and hear this group. The ordinance does not require that the alternative route be one that the applicant will accept. The proposed alternate route in this case meets the requirements of the ordinance.

**FINDINGS OF FACT –**

The applicant had due and adequate notice of the date, time and location of the requested hearing and of the reasons stated by the Commissioner of the Department for the denial of this parade permit application.

The Department of Transportation investigated the facts of this application, in consultation with the police department, as required by Municipal Code10-8-330 (5)(f).

The City of Chicago proved by a preponderance of the evidence that the issuance of this Parade Permit would substantially and unnecessarily interfere traffic in the area contiguous to the activity, and that there are not available at the time of the proposed parade sufficient city services to mitigate the disruption pursuant to Chicago Municipal Code 10-8-330(g)(1).

The City of Chicago proved by a preponderance of the evidence that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards in light of the other demands for police protection at the time of the proposed parade pursuant to Chicago Municipal Code 10-8-330(g)(2).

The City of Chicago proved by a preponderance of the evidence that the proposed alternate route offered to the Applicant did, to the extent practicable, authorize the conduct of a parade that would have had comparable public visibility and a similar route, location and date to that of the proposed parade.

**DECISION –**

The Finding of the City of Chicago's Commissioner of Transportation denying the issuance of this Parade Permit is AFFIRMED.


Dennis Michael Fleming

Administrative Law Judge                              Dated: March 20, 2024.

# Exhibit O

# CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS
## MUNICIPAL DIVISION

In re the Denial of the Parade Permit Application of

the Students for a Democratic Society for the "March     24 PA 000005

Against US funded Gaza genocide"


**BACKGROUND –**

On February 29, 2024, Henry Rathburn, President of the SDS at UIC, filed an application for a Parade Permit on behalf of that organization for a parade entitled the March against US funded Gaza genocide. The date for the requested permit was August 19, 2024. The parade would assemble at 11:00am at the Union Park Football/Soccer Combo Field within Union Park at 1501 W. Randolph St. The parade would start at 12:00 pm. The proposed parade route would exit Union Park and enter the street via Washington Blvd. On Washington Blvd. the crowd will march west occupying both lanes and marching past Paulina St, Wolcott Ave, Hoyne Ave., Leavitt St., and Oakley Blvd. before turning left on Western Ave. On Western Ave. the crowd will march south occupying the southbound lane and marching past Warren Blvd, Madison St, Wilcox St, and Adams St. before turning left onto Jackson. On Jackson the crowd will march East occupying all of Jackson Blvd. and marching past Oakley Blvd, Bell Ave, Leavitt St, Seeley Ave, Damen Ave, Wood St. Old Rt. 66, Paulina St before turning left onto Ashland Ave. On Ashland the crowd will march north occupying the northbound lane and marching past Adams St, Monroe St, Madison St, Ogden Ave, Warren Blvd, and Washington Blvd before reentering Union Park. The parade would last an estimated two hours and fifteen minutes and would begin to disband at 3:00pm. The estimated number of participants was listed as 5,000 based on this organization's experience with past marches and verbal commitments from endorsing organizations.

On March 7, 2024, the Commissioner of the City of Chicago's Department of Transportation denied this Parade Permit Application for these two reasons:

1. Under Subsection 10-8-330(g)(1) of the Municipal Code of Chicago, the Commissioner found that the proposed parade route will substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption.
2. Under Subsection 10-8-330(g)(2) of the Municipal Code of Chicago, the Commissioner found that there are not available at the time of the parade a sufficient number of on-duty police officer, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of other requirements for police protection during the time of the proposed parade.

Also included in this denial letter was a proposed alternate route for this parade. The parade would be held on August 19, 2024. It would assemble at 4:30 pm on Columbus Drive north of Roosevelt Road. It would step-off at 5:00pm and proceed north along Columbus Drive from Roosevelt Road ending at Jackson Drive. The parade would disband at 7:00pm at Jackson Drive between Michigan and Columbus. The applicant did not accept this proposed alternate route.

The Applicant filed a timely appeal of the denial. The Hearing was held on March 18, 2024.

**SUMMARY OF THE PROCEEDING –**

Prior to the start of the evidence, the parties stipulated to the introduction of the following city exhibits:

- Exhibit 1 – Homeland Security Memorandum dated March 24, 2018, designating the Republican and Democratic National Conventions as National Special Security Events,
- Group Exhibit 3 a-c – Application for a Parade Using the Public Way filed by the Students for a Democratic Society on February 29, 2024.
- Exhibit 4 – Google Map for proposed parade route.
- Group Exhibit 5 a-c – Denial Letter dated March 7, 2024.
- Exhibit 6 – Google Map for proposed alternate route.

