# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| BODIES OUTSIDE OF UNJUST LAWS: COALITION FOR REPRODUCTIVE JUSTICE & LGBTQ+ LIBERATION, ANDREW THAYER, KRISTI KEORKUNIAN, and LINDA LOEW, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, TOM CARNEY, in his official capacity as Commissioner of the Chicago Department of Transportation, and LARRY SNELLING, in his official capacity as Superintendent of the Chicago Police Department. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) No. 24-cv-3563 ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Rebecca K. Glenberg
rglenberg@aclu-il.org
Kevin M. Fee, Jr.
kfee@aclu-il.org
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ...............................................................................................1

Bodies Outside's Permit Application and CDOT's Denial .................................................1

The Administrative Hearing ...............................................................................................3

The Defendants' Policy or Practice of Distancing Protesters from Convention Delegates ............5

ARGUMENT .......................................................................................................................5

I.      Preliminary Injunction Standard. .........................................................................7

II.     Bodies Outside of Unjust Laws is Likely to Prevail on the Merits. ....................8

        A.      The One-and-Done Provisions of the Permit Ordinance are Unconstitutional on Their Face and as Applied to Plaintiffs. ...................9

                1.      The one-and-done scheme is not narrowly tailored to serve an important government interest on its face or as applied to Plaintiffs. ........................10

                2.      On its face and as applied, the one-and-done scheme does not allow ample alternative channels of ...........................................................11

        B.      The Indemnity, Hold Harmless and Reimbursement Conditions in the Permit Ordinance and the Permit Application Form Violate the First Amendment. ........14

        C.      The Defendants' Denial of Bodies Outside's Permit Application Violates the First Amendment. .....................................................................17

        D.      The Footprint Ordinance is Unconstitutionally Vague. ........................18

                1.      The Footprint Ordinance fails to give sufficient notice of prohibited conduct. ................................................................................19

                2.      The Footprint Ordinance does not provide sufficient guidance to law enforcement to prevent arbitrary or discriminatory enforcement. .............21

III.    The Balance of Hardships Favors Preliminary Relief. ........................................22

        A.      Without a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm. .........22

B.    The Irreparable Harm to Plaintiffs Outweighs any Harm that a Preliminary
        Injunction Would Cause to Defendants. .................................................................23

CONCLUSION .........................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Illinois v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012) ...........................................................................24

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004)...........................................................................................9

*Aurora Pride v. City of Aurora,*
   2023 WL 3569130 (N.D. Ill. May 18, 2023) ..................................................16

*Ayres v. City of Chicago,*
   966 F. Supp. 701 (N.D. Ill. 1997) ...................................................................22

*Bay Area Peace Navy v. United States,*
   914 F.2d 1224 (9th Cir. 1990) .........................................................................12

*Bell v. Keating,*
   697 F.3d 445 (7th Cir. 2012) ...................................................................19, 21

*Brown v. Kemp,*
   86 F.4th 745 (7th Cir. 2023) ...........................................................................19

*Christian Legal Society v. Walker,*
   453 F.3d 853 (7th Cir. 2006) ..........................................................................24

*Citizens for Peace in Space v. City of Colorado Springs,*
   477 F.3d 1212 (10th Cir. 2007) ......................................................................13

*City of Chicago v. Morales,*
   527 U.S. 41 (1999)......................................................................................19, 21

*Coalition to March on the RNC and Stop the War v. City of St. Paul,*
   557 F. Supp. 2d 1014 (D. Minn. 2008)......................................................13, 23

*D.U. v. Rhoades,*
   825 F.3d 331 (7th Cir. 2016) .............................................................................7

*Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago,*
   419 F. Supp. 667 (N.D. Ill. 1976) ...................................................................12

*Elrod v. Burns,*
   427 U.S. 347 (1976)..........................................................................................23

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)......................................................................8, 15, 17

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................20

*Higher Soc'y of Indiana v. Tippecanoe County, Indiana*,
    858 F.3d 1113 (7th Cir. 2017) ...................................................23

*Horina v. City of Granite*,
    538 F.3d 624 (7th Cir. 2008) .....................................................9

*Hynes v. Mayor & Council of Borough of Oradell*,
    425 U.S. 610 (1976)......................................................................19, 20

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) .....................................................8

*Joelner v. Village of Washington Park*,
    378 F.3d 613 (7th Cir. 2004) .....................................................8

*Johnson v. United States*,
    576 U.S. 591 (2015)......................................................................18

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) .....................................................16

*Kolender v. Lawson*,
    461 U.S. 352 (1983)......................................................................21

*Long Beach Area Peace Network v. City of Long Beach*,
    574 F.3d 1011 (9th Cir. 2009) ..................................................15, 16

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012).........................................................13

*Mays v. Dart*,
    974 F.3d 810 (7th Cir. 2020) .....................................................7, 8

*McCullen v. Coakley*,
    573 U.S. 464 (2014)......................................................................8, 11, 17

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)......................................................................15, 16, 17

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972) .........................................................................................20

*Price v. City of Chicago*,
915 F.3d 1107 (7th Cir. 2019) ...........................................................................9

*Reform Am. v. City of Detroit*,
542 F. Supp. 3d 628 (E.D. Mich. 2021) .........................................................13

*Reform Am. v. City of Detroit, Michigan*,
37 F.4th 1138 (6th Cir. 2022) ..........................................................................13

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781, (1988) ..................................................................................11, 12

*Serv. Employee Int'l Union [SEIU] v. City of Los Angeles*,
114 F. Supp. 2d 966 (C.D. Cal. 2000) ....................................12, 13, 17, 17, 23

