**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BODIES OUTSIDE OF UNJUST LAWS: COALITION FOR REPRODUCTIVE JUSTICE & LGBTQ+ LIBERATION, ANDREW THAYER, KRISTI KEORKUNIAN, and LINDA LOEW, | ) ) ) ) ) | No. 24-cv-3563 |
| | ) | |
| Plaintiffs, | ) | Hon. Thomas M. Durkin |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, TOM CARNEY in his official capacity as Commissioner of the Chicago Department of Transportation, and LARRY SNELLING, in his official capacity as Superintendent of the Chicago Police Department, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION[1]**

Section II of Chicago's Footprint Ordinance makes it a criminal offense to possess any item that the Superintendent of Police, in his unlimited discretion, determines to pose a "potential safety hazard" within the yet-to-be announced "security footprint" during the Democratic National Convention (DNC) scheduled for Augst 19-21, 2024. Compl. Ex. P Sec. II (2) (iii). The objects determined to be potential safety hazards include, but are not limited to, a list of items and categories of items attached to the Ordinance. Both parts of Sec. II are void for vagueness. In the absence of any context or limitations on the Superintendent's discretion, ordinary people

---

[1] Plaintiffs filed their Memorandum in support of their Motion for Preliminary Injunction on May 6, 2024. Dkt. 9. That document included arguments about all of the major issues in the litigation, with only about four and a half pages devoted to Count III of the Complaint, which is now the only issues before the Court on Motion for Preliminary Injunction.

have no way of knowing which articles he may deem "potential safety hazards," and the Ordinance does not require him to tell them. Moreover, the prohibited items list includes broad categories that could encompass countless innocent, everyday objects. Defendants claim that "hazardous" is an ordinary word that everyone understands, rendering the entire Ordinance pellucid, but the meaning of "hazardous" is highly context sensitive. What is hazardous on an airplane is not necessarily hazardous on a public street. The word "potentially" simply adds to the confusion.

The Fourteenth Amendment demands that the City of Chicago provide Plaintiffs Andrew Thayer, Kristi Keorkunian, and Linda Lowe (collectively, "Protesters")—and thousands of others planning to protest the DNC—fair notice of what they can carry in the area around the United Cetner without risking arrest or incarceration. Accordingly, Protesters ask the Court preliminarily to enjoin enforcement of Section II of the Footprint Ordinance.[2]

## I.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE FOOTPRINT ORDINANCE FOR VAGUENESS ON ITS FACE, PRE-ENFORCEMENT.

Protesters intend to protest during the DNC within the security footprint designated by the Superintendent,[3] and they intend to carry items with them that may be prohibited in that zone. *See generally* Declaration of Andy Thayer, Ex. R; Declaration of Kristi Keorkunian, Ex. S; Declaration of Linda Loew, Ex. T. These facts demonstrate Protesters' standing. The Court

---

[2] Although this brief addresses only the first factor of preliminary injunction analysis—likelihood of success on the merits—Protesters remind the Court of its extraordinary power to craft appropriate equitable relief. Protesters ask the Court to enjoin all of Section II, but the Court may choose to enjoin only part of it, or to order the Defendants to adopt a policy clarifying it, or to issue other relief that addresses the harms caused by its vagueness. To date, Defendants have not explained how they would be harmed by clarifying the scope of the Ordinance.

[3] The Defendants' suggestion that Protesters "may not go within the boundaries of the Security Footprint" (Resp. at 6) is not credible. No one disputes that the DNC will be hosted at the United Center, where Protesters intend to march and demonstrate. By definition, the Security Footprint covers areas "for the Convention and Convention-related activities." *See* Compl. Ex. P, Sec. I.

should decline Defendants' suggestion to reject Protesters' challenge "out of hand" and wait for them to be arrested and charged before considering the Footprint Ordinance's vagueness. Defendants' Memorandum in Opposition (hereafter, "Resp.") Resp. at 6-7.

### A. Protesters have standing.

The gravamen of a vagueness challenge is that ordinary people cannot discern the conduct the law prohibits. Accordingly, Protesters need not—because they *cannot*—establish with certainty that their intended conduct will violate the Footprint Ordinance. Rather, "[t]o suffice for standing, and to avoid confusing standing with the merits, plaintiffs' intended course of conduct need only be 'arguably' affected by constitutional interests, and 'arguably' proscribed by the challenged statute." *Brown v. Kemp*, 86 F.4th 745, 762 (7th Cir. 2023) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 299 (1979)).

