**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BODIES OUTSIDE OF UNJUST LAWS: | ) | |
| COALITION FOR REPRODUCTIVE | ) | |
| JUSTICE & LGBTQ+ LIBERATION, | ) | |
| ANDREW THAYER, KRISTI | ) | |
| KEORKUNIAN, and LINDA LOEW, | ) | No. 24-cv-3563 |
| | ) | |
| Plaintiffs, | ) | Hon. Thomas M. Durkin |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, TOM CARNEY in | ) | |
| his official capacity as Commissioner of the | ) | |
| Chicago Department of Transportation, and | ) | |
| LARRY SNELLING, in his official | ) | |
| capacity as Superintendent of the Chicago | ) | |
| Police Department. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED VERIFIED COMPLAINT

Plaintiffs Bodies Outside of Unjust Laws: Coalition for Reproductive Justice & LGBTQ+ Liberation ("Bodies Outside of Unjust Laws" or "Bodies Outside"), Andrew Thayer, Kristi Keorkunian, and Linda Loew, bring this Complaint against the City of Chicago, Tom Carney, in his official capacity of Commissioner of the Department of Transportation, and Larry Snelling, in his official capacity as Superintendent of the Chicago Police Department.

### INTRODUCTION

1.      Plaintiff Bodies Outside of Unjust Laws has an important message for the Democratic Party: despite its branding as a champion of reproductive rights and an ally to the LGBTQ+ community, the party has not done enough to protect the right to bodily autonomy from a devastating series of attacks in recent years.

2.     Bodies Outside and its members have just one historic opportunity to present their demands to some of the most influential Democrats in the country, the 2024 Democratic National Convention ("the Convention" or "DNC"), to be held in Chicago from August 19 to 22, 2024. Thousands of delegates from across the country and journalists from around the world will converge on the city. Political conventions have typically been the site of mass protests because they provide a singular occasion to send a message to the national parties and the national and international media.

3.     Nonetheless, the City of Chicago has released few plans for accommodating large-scale protests during the Convention.

4.     To the contrary, Defendants exploited Chicago's constitutionally defective parade permit ordinance to summarily deny a permit to Bodies Outside and other groups who wish to march during the convention. Instead, they offered Bodies Outside and other applicants a permit to march along the same alternative route — one that was virtually invisible to the protesters' intended audience. The message was clear: Defendants would tolerate marches during the Convention only if they were nowhere near the Convention or its delegates.

5.     The ostensible grounds for denying all of the permits were the proposed marches' impact on traffic and a lack of adequate law enforcement resources before and during the Convention. But those rationales were supported more by supposition than evidence, as testimony at an administrative hearing on Bodies Outside's application made clear. Indeed, at the time Defendants denied Bodies Outside's permit the Defendants lacked key information, such as how many law enforcement officers would be available during the Convention.

6.     Moreover, the denial of Convention-related parade permits could have created more traffic problems and divert more police resources than granting them would. The purpose

of permit requirements is to give officials advance knowledge of where protesters will be and when so that they can plan to have appropriate resources in place. A permit also ensures that officials have contact information for one or more protest organizers with whom they can coordinate before and during the permitted event. The City of Chicago forwent that planning opportunity, opting by default to respond to protests wherever and however they arise.

7.     In addition to denying permits, the City enacted a new ordinance prohibiting an indeterminate list of objects within an undefined "security footprint" on the days before, during, and after the Convention.

8.     This is a lawsuit for declaratory and injunctive relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution facial constitutionality of Chicago's ordinances governing parade permits and prohibited items within the security footprint.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and §1343. Plaintiffs seek redress for violations of their constitutional and civil rights granted under First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.

10.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

11.     Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because Defendants reside in, and all transactions and occurrences giving rise to this matter arose in, the Eastern Division of the Northern District of Illinois.

## PARTIES

12.     Plaintiff Bodies Outside of Unjust Laws is an unincorporated coalition of organizations and individuals formed to demand a federal response to a wave of attacks on bodily autonomy. It demands national legislation to expand access to abortion, support families, and defend the rights of LGBTQ+ people. After its planned march on August 18, 2024, it intends to continue holding marches and other demonstrations on those issues in Chicago.