City Group Exhibit 2 a-c, the affidavit of Secret Service Agent Rashad Spriggs, was allowed in evidence over objection.


Bryan Gallardo is the Assistant Commissioner in charge of the Public Way Permit office for the Chicago department of Transportation. He explained that after a Parade Permit Application is filed in his office, it is sent to other city departments including the CPD, the CFD, OEMC, Special Events, and the Ward offices to obtain their input as to any conflicts and the availability of resources. He identified City Group Exhibit 3 a-c as the Parade Permit Application at issue in this case. It was filed on February 29, 2024, by Henry Rathburn from the sponsoring organization, Students for a Democratic Society for the parade entitled" March against US funded Gaza genocide." This application was brought to his attention because it was related to the Democratic National Convention. The route would encircle the United Center with an estimated 5000 marchers on August 19, 2024. This application was circulated to the previously listed city departments.

The Department of Transportation reviewed this application for any traffic conflicts. The first traffic conflict was the existing traffic closings due to the convention itself. Streets were scheduled to be closed for the convention. To accommodate this route would require the closing of three main arterial streets: Ashland, Damen and Western. All three streets have multiple north/south bus routes which would need to be rerouted. This route would also impact emergency vehicles traveling to the hospitals in the Illinois Medical District. These were the reasons the Commissioner denied this permit under Section 10-8-330 (g)(1).

Mr. Gallardo stated the CPD responded to this application saying it had insufficient resources to hold this event. He explained the alternate route on Columbus Drive was chosen because it would have a less significant impact on traffic and would require less police resources.

On cross-examination Mr. Gallardo testified the CPD responded to this application by sending him a Commander Review Letter from the 12th District Commander stating they had inadequate resources for this event. The alternate route has high visibility but would require less city resources and less traffic concerns. This route has been used for past events and the city departments agreed it could accommodate this event. He did look at locations closer to the United Center.

On re-direct examination the witness stated the Columbus Drive location is close to Lake Shore Drive and is visible to the buildings on Michigan Avenue.

Gabriella Shemash is the Area 3 Deputy Chief of Patrol. She is responsible for patrol operations in Area 4 which includes the 12th District which includes the United Center. She also has experience managing large parades such as the Pride Parade and the Puerto Rican Day Parade, but the Democratic National Convention will be much larger than those events. The CPD will be responsible for security for everything outside the security zones which will be set up around the United Center and McCormick Place. Other events have been rescheduled due to the convention. The Air and Water Show has been moved up one week and the Chicago Public Schools will open one week later.

Thousands of Chicago police officers will be assigned to the convention security detail. There are no furloughs and all days off and training sessions have been cancelled during the convention. The CPD is working with the Illinois State Police, the Cook County Sheriff and some suburban police departments to coordinate their security efforts. It is anticipated the convention will bring one million visitors to Chicago. Ther will be thousands of delegates, heads of state and the President and Vice-President in attendance.

She received a copy of this parade application from the CPD's Special Events Unit. She reviewed it to determine if it was feasible to handle with respect to police resources. Those resources include police personnel as well as the equipment for the police personnel. That equipment would include vehicles, radios and barriers. She is familiar with the area from her previous position as the Commander of the 12th District. She recommended the denial of this permit application. She estimated she would need to close 30 major intersections to secure the route, and the closure of minor streets. On the requested date and time, the police resources will already be deployed. It would take hundreds of police officers and resources to secure this route. It is likely that portions of the proposed route will be within the security perimeter. Ashland Avenue cannot be shut down as it is the major access street for the emergency rooms in the three hospitals in the Illinois Medical District. The same for Western and Damen as these roads are also used by emergency vehicles transporting patients to hospital within the Illinois Medical District. The proposed time for this parade would be at rush hour when traffic in this area is heavy. She reviewed this information with the 12th District Commander who sent the Commander Review Letter to the Department of Transportation requesting this application be

denied. The proposed alternate route is downtown and highly visible. It would require less manpower and resources as it is a straighter, shorter route that is not near any hospitals.

Henry Rathbun is the President of the SDS at UIC. He submitted City Group Exhibit a-c for this parade. The purpose of the march is to focus on the Garza War by expressing their view that this war is unjustifiable. This protest will be directed at the Democratic Senators, Congressmen, Ambassadors and the President. The protest will be conveyed through chants, banners and speech within sight and sound of the United Center.

The proposed alternate route was rejected because it is three miles from the United Center. The delegates and other officials cannot hear or see the protest. The alternate route is across from a public park where not that many people will be present.