*Speech First, Inc. v. Killeen*,
968 F.3d 628 (7th Cir. 2020) .............................................................................7

*Stand Up Am. Now v. City of Dearborn*,
969 F. Supp. 2d 843 (E.D. Mich. 2013) ..........................................................16

*Stauber v. City of New York*,
03 CIV. 9162 (RWS), 2004 WL 1593870 (S.D.N.Y. July 16, 2004) ...................17, 18, 23

*United States v. Grace*,
461 U.S. 171 (1983) ...........................................................................................8

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ...........................................................................................8

*Weinberg v. City of Chicago*,
310 F.3d 1029 (7th Cir. 2002) .........................................................................12

**Code**

Chicago Municipal Code 8-4-120 .................................................................................14

**Other Authority**

Mitchell Armentrout, *'Security footprint' plan for Democratic Convention kicked to City Council for Wednesday vote*, Chicago Sun-Times (Apr. 11, 2024), https://chicago.suntimes.com/2024-democratic-national-convention/2024/04/11/democratic-national-convention-dnc-security-zone-city-council-united-center-mccormick-place (last visited April 30, 2024) ...................................22

**INTRODUCTION**

This case is about Plaintiffs' right to communicate their urgent message to delegates attending the Democratic National Convention in Chicago this August. The Defendants' unwarranted denial of Plaintiffs' permit application and their implementation of unconstitutional ordinances violated and continue to violate Plaintiffs' rights to freedom of speech, peaceable assembly, and due process of law under the First and Fourteenth Amendment. They seek a preliminary injunction allowing them to exercise those rights at the Convention.

**FACTUAL BACKGROUND**[1]

**Bodies Outside's Permit Application and CDOT's Denial**

Plaintiff Bodies Outside of Unjust Laws ("Bodies Outside") is a coalition of civil rights organizations and individuals who support expanded access to abortion, funding for families, and protection for the rights of LGBTQ+ people. Compl. ¶ 12. Plaintiffs Andy Thayer, Kristi Keorkunian and Linda Loew are members of Bodies Outside and longtime activists with years of experience organizing peaceful demonstrations in Chicago. Compl. ¶¶ 13-15.

Bodies Outside desires to send a message to the Democratic Party during the Democratic National Convention ("DNC" or "Convention") that it should prioritize a national plan to address critical issues of bodily autonomy and civil rights. Compl. ¶¶ 19-20. Mr. Thayer applied to the Chicago Department of Transportation ("CDOT") for a parade permit on behalf of Bodies Outside (the "Application," Compl. Ex. B), proposing a march on Sunday, August 18, 2024 (the day before the DNC), along Michigan Avenue and State Street—a route that would be visible from Magnificent Mile and downtown hotels where DNC delegates will stay (the "Proposed Route," Compl. Ex. A). Personnel from the Chicago Police Department phoned Mr. Thayer on

---

[1] A full statement of facts may be found in the Verified Complaint, cited here as "Compl.".

1

January 3 and 4, 2024, suggesting that his permit would not be approved as submitted. Compl. ¶¶ 22-23. On January 5, 2024, an employee of CDOT suggested that Mr. Thayer should submit an amended application, but she did not recommend any specific changes. Compl. ¶ 24.

Mr. Thayer submitted an amended application on January 8, 2024 ("Amended Application," Compl. Ex. C; collectively with the Application, "the Applications"). He shortened the portion of the route on Michigan Avenue north of the Chicago River, and otherwise modified the route to ensure that marchers walked in the direction of traffic in the lanes they occupied ("Amended Route," Compl. Ex. D; collectively with the Proposed Route, the "Proposed Routes").

On January 16, 2024, Defendant Tom Carney, the CDOT Commissioner ("Commissioner") denied both the Applications. A denial letter signed on behalf of the Commissioner by CDOT Assistant Commissioner Bryan Gallardo (Compl. Ex. E), cited two reasons: (1) under Chicago Code Section 10-8-330(g)(1) "the proposed parade will substantially and unnecessarily interfere with traffic" and there will not be "sufficient city resources to mitigate the disruption"; and (2) under Section 10-8-330(g)(2), there will not be "a sufficient number of on-duty police officers or other city employees authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards." The Commissioner offered an alternate route (Compl. Ex. F) assembling on Columbus Drive north of Roosevelt Road, proceeding north on Columbus Avenue to Jackson Drive, and disbanding on Jackson between Michigan and Columbus. The alternate route would not be visible from DNC delegates' hotels. Compl. ¶ 28.

The Commissioner's denial letter did not provide any opportunity for Bodies Outside to propose a different route or a different date or time. Instead, the letter stated that Bodies Outside

had five days to accept the alternate route, after which the offer of an alternate route would be withdrawn. Compl. Ex. E at 3. Bodies Outside did not accept the City's proposed alternate route. Instead, it timely filed an administrative appeal from the denial.

**The Administrative Hearing**

On January 30, 2024, the Chicago Department of Administrative Hearings heard Bodies Outside's appeal. As detailed below, testimony at the hearing failed to establish that insufficient law enforcement resources were available for the Proposed Routes, or that insufficient city resources were available to mitigate their impact on traffic.

Secret Service Agent Rashad Spriggs testified that the DNC is a National Special Security Event ("NSSE"), meaning that "the full capacity and capabilities of the Federal Government are to be used to help in the securing of the event" (transcript of January 30, 2024, hearing, Compl. Ex. G, Tr. 17:11-15, hereafter "Tr.").

Bryan Gallardo, an assistant commissioner of CDOT who reviewed the Applications, testified he met with CPD representatives who "said that they were concerned given with the activities at the DNC that they weren't going to have sufficient resources to safely provide a path that [Bodies Outside] had requested" on the Applications. Tr. 69:13-19.