As they habitually do, Protesters intend to bring a variety of items with them as they protest the DNC. Some of these items, arguably, are prohibited by the Ordinance. For example, some of the Protesters intend to bring pens and protest buttons of the type that are pinned to clothing (both arguably "pointed"). *See* Ex. S, ¶¶ 5.l., 8; Ex. T, ¶¶ 5.a. and i., 8; Ex. R, ¶¶ 5.a. and e., 8. Ms. Keorkunian plans to bring an off-the-shelf first-aid kit, which typically includes a sealed packet of gauze (arguably a "sealed package") and a small pair of scissors (arguably "pointed") to cut it. *See* Ex. S ¶¶ 5.a. They will also bring a glucose monitoring kit, which includes lancets that have sharp points (arguably "pointed"). *See id.* ¶ 5.e.

More broadly, the Superintendent has unlimited authority to determine whether *any* item—including items that Protesters intend to bring to DNC protests— "poses a *potential* safety hazard." *See* Ex. R ¶ 9; Ex. S ¶ 10; Ex. T ¶ 9-10. As discussed in detail in Part II.A, ordinary people cannot predict the determinations that the Superintendent may make, and the Ordinance

has no provisions to ensure that the public learns of them. Thus, Protesters face imminent harm: They cannot attend protests near the United Center during the DNC carrying any item without risking arrest, prosecution, and up to six months of incarceration. *See* Compl. Ex. P, Sec. II. (3).

Notably, the concrete and particularized injury giving rise to standing need not be *actual* enforcement of the challenged ordinance. For example, in *Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 283-5 (1961), the Supreme Court rejected the State's argument that a teacher lacked standing to challenge a statutorily required oath disclaiming support of the Communist Party because his complaint alleged that he had not and would not support the Communist Party. Even though the teacher believed that he could truthfully sign the oath, "the very vice of which he complains is that the language of the oath is so vague and indefinite that others could with reason interpret it differently." *Id.* at 284. "[A]ll who are compelled to execute an unconstitutionally vague and indefinite oath may be exposed" to the risk of prosecution for perjury based on someone else's interpretation of its language. *Id.* The teacher would "be subjected to these hazards to the same degree as other public employees required to take the oath." *Id.* In other words, the teacher did not need to show that he was in immediate danger of prosecution. Rather, he was injured because to keep his job, he had to subject himself to this unacceptable risk.

Likewise, to protest near the United Center during the DNC, Protesters must subject themselves to the risk that a police officer will decide that one of their possessions is "pointed" or a "sealed package," or that the Superintendent will decide that it is a "potential safety hazard." That injury is as "concrete" and "imminent" as the DNC itself. That injury is directly attributable to the Ordinance and would be redressed by an injunction barring Defendants from enforcing it

or requiring them to take steps to clarify its prohibitions. Protesters have standing to request that relief.

### B. The Court may not simply reject Protesters' facial challenge "out of hand."

"A party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality if there are circumstances that render the threatened enforcement sufficiently imminent." *Brown*, 86 F.4th at 761 (internal quotation marks and citation omitted). Given that Protesters have established standing, Defendants' suggestion that the Court simply "reject out of hand" their pre-enforcement challenge is meritless. Resp. at 6-7. Under such a rule, "the contours of regulation would have to be hammered out case by case— and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Defendants' argument rests heavily on their blithe denial that First Amendment interests are at stake in this case. Resp. at 7 n.3. As explained above, however, the impact of the Ordinance on Protesters' right to speak and peaceably assemble is the *core* issue. "[W]hen an imprecise law implicates speech and assembly rights, an injured plaintiff may [] facially challenge a statute as void for vagueness." *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012); *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (If a law "*threatens to inhibit*" or "*interferes with* the right of free speech or of association, a more stringent vagueness test should apply.") (emphasis added).