13.     Plaintiff Andrew Thayer is a Chicago resident and a member of Bodies Outside of Unjust Laws. He is a decades-long activist who has organized and participated in countless marches and demonstrations in Chicago and expects to continue doing so in the future. In addition to participating in the Bodies Outside march on August 18, 2024, he intends to participate in marches or demonstrations near the United Center on one or more days during the Democratic National Convention.

14.     Plaintiff Kristi Keorkunian is a Chicago resident and a member of Bodies Outside of Unjust Laws. They are the co-founder of Stop Trans Genocide Chicago, a grassroots organization dedicated to fighting to uphold and expand the rights and resources of gender-variant and gender-expansive youth and adults, including reproductive care, family planning, and abortion access. In addition to participating in Bodies Outside's march on August 18, 2024, they intend to co-organize and participate in marches and demonstrations near the United Center on one or more days during the Democratic National Convention and to continue organizing and participating in protests in Chicago in the future.

15.     Plaintiff Linda Loew is a Chicago resident and a member of Bodies Outside of Unjust Laws. She has actively organized and participated in countless marches and demonstrations in Chicago, with particular emphasis on reproductive justice and labor rights. She

expects to continue as an active participant in protests in the future, including in one or more marches or demonstrations near the United Center during the Democratic National Convention.

16.     Defendant City of Chicago ("the City" or "Chicago" or "Defendant") is an Illinois municipal corporation.

17.     Defendant Tom Carney ("Commissioner") is the Commissioner of the Chicago Department of Transportation (CDOT). By ordinance, the Commissioner is authorized to grant or deny permits for parades and public assemblies. He is sued in his official capacity only.

18.     Defendant Larry Snelling ("Superintendent") is the Superintendent of the Chicago Police Department (CPD). The Superintendent directs the operations of the CPD, which consults with CDOT on permit applications. By ordinance, the Superintendent is authorized to designate a "security footprint" and a list of items prohibited within the security footprint in the days before, during, and after the Convention.

## STATEMENT OF FACTS

**Bodies Outside of Unjust Law's permit application.**

19.     Plaintiff Bodies Outside of Unjust Laws has some bones to pick with the Democratic Party. In its view, Democrats, who portray themselves as allies of the LGBTQ+ community and supporters of reproductive rights and bodily autonomy, have not lived up to that image. Hate crimes against LGBTQ+ individuals have risen, and laws targeting their most personal family and medical decisions have proliferated in recent years. Meanwhile, state after state has enacted harsh antiabortion laws that criminalize or chill necessary prenatal care and render pregnancy more dangerous for millions of people. Yet Democrats have failed to pursue an aggressive national agenda to protect the rights of equality and bodily autonomy.

20.     In November 2023, Bodies Outside began organizing a march to bring their demands directly to the Democratic Party when its representatives come to Chicago for the Convention. It planned to greet the arriving delegates the evening before the Convention rather than to encroach on the Convention itself. The march would assemble at Water Tower Park, a common assembly point well-known to the local activist community. Based on the collective organizing experience of its members, it devised a route down Michigan Avenue and State Street—streets frequently used as sites for marches and parades—that would be visible from Magnificent Mile and downtown hotels ("the Proposed Route," Ex. A).

21.     Plaintiff Andy Thayer hand-delivered a parade permit application ("the Application," Ex. B) on behalf of Bodies Outside of Unjust Laws to CDOT on January 2, 2024, the first day he was permitted to file such an application under Chicago's parade permit ordinance. The Application requested a permit to march along the Proposed Route on August 18, 2024.

22.     On or about January 3, 2024, Mr. Thayer received a phone call from a person who said that she was from the First District of the Chicago Police Department and that CPD did not allow permits for marching in the street, a statement that contradicted Chicago's permit ordinance and CDOT's permit application form.