## DISCUSSION –

The testimony of Bryan Gallardo with respect to the traffic problems was credible. He documented the traffic problems faced by the city just because of the convention and that those problems would be exacerbated by this event.  This event would require the closing of Ashland avenue, Damen avenue and Western Avenue. These streets are all major thoroughfares that have north/south bus routes that would need to be re-routed. Closing these streets would also impact the flow of emergency vehicles taking patients to the three hospitals in the Illinois Medical District. This testimony was not contradicted..

Mr. Gallardo's testimony concerning his investigation of this parade permit application was also credible. He followed his usual investigative procedure by notifying the CPD and other city agencies about this permit application and their input on the issuance of this permit. It was through this investigation that Mr. Gallardo received the email from the 12th District Commander objecting to the issuance of this permit.

The testimony of Gabriella Shemash was also credible. Her perspective and opinion on the issuance of this permit is unique because she has managed large scale parades in the past and, as a past Commander of the 12th district, she is aware of the route proposed in the permit application. She detailed the duties of the CPD with relation to security during the convention while continuing to patrol the entire city. She explained the required resources that would be needed for this parade would be hundreds of police officers and the equipment each officer would need. This would include barricades, radios, cameras and vehicles. She reiterated the impact on emergency traffic to the Medical District that would occur if Ashland Avenue was closed. Her opinion that the CPD does not have the resources to handle this event was uncontradicted.

Henry Rathbun is the President of the Students for a Democratic Society UIC and is the applicant for this parade permit under the name "March against US funded genocide." He and his organization want to march to express their views that the Gaza war is unjustifiable. They wish to protest within sight and sound of the Federal Officials, Senators, Congressmen and the President through chants, banners, and speech. His organization rejected the proposed alternate

route because it is three miles from the United Center and the delegates and other officials will not hear their message or see their protest if they march on Columbus Drive.

The Secret Service will be establishing a security perimeter that will probably extend at least a couple of blocks around the United Center. That security perimeter will likely make it impossible for this group or any group of protestors to protest within sight and sound of the United Center. The ordinance does not require the alternate suggested route to be one that would allow the applicant group to march in a position where they could protest within wight ands sound of the United Center. The ordinance does not require the applicant approve an alternate route. Under the facts specific to this case, the proposed alternative route meets the requirements of the ordinance.


**FINDINGS OF FACT –**

The applicant had due and adequate notice of the date, time and location of the requested hearing and of the reasons why the Commissioner of Transportation denied this Parade Permit Application.

The Department of Transportation investigated the facts of this application, in consultation with the police department, as required by Chicago municipal code 10-8-330(5)(f).

The City of Chicago proved by a preponderance of the evidence that the issuance of this Parade Permit would substantially and unnecessarily interfere with traffic in the area contiguous to the activity, and that there are not available at the time of the proposed parade sufficient city resources to mitigate the disruption pursuant to Section 10-8-330(g)(10) of the Chicago Municipal Code.

The City of Chicago proved by a preponderance of the evidence that there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees, authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards because of other requirements for police protection during the time of the proposed parade.

The City of Chicago proved by a preponderance of the evidence that the alternate parade route proposed by the City had, to the extent practicable, comparable public visibility and a similar route, location and date to the prosed parade.

**DECISION –**

The Finding of the Commissioner of the City of Chicago's Department of Transportation denying the issuance of this Parade Permit is AFFIRMED.


Dennis Michael Fleming

Administrative Law Judge                    Dated: March 20. 2024

# Exhibit P

<u>O R D I N A N C E</u>

**WHEREAS**, the City of Chicago ("City") is a home rule unit of government under Article VII, Section 6(a) of the 1970 Constitution of the State of Illinois (the "State") and, as such, may exercise any power and perform any function pertaining to its government and affairs, including, but not limited to, the power to regulate for the protection of the public health, safety, and welfare; and

**WHEREAS**, the City was selected to host the 2024 Democratic National Convention (the "Convention"), which is currently scheduled to take place from August 19, 2024 to August 24, 2024; and

**WHEREAS**, historical data from previous host cities indicates that the Convention is expected to attract approximately 50,000 visitors to the City, including delegates, media, and interested persons; and

**WHEREAS**, the City recognizes the compelling need to facilitate safety and order during the Convention to accommodate both Convention-related activities and the interests of persons not participating in the Convention-related activities; and

**WHEREAS,** it is appropriate for the City to prepare, plan, and coordinate in advance with local, State, and federal law enforcement agencies and other public and private entities to successfully host the Convention; now, therefore,

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:**

**SECTION I.** *Definitions.*

The following definitions shall apply for purposes of this ordinance:

"City" means the City of Chicago.

"Convention" means the 2024 Presidential Nomination Convention of the Democratic National Party scheduled to be held on August 19, 2024 through August 24, 2024.