However, CPD lacked sufficient information to make such a determination. Daniel O'Connor, deputy chief in CPD's Bureau of Patrol, who reviewed the Applications, testified that CPD will be operating at full capacity during the Convention, cancelling all time off; as a result, over 11,000 CPD officers will be available. Tr. 135:8-14. Officers from the Illinois State Police and Cook County Sheriff's Office will also be deployed. Tr. 183:12-14. Further, CPD "may" supplement its forces during the Convention with officers from other law enforcement agencies in Illinois, and it was "contemplating" bringing in officers from other states. Tr. 133:1-14.

Deputy Chief O'Connor did not know how many officers from other law enforcement agencies would be available. Nor did he know how many officers would be required for Bodies Outside's Proposed Routes. He estimated the number at "several hundred" (Tr. 129:19), and, when pressed, said "over 500" (Tr. 145:3). Asked about the margin of error for that estimate, he said, "I don't have a margin of error. I would have to review it more thoroughly." Tr. 145:14-16.

Deputy Chief O'Connor further testified that the Alternative Route would also require "several hundred officers" (Tr. 144:17:19) but "less resources" (Tr. 141:21-22) than Bodies Outside's Proposed Routes. He did not explain why CPD would have sufficient resources to secure the Alternative Route on Columbus Avenue but not either of the Plaintiff's Proposed Routes.

Likewise, there was insufficient evidence to establish that the City could not mitigate the Proposed Routes' impact on traffic. Mr. Gallardo noted that the march would take place on "heavily trafficked streets" and that thirteen bus routes "would be impacted." Tr. 75:6-23. Yet he acknowledged that CDOT had previously authorized parades on Michigan Avenue, such as the Festival of Lights parade. He testified that permits for that parade were approved because organizers provided their own parade marshals and traffic barriers, and CDOT met with them ahead of time to review their traffic management plan. Tr. 88:11-89:6. Yet Mr. Gallardo acknowledged that he did not ask Bodies Outside about marshals. Tr. 89:7-10. (In fact, parade marshals were and are an integral part of Bodies Outside's plans. Compl. ¶ 42.) Nor did he communicate his traffic-related concerns to Bodies Outside or give them an opportunity to address those issues. Compl. ¶ 43.

Despite the gaps in the Defendants' knowledge of relevant facts and their failure to provide Bodies Outside the information they would need to submit a successful application, the ALJ found that the City's denial of the application was proper. Compl. Ex. H.

**The Defendants' Policy or Practice of Distancing Protesters from Convention Delegates**

The Defendants' denial of Bodies Outside's permit is only one in a series of actions they have taken to keep protesters away from the DNC and its delegates. First, Defendants denied at least four other applications for permits to protest the Convention. Compl. Exs. I-L. Second, Defendants have taken no affirmative steps to protect First Amendment rights at the Convention—at least, none they have disclosed to the public. They have issued no plan for accommodating protesters who wish to march. Nor have they announced any areas near the Convention's primary venues where protesters may communicate with delegates. Compl. ¶ 50. The steps Defendants *have* taken are aimed at controlling protesters, not accommodating them. The Chicago Police Department has rolled out a new policy to facilitate mass arrests (Compl. ¶ 51), and the City has enacted a new ordinance authorizing the Superintendent to designate a yet-to-be announced "security footprint," in which he may ban any objects he determines to be potential safety hazards (the "Footprint Ordinance," Compl. Ex. P).

## ARGUMENT

Bodies Outside of Unjust Laws intends to make the most of the upcoming Democratic National Convention by conveying its urgent message about bodily autonomy directly to the delegates. But Defendants have told the group that it may not march anywhere near the delegates. Plaintiffs seek a preliminary injunction before the Convention to restore their First Amendment rights to freedom of speech and peaceable assembly. Specifically, they ask the Court to enjoin Defendants from enforcing certain provisions of the Permit Ordinance; enjoin

Defendants from enforcing Section II of the Footprint Ordinance; and require Defendants to issue them a permit for August 18, 2024, along a route that allows them to reach a substantial number of delegates to the Convention.

Two elements of the Permit Ordinance violate the First Amendment. First, the ordinance's "one-and-done" scheme allows Defendants to summarily deny a permit application without allowing applicants to modify their request to address the reasons for the denial. Although Defendants must offer an alternate permit, that alternate need not satisfy the constitutional requirement that speakers be allowed to reach their intended audience. Once the denial becomes final, the Permit Ordinance precludes applicants from submitting any further requests for an event on the same "theme." These one-and-done provisions are unconstitutional because they burden the right to free speech and assembly in a traditional public forum without satisfying the standards of narrow tailoring to serve a significant government interest and leaving open ample alternative avenues for speakers to communicate their message. As a result of this system, Bodies Outside received a denial letter seven months before the Convention is to begin—plenty of time to work out an acceptable alternative route in light of the reasons for denial—but it was permanently barred from reapplying.

Second, the indemnification and hold harmless section of the ordinance—and the even broader liability provisions that appear in the standard parade permit application—impermissibly burden speech and assembly by requiring permittees to accept potentially crushing liability for injuries and property damages "arising out of" a march, even if the harm is caused by third-party acts that the permittee does not authorize, direct, or ratify.

Defendants' denial of Bodies Outside's permit application was unconstitutional because it was based on an unconstitutional ordinance and for the separate reason that the denial itself

was not narrowly tailored to serve a significant government interest. First, Defendants denied the application before they had sufficient information to know whether the grounds for denial were warranted. Second, Defendants ignored alternative means of addressing their staffing and traffic concerns that would burden substantially less speech.