A law may "implicate," "inhibit," or "interfere with" speech and assembly without regulating speech directly. In *Bell*, the challenged ordinance regulated conduct, not speech, by mandating obedience to police dispersal orders when three or more people in the "immediate vicinity" were engaged in disorderly conduct that was "likely to cause substantial harm or

serious inconvenience, annoyance or alarm." 697 F.3d at 450. Still, the plaintiff had a First

Amendment interest at stake in his vagueness challenge because it was "impossible for him to

know" whether other people would be disorderly at any given protest, so "he must abstain from

all protests unless he wishes to risk prosecution." *Id.* at 455. Protesters here face the same

dilemma: avoid protests near the United Center during the DNC or else risk punishment if the

Superintendent decides that some as-yet undetermined object in their pocket is a "potential safety

hazard." *See also Brown*, 86 F.4th at 763-64 (Pre-enforcement vagueness challenge to ordinance

prohibiting interference with hunting by "maintaining a visual or physical proximity to" or

"approaching or confronting" a hunter was "affected with a constitutional interest" where

plaintiffs' planned newsgathering about hunters could arguably violate the statute.)

Even if this case did not involve "constitutional interests," however, Defendants cite no

cases to support their claim that a facial, pre-enforcement challenge "may be rejected outright,"

until the law at issue is "actually applied in a particular situation." Resp. at 6, citing *Planned*

*Parenthood of Ind. & Ky., Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 603 (7th Cir. 2021). In

*Planned Parenthood*, the court indicated that facial challenges were "disfavored," but noted that

the Supreme Court has nonetheless repeatedly "entertained them," and *itself* went on to consider

the merits of the facial challenge. 7 F.4th at 603. Likewise, in *Moody v. NetChoice, LLC*, a facial

challenge to a statute with many applications to various types of services provided by sundry

internet platforms, the Supreme Court remanded the case *not* because a facial challenge was

"improper," but because neither the parties nor the courts below *treated* the suit as a facial

challenge in their briefs and opinions. Nos. 22-277 and 22-555, 2024 WL 3237685 at *5 (U.S.

July 1, 2024). Nor can Defendants find succor in the string of other cases they cite for the

proposition that facial challenges not brought under the First Amendment "are so 'disfavored,'

that they may be rejected outright." Resp. at 6. Those cases are appeals from criminal *convictions* and stand for the proposition that a conviction may not be overturned on vagueness grounds if the defendant had clear notice that *his* conduct was unlawful. They have nothing to say about facial, pre-enforcement challenges that seek to avoid criminal liability in the first instance.

## II.     THE FOOTPRINT ORDINANCE IS UNCONSTITUIONALLY VAGUE

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or if it fails to "provide explicit standards for those who apply them" sufficient to prevent arbitrary and discriminatory enforcement. *Id.*

In applying these standards, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). For several reasons, the Footprint Ordinance is the type of law that requires a high degree of clarity. *First*, as explained above, the Ordinance implicates core First Amendment interests in free speech and peaceable assembly, so "the vagueness doctrine demands a greater degree of specificity than in other contexts." *Brown*, 86 F.4th at 772. (quotation and alteration omitted). *Second*, as Defendants acknowledge (Resp. at 13), the Ordinance has no *mens rea* requirement; it is a strict liability offense. Though not necessarily dispositive, a "scienter requirement in a statute alleviates vagueness concerns." *United States v. Pacilio*, 85 F.4th 450, 459 (7th Cir. 2023), *cert. denied,* 144 S. Ct. 1033 (2024); *see also United States v. Williams*, 553 U.S. 285, 293- 294 (2008) (statute's scienter requirement is "important to our [vagueness] analysis"). *Third*, the

7

Ordinance prescribes criminal rather than civil penalties. *See Village of Hoffman Estates*, 455 U.S. at 498–99 (Supreme Court has "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *accord*, *Whatley v. Zatecky*, 833 F.3d 762, 777 (7th Cir. 2016). *Fourth*, the Ordinance "makes criminal activities which by modern standards are normally innocent," such as walking on a public sidewalk with a pack of cigarettes or a can of Coke. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972). "Where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained." *Winters v. New York*, 333 U.S. 507, 520 (1948).

**A. The Ordinance does not provide sufficient notice of prohibited conduct.**

Protesters are barred from carrying any item in the security footprint during the DNC that the Superintendent has designated as a "potential safety hazard," including but not limited to the motley list of prohibited items described in the Ordinance. But Protesters cannot discern whether the Superintendent has so designated any of the objects they plan to bring to a protest, or even whether certain items are encompassed by enumeration already set forth.

Defendants argue that the Ordinance has a "core of understandable meaning" because everyone understands the word "hazard." Resp. at 7-8. But the meaning of "hazard" depends entirely on context. The "hazard" posed by an object may depend on where it is, how it is used, and by whom. It may pose a hazard of death, injury, illness, property damage, or inconvenience. It may be extremely likely to cause harm at any time, or it may be hazardous only under narrow circumstances. By itself, the word "hazard" does constrain the universe of objects that are prohibited within the security footprint. Adding the word "potential" does not help; it is constrained only by a person's ability to imagine various scenarios in which the hazard of a given object may be realized.