23.      On or about January 4, 2024, Mr. Thayer received a phone call from a person who said he was with the "special events department," which Mr. Thayer understood to mean CPD's special events department. Mr. Thayer inferred from the caller's statements that the application would probably be denied if it were not modified, but the caller did not suggest any modifications.

24.     On or about January 5, 2024, Mr. Thayer received a phone call from Susan Pawlak, who works at CDOT. She told Mr. Thayer that Bodies Outside should be flexible with the permit application and that it might want to submit an amended version. She did not tell Mr. Thayer about any concerns Defendants had about the Application, recommend any specific changes, or ask for any additional information.

25.     On January 8, 2024, Mr. Thayer submitted an amended version of the application ("Amended Application," Ex. C; collectively with the Application, "the Applications"). Based on his years of experience with Chicago's permitting process, he thought he had a sense of Defendants' likely concerns and the type of revisions they might want. He shortened the portion of the route on Michigan Avenue north of the Chicago River, and otherwise modified the route to ensure that marchers walked in the direction of traffic in the lanes they occupied ("Amended Route," Ex. D; collectively with the Proposed Route, the "Proposed Routes").

26.     On January 16, 2024, the Commissioner denied both the Applications. A denial letter signed on behalf of the Commissioner by CDOT Assistant Commissioner Bryan Gallardo (Ex. E), cited two reasons: (1) under Chicago Code Section 10-8-330(g)(1) "the proposed parade will substantially and unnecessarily interfere with traffic" and there will not be "sufficient city resources to mitigate the disruption"; and (2) under Section 10-8-330(g)(2), there will not be "a sufficient number of on-duty police officers or other city employees authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards."

27.     In the denial letter, the Commissioner offered an alternate route (Ex. F) that would allow marchers to assemble on Columbus Drive north of Roosevelt Road, proceed north

on Columbus Avenue to Jackson Drive, and disband on Jackson between Michigan and Columbus.

28.     The Commissioner's alternate route would not be visible from the hotels designated for delegate use.

29.     The denial letter did not indicate any opportunity for Bodies Outside of Unjust Laws to propose a different route or a different date or time. Instead, the letter stated that Bodies Outside of Unjust Laws had five days to accept the alternate route, after which the offer of an alternate route would be withdrawn. Ex. E at 3.

30.     Bodies Outside of Unjust Laws did not accept the City's proposed alternate route. Instead, it timely filed an administrative appeal from the denial.

**The administrative hearing.**

31.     On January 30, 2024, the Chicago Department of Administrative Hearings held a hearing on Bodies Outside's appeal before Administrative Law Judge (ALJ) Dennis Fleming.

32.     Testimony at the hearing failed to establish that insufficient law enforcement resources were available for the Proposed Routes, or that insufficient city resources were available to mitigate their impact on traffic.

33.     At the hearing, Secret Service Agent Rashad Spriggs testified that the DNC is a National Special Security Event (NSSE), meaning that "the full capacity and capabilities of the Federal Government are to be used to help in the securing of the event" (transcript of January 30, 2024, hearing, Ex. G, Tr. 17:11-15). Agent Spriggs sits on a steering committee with representatives of CPD, CDOT, and other federal, state and local agencies for this purpose. Ex. G, Tr. 18:5-19:3. The Secret Service had asked to be made aware of any parade permit

applications affecting the Convention, but it had no role in deciding whether particular applications would be granted. *Id.*, Tr. 26:14-21, 27:2-9, 37:2-5, 42:21-24.

34.     Bryan Gallardo, an assistant commissioner of CDOT who reviewed the Application and Amended Application, met with CPD representatives who "said that they were concerned given with the activities at the DNC that they weren't going to have sufficient resources to safely provide a path that [Bodies Outside] had requested" on the Applications. *Id.*, Tr. 69:13-19.

35.     But CPD lacked the basic information to make such a determination, that is, the number of officers who would be available during the Convention and the number that would be required for the march.