"Convention Period" means the time period commencing at 12:01 a.m. Central Daylight Time on Saturday, August 17, 2024 and extending until 12:01 a.m. Central Daylight Time on Monday, August 26, 2024.

"Designee" means a City official or employee designated by the Mayor in writing to negotiate and execute agreements with public or private entities as specified in subsection (1) of SECTION III of this ordinance.

"Municipal Code" means the Municipal Code of Chicago.

"Security Footprint" means the boundaries of the area designated by the Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications, for the Convention and Convention-related activities.

**SECTION II.** *Security Footprint regulations.*

(1)     The Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications, is authorized to designate, and mark as necessary, the boundaries of the Security Footprint. The boundaries of the Security Footprint shall be publicized on the Chicago Police Department's website to the extent feasible.

(2)     During the Convention Period, it shall be unlawful for any person, other than governmental employees in the performance of their duties, or persons duly issued a permit that specifically authorizes the activities specified in this subsection, to do any of the following in the Security Footprint:

   (i) push, pull or transport any vehicle, cart, or float;

   (ii) throw any item;

   (iii) possess, carry, control, or have immediate access to any item that poses potential safety hazards, as determined by Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications, including, but not limited to, any item listed in Exhibit A to this Ordinance, which is incorporated into and made an integral part of this Ordinance.

   (iv) except as otherwise provided in subsection (c) of Section 10-36-400 of the Municipal Code, operate any small unmanned aircraft. For purposes of this subsection (2)(iv) of SECTION II, the terms "operate" and "small unmanned aircraft" have the meanings ascribed to these terms in Section 10-36-400 of the Municipal Code. Any person who violates this subsection (2)(iv) of SECTION II shall be subject to the penalty set forth in subsection (d) of Section 10-36-400 of the Municipal Code.

(3)     Except as otherwise provided in this ordinance, any person who violates subsection 2 of Section II of this ordinance shall be fined not less than $100 nor more than $500 or imprisoned for a period of not less than ten days nor more than six months, or both, for each offense.

**SECTION III.** *Transaction authority.*

(1)     The Mayor or his designees are authorized to negotiate and execute agreements with public and private entities for goods, work, services or interests in real property, or for providing grants of duly appropriated funds, personal property or services, regarding the planning, security, logistics, and other aspects of hosting the Convention, on such terms and conditions as the Mayor or such designees deem appropriate and which terms may provide for indemnification by the City, and to provide such assurances, execute such other documents and take such other actions, on behalf of the City, as may be necessary or desirable to host the Convention. All such agreements shall be subject to the approval of the Corporation Counsel as to form and legality.

(2)     Notwithstanding anything to the contrary contained in the Municipal Code or any other ordinance or mayoral executive order, no parties to agreements entered into with the City pursuant to this Section III shall be required to provide to the City the document commonly

known as the "Economic Disclosure Statement and Affidavit" (or any successor to such document) in connection with such agreements.

(3)     Except as otherwise provided in subsection (1) of this section, notwithstanding anything to the contrary contained in the Municipal Code or any other ordinance or mayoral executive order, agreements entered into with the City pursuant to this Section III may contain such terms as the Corporation Counsel determines to be necessary for entering into such agreements but need not contain provisions imposed by City ordinances or State law, unless such provisions are mandated by State law and preempt the City's home rule authority, or mandated by federal law.

(4)     The Mayor or his designees may enter into an agreement as provided in subsection (1) of this Section only after making a determination that: (i) there is no existing contract awarded by the City to a vendor that can be used to procure the needed goods, work, services or interests in real property; or (ii) an existing contract awarded by the City to a vendor is not sufficient to procure the needed goods, work, services or interests in real property.

(5)     Except when the minimum commercially available term for any agreement entered into pursuant to this Section III extends beyond September 30, 2024, no agreement entered into pursuant to this Section III may contemplate the provision of goods, work, services or interests in real property beyond September 30, 2024, unless there is separate authority for the agreement.


**SECTION IV.** This ordinance shall take effect 10 days after its passage and publication. This ordinance shall expire of its own accord, without further action of the City Council, on September 30, 2024.

**Exhibit A**

Items prohibited in the Security Footprint during the Convention:

- Laptops, Tripods, Monopods, and Selfie Sticks
  *If an invited guest arrives with a tablet, they will be redirected to the X-ray line for screening and then permitted entry with the tablet.