Finally, the Footprint Ordinance burdens Plaintiffs' exercise of their rights to free speech and assembly because does not give speakers adequate notice of what conduct is prohibited and where, nor does it provide sufficient guidance to law enforcement officers to prevent arbitrary or discriminatory enforcement. Therefore, the ordinance is impermissibly vague in violation of the Fourteenth Amendment.

The highest command of the First Amendment is to protect the people's right to lay their political views directly at the feet of the government. The Court should grant preliminary relief to prevent the irreparable harm that Defendants' unconstitutional actions and ordinances currently cause and will continue to cause to Plaintiffs.

## I.    Preliminary Injunction Standard.

"To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (internal quotations and citations omitted). "[T]he threshold for demonstrating a likelihood of success on the merits is low." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016).

"If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays v. Dart*, 974 F.3d 810, 818

(7th Cir. 2020). The balancing analysis involves a "'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* Finally, "the balance of equities must tip in [the applicant's] favor, and the injunction [must be] in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (internal quotation marks and citation omitted). "When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). In this case, all of these factors weigh decisively in factor of preliminary relief.

II.      **Bodies Outside of Unjust Laws is Likely to Prevail on the Merits.**

The Permit Ordinance and the Footprint Ordinance govern speech and assembly on public streets and sidewalks, traditional public forums that are "historically associated with the free exercise of expressive activities" *United States v. Grace*, 461 U.S. 171, 177 (1983). "In such places, the government's ability to permissibly restrict expressive conduct is very limited." *Id.* The government may not regulate speech in a public forum based on its content, but it "may impose reasonable restrictions on the time, place, or manner of protected speech," as long as "they are narrowly tailored to serve a significant governmental interest, and [] they leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014), quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Such rules must also "contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (citation and internal quotation marks omitted). These principles help ensure that local streets, sidewalks, and

parks are available on the same terms to all speakers and that government officials do not arbitrarily restrict access to them.

Defendants must justify the burdens they impose on a speaker's right to use traditional public forums. *Price v. City of Chicago*, 915 F.3d 1107, 1111 (7th Cir. 2019); *see also Horina v. City of Granite*, 538 F.3d 624, 631, 633-634 (7th Cir. 2008) (government bears the burden to produce "objective evidence" to show constitutionality of time, place, and manner restrictions). The Defendants' burden to justify their speech restrictions applies even at the preliminary injunction stage, *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

### A.    The One-and-Done Provisions of the Permit Ordinance are Unconstitutional on Their Face and as Applied to Plaintiffs.

Three provisions of the Permit Ordinance make it possible for the Commissioner to dispose of applications quickly and with finality, sidestepping constitutional requirements. First, if the Commissioner finds that an application fails any of six conditions enumerated in Sec. 10-8-330(g), he issues a notice "stating the facts and conclusions which are the basis for [the] denial of the permit." Compl. Ex. Q, Sec. 10-8-330(j)(2). The ordinance does *not* require him to allow the applicant to address those facts and conclusions by amending its request.[2] Second, when the Commissioner denies a permit, he must "authorize the conduct of a parade on a date, at a time, at a location, or over a route different from that named by the applicant." *Id.*, Sec. 10-8-330(k). The applicant has five business days to accept the alternate permit. *Id.* The ordinance does *not* require the Commissioner to consult the applicant about the "alternate permit" or to ensure that it allows the applicant to reach its intended audience. Third, if the applicant does not accept the alternate

---

[2] There is one exception: "If the commissioner denies an application for failure to provide sufficient information about the proposed route or the estimated number of participants, he shall specify what additional information must be provided in a new or amended application." *Id.* This is cold comfort for applicants who *do* provide the necessary information and are given no second chances.

permit, it may not submit another application "for a parade substantially similar in theme or units described but requesting an alternate date or route." *Id.*, Sec. 10-8-330(d)(1). If the applicant does submit subsequent applications, it "shall not be eligible for such a permit and shall be in violation of the ordinance." *Id.*, Sec. 10-8-330(d)(3). Violations of the ordinance are punishable by a fine of up to $1,000, incarceration of up to ten days, or both. *Id.*, Sec. 10-8-330(s).

The one-and-done scheme imposes substantial burdens on the right to speak and assemble in a traditional public forum. Permit applicants do not have access to the information that the Commissioner uses to evaluate whether sufficient police officers and other resources will be available to manage the parade or mitigate interference with traffic—information that the Commissioner gathers from CPD and other city agencies. *Id.*, 10-8-330(f). They can only guess whether the Commissioner will approve their proposed date, time, and route. If they guess wrong, they get the Commissioner's "alternate permit"—constructed without their input—or nothing, since they are barred from reapplying. Bodies Outside of Unjust Laws guessed wrong and got nothing.

These burdens on the freedom of speech and assembly are not narrowly tailored to serve a significant government interest and do not leave open ample alternative avenues for communication. The one-and-done provisions violate the First Amendment.

        **1.**        **The one-and-done scheme is not narrowly tailored to serve an important government interest on its face or as applied to Plaintiffs.**

There is no important government interest to support the one-and-done provisions. These limitations do not advance public safety or resource allocation. Instead, they allow administrators to close an application within five business days without interacting with the applicant or considering its constitutional rights. Such efficiencies do not justify the harms they inflict on applicants' right to freedom of speech and assembly. "[T]he First Amendment does not permit

the State to sacrifice speech for efficiency." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). Rather, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495 (responding to police captain's testimony that the regulation at issue would "make our job so much easier"). The narrow tailoring requirement prevents the government from suppressing speech out of "mere convenience" when doing so is "the path of least resistance." *Id.* at 486.