Protesters do not argue that the Ordinance must provide "mathematical certainty" or "define every word." Resp. at 9 (citations omitted). But it must sufficiently constrain the universe of "potentially hazardous" items (and "pointed objects," "thermal containers" and other categories on the prohibited items list) to provide fair notice and inform Protesters of what they may bring into the security footprint without risking arrest. Ample statutory devices are available to accomplish this, as Defendants' string of cases involving statutes using the word "hazardous" or "dangerous" illustrates. Resp. at 9-10. In none of those cases does a law prohibit "hazardous" or "dangerous" articles in a vacuum, as the Footprint Ordinance does. Rather, in each case, the law provides context that shapes the contours of the prohibition.

For example, in *United States v. Wyatt*, the court upheld a statute prohibiting the use of a "hazardous or injurious device on Federal land" with "intent to obstruct or harass the harvesting of timber." 408 F.3d 1257, 1260-61 (9th Cir. 2005). The statute defined "hazardous or injurious device" as "a device, which when assembled or placed, is capable of causing bodily injury, or damage to property, by the action of any person making contact with such device subsequent to the assembly or placement." *See Wyatt,* 408 F.3d at 1261. Thus, the statute defined hazardous devices according to (1) the conditions under which it was dangerous ("assembled or placed"), (2) the type of damage it could inflict, and (3) the means by which it could inflict that damage. The definition also had a list of illustrative examples with a common theme: they could be used as booby-traps triggered by people cutting down trees. *See id.* at 1262 (discussing 18 U.S.C. § 1864(d)(3)). Finally, the statute applied only on federal lands, and with a criminal *mens rea*. *See id.* at 1261(the statute "does not simply prohibit the use of 'hazardous or injurious device," but with the intent to obstruct or harass the harvesting of timber"). In short, compared to the Footprint Ordinance, the statute is virtually a master class in precise legislative drafting.

In Defendants' other cases, as well, the challenged laws contain contextual elements that significantly constrain the category of "hazards" at issue. *See Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1258 (10th Cir. 2018) (upholding OSHA regulation providing that "[n]o person shall store, handle, or transport *explosives* or *blasting agents* when such *storage*, *handling*, and *transportation* of explosives or blasting agents constitutes an *undue* hazard *to life*" applicable to a "reasonable person responsible for employee safety" in a fireworks factory) (emphasis added); *United States v. DiVarco*, 602 F. Supp. 1029, 1035 (N.D. Ill. 1985) (Bail Reform Act's "danger to community" standard not vague as to defendants appealing convictions for violent offenses); *Robinson v. Warden*, 250 Fed. Appx. 462, 464 (3d Cir. 2007) (rule proscribing "hazardous tools" in *prison* was not vague given the explanatory phrase "*likely to be used in an escape* or escape attempt or to *serve as weapons* capable of doing *serious bodily harm* to others; or those hazardous to institutional security or personal safety," as applied to prisoner who had actual notice that a cell phone was a hazardous tool) (emphasis added); *Stout v. Dallman*, 492 F.2d 992, 993-94 (6th Cir. 1974) (statute prohibiting stealing "while armed with a *pistol, knife*, or other *dangerous weapon*, by force or violence, or by putting in fear," was not vague as applied to a hard object used to hit the victim, "inflicting a head wound requiring twelve stitches and knocking some teeth loose") (emphasis added). In short, none of these cases suggest that the phrase "potential safety hazards" is self-explanatory. To the contrary, they illustrate the need to clarify such a term to avoid creating a "trap for the innocent." *Hoffman Estates*, 455 U.S. at 498.

Defendants nonetheless insist that the Footprint Ordinance is perfectly clear because it "plainly prohibits a multitude of items that ordinary people and police officers understand to present [safety] hazards," such as firearms and knives. Resp. at 8. More to the point, however, the Ordinance prohibits many items that ordinary people do *not* typically understand as

hazardous—laptops, sealed packages (of any size or type), balloons, thermal containers, and folding chairs, to name a few. Compl. Ex. P at 4. Thus, the list does not describe some ascertainable "core" of meaning; it is a hodgepodge of objects that have no coherent throughline. Rather, the list communicates that the Superintendent may designate objects as "potential safety hazards" based on some information or metric that is unknown to the reader. Indeed, it would be unsurprising if the Superintendent (in consultation with the USSS and the OEMC) designated additional prohibited items based on specific intelligence or experience that is inaccessible, and therefore unpredictable, to the public.