36.     Daniel O'Connor, a deputy chief in CPD's Bureau of Patrol who reviewed the Application and Amended Application, testified that CPD will be operating at full capacity during the Convention, cancelling all officers' time off and prohibiting vacations, and as a result, over 11,000 CPD officers will be available. *Id.*, Tr. 135:8-14. Further, CPD "may" supplement its forces during the Convention with officers from other law enforcement agencies in the state, and it was "contemplating" bringing in law enforcement officers from out-of-state law enforcement agencies. *Id.*, Tr. 133:1-14. Officers from the Illinois State Police and Cook County Sheriff's Office will also be deployed. *Id.*, Tr. 183:12-14. Deputy Chief O'Connor did not know how many officers from other law enforcement agencies would be coming to Chicago.

37.     Nor did Deputy Chief O'Connor know how many police officers would be required for Bodies Outside's Proposed Routes. He estimated the number at "several hundred," (*Id.*, Tr. 129:19) and, when pressed, said "over 500" (*Id.*, Tr. 145:3). Asked about the margin of

error for that estimate, he said, "I don't have a margin of error. I would have to review it more thoroughly." *Id.*, Tr. 145:14-16.

38. Deputy Chief O'Connor further testified that the alternative Columbus Avenue Route would also require "several hundred officers" (*Id.*, Tr. 144:17:19) but "less resources" (*Id.*, Tr. 141:21-22) than Bodies Outside's Proposed Routes. He offered no testimony to explain how, given the vagueness of these numbers, he knew that CPD would have sufficient resources to secure the Columbus Avenue route but not either of the Plaintiff's Proposed Routes.

39. Likewise, there was insufficient evidence to establish that the Proposed Routes would have a substantial impact on traffic that the City had insufficient resources to mitigate.

40. Mr. Gallardo noted that the march would take place on "heavily trafficked streets" and that thirteen bus routes "would be impacted." *Id.*, Tr. 75:6-23. Yet he acknowledged that CDOT had previously authorized parades on Michigan Avenue, such as the Festival of Lights parade. He testified that permits for that parade were approved even though it had a substantial impact on traffic because organizers of the event provided their own parade marshals and traffic barriers, and CDOT met with them ahead of time to review their traffic management plan. *Id.*, Tr. 88:11-89:6.

41. Yet Mr. Gallardo acknowledged that he did not know whether Bodies Outside planned to have its own marshals for its march. *Id.*, Tr. 89:7-10. Neither Gallardo nor any other CDOT employee asked Bodies Outside about marshals or traffic barriers. Nor did they offer to meet with Bodies Outside about their traffic and pedestrian safety plans.

42. In fact, parade marshals were and are an integral part of Bodies Outside's plans. Plaintiffs Thayer, Keorkunian, and Loew, as well as other members of Bodies Outside, are experienced activists who have acted as marshals, trained others as marshals, or both.

43.     Nor did CDOT communicate other traffic-related concerns to Bodies Outside, such as "how [the Amended Route] zig-zags through the city streets," or difficulty of rerouting buses for a march that uses both Michigan Avenue and State Street, as opposed to one or the other—issues that Bodies Outside may have been able to address. *Id.*, Tr. 144:17-19, 76:3-8.

44.     Instead, Mr. Gallardo instructed Ms. Palwak to call Mr. Thayer and tell him that there were concerns about the application, but he did not instruct her to tell him any specifics or ask for any additional information. The goal of the call was not to give Bodies Outside "an opportunity to modify their route to avoid having their permit denied," but to make it aware the City had concerns about the application as a matter of "good customer service." *Id.*, Tr. 89:24-91:11.

45.     Despite the gaps in the Defendants' knowledge of relevant facts and their failure to provide Bodies Outside the information they would need to submit a successful application, the ALJ found that the City's denial of the application was proper. Ex. H.

**The Defendants' policy or practice of distancing protesters from Convention delegates.**

46.     The Defendants' denial of Bodies Outside's permit was only one in a series of actions they took to keep protesters away from the Convention and Democratic delegates.