- Large Bags and Suitcases exceeding size restrictions (18" x 13" x 7")

- Sealed packages

- Drones and other Unmanned Aircraft Systems

- Animals other than service/guide dogs

- Bicycles, Scooters, Folding Chairs, Balloons, Coolers

- Glass, Thermal, or Metal Containers

- Umbrellas with metal tips

- Any pointed object(s), including knives of any kind

- Aerosols, Tobacco Products, e-Cigarettes, Lighters, Matches

- Firearms, Ammunition, Fireworks, Laser Pointers, Stun Guns, Tasers, Mace/Pepper Spray, Toy Weapons

- Tents and Structures

- Any Other Items Determined by Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications, to be Potential Safety Hazards.

# Exhibit Q

## 10-8-330 Parade.

(a)   The following terms are defined for the purposes of this chapter, as follows:

"Business day" means those days in which municipal offices are open for conducting city business. A "business day" does not include Saturday, Sunday or the holidays listed in Section 2-152-090.

"Commissioner" means the commissioner of transportation.

"Large parade" means any parade that is held in the central business district, as that term is defined in Section 9-4-010, or any parade that is anticipated to require city services exceeding $20,000.00 in value, to be adjusted beginning in 2013 for inflation.

"On-duty" means any city employee, including a police officer, who is scheduled to work on a specific day or shift as part of the employee's normal working hours. A city employee is not "on-duty" if the employee was not normally scheduled to work on that specific day or shift as part of the employee's normal working hours, but was called in or scheduled to work on that specific day or shift due to the demand for additional city personnel or resources.

The term "organization" shall include any voluntary association entered into for the purpose of organizing a parade.

"Parade" means any march, procession or other similar activity consisting of persons, animals, vehicles or things, or any combination thereof, upon any public street, sidewalk, alley or other public place, which requires a street closing or otherwise requires authorized city employees to stop or reroute vehicular traffic because the parade will not or cannot comply with normal and usual traffic regulations or controls.

"Parade organizer" means the person listed on the permit application who is designated as the responsible planner and on-site manager for the parade.

"Parade unit" or "unit" means one vehicle, one float or one marching group.

"Person" has the same meaning ascribed to that term in Section 1-4-090.

"Traditional parade" means a parade that has been conducted on or about a certain date, on a substantially similar route, and in connection with a specific holiday or consistent theme, for at least the prior five years. Not having a parade in 2020 or 2021 shall not be included as part of the counting of the five years.

(b)   No parade is permitted on any portion of the public way unless a permit allowing such activity has been obtained from the department of transportation.

(c)   Except as provided in subsection (i), any person or organization seeking to obtain a parade permit shall file an application with the commissioner in the same calendar year as, and not less than 15 business days before, the date for which the parade is proposed; provided that if the requested permit is for a parade to be held in January, the application must be filed not less than 15 business days before, and not more than one year before, the date for which the parade is proposed. The commissioner shall consider an application for a parade which is filed less than 15 business days before the proposed event, where the purpose of such event is a spontaneous response to a current event, or where other good and compelling causes are shown.

(d)   (1)   No person or organization may submit more than one application for the same parade date and route, or for a parade substantially similar in theme or units described but requesting an alternate date or route, whether using the same name, different names, or different affiliations that the person or organization may control or be a member of.

(2)   No person or organization may submit an application on behalf of another person or entity that is also filing a parade application.

(3)   Where a person or organization submits multiple applications for the same parade date and route, or for a parade substantially similar in theme or units described but requesting an alternate date or route, whether by using one name or multiple names, that person or organization shall not be eligible for such a permit and shall be in violation of this ordinance.

(4)   The commissioner is authorized to disregard any such multiple applications and to deny any permit on the basis of a violation of this subsection (d). Any applicant who disagrees with the commissioner's actions hereunder may appeal, in the manner set forth in subsection (l).

(e)   (1)   An application for a parade permit shall contain the following information:

(i)   the name, address, 24-hour contact telephone number, and, if available the fax number and e-mail address, of the person signing the application, and the organization with which that person is affiliated or on whose behalf the person is applying, if applicable. If the person is signing the application on behalf of an organization, evidence that the person is authorized to sign the application on behalf of such organization;

(ii)   where an organization is involved in requesting a permit, the name, address, 24-hour contact telephone number, and, if available, the fax number and e-mail address, of the leaders of the organization conducting the parade. If the applicant at a later date becomes affiliated with an organization for purposes of producing a parade, this information shall be submitted at such time;

(iii)   the name, address, 24-hour contact telephone number, and, if available, the fax number and e-mail address of the parade organizer;

(iv)   the date of the proposed parade and the hours that it will begin and end;

(v)   the location and exact street address of the assembly and disbanding area, the time when the parade will begin to assemble and disband and whether a permit has been obtained from the property owner to use the assembly or disbanding area;

(vi)   the approximate number of persons and vehicles, floats or other units to participate in the parade and the basis on which this estimate is made;

(vii)   the route along which the parade will proceed and the sidewalks or lanes of traffic it will occupy;

(viii)   a list identifying the type and number of all animals that applicant intends to have at the parade; and

(ix)   a description of any sound amplification or other equipment that is on wheels or too large to be carried by one person, and a description of the size and dimension of any sign, banner or other attention-getting device that is too large to be carried by one person, to be used in connection with the parade.