Whatever the Defendants' interest in the efficient resolution of parade permits, it cannot justify the extreme burdens on speech posed by the one-and-done provisions and the Commissioner's implementation of them.

> ## 2. On its face and as applied, the one-and-done scheme does not allow ample alternative channels of communication.

The First Amendment requires that restrictions on speech in a traditional public forum leave open ample alternative avenues for communication. That is, if the government does not allow a protest at the time and place a speaker requests, the speaker must be able to deliver its intended message to its intended audience in some other way. But the Chicago Permit Ordinance does not leave such options available; instead, it affirmatively closes them by prohibiting organizers from reapplying after their permit applications are denied. Compl. Ex. Q, Sec. 10-8-330(d)(1).

Although the Permit Ordinance requires the Commissioner to authorize an "alternate permit" when he denies an application, it does not require him to issue a constitutionally adequate one. "Whether an alternative is ample should be considered from the speaker's point of view," because courts must "presume that speakers, not the government, know best both what

they want to say and how to say it." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) (*quoting Riley,* 487 U.S. at 790–91). In particular, "an alternative is not ample if the speaker is not permitted to reach the intended audience." *Weinberg*, 310 F.3d at 1042 (*quoting Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990)); *see also id.* at 1041 (listing cases). The Permit Ordinance does not require the Commissioner even to consider an applicant's intended audience, and the alternate permit he offered to Bodies Outside (and to *every other applicant* seeking to protest the Convention) seems designed to keep them *away* from their intended audience.

This case resembles *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F. Supp. 667 (N.D. Ill. 1976), in which the City denied a parade permit to a group protesting racist attacks against Black people who wished to move into the almost exclusively white neighborhoods around Marquette Park. The court noted that the organization "wanted to call their dissatisfaction to the attention of [white residents], solicit their support, and bring action from the public authorities." 419 F. Supp. at 673-74. Instead, the City authorized an alternate route that would proceed in a different direction through predominantly Black neighborhoods where residents "needed no persuasion to the views plaintiffs had concerning events near Marquette Park." *Id.* at 674. The court concluded that the alternate route "had the effect of depriving plaintiffs of their First Amendment rights." *Id.*

Likewise, a court considering security restrictions at a previous DNC found that a designated "Official Demonstration" area was not an adequate alternative for groups that wanted to protest or march near the convention's venue. *Serv. Employee Int'l Union [SEIU] v. City of Los Angeles*, 114 F. Supp. 2d 966, 972 (C.D. Cal. 2000). The court observed that the SEIU wished to reach convention delegates because they "are the ones who will determine the party's

platform, nominate its candidate for president, and … include in their ranks many elected officials." *Id.* But the distance between the protest area and the convention venue "ensures that only those delegates with the sharpest eyesight and most acute hearing have any chance of getting the message…." *Id.* Because the demonstration zone did not allow protesters to communicate effectively with delegates entering and leaving the convention, it was not an adequate alternative.

By contrast, courts who denied injunctions in the political convention context provided various means by which protesters could reach delegates with their message. *See*, *e.g.*, *Marcavage v. City of New York*, 689 F.3d 98, 102 (2d Cir. 2012) (city provided a "protest zone" equipped with a stage a block away from the convention venue where "expressive activity was permitted at any time during the Convention"); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1218 (10th Cir. 2007) (plaintiffs allowed to protest at checkpoint where delegates entered the secure zone around the convention site); *Reform Am. v. City of Detroit*, 542 F. Supp. 3d 628, 634 (E.D. Mich. 2021), *aff'd sub nom. Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022) (same, in the context of a presidential candidate debate); *Coalition to March on the RNC v. The City of St. Paul, Minn.*, 557 F. Supp. 2d 1014, 1028 (D. Minn. 2008) (alternate parade route was adequate because it was visible from the upper levels of the convention venue and "provide[d] unprecedented proximity to convention site.").

The one-and-done provisions of the Permit Ordinance do not satisfy the constitutional standards for restrictions on speech in a traditional public forum because they are not narrowly tailored to serve an important government interest and do not leave open ample alternative avenues of communication. Defendants' application of these provisions to Bodies Outside permanently barred it from holding a march during the convention along any route where a

significant number of delegates were likely to see them. The provisions violate the First

Amendment on their face and as applied to Plaintiffs.

> **B.** **The Indemnity, Hold Harmless and Reimbursement Conditions in the Permit Ordinance and the Permit Application Form Violate the First Amendment.**

The indemnity, hold harmless, and reimbursement provisions in the Permit Ordinance

and on CDOT's application form require speakers to accept civil liability for damage and injuries

caused by others—including the City itself. Courts have repeatedly invalidated similar indemnity

clauses, including in this District.

The insurance and indemnity provisions in the Permit Ordinance apply to "large

parades," defined as "any parade that is held in the central business district … or any parade that

is anticipated to require city services exceeding $20,000.00 in value, to be adjusted beginning in

2013 for inflation." Compl. Ex. Q, Sec. 10-8-330(a). Organizers of "large parades" must carry

liability insurance and agree to "indemnify, defend and hold harmless the City of Chicago and its

assignees and employees against any additional or uncovered third party claims against the city

arising out of or caused by the parade; and shall agree to reimburse the city for any damage to

the public way or to city property arising out of or caused by the parade." *Id.*, Sec. 10-8-330(m).