Further, the Ordinance provides no means for the public to learn what items have been designated as potential hazards. That opacity is a crucial distinction between the Ordinance and the lists of prohibited items for courthouses and other venues cited by Defendants. Resp. at 10. Those lists are available on websites that individuals may consult before they leave their homes. Such venues also typically post the list at the entrance and have employees available to answer any questions about what is prohibited. And they apply to the types of buildings and enclosed areas where ordinary people expect special security measures, not to public streets and sidewalks that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939).[4]

---

[4] These lists are also more specific than the list in the Ordinance. *See* Supreme Court of the United States, *Entering the Building & Prohibited Items*, https://www.supremecourt.gov/visiting/prohibited-items.aspx (last visited July 12, 2024) (accompanying prohibition on "[k]nives of any size and any pointed objects" with a picture of a knife and knitting needles, and noting that "[p]ens and pencils are permitted"); U.S. Capitol Visitor Center, *Prohibited Items*, https://www.visitthecapitol.gov/visit/know-before-you-go/prohibited-items (last visited July 12, 2024) (prohibiting "[a]ny pointed object, e.g. knitting needles and letter openers (Pens and pencils are permitted.")). Protesters do not and currently cannot know if pens and pencils are allowed inside the City's security footprint.

Most important, absent some other provision of law, the harshest consequence for inadvertently bringing a prohibited item to a courthouse or arena is to be ejected from the place or prohibited from entering. A person who forgets to remove her e-cigarette from her pocket before the big Bears game is not subject to a fine of up to $500 or six months in jail. *Compare* Compl. Ex. P at 2. Not only does the Ordinance provide such penalties, it does so regardless of the person's purpose, intent, or knowledge and regardless of whether the item was expressly listed in the Ordinance or simply deemed "potentially hazardous" by the Superintendent. Despite the potentially harsh consequences for making a harmless mistake, the Ordinance provides no safeguards like a website or posted signs at boundaries of the footprint to ensure that people know what items are prohibited.

### B. The Ordinance does not provide sufficient guidance to prevent arbitrary and discriminatory enforcement.

The Ordinance is also unconstitutionally vague because it does not "establish minimal guidelines to govern law enforcement." *Morales*, 427 U.S. at 60. Police officers are no better equipped than any ordinary person to know whether a pen is prohibited as "pointed" or a tin of Altoids mints as a "metal container" or a packet of chips as a "sealed package." But possession of such common and innocent items may provide a convenient hook for an officer to arrest someone who seems suspicious or annoying.

The broad and flexible meaning of these categories and the lack of guidelines to constrain official discretion make the Footprint Ordinance ripe for arbitrary enforcement. Despite Defendant's suggestion to the contrary, Protesters need not produce "actual evidence" that police will enforce the Ordinance in such a manner. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991) ("The question is not whether discriminatory enforcement occurred here, and we

assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility.")

Nor does the Ordinance offer standards for the *manner* of enforcement. An officer may arrest one person on the spot for having, say, a soda can, but simply direct another person to dispose of the can. It is true enough that the absence of such direction does not by itself make a statute vague. Resp. 14-15. But clear enforcement standards are one way to constrain the discretion that a vaguely worded ordinance may otherwise afford officers, just as "a *scienter* requirement in a statute alleviates vagueness concerns." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (alterations omitted).

Finally, the Ordinance delegates unfettered discretion to the Superintendent to determine which items "pose[] potential safety hazards," Ex. P Sec. II (2) (iii), unconstrained by standards, criteria, or procedures. The Ordinance does not, for example, prevent the Superintendent from choosing to prohibit only items that are associated with particular religious or political views. Again, the question is not whether the Superintendent *has* exercised or *will* exercise this discretion in a discriminatory fashion (and Protesters assume he has not and will not), but whether the statutory language makes it a "real possibility." It does.

## CONCLUSION

For the foregoing reason, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

June 12, 2024

Respectfully submitted,

By: /s/ Rebecca K. Glenberg

Rebecca K. Glenberg
Kevin M. Fee, Jr.
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
rglenberg@aclu-il.org
kfee@aclu-il.org

*Attorneys for Plaintiffs*