47.     First, Defendants denied four other applications submitted after January 2, 2024, for permits to protest the Convention. The groups submitting these applications were March on the DNC 2024 (Ex. I), Poor People's Economic Human Rights Campaign (Ex. J), March for the People's Agenda (Ex. K), and Students for a Democratic Society at UIC (Ex. L).

48.     In contrast to Bodies Outside, the other four organizations sought to march during the Convention, rather than the evening before, and they proposed routes in the vicinity of the United Center, rather than near delegate hotels. Nonetheless, Defendants offered these

organizations the same alternate route on Columbus Avenue that they offered to Bodies Outside. Ex. I at 2; Ex. J at 2; Ex. K at 2; Ex. L at 2.

49.     Defendants were later compelled to grant the application of the Poor People's Economic Human Rights Campaign because their denial was issued after the ten business days provided by ordinance. The remaining three organizations filed administrative appeals. In each case, an ALJ affirmed the Commissioner's denial of the permit. Exs. M, N and O.

50.     Further, Defendants took no affirmative steps to protect First Amendment rights at the Convention until just two weeks before the DNC, when they announced that a speaking platform and sound amplification would be provided in or near Park 578, and that people could sign up for 45-minute speaking slots that would be granted on a first-come, first-serve basis . They  have not announced any "free speech zones" near the Convention's primary venues where people may peaceably assemble as a group to deliver a collective message.

51.     On the other hand, the City took prompt steps to facilitate the policing of protesters. In February 2024, CPD released a proposed policy for facilitating mass arrests in "response to crowds, protests, and civil disturbances" (Special Order S06-06). The mass arrest policy stated that "[i]f there is any perceived conflict," it "will take precedence" over other CPD policies, including policies on First Amendment rights, use of force, force reporting, and other accountability measures. Officers began training on the mass arrest policy in March 2024. CPD later issued a revised version of the policy that addressed some of these issues, but advocates have continued to express concerns that the policy will have adverse impacts on protesters.

52.     In April 2024, the Chicago City Council enacted Ordinance 2024-0008373 (the "Footprint Ordinance," Ex. P), a measure introduced by Mayor Brandon Johnson that restricts

activity within a yet-to-be-announced "security footprint" from August 17 to August 26, 2024. Broad categories of everyday objects are prohibited within the security footprint, including "sealed packages," "metal containers," and "pointed objects," as well as any other objects later deemed potential safety hazards. Ex. P at 4.

**The Chicago parade permit ordinance.**

53.     Chicago's parade permit ordinance, Code Sec. 10-8-330 (the "Permit Ordinance," Ex. Q), facilitated Defendants' denial of Convention-related parade permit applications, including Bodies Outside's application.

*Permit denial provisions.*

54.     The Permit Ordinance establishes a "one-and-done" regime that Defendant Commissioner may wield to permanently bar any given march without considering alternative means by which organizers may reach their intended audience.

55.     First, under the Permit Ordinance, the Commissioner is not required to communicate any problems with the proposed date, time, or route of a parade until it issues a denial letter "stating the facts and conclusions which are the basis for" the denial. Ex. Q, Sec. 10-8-330(j)(2). As a result, applicants have no opportunity to adjust their application to address those concerns. If applicants do not accurately guess which route will be acceptable to Defendants, the application will be denied.

56.     In the case of Bodies Outside, the organization received only vague warnings that its Proposed Route was unacceptable. In the absence of specific feedback, the organization submitted an Amended Route, but its educated guess about how to fix the route was wrong.

57.     Second, although each parade permit denial must include an offer for an "alternate permit," the Commissioner need not consult with applicant in designating that

alternative. The alternate permit must have "comparable public visibility and a similar route, location and date to that of the proposed parade," only "to the extent practicable" (*Id.*, Sec. 10-8-330(k)), and it need not take account of an applicant's intended audience.

58.     In the case of Bodies Outside's permit application, Defendants claimed that the Columbus Avenue route would be comparably visible because it is in the central business district and would be seen by visitors to Grant Park and vehicles on the busy thoroughfare of DuSable Lake Shore Drive. Ex. G, Tr. 101:12. But they did not and could not claim that DNC delegates—much less the throngs of reporters covering them—were likely to see a march on that route.