(2)   As a condition of the permit, the permit holder shall keep all information current. Any change in required information shall be reported to the commissioner immediately.

(3)   The application for a parade permit shall be accompanied by a non-refundable processing fee of $50.00.

(4)   No permit shall be issued until the parade organizer provides proof of the insurance required in subsection (m), if applicable.

(5)   The application shall be in a form and format as prescribed by the commissioner in rules and regulations. The commissioner is authorized to disregard any application filed not in compliance with such rules and regulations and the application shall be returned to the applicant.

(f)   The commissioner shall investigate the facts set out in the application, in consultation with the police department, which shall be sent copies of the application immediately upon receipt. Where the commissioner determines that additional information on the factors set forth in subsection (g)(1) – (5) is required, copies of

the application and a request for such information also shall be sent to any appropriate city department or other governmental agency, including any sister agency. Where the commissioner determines that any such entities may need to make advance preparations for the parade, or may have information useful to planning for city services supporting the event, a copy of the permit or an alternative form of notice shall be sent to the appropriate city department, and any governmental agency, including any sister agency, which may be affected by the parade.

The commissioner shall send a copy of each parade permit application to the alderman of the ward or wards in which the parade is to be held, with a request for any information on the factors set forth in subsection (g)(1) – (3), and a copy of the grant or denial of a parade permit.

Every February 1st and August 1st, the commissioner shall send to the police department and the city council committees on special events, cultural affairs and recreation and transportation and public way a list of all parade permits granted which have not previously been reported.

(g)   After such investigation, the commissioner shall issue a permit when the commissioner finds that:

(1)   The parade will not substantially or unnecessarily interfere with traffic in the area contiguous to the activity, or that, if the parade will substantially interfere with such traffic, that there are available at the time of the proposed parade sufficient city resources to mitigate the disruption;

(2)   There are available at the time of the parade a sufficient number of on-duty police officers, or other city employees authorized to regulate traffic, to police and protect lawful participants in the parade and non-participants from traffic-related hazards in light of the other demands for police protection at the time of the proposed parade;

(3)   The concentration of persons, animals, vehicles or things at the assembly and disbanding areas and along the parade route will not prevent proper fire and police protection or ambulance service;

(4)   The parade will not interfere with the use of the requested area by another party to whom a valid permit has been issued for the same area or route, or does not conflict with another application, or with a traditional parade;

(5)   The parade will not be conducted for any purpose or in any manner made unlawful elsewhere in this code or by any other local, state or federal law; and

(6)   The application contains sufficient information about the person or organization applying for the permit, the parade organizer, and the proposed date, time, location, route and number of participants.

(h)   Subject to subsection (i), all applications for any parade permit shall be processed on a first-in-time basis; provided that if there is a conflict between two or more applications filed, the conflict shall be resolved as follows:

(1)   During the first five business days of each calendar year, the commissioner shall accept all applications for a parade permit filed without giving priority to applications filed first in time; provided however that for purposes of calculating the number of days required to take action or provide notice pursuant to subsection (j), all applications filed within the first five business days of the calendar year shall be deemed as filed on the fifth business day of the year.

(2)   Where there is a conflict between two or more applications filed during the first five business days, or with an application for a traditional parade, the commissioner shall first evaluate whether the conflict could be resolved by assigning the applicants consecutive times on the same day and route, giving consideration to the criteria set forth in subsection (g)(1) – (4). If the commissioner finds that consecutive times are appropriate, the commissioner shall notify each applicant that the permit shall be granted for the specified alternative time. For those applicants who are not assigned their requested time period, such notice shall be treated as a denial and offer of alternative under subsection (k) for purposes of the five-business day time period in which to file an

acceptance or appeal.

Where consecutive times are not deemed appropriate and the conflict is with an application for a traditional parade, the traditional parade shall receive the permit in compliance with subsection (i).

(3)   With respect to any remaining conflicts among permit applications, the commissioner shall notify the applicants that the conflict shall be resolved by lottery, and of the date, time and place of the lottery. Within seven days after the lottery, the applicants not chosen may submit alternative preferences to the commissioner. Any requests for alternative preferences submitted by applicants under this subsection shall be treated as a new application, for purposes of all time limitations under this section, and any conflicts arising among the alternative preferences shall be resolved in accordance with the procedures set forth herein,

(4)   Applications for a parade permit received during the first five business days of the calendar year shall be given priority over applications received thereafter.