The permit application form includes additional conditions that apparently apply to *all*

parade permit holders, regardless of the size of the event:

> Per section 8-4-120[3] of the Chicago Municipal Code, the applicant must promptly reimburse the City for any and all damage of any kind to any property of the City which may result from the use by the applicant of the City's premises under the permission granted herein, and the applicant further agrees that it will not hold liable the City for or on account of any losses or damage to property owned by it or controlled by the applicant or for or on account of any loss or damage sustained by the applicant as a result of injuries to employees or agents of the applicant.

---

[3] Despite the citation, Section 8-4-120 does *not* authorize this condition. It simply sets forth the offense of damage to public property and prescribes penalties for violating it. The section has nothing to do with reimbursement or parades.

Compl. Ex. B at 3. The Permit Ordinance does not authorize this language. Under the Ordinance, only "large parade" permittees are required to reimburse the City for property damage, and *no* permittee is required to absolve the City from liability for injuries suffered by the permittee.

These provisions of the Permit Ordinance and the application form violate the First Amendment. Courts have long held that organizations and their leaders may not be held liable for the acts and omissions of others that are beyond their control. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In *Claiborne*, merchants sued the NAACP and its leaders for damages they incurred during a boycott that the NAACP supported. The Court held that those who committed violence during the boycott could be held liable for the resulting injuries, but the NAACP, its leadership, and organizers could not be held liable for conduct that that they had not "authorized, directed, or ratified." 458 U.S. at 927; *id.* at 924. The First Amendment demands "precision of regulation," and therefore "imposes restraints on . . . who may be held accountable for … damages" in the context of protected activities. *Id.* at 916-17.

For these reasons, the Ninth Circuit invalidated indemnity provisions virtually indistinguishable from those challenged here. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009). Like the Chicago ordinance and application form, the Long Beach ordinance required permittees to hold the city harmless from liability for injuries and indemnify it from liability for injuries to third parties arising out of the permitted event. This would require protesters to reimburse the City for its losses "occasioned by the reaction to the permittees' expressive activity." 574 F.3d at 1040. The First Amendment does not allow a "heckler's veto" of this sort. *See Forsyth County,* 505 U.S. at 134–35 ("Speech cannot be financially burdened…simply because it might offend a hostile mob.")

Further, the Long Beach ordinance's hold harmless provision, like the language of the Chicago permit application, required speakers "to forgo recovery on any cause of action they might otherwise have against the City," including personal injury and constitutional torts. *Long Beach*, 574 F.3d at 1040. The court found it "obvious" that "permittees cannot be required to waive their right to hold the City liable for its otherwise actionable conduct as a condition of exercising their right to free speech." *Id.* at 1040.

Finally, the Long Beach ordinance, like the Permit Ordinance here, held permit holders responsible for acts "that are outside the control of the permittee, indeed including activities of the City, burdening substantially more speech than the liability found unconstitutional in *Claiborne*." *Id.* at 1040-41. All of these defects rendered the indemnification and hold harmless provisions unconstitutional. *Id.* at 1039. *See also Stand Up Am. Now v. City of Dearborn*, 969 F. Supp. 2d 843 (E.D. Mich. 2013) (invalidating requirement that organizers release the city from claims "resulting from their activities on the City … property" and to assume liability "even for those activities at the event that are outside of the permittee's control, including activities of the City"); *compare* with *Kaahumanu v. Hawaii*, 682 F.3d 789, 810 (9th Cir. 2012) (upholding indemnity and hold harmless requirements and distinguishing *Long Beach* because permittees were liable only for their own acts or omissions).

For these reasons, a judge in this District recently held that a plaintiff was likely to succeed in its First Amendment challenge to similar indemnification, hold harmless, and reimbursement provisions and granted a preliminary injunction against their enforcement. *Aurora Pride v. City of Aurora*, 2023 WL 3569130, at *29-*30 (N.D. Ill. May 18, 2023). This Court should follow suit. Pursuant to the Permit Ordinance and application form, the threat of ruinous liability hangs over every permit, even if an organization does everything within its

power to ensure that its demonstration is peaceful and lawful. The threat of liability is a heavy

burden on constitutionally protected speech, and it contravenes the principles of *Forsyth* and

*Claiborne*.

      **C.**    **The Defendants' Denial of Bodies Outside's Permit Application Violates the First Amendment.**

      The Defendants' denial of Bodies Outside's application violated the First Amendment

because it was not narrowly tailored to serve a significant government interest. That is,

"measures that burden substantially less speech would [have] achieve[d] the government's

interests" in public safety and traffic management. *McCullen*, 573 U.S. at 495.

      Courts that have conducted the narrow tailoring analysis in the context of protests at

national political conventions have insisted that "government cannot infringe on First

Amendment rights on the mere speculation that violence *may* occur." *SEIU*, 114 F. Supp. 2d at

971 (emphasis in original). Although public safety concerns surrounding a national political

convention are "no doubt real," they must be based on evidence rather than a hypothetical "worst

case scenario." *Id.* at 972. The *SEIU* court found that the "secure zone" around the DNC's venue

"cover[ed] much more area than necessary to serve" the government's legitimate interest in

ensuring the safe passage of delegates (*Id.* at 971), and that the city made "no attempt … to

accommodate or balance the speech interests of the protestors against the need for security at the

Convention site." *Id.* at 972.

      Similarly, in the context of the 2004 Republican National Convention, a court invalidated

two heavy-handed police tactics: "penning" demonstrators without sufficient means of ingress

and egress; and suspicionless bag checks. *Stauber v. City of New York*, 03 CIV. 9162 (RWS),

2004 WL 1593870 (S.D.N.Y. July 16, 2004). With respect to the first tactic, the Court carefully

examined the New York Police Department's claimed security concerns about police

"manpower" and "loss of control" over protesters, and determined that, upon the facts provided, the practice of "penning" demonstrators was not narrowly tailored. *Id.* at *29. Likewise, the Court found that NYPD's invocation of "the increased risk of violence" and "potential terrorism" occasioned by the RNC were too vague to justify random searches. *Id.* at *31.