59.     Third, after receiving a denial letter, applicants may not submit a new application that addresses the specific reasons for denial. The Permit Ordinance prohibits them from "submit[ting] more than one application…for a parade substantially similar in theme or units described but requesting an alternate date or route…." Ex. Q, Sec. 10-8-330(d)(1). The Commissioner may "disregard any such multiple applications," and the applicant "shall not be eligible for such a permit and shall be in violation of" the Permit Ordinance. *Id.*, Sec. 10-8-330(d)(3), (4). Instead, if the applicant does not accept the "alternate route" within five days, the denial becomes final. *Id.*, Sec. 10-8-330(l)(1).

60.     The Commissioner issued a final denial of Bodies Outside's application on January 16, 2024, seven months before the Convention and without adequate information to determine whether the parade was feasible. Nonetheless, he did not invite Bodies Outside to submit further revisions to its route or consider options such as provisionally granting the permit subject to modifications based on new information about resources and security needs.

*Liability and indemnification.*

61.     In the event a permit is granted for a "large parade"—one that takes place in the central business district or will require city services valued above a certain amount—the Permit Ordinance subjects the permit-holder to a risk of unlimited liability for damages it did not proximately cause and could not have reasonably foreseen or mitigated. In addition to carrying liability insurance, organizers of "large parades" must "indemnify, defend and hold harmless the City of Chicago and its assignees and employees against any additional or uncovered third party claims against the city arising out of or caused by the parade; and shall agree to reimburse the city for any damage to the public way or to city property arising out of or caused by the parade." *Id.*, Sec. 10-8-330(m).

62.     Further, CDOT's parade permit application form provides that as a condition for *any* parade permit, the applicant "agrees that it will not hold liable the City for or on account of any losses or damage to property owned by it or controlled by the applicant or for or on account of any loss or damage sustained by the applicant as a result of injuries to employees or agents of the applicant." *See* Ex. B at 3. This language does not appear in the Permit Ordinance.

**The Chicago Footprint Ordinance.**

63.     On April 17, 2024, Chicago enacted Ordinance 2024-0008373, introduced by Mayor Brandon Johnson, which restricts activity within a yet-to-be-announced "security footprint" from August 17 to August 26, 2024 (the "Footprint Ordinance," Ex. P, Sec. I.).

64.     Under the Footprint Ordinance, the Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications, has complete authority to designate the boundaries of the security footprint. *Id.*, Sec. II (1).

65. The Footprint Ordinance does not provide any guidelines or standards for determining the security footprint. Nothing in the Ordinance would prevent the Superintendent of Police from designating the entire City as within the security footprint. Nor does the Footprint Ordinance provide a date by which the security footprint must be announced.

66. The Footprint Ordinance makes it unlawful to "possess, carry, control, or have immediate access to any item that poses potential safety hazards, as determined by Chicago Superintendent of Police, in consultation with the United States Secret Service and the Chicago Office of Emergency Management and Communications." *Id.*, Sec. II (2)(iii).

67. A non-exhaustive list of items prohibited within the footprint is attached to the Footprint Ordinance as Exhibit A. The list includes broad categories such as "pointed objects," which may include everyday objects such as pencils and medically necessary items such as Epi-pens or insulin injectors. *Id.*, at 4.

68. The Footprint Ordinance does not provide for adequate public notice of the boundaries of the security footprint. It requires that the borders be posted on CPD's website only "to the extent feasible," and authorizes the marking of boundaries only "as necessary." *Id.*, Sec. II (1). The Footprint Ordinance does not require that the list of prohibited items be publicized at all.

69. Violation of Section II (2)(3) of the Footprint Ordinance is a strict liability offense. Possession of a prohibited item in the security footprint is unlawful regardless of whether the person knows that they are in the security footprint or that they are carrying a prohibited item or their purpose in carrying it.

70. The Footprint Ordinance contains no guidelines for law enforcement to ensure that its application is not arbitrary or discriminatory.