(i)   For purposes of protecting the expectations and enjoyment of the public, a traditional parade shall be given a preference to continue on the traditional date and route of the parade. An application for a permit for a traditional parade shall be filed between the 1st and 15th day of December in the year prior to which the parade is to be held. Any application for a permit for a traditional parade filed after such time shall lose the traditional parade preference and shall be considered as an application for a non-traditional parade permit and subject to subsection (h).

In addition to any other information required, the commissioner may request an applicant for a traditional parade permit to provide information or documentation that the parade for which the permit is requested meets the criteria for a traditional parade.

Where the prior organizer of a traditional parade has been consistent and is ascertainable, that person or organization shall be given the preference.

Where there is a dispute regarding which person or organization shall receive the traditional parade preference for a certain date or route, the traditional parade which has been in existence longer shall receive the permit.

Where two or more applications are filed purporting to represent the prior organizer of a traditional parade, or where there have been different organizers over the past five years, the commissioner may request those involved to submit documentation to resolve such conflict. Where the commissioner finds no clear resolution of the conflict, the commissioner shall conduct a lottery to select the permittee, and shall notify each applicant in writing by mail, fax or e-mail of the existence of the conflict and of the date, time and place of the lottery.

Any applicant who disagrees with the commissioner's actions hereunder may appeal, in the manner as set forth in subsection (i).

(j)   (1)   The commissioner shall take action upon the application for a parade permit, and provide notice thereof, for applications filed in January within 10 business days after filing of an application, for all other applications within seven business days after the filing thereof or, if any lottery is held, within seven business days of the lottery, except that where the purpose of such event is a spontaneous response to a current event, or where other good and compelling cause is shown, the commissioner shall act within two business days.

(2)   Notice shall be made in writing by mail, fax, or e-mail directed to the applicant, stating the facts and conclusions which are the basis for any denial of the permit and, if the action taken is setting a lottery date or offering a consecutive time, then describing the conflict among application requests. If the commissioner denies an application for failure to provide sufficient information about the proposed route or the estimated number of participants, he shall specify what additional information must be provided in a new or amended application.

(3)   In the event that the commissioner fails to take action within the time prescribed in subsection (j)(1) after the date upon which the application was filed, the application shall be deemed approved and the permit deemed granted as to the time, date, location and route as set forth in the application.

(k)   When the commissioner denies an application for a parade permit, the commissioner shall authorize the conduct of a parade on a date, at a time, at a location, or over a route different from that named by the applicant. This alternate permit shall, to the extent practicable, authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed parade. An applicant desiring to accept an alternate parade permit shall, within five business days after notice of the action by the commissioner, file a written notice of acceptance with the commissioner. Where the denial and alternate are based on a conflict between applications for a parade permit, however, the procedures set forth in subsection (h) shall apply.

The commissioner is empowered to limit the parade to the sidewalk or to one or more traffic lanes of the street if it is determined that such limited area is capable of accommodating the number of parade participants or parade units anticipated, based upon the information submitted by the applicant and the experience of previous comparable events, and such limitation shall not be considered a denial.

(l)   (1) Any applicant who believes that his application for a permit is wrongfully denied may file an appeal with the department of administrative hearings within five business days of the date of notice of the commissioner's decision. If no appeal is filed within five business days of the date of notice of the commissioner's decision, that decision shall be deemed final.

Upon the filing of such appeal, the department of administrative hearings shall cause a hearing to be held within five business days and based upon the evidence contained in the record of such hearing, either affirm or reverse the decision of the commissioner.

Any final decision of the department of administrative hearings shall be subject to judicial review in accordance with applicable law.

In the event that the department of administrative hearings fails to act within two business days of the conclusion of a hearing held under this section, the application for a permit shall be deemed approved and the permit deemed granted as to the date, time, location and route as set forth in the application.

(2)   If there is not sufficient time to file the appeal in accordance with the procedure set forth in this subsection, the decision by the commissioner shall be deemed a final decision subject to judicial review in accordance with applicable law.

(m)   For large parades, the commissioner shall require, as a condition of the permit, that the parade organizer obtain a commercial general liability insurance policy with limits of not less than $1,000,000.00 per occurrence for bodily injury, personal injury and property damage, naming the city as an additional insured on a primary, noncontributory basis for any liability arising directly or indirectly from the permittee's operations. In addition to the requirements stated above, and apart from and separate from any insurance requirement under this section, the permittee shall indemnify, defend and hold harmless the City of Chicago and its assignees and employees against any additional or uncovered third party claims against the city arising out of or caused by the parade; and shall agree to reimburse the city for any damage to the public way or to city property arising out of or caused by the parade.