The Commissioner's denial of a permit for Bodies Outside of Unjust Laws did not meet the level of means-end fit that these precedents demand. First, without knowing how many law enforcement officers would be available on August 18, 2024, and how many would be required to manage Bodies Outside's proposed routes, the Commissioner did not have sufficient information to determine whether staffing and resource issues required denial of the permit. Second, the Commissioner did not consider whether it was possible to address concerns about traffic and police availability while burdening "substantially less speech." For example, he did not consider asking Mr. Thayer if Bodies Outside could construct a shorter route with fewer turns. Nor did he consider offering a conditional permit subject to revision based on new information about security needs and officer availability. Neither he nor the Superintendent considered trying to recruit sufficient officers from other law enforcement agencies to ensure that permitted events like the Bodies Outside march could safely proceed.

Because the denial of a permit to Bodies Outside burdened substantially more speech than necessary to serve the Defendants' legitimate interests, it violated the First Amendment.

### D. The Footprint Ordinance is Unconstitutionally Vague.

A criminal law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," violates the guarantee of due process of law under the Fourteenth Amendment. *Johnson v. United States*, 576 U.S. 591, 595 (2015). This standard applies with "particular force" when a law implicates the freedom of

speech and assembly. *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976). *See also Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012) ("Although it derives from the Fourteenth Amendment, a statute that is vague may implicate a plaintiff's First Amendment rights, fostering those same chilling concerns that attend an overbreadth challenge.") Under these standards, the Footprint Ordinance (Compl. Ex. P) is unconstitutional.

      1.      **The Footprint Ordinance fails to give sufficient notice of prohibited conduct.**

A statute is unconstitutionally vague if it does not "give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) (internal quotation marks and citation omitted). The Footprint Ordinance fails this standard for three reasons.

First, the Footprint Ordinance does not provide fair notice of what items are prohibited within the security footprint. Some of the prohibited items listed in Exhibit A to the Footprint Ordinance are broad categories with unclear boundaries. For example, Exhibit A includes "[a]ny pointed object(s) [*sic*], including knives of any kind." Compl. Ex. P at 4. Despite the endless examples of innocent "pointed objects," including pencils, star-shaped pendants, Epi-pens, and arrow-shaped cardboard protest signs, the category is not limited to (for example) sharp objects or objects that could injure others. The list also includes—or can be read to include—other everyday objects such as tobacco products and e-cigarettes, insulated water bottles ["Thermal Containers"], and soda cans ["Metal Containers"]. *Id.* A catchall provision prohibits "Any Other Items Determined by Chicago Superintendent of Police … to be Potential Safety Hazards." *Id.* Further, the Footprint Ordinance does not require the Superintendent to make any effort to

publicize the list—including by posting it online or physically posting it around the security footprint. Between the vagueness of the list and the lack of public education, a reasonable person would not know which of the ordinary items they carry daily might be unlawful in the security footprint.

Second, the Footprint Ordinance fails to give adequate notice of the footprint itself, nor does it require the Superintendent to do so.[4] There is no deadline for the Superintendent to designate the footprint. Once the Superintendent has designated the footprint boundaries, he is required to publicize them only "on the Chicago Police Department's website to the extent feasible." *Id.*, Sec. II (1). He is also "authorized" to "mark as necessary the boundaries of the Security Footprint" *Id.*, but there are no requirements as to the type or size of the "marking" to ensure that people know when they are entering the footprint.

Third, the Footprint Ordinance contains no *mens rea* requirement as to any of its elements. A person may violate the ordinance without knowing they are within the security footprint or that they are carrying any prohibited item. They may be arrested for having an everyday item regardless of whether they have a lawful purpose for carrying it.

Thus, the Footprint Ordinance "makes criminal activities which by modern standards are normally innocent," such as walking on a public sidewalk with a cigarette and a soda can. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972). Its lack of clarity "may trap the innocent by not providing fair warning." *Hynes*, 425 U.S. at 622, *quoting Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A protester caught unawares with a matchbook may be arrested, convicted, and jailed. These are the marks of an unconstitutionally vague law.

---

[4] It is not even clear whether the footprint will be coterminous with the "hard" security perimeter maintained by the Secret Service within which only authorized persons may enter or represents a "soft" security area that is porous to the general public. Plaintiffs assume it is the latter, but the ordinance simply does not say.

### 2. The Footprint Ordinance does not provide sufficient guidance to law enforcement to prevent arbitrary or discriminatory enforcement.

For similar reasons, the Footprint Ordinance does not satisfy the "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Morales*, 427 U.S. at 60 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). Indeed, the ordinance says nothing at all about enforcement, apart from a cryptic note in the list of prohibited items regarding "invited guest[s]" carrying tablets. Compl. Ex. P at 4. The ordinance neither authorizes nor prohibits the use of checkpoints at the boundaries of the security footprint, random bag searches within the footprint, or other means to determine who has prohibited items. Nor does the ordinance authorize or prohibit the on-the-spot arrest of a person caught with a matchbook or giving the person an opportunity to discard the item or leave the footprint. In the vacuum, these various enforcement mechanisms may be applied in an arbitrary or discriminatory fashion.