71.     CPD counterterrorism Chief Duane DeVries said of the security footprint:

> So if something goes bad, and those protests are pushing up against the fence, we don't want anybody to get hurt and get crushed against the fence. Walking a dog in the neighborhood, you're not gonna be right against that fencing. Yes, a dog wouldn't be allowed in that area. But in the neighborhoods, the bike lanes, the scooters, backpacks, people going to work — they will be able to carry all that.

Mitchell Armentrout, *'Security footprint' plan for Democratic Convention kicked to City Council for Wednesday vote*, Chicago Sun-Times (Apr. 11, 2024), https://chicago.suntimes.com/2024-democratic-national-convention/2024/04/11/democratic-national-convention-dnc-security-zone-city-council-united-center-mccormick-place.

72.     Chief DeVries' statement suggests that CPD intends to enforce the Footprint Ordinance selectively, with local residents exempt from some or all of its proscriptions.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983

### Facial Challenge to the Permit Ordinance
### Under the First and Fourteenth Amendments

73.     The allegations set forth above are realleged and incorporated by reference as if fully set forth in this paragraph.

74.     The Permit Ordinance is not narrowly tailored to any significant governmental interest on its face or as applied to Plaintiffs.

75.     By creating a "one and done" regime that disallows resubmissions, the Permit Ordinance, on its face, does not provide adequate alternative avenues for communication.

76.     The Permit Ordinance, on its face, grants undue discretion to the Commissioner to deny permit applicants and propose alternate routes.

17

77.     The Permit Ordinance requires applicants to accept liability for the acts of third parties as a condition of marching on Chicago streets.

78.     On its face, the Permit Ordinance violates the First Amendment as incorporated by the Fourteenth Amendment.

## COUNT II
## 42 U.S.C. § 1983

**Facial Challenge to the Chicago Footprint Ordinance
Under the Due Process Clause of the Fourteenth Amendment**

79.     The allegations set forth above are realleged and incorporated by reference as if fully set forth in this paragraph.

80.     The Footprint Ordinance does not give Plaintiffs and others sufficient notice of what conduct is prohibited to allow them to conform their conduct to the law.

81.     The Footprint Ordinance does not contain adequate standards for law enforcement to avoid arbitrary or discriminatory enforcement.

82.     The Footprint Ordinance is unconstitutionally vague on its face in violation of the Due Process Clause of the Fourteenth Amendment.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     Declaratory relief, including the following:

    1.     A declaration that Chicago Code Sec. 10-8-330, violates the First and Fourteenth Amendments to the United States Constitution on its face; and

    2.     A declaration that Section II of Chicago Ordinance 2024-0008373 violates the Fourteenth Amendment to the United States Constitution on its face;

B.     Preliminary relief against Defendants, including a preliminary injunction that:

      1.      Enjoins Defendants from enforcing unconstitutional provisions of the Permit Ordinance; and

      2.      Enjoins Defendants from enforcing Section II of the Footprint Ordinance

C.      A permanent injunction prohibiting Defendants from enforcing unconstitutional provisions of the Permit Ordinance;

D.      Costs and expenses, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

E.      Any other relief the Court deems just and proper.

Dated: August 6, 2024

Respectfully submitted,

BODIES OUTSIDE OF UNJUST LAWS:
COALITION FOR REPRODUCTIVE JUSTICE &
LGBTQ+ LIBERATION, ANDREW THAYER,
KRISTI KEORKUNIAN, and LINDA LOEW

By counsel:


/s/ Rebecca K. Glenberg

Rebecca K. Glenberg
Kevin M. Fee, Jr.
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
rglenberg@aclu-il.org
kfee@aclu-il.org

*Attorneys for Plaintiffs*

## VERIFICATION

I, Andrew Thayer, have read the foregoing Verified Complaint and under penalty of perjury state the facts alleged therein are true and correct to the best of my knowledge and recollection.

Date: August 6, 2024

_____

Andrew Thayer
One of the Plaintiffs