(n)   (1)   At least one week prior to the scheduled parade, the parade organizer shall submit to the department of cultural affairs and special events a line of march, which shall list all parade units in numerical order, with a description and an estimate of the size or length of each unit. For any new parade, and for any parade for which in the prior year the estimate of the number or size of units was substantially inaccurate, the parade coordinator also shall be required to submit documentation demonstrating the planned participation of the parade units. At least one week prior to the scheduled parade, the parade organizer shall furnish to the commissioner documents demonstrating compliance with the insurance requirement set forth in this section, if required.

(2)   Where animals will participate or be involved in the parade, the parade coordinator must provide: a veterinarian's certificate of good health for each animal to be used; the name of the attending local veterinarian who shall provide care for any sick or injured animals; a copy of the handler's Federal Exhibitor's license for any animal identified in the Illinois Dangerous Animal Act; and access to an animal ambulance.

In order to protect the health and safety of the public, employees of the commission on animal care and control are authorized to inspect animals prior to their use in the parade and to prohibit the use of any animal found to be diseased or unhealthy, or which poses a danger to public health and safety.

   (3)   The commissioner may establish in rules and regulations provisions for the orderly conduct of the parade, including requiring the parade units to proceed at a reasonable pace.

   (o)   (1)   The parade shall last no longer than two hours and 15 minutes, except that where a traditional parade consistently has lasted longer and the commissioner determines that there is no traffic safety or undue congestion problem in continuing to allow the longer time period, the permit may provide for additional hours. The parade permit time may be reduced by the department of cultural affairs and special events after receipt of the parade lineup, where the number and size of the planned parade units are not sufficient to fill the permit time while proceeding at a reasonable pace, or may be reduced by the police department on location, for the same reason, where the actual size and number of parade units at the lineup are insufficient to require a two-hour and 15 minute street closing. Once the last unit has started on the parade route, the department of streets and sanitation will begin cleaning the street, and the police department will reopen the street to traffic as street cleaning is completed. Once the last parade unit has completed the parade route, all parade participants must disperse from the street so that it may be safely cleaned and reopened to traffic.

   (2)   Where the parade permit was limited to the sidewalk or one lane of traffic based on the estimated number of parade participants and parade units, and in the event that the number of participants in attendance exceeds anticipated levels, members of the police department are authorized to make reasonable accommodation to increase the portion of the public way made available in order to preserve public health and safety.

   Alternatively, where the number or size of parade participants or parade units participating are substantially less than expected, members of the police department are authorized to limit the available portion of the public way, where one lane of traffic or the sidewalk is capable of accommodating the number of participants and parade units present.

   (p)   The commissioner, in consultation with other city departments and agencies, including the department of cultural affairs and special events, is authorized to promulgate rules and regulations to implement this section.

   (q)   It shall be unlawful for any person to knowingly interfere with any person or organization lawfully conducting a parade.

   (r)   Any requirement for an application fee or obtaining insurance provided for in this section shall be waived by the commissioner if the application is for an activity protected by the 1st Amendment to the United States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from applying for a parade permit for the proposed activity. An application for a waiver of the application fee or insurance requirement shall be made on a form prescribed by and contain reasonable proof acceptable to, the commissioner.

   (s)   Any person violating any of the provisions of this section, or any of the provisions of the regulations promulgated hereunder, shall be fined not less than $200.00 nor more than $1,000.00, or may be subject to incarceration for up to ten days, or both. In addition to any other penalty or fine provided, any person who sells or transfers a permit granted under this section shall be barred from applying for another such permit for a period of three years.

(Prior code § 36-31; Amend Coun. J. 7-29-87, p. 2888; Amend Coun. J. 12-20-89, p. 10127; Amend Coun. J. 12-11-91, p. 10832; Amend Coun. J. 11-30-94, p. 62771; Amend Coun. J. 12-21-94, p. 64115; Amend Coun. J. 11-18-98, p. 84402, § 1; Amend Coun. J. 12-12-01, p. 76493, § 1; Amend Coun. J. 7-27-05, p. 53211, § 1; Amend Coun. J. 12-7-05, p. 64870, § 1.9; Amend Coun. J. 11-19-08, p. 47220, Art. IX, § 1; Amend Coun. J. 11-17-10, p. 106597, Art. VII, § 3; Amend Coun. J. 1-18-12, p. 19230, § 5; Amend Coun. J. 10-28-15, p. 11951, Art. VI, § 27; Amend Coun. J. 11-16-16, p. 37901, Art. II, § 28; Amend Coun. J. 4-21-21, p. 29736, § 1)