The ordinance also lacks any guidelines for determining which items within various broad categories should be considered contraband. Given the potential breadth of the list of prohibited items, "the city cannot conceivably have meant to criminalize each instance" a person carries an item in the security footprint that is arguably on the list. *Morales*, 527 U.S. at 57. Thus, the issue for law enforcement officers is not so much "uncertainty about the normal meaning of," say, the term "pointed objects," but rather about which pointed objects are covered by the ordinance and which are not. Without further guidance, the ordinance "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Morales*, 527 U.S. at 60 (quoting *Kolender*, 461 U.S. at 360). The Footprint Ordinance "thereby invites arbitrary, discriminatory, and overzealous enforcement." *Bell*, 697 F.3d at 463 (alterations and citation omitted).

The fact that residences and businesses will likely fall within the footprint aggravates the prospect of arbitrary or discriminatory enforcement, especially if law enforcement wishes to avoid inconveniencing them. At a meeting of the City Council's Public Safety Committee, CPD counterterrorism Chief Duane DeVries explained that "if something goes bad, and those protests are pushing up against the fence, we don't want anybody to get hurt and get crushed against the fence. Walking a dog in the neighborhood, you're not gonna be right against that fencing."[5] He continued, "in the neighborhoods, the bike lanes, the scooters, backpacks, people going to work—they will be able to carry all that."[6] But the Footprint Ordinance does not distinguish between people "against the fence" and "in the neighborhood" any more than it distinguishes between lawful uses of backpacks and unlawful ones. Without clear guidelines, such distinctions are wholly within the discretion of law enforcement.

Accordingly, Section II of the Footprint Ordinance violates the Fourteenth Amendment.

**III.   The Balance of Hardships Favors Preliminary Relief.**

Plaintiffs have established its likelihood of success on the merits based on longstanding constitutional principles. Because the balance of hardships decisively favors preliminary injunctive relief, the Court should grant that relief.

**A.      Without a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm.**

When considering a First Amendment challenge to government action, "once a likelihood of success on the merits has been established, irreparable harm necessarily follows." *Ayres v. City of Chicago*, 966 F. Supp. 701, 717 (N.D. Ill. 1997), *aff'd*, 125 F.3d 1010 (7th Cir. 1997).

---

[5] Mitchell Armentrout, *'Security footprint' plan for Democratic Convention kicked to City Council for Wednesday vote*, Chicago Sun-Times (Apr. 11, 2024), available at: https://chicago.suntimes.com/2024-democratic-national-convention/2024/04/11/democratic-national-convention-dnc-security-zone-city-council-united-center-mccormick-place (last visited May 1, 2024).
[6] *Id.*

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In this case, without a preliminary injunction, Bodies Outside will be unable to receive a permit to march anywhere in the vicinity of Democratic delegates. It will be put to the choice of remaining silent during a historic opportunity to reach those delegates or risking arrest by seizing that opportunity. Likewise, the individual Plaintiffs and other protesters near the convention venues risk search or arrest if the Superintendent deems some personal item "potentially hazardous." No remedy at law can redress this injury.

### B. The Irreparable Harm to Plaintiffs Outweighs any Harm that a Preliminary Injunction Would Cause to Defendants.

The "likelihood of success on the merits is usually the determinative factor when a preliminary injunction is sought on First Amendment grounds." *Higher Soc'y of Indiana v. Tippecanoe County, Indiana*, 858 F.3d 1113, 1118 (7th Cir. 2017). More specifically, if a regulation of speech lacks narrow tailoring, it follows that the government may address any harm caused by a preliminary injunction by means that burden substantially less speech. Thus, in cases seeking a preliminary injunction to protect protests at national political conventions, the determination of the plaintiffs' likelihood of success on the merits typically determined the outcome of the equitable balancing element. *Coalition to March on the RNC and Stop the War v. City of St. Paul*, 557 F. Supp. 2d 1014, 1031 (D. Minn. 2008) (determining no further analysis was required on balancing of equities after analyzing likelihood of success on merits); *Stauber v. City of New York*, 2004 WL 1593870 at *32 (passing over equitable balancing element because "the consideration of safety has already been taken into consideration in determining whether relief is appropriate."); *SEIU*, 114 F. Supp.2d at 975 (finding that plaintiffs' "strong likelihood of prevailing on the merits" of their challenge to a "secured zone" around the 2000 Democratic

National Convention site entitled them to preliminary injunctive relief mandating issuance of rally permits and reconfiguration of the "secured zone," without further consideration of equitable balancing).

Similarly, "[a]n injunction protecting First Amendment rights is always in the public interest." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). For that reason, "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012).

For these reasons, the balance of hardships favors injunctive relief.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its motion for a preliminary injunction.

Dated: May 2, 2024                    Respectfully submitted,


                                      BODIES OUTSIDE OF UNJUST LAWS
                                      ANDREW THAYER
                                      KRISTI KEORKUNIAN
                                      LINDA LOEW


                        By:    /s/  *Rebecca K. Glenberg*
                               Rebecca K. Glenberg
                               rglenberg@aclu-il.org
                               Kevin M. Fee, Jr.
                               kfee@aclu-il.org
                               ROGER BALDWIN FOUNDATION OF ACLU, INC.
                               150 N. Michigan, Suite 600
                               Chicago, IL 60601
                               Phone: (312) 201-9740
                               Fax: (312) 201-9760

                               *Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

   The undersigned, an attorney, certifies that on May 2, 2024, she caused a copy of the above and foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION to be served on the following:


<u>***Via Process Server***</u>

City of Chicago
121 N. LaSalle St., Room 107
Chicago, IL 60602

Tom Carney
Commissioner
Chicago Department of Transportation
2 N. LaSalle St., Ste. 1110
Chicago, IL 60602

Larry Snelling
Superintendent
Chicago Police Department
3510 South Michigan Ave.
Chicago, IL 60653

          /s/ Rebecca K. Glenberg