## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BODIES OUTSIDE OF UNJUST LAWS:
COALITION FOR REPRODUCTIVE JUSTICE &
LGBTQ+ LIBERATION; ANDREW THAYER;
KRISTI KEORKUNIAN; and LINDA LOEW,

                Plaintiffs,

    v.

CITY OF CHICAGO; TOM CARNEY, in his
official capacity as Commissioner of the
Chicago Department of Transportation; and
LARRY SNELLING, in his official capacity as
Superintendent of the Chicago Police
Department,

                Defendants.

No. 24 CV 3563

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring a facial challenge to the City of Chicago's parade ordinance, contending that it violates the First Amendment. Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). R. 44. For the following reasons, the motion is granted in part and denied in part.

### Legal Standard

Under Rule 12(b)(1), a defendant may move to dismiss claims over which the federal court lacks subject-matter jurisdiction, including claims for which the plaintiff lacks standing. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999). In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court "must accept all well-pleaded factual allegations as true and draw

all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). A complaint must provide "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, the complaint must provide the defendant with "fair notice" of the claim and "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "Facial plausibility exists when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (citations omitted). In deciding a motion to dismiss, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023). The Court may also consider "documents attached to the complaint, documents central to the complaint and referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (cleaned up).

## Background

### I. The Ordinance

The City of Chicago ("the City" or "Chicago") has enacted an ordinance that requires an individual or organization to obtain a permit from the Chicago

Department of Transportation ("CDOT") to hold a parade or march on public ways ("the Ordinance"). Municipal City Code ("M.C.C.") § 10-8-330(b). Relevant here, the Ordinance does not permit the same applicant to submit more than one application for the same parade date and route, or for a substantially similar parade but requesting an alternate date or route. *Id.* § 10-8-330(d)(1). Failure to comply with this requirement may result in the denial of a permit. *Id.* § 10-8-330(d)(3)–(4). When an application is filed, the Commissioner of CDOT ("Commissioner") conducts an investigation to consider whether the permit can be issued. *Id.* § 10-8-330(g). If the Commissioner denies the application, he or she must notify the applicant in writing, "stating the facts and conclusions which are the basis for any denial of the permit." *Id.* § 10-8-330(j)(2). The denial letter must also offer an "alternate permit" which, "to the extent practicable, authorize[s] an event that will have comparable public visibility and a similar route, location and date to that of the proposed parade." *Id.* § 10-8-330(k). Within five days of the notice of denial, the applicant can either accept the alternate permit or appeal the decision to an Administrative Law Judge ("ALJ"). *Id.* § 10-8-330(k), (l). The ALJ's decision is subject to judicial review. *Id.* § 10-8-330(l).

The Ordinance further requires that for "large parades," a permit holder must obtain a commercial general liability insurance policy and:

> indemnify, defend and hold harmless the City . . . against any additional or uncovered third party claims against the [C]ity arising out of or caused by the parade; and shall agree to reimburse the [C]ity for any damages to the public ways or to [C]ity property arising out of or caused by the parade.

3

*Id.* § 10-8-330(m). A "large parade" is defined as "any parade that is held in the central business district[1] . . . or any parade that is anticipated to require city services exceeding $20,000.00[.]" *Id.* § 10-8-330(a). CDOT's parade permit application form ("Application Form"), which must be signed by all parade permit applicants, contains reimbursement and hold harmless language.[2] *See* R. 36-2 at 3.

## II.     Factual Background

Plaintiffs are a coalition of organizations and individuals who seek to bring awareness to a variety of issues—such as bodily autonomy, abortion, reproductive care, family planning, and the rights of LGBTQ+ people—through marches and demonstrations in Chicago. R. 36 ¶¶ 12–15. In August 2024, the City hosted the Democratic National Convention ("DNC"). *Id.* ¶ 2. Viewing the DNC as an opportunity to voice their messages to and grievances with the Democratic Party,

---

[1] The central business district is:

> The district consisting of those streets or parts of streets within the area bounded by a line as follows: beginning at the easternmost point of Division Street extended to Lake Michigan; then west on Division Street to LaSalle Street; then south on LaSalle Street to Chicago Avenue; then west on Chicago Avenue to Halsted Street; then south on Halsted Street to Roosevelt Road; then east on Roosevelt Road to its easternmost point extended to Lake Michigan; including parking spaces on both sides of the above-mentioned streets.

M.C.C. § 9-4-010.

[2] "[T]he applicant must promptly reimburse the City for any and all damage of any kind to any property of the City which may result from the use by the applicant of the City's premises under the permission granted herein, and the applicant further agrees that it will not hold liable the City for or on account of any losses or damage to property owned by it or controlled by the applicant or for or on account of any loss or damage sustained by the applicant as a result of injuries to employees or agents of the applicant." R. 36-2 at 3.

Plaintiffs applied for a parade permit from the City to hold a march the evening before the DNC started. *Id.* ¶¶ 20–21. Plaintiffs proposed a route within the central business district going down Michigan Avenue and State Street so that the procession could be visible from downtown hotels. *Id.*

Andrew Thayer, the parade organizer, received calls from both the Chicago Police Department ("CPD") and CDOT suggesting that the application may be denied if modifications were not made, but he was provided with no specifics on what those modifications should be. *Id.* ¶¶ 22–24. Thayer then submitted an amended application. *Id.* ¶ 25. On January 16, 2024, the Commissioner denied both applications, explaining that the proposed parade would "substantially and unnecessarily interfere with traffic"; that there would not be "sufficient city resources to mitigate the disruption"; and that there would not be "a sufficient number of on-duty police officers or other city employees authorized to regulate traffic, to police the public, and to protect parade participants and non-participants from traffic-related hazards." *Id.* ¶ 26.

The denial letter offered an alternate route that Plaintiffs found to be unsatisfactory because it would not be visible to their intended audience of delegates who would be staying at designated downtown hotels. *Id.* ¶¶ 4, 27–28. The denial letter gave Plaintiffs five days to accept the alternate route. *Id.* ¶ 29. Plaintiffs did not accept the proposed alternate route and instead filed an administrative appeal. *Id.* ¶ 30.

An administrative appeal hearing was held on January 30, 2024. The ALJ heard testimony from a United States Secret Service agent and representatives from CDOT and CPD. CDOT shared its concerns that the City would not have sufficient resources to safely provide the proposed route in light of the DNC, and that the march would zig-zag through the streets, impacting "heavily trafficked streets" and thirteen bus routes. *Id.* ¶¶ 34, 40, 43. CPD indicated that it would be operating at full capacity during the DNC and may not be able to provide the number of personnel needed to secure the proposed route. *Id.* ¶¶ 36–38. Ultimately, the ALJ found that the City's denial of the application was proper. *Id.* ¶ 44.

### III.    Procedural Background

Plaintiffs filed this action under 42 U.S.C. § 1983, challenging the denial of the permit applications, asserting facial and as-applied challenges to the Ordinance under the First Amendment, and a facial challenge to the City's Footprint Ordinance[3] under the Due Process Clause of the Fourteenth Amendment. *See generally* R. 1. Plaintiffs moved to enjoin enforcement of the Footprint Ordinance, which this Court denied, and the Seventh Circuit affirmed on appeal. R. 6, 28, 40. Plaintiffs then filed an amended complaint with a First Amendment facial challenge to the Ordinance and a Due Process facial challenge to the Footprint Ordinance. R. 36. Before the DNC

---

[3] In anticipation of the DNC, Chicago also enacted Ordinance 2024-0008373 ("the Footprint Ordinance"), which made it unlawful for people to bring certain items into the "Security Footprint," a protected area around the Convention sites. R. 1-1 at 314–17. Within the Security Footprint, people could not possess "any item that poses potential safety hazards . . . including, but not limited to, any item listed in Exhibit A." *Id.* at 315. During the DNC, Plaintiffs intended to enter the Security Footprint area "to participate in marches or demonstrations." R. 1 ¶ 13.

commenced, the parties reached an agreement on a route for Plaintiffs to march. R. 47 at 6. Plaintiffs voluntarily dismissed the challenge to the Footprint Ordinance. R. 43. Defendants move to dismiss the remaining facial challenges to the Ordinance pursuant to Rules 12(b)(1) and 12(b)(6).

## Discussion

### I.     Rule 12(b)(1)

Defendants first argue Plaintiffs lack standing because they have failed to show an injury that is actual or imminent. Generally, to establish Article III standing, a plaintiff must show (1) an injury in fact; (2) traceable to the defendant; and (3) redressable by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An "injury in fact" is a legally protected interest that is "concrete, particularized" and "actual or imminent, not conjectural or hypothetical" *Id.* at 560 (citations omitted).

Where a plaintiff brings a facial challenge to a policy as violative of free speech under the First Amendment, the Seventh Circuit has explained that the prior enforcement of the policy is not required to establish injury in fact. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 639 (7th Cir. 2020). In the absence of enforcement, a plaintiff must either show (1) "an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does"; or (2) "a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (citations omitted). For either of these "to be

'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988), and *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002), inform how *Speech First* applies in the licensing and permitting context. In *City of Lakewood*, the Supreme Court held that "[i]t is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." 486 U.S. at 756. Applying *City of Lakewood*, the Seventh Circuit thereafter held that a plaintiff challenging a licensing scheme set forth in a city ordinance need not "subject himself to the requirements prescribed in the ordinance" where "it vest[s] unbridled discretion with the city official." *Weinberg*, 310 F.3d at 1043. Rather, a plaintiff has standing to challenge a licensing scheme where "he will 'suffer the vagaries of discretion' implicit in the licensing procedure." *Id.* at 1044 (quoting *Stokes v. City of Madison,* 930 F.2d 1163, 1168 (7th Cir. 1991)). Incorporating *Speech First*'s first showing requirement, this means that a plaintiff must demonstrate an intent to engage in conduct arguably subject to the permitting scheme, and a likelihood that he will suffer the vagaries of the scheme in the process.

Defendants contend that Plaintiffs fail to make either showing under *Speech First*. In their view, as to the first showing, Plaintiffs do not allege any particular parade they intend to hold in the future, and it is pure speculation that if they applied

in the future, the City would apply the Ordinance to deny them a permit, offer an unacceptable alternate route, or subject them to liability for third party conduct. As to the second showing, there is no allegation that Plaintiffs' speech has been chilled or that they are engaging in self-censorship as a result of the ordinance.

Here, Plaintiffs adequately show an intent to engage in conduct arguably proscribed by the Ordinance and that they will likely be subject to the allegedly unconstitutional provisions of the Ordinance. Specifically, Plaintiffs allege that they intend to organize and participate in marches and other demonstrations on the streets of Chicago to bring awareness to bodily autonomy, abortion, reproductive care, family planning, and the rights of LGBTQ+ people. R. 36 ¶¶ 12–15. Each time they want to hold such a demonstration, they must apply for a parade permit and subject themselves to the permitting scheme set forth in the Ordinance. That scheme, as alleged, vests unlimited discretion in the Commissioner to deny their application and offer a route that does not reach their intended audience, and leaves Plaintiffs susceptible to open-ended liability for damages they did not cause. Plaintiffs further allege that they have previously subjected themselves to the Ordinance which resulted in the Commissioner offering a route that did not meet their intended audience. *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct" can serve as evidence of threatened future injury.); *Barrett v. Walker Cnty. Sch. Bd.*, 872 F.3d 1209, 1220–21 (11th Cir. 2017) (plaintiff had standing where he "at least once in the past applied for permission to speak" and "intends in the future to seek permission to speak").

9

Defendants further contend that there is no basis to infer that Plaintiffs' intended activities would constitute "large parades" such that they would be subject to a credible threat of enforcement of the Ordinance's indemnification, hold-harmless, and reimbursement provisions, M.C.C. § 10-8-330(m). "Large parade" applies to any parade in the central business district. Plaintiffs allege that they applied for a permit to march in the central business district during the DNC and that they intend to continue organizing demonstrations on the streets of Chicago. It is reasonable to infer that this will include the central business district, an area with significant public interest sites and public visibility. Also, Plaintiffs are not only challenging § 10-8-330(m), but also the Application Form which all applicants must sign and contains reimbursement and hold harmless language. Combined, these allegations are sufficient to infer that there is a credible threat that these provisions may be enforced against Plaintiffs.

Lastly, Defendants argue that Plaintiffs have not satisfied the injury-in-fact requirement by failing to allege how the Ordinance chills their speech, articulate their future plans, or explain how they are injured by the Ordinance. *See Duhe v. City of Little Rock*, 902 F.3d 858, 866–67 (8th Cir. 2018) (finding plaintiffs lacked standing because they were arrested for violating the disorderly conduct statue, not the permit ordinance, and did not articulate a desire to return to Little Rock for an event that would be subject to the permit ordinance); *Benham v. City of Charlotte*, 635 F.3d 129, 139 (4th Cir. 2011) (at summary judgment, plaintiffs failed to present sufficient evidence that the ordinances chilled them from holding future events); *Sullivan v.*

*City of Augusta*, 511 F.3d 16, 25 (1st Cir. 2007) (plaintiffs did not allege that they would be required to obtain a permit as a prerequisite to conduct their desired activities). As explained, Plaintiffs have alleged that they intend to hold marches and demonstrations in Chicago, which would require them to obtain a permit pursuant to the Ordinance. *Speech First* instructs that Plaintiffs must make one of two showings to confer standing in this case: either an intent to engage in conduct affected by a policy *or* a chilling effect. 968 F.3d at 639. Because Plaintiffs have sufficiently alleged their intent to engage in activity affected by the Ordinance, they need not also allege that they have been chilled.

In sum, Plaintiffs' allegations, taken together, are sufficient to confer standing. Defendants' motion to dismiss pursuant to Rule 12(b)(1) is denied.

## II.     Rule 12(b)(6)

Plaintiffs lodge two facial challenges. The first is against the Ordinance's "one-and-done" scheme whereby Defendants can deny a permit and offer an alternative route without considering whether that route would allow the applicant to reach their intended audience and barring the applicant from proposing an alternative that does so (the "One-and-Done Scheme"). *See* M.C.C. § 10-8-330(d), (k). The second is against the Ordinance's indemnification, hold-harmless, and reimbursement provisions, *id.* § 10-8-330(m), as well as the Application Form's hold-harmless and reimbursement language[4] (together, the "Indemnification, Hold-Harmless, and Reimbursement

---

[4] Defendants argue that the Court should not consider the Application Form because it does not appear in the Ordinance and any objection to the Application Form's language is not relevant to the facial challenge. But the Application Form reflects

Provisions"). The Court addresses each argument in turn.

A. One-and-Done Scheme

Plaintiffs first allege that the One-and-Done Scheme is facially unconstitutional under the First Amendment. Plaintiffs seek to hold marches and protests on streets and sidewalks, which are traditional public forums, open for expressive activity, public assembly, and debate. *See Frisby v. Schultz*, 487 U.S. 474, 480 (1988); *United States v. Grace*, 461 U.S. 171, 177 (1983). "The government has a 'very limited' ability to regulate speech in traditional public forums, but the Supreme Court has given somewhat 'wider leeway' when the regulation at issue focuses on 'features of speech unrelated to its content.'" *Nicodemus v. City of S. Bend, Ind.*, 137 F.4th 654, 664 (7th Cir. 2025) (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)). More specifically, "the government is permitted to enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* (citations and internal quotation marks omitted). Here, Plaintiffs contend that the Ordinance is facially unconstitutional because it vests undue discretion in the Commissioner, is not narrowly tailored to a significant

---

Defendants' implementation and interpretation of the Ordinance, specifically the application of the hold-harmless and reimbursement provisions to all parades. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.") (citations omitted). It is therefore a valid consideration in Plaintiffs' facial challenge.

government interest, and fails to ensure adequate alternative channels of communication.

### 1. *Content Neutrality*

Plaintiffs allege that the One-and-Done Scheme gives the Commissioner undue discretion to deny permit applications and propose alternate routes that potentially do not reach a marcher's intended audience. "A government's regulation of expressive activity is content-neutral if it is justified without reference to the content of the regulated speech." *Nicodemus*, 137 F.4th at 668 (citation and internal quotation marks omitted).

Here, Plaintiffs do not allege that the One-and-Done Scheme is premised on restricting marches or parades based on their content. The One-and-Done Scheme is justified by the City's interests in safety and traffic control. None of these justifications relate to the content of any impacted speech. *See MacDonald v. City of Chicago*, 243 F.3d 1021, 1032 (7th Cir. 2001) (whether the proposed activity will interfere with traffic or prevent proper fire and police protection "do[ ] not depend on the content of the march's speech" and "are neutral [justifications] by any objective standard").

Yet, courts have concluded that policies which "invest unbridled discretion in the person who decides whether a permit will issue" are susceptible to being content-based. *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014). "This is because a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in

13

censorship." *Nicodemus*, 135 F.4th at 666 (citation and internal quotation marks omitted). Instead, a valid time-place-manner regulation must not "deny the right to speak altogether," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), and "contain adequate standards to guide the official's decision and render it subject to effective judicial review," *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002).

The One-and-Done Scheme does not allow the Commissioner to deny applicants their right to hold a march in Chicago altogether. And the Ordinance contains adequate standards to guide the Commissioner's decision. When considering whether to grant a permit, the Commissioner must investigate and consider certain factors, such as the march's interference with traffic, availability of City resources to protect the marchers and the public, and potential interruption of emergency services. M.C.C. § 10-8-330(g). If the permit cannot be issued as proposed, the Commissioner must provide, on a similar date and in a similar location, the "next-best" alternate route with "comparable public visibility" that "does not interfere with safety, traffic and emergency services." M.C.C. § 10-8-330(k); *MacDonald*, 243 F.3d at 1034. If an applicant is dissatisfied with the alternate route because it does not, for example, adequately reach their intended audience, they have recourse to challenge that route both with an ALJ and in court. M.C.C. § 10-8-330(l). These requirements sufficiently guide and cabin the Commissioner's discretion. Plaintiffs fail to allege that the One-and-Done Scheme is content-based.

2. *Narrow Tailoring*

Plaintiffs next claim that the One-and-Done Scheme is not narrowly tailored. A content-neutral law is narrowly tailored when "the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." *TikTok Inc. v. Garland*, 604 U.S. 56, 76–77 (2025) (per curiam) (citations and internal quotation marks omitted). "There must be a reasonably close fit between the law's means and its ends, though perfect calibration is not required." *Nicodemus*, 137 F.4th at 668 (citation and internal quotation marks omitted); *see also see also GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022) (the speech restriction need not represent "a perfect or least restrictive fit" with the proffered interest). Essentially, the question is whether the time-place-manner restriction at issue is reasonable. *Nicodemus*, 137 F.4th at 668.

Here, the Ordinance is aimed at promoting the governmental interests of safety, organized flow of traffic, especially emergency vehicles, and preventing violent confrontations. *See MacDonald*, 243 F.3d at 1025 (listing government interests that the parade ordinance promotes). The Ordinance and its One-and-Done Scheme are narrowly tailored to promote these interests. They require the Commissioner to conduct an individualized assessment of the proposed march with regard to these interests and the City's available police officers and resources. If the City is unable to accommodate the proposed route, the Commissioner must offer the applicant the

15

next-best route which does not interfere with safety, traffic, and emergency services. *See id.* at 1034 (finding that Chicago's parade ordinance was narrowly tailored).

Plaintiffs argue that *MacDonald* is not controlling because the plaintiffs there did not challenge in the district court, and the Seventh Circuit did not consider, the One-and-Done Scheme at issue here. In *MacDonald*, the plaintiffs lodged a facial First Amendment challenge to Chicago's parade ordinance. The Seventh Circuit upheld the ordinance, finding that it required the City to offer the "next-best route" with "comparable [ ] public visibility and similar location and date to that requested." *Id.* (quoting M.C.C. § 10-8-330). This provided ample alternative channels to communicate an applicant's message while also being narrowly tailored to the significant governmental interests of safety, traffic, and emergency services. *Id.* Thus, the Seventh Circuit did consider the One-and-Done Scheme and found it to be narrowly tailored.

Plaintiffs further argue that the One-and-Done Scheme is poorly tailored because the City has not demonstrated that other alternative measures would fail to achieve the government's interest. Plaintiffs propose several alternatives. Before denying a permit, Defendants could: allow applicants to propose changes to address Defendants' concerns; solicit alternate routes from applicants or ask them about their intended audience; or allow applicants to reapply.

"To survive intermediate scrutiny, a regulation need not be the least speech-restrictive means of advancing the [g]overnment's interests." *TikTok*, 604 U.S. at 76 (citation and internal quotation marks omitted). "[R]estrictions on the time, place, or

manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Ward*, 491 U.S. at 797 (citation and internal quotation marks omitted). So long as the means chosen "do[ ] not burden substantially more speech than is necessary," *TikTok*, 604 U.S. at 76, "the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800.

In this case, the One-and-Done Scheme does not prohibit applicants from engaging in protected First Amendment activity. Individuals or organizations seeking to hold a march or parade in Chicago must apply for a permit and propose their intended route. As just explained, Plaintiffs do not adequately allege that the One-and-Done Scheme fails to be narrowly tailored to the City's significant interests or allows the Commissioner to forgo providing alternative routes with comparable public visibility. While the One-and-Done Scheme may have incidental effects on speech, Plaintiffs do not sufficiently allege that it burdens substantially more speech than is necessary to further the City's interests.

Nevertheless, Plaintiffs contend that the Court must conduct a least restrictive alternatives analysis pursuant to *McCullen v. Coakley*, 573 U.S. 464 (2014). This would seem contradictory to *Ward*, 491 U.S. at 798 (a time-place-manner regulation "need not be the least restrictive or least intrusive means of serving the government's interests"). In *McCullen*, the Court, in determining whether the means chosen were substantially broader than necessary, identified several less restrictive alternatives

17

that would have plausibly achieved the government's stated interest. 573 U.S. at 491–93. "*McCullen* taught us a less restrictive means analysis might be helpful in the narrow tailoring inquiry, but it did not modify *Ward*'s clear rule." *Evans v. Sandy City*, 944 F.3d 847, 859 (10th Cir. 2019) (citations omitted). Thus, it is unnecessary to conduct a least restrictive alternative analysis here. The One-and-Done Scheme allows Plaintiffs to exercise their First Amendment rights, and it is narrowly tailored to serve the City's interests. Plaintiffs do not adequately allege that it burdens substantially more speech than necessary to meet those interests.

Further, Plaintiffs argue that the One-and-Done Scheme is not narrowly tailored to a significant government interest, which makes it unconstitutional in all of its applications, and therefore facially invalid. In *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615–18 (2021), the Supreme Court found that California's regulation requiring tax-exempt organizations to disclose information about their donors to the state attorney general burdened a substantial amount of associational rights, and was thus overbroad, because the regulation was not narrowly tailored to the state's interest in investigating charitable wrongdoings. As explained, Plaintiffs fail to sufficiently allege that the One-and-Done Scheme, on its face, lacks narrow tailoring and burdens substantially more speech than necessary. Therefore, Plaintiffs have also failed to allege that the One-and-Done Scheme, due to its tailoring, is unconstitutional in all of its applications.

3. *Adequate Alternative Channels of Communication*

Lastly, Plaintiffs contend that the One-and-Done Scheme does not provide for adequate alternative channels of communication. Such alternatives "need not be the speaker's first choice, but they must be realistic and more than theoretically available." *Nicodemus*, 137 F.4th at 669–70 (cleaned up).

Here, when the Commissioner denies an application, he or she must provide a permit, which, "to the extent practicable, authorize[s] an event that will have comparable public visibility and a similar route, location and date to that of the proposed parade." M.C.C. § 10-8-330(k). As the Seventh Circuit explained in *MacDonald*, this requirement "ensures ample alternative channels of communication" are available. 243 F.3d at 1034.

Plaintiffs nonetheless argue that the One-and-Done Scheme allows the Commissioner to summarily deny an applicant's access to their intended audience. But by requiring the Commissioner to offer an alternative that is comparable in visibility, place, and time to that of the proposed parade, the alternative necessarily takes into account the intended audience. Plaintiffs fail to plausibly allege that the One-and-Done Scheme does not provide adequate alternative channels of communication.

Plaintiffs also make another attempt at distinguishing *MacDonald*. While in *MacDonald*, the Seventh Circuit found that the ordinance required the City to offer the next-best route, here, the City offered routes through the One-and-Done Scheme that were further from the applicants' intended audiences. As examples, Plaintiffs

point to this case and *Chicago Alliance Against Racist and Political Repression v. City of Chicago* ("*CAARPR*"), No. 24-cv-02347 (N.D. Ill.). *CAARPR* concerned a challenge to the City's proposed alternative route for a protest near the United Center during the DNC.

However, these few examples are not sufficient for the Court to infer that the One-and-Done Scheme does not offer adequate channels of communication, or that there were significant divergences from the plain language of the Ordinance. Section 10-8-330(k) states that the "alternate permit shall, *to the extent practicable*, authorize an event that will have *comparable public visibility* and a *similar* route, location and date to that of the proposed parade." M.C.C. § 10-8-330(k) (emphasis added). In this case, as alleged, Plaintiffs originally proposed a route in the central business district. The City ultimately offered a route also within the central business district on the same date. As for the *CAARPR* case, to the extent it is relevant, Plaintiffs fail to allege that the alternative route there did not have comparable public visibility and was not the most practicable, especially when considering the City's heightened interest in safety around the United Center where the DNC was being held. *See CAARPR*, 2024 WL 3791478, at *5 (N.D. Ill. Aug. 12, 2024) ("[T]he government has a strong interest in promoting safety and security, particularly in the context of high-profile political events[, like the DNC]. . . . Likewise, courts routinely acknowledge the governmental interest in managing traffic around these types of events." (collecting cases)).

For all these reasons, the motion to dismiss Plaintiffs' facial challenge to the One-and-Done Scheme is granted.

B.   Indemnification, Hold-Harmless, and Reimbursement Provisions

Plaintiffs next contend that the Indemnification, Hold-Harmless, and Reimbursement Provisions violate the First Amendment because they impose liability on protest organizations or their leadership for conduct that they have not authorized, directed, or ratified.

The First Amendment restricts imposition of damages liability on organizers of protected events unless the organizers "authorized, directed, or ratified specific tortious activity." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916–17 (1982). Additionally, speech "cannot be financially burdened" based on the potential reactions of hostile third parties. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35, 135 n.12 (1992).

The Indemnification, Hold-Harmless, and Reimbursement Provisions provide that large parade permittees must indemnify, defend, and hold harmless the City against "*any*" third party claims "arising out of or caused by" the parade, and require permittees to reimburse the City for "*any*" damages to public ways or City property "which may result from," "aris[e] out of[,] or [be] caused by the parade." M.C.C. § 10-8-330(m); R. 36-2 at 3 (emphasis added). In this way, the plain language of the Ordinance broadly assigns liability and financial obligations to permittees for harm caused by conduct outside of their control. *See Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1038–41 (9th Cir. 2009) (finding that the hold-harmless and indemnification clauses of a parade ordinance violated the First Amendment because the clauses were broadly written to require permittees to assume legal and

financial responsibility for activities outside the permittee's control and to pay for costs related to listeners' reactions to the speech); *Aurora Pride v. City of Aurora*, No. 23-cv-00259, 2023 WL 3569130, at *29–30 (N.D. Ill. May 18, 2023) (finding that the city's indemnification provision likely violated the First Amendment because it required the permit holder to absorb damages cause by hostile third parties and actions that the permittee did not authorize).

Defendants argue that *Thomas v. Chicago Park District*, 227 F.3d 921 (7th Cir. 2000), *aff'd on other grounds*, 534 U.S. 316 (2002), says otherwise. There, the Seventh Circuit upheld a park district ordinance that required applicants to obtain liability insurance, reasoning that the amount of the insurance was not based on the nature of the event and instead solely on the size of the event and the facilities involved. *Id.* at 925. But here, applicants face open-ended liability for conduct that they did not authorize, direct, or ratify. That conduct may be reactionary to the nature of the event. Additionally, the Indemnification, Hold-Harmless, and Reimbursement Provisions are not, as Defendants contend, based on the size of the parade. The Application Form applies to all parade applicants, regardless of size, and a "large parade" is "any" parade held in the central business district. Thus, *Thomas* is inapposite.

Defendants additionally argue that Plaintiffs have not adequately alleged that the Indemnification, Hold-Harmless, and Reimbursement Provisions violate the First Amendment in a substantial majority of cases, as required for a facial challenge. Generally, a plaintiff bringing a facial challenge must "establish that no set of

22

circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or show that the law lacks "a plainly legitimate sweep," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks omitted). In the First Amendment context, however, there is "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024) ("So in this singular context, even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones.").

Defendants first emphasize that the Indemnification, Hold-Harmless, and Reimbursement Provisions within the Ordinance are limited to "large parades." However, "large parades" encompass not just parades anticipated to require city services exceeding $20,000.00 but all parades within the central business district of Chicago, which is a substantial area with a high volume of public interest sites and gathering places. It is reasonable to infer that a substantial number of parade applicants subject to the Ordinance would be seeking permits for "large parades." What's more, the hold-harmless and reimbursement provisions apply to all parades, regardless of whether they qualify as large parades, as every applicant must sign the Application Form.

Defendants also focus on the fact that Plaintiffs fail to allege a single instance where the Indemnification, Hold-Harmless, and Reimbursement Provisions have been enforced or that the threat of enforcement caused an applicant to forgo their parade. However, such an allegation is not required to make out a plausible facial challenge here. That is because the broad language of the Indemnification, Hold-Harmless, and Reimbursement Provisions imposes liability on permittees for damages they do not authorize, direct, or ratify "in every case." *Bonta*, 594 U.S. at 615; *see also Long Beach*, 574 F.3d at 1041 (requiring permittees to compensate third parties for harm caused by those not part of permittees' organization "restricts substantially more speech").

Defendants contend that the breadth of the Indemnification, Hold-Harmless, and Reimbursement Provisions could be narrowed by state law. Specifically, Defendants claim that Illinois law voids agreements to indemnify against intentional misconduct, such that the City may not be insulated from its own intentional tortious conduct. They also argue that third party claims brought against the City are narrowed by Illinois' Tort Immunity Act, which limits the City's duty of care to "intended and permitted" users of property. *See* 745 ILCS 10/3-102(a). But these laws concern the City's own actions and exposure to liability, not those of organizers. Additionally, they do not address the facial challenge to the law. The First Amendment mandates "precision of regulation" with respect to "the grounds that may give rise to damages liability" as well as "the persons who may be held accountable for those damages." *Claiborne Hardware*, 458 U.S. at 916–17. As explained, the

Indemnification, Hold-Harmless, and Reimbursement Provisions do not have the requisite precision because the plain language makes organizers susceptible to liability for damages caused by third parties. The limitations posed by Defendants do not avoid the constitutional difficulties presented.

Next, Defendants argue that the Indemnification, Hold-Harmless, and Reimbursement Provisions are reasonable means of sharing between organizers and the City the financial risks incurred when a march is held, much like requiring applicants to pay fees and traffic control costs. *See Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (fee imposed on parade organizers to "meet the expense incident to the administration of the [law] and to the maintenance of public order" is acceptable); *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 371 (5th Cir. 2010). But exposing applicants to liability for damages or injuries caused by third parties which the organizers did not authorize, direct, or ratify is not analogous to paying an administrative fee or traffic costs. And there is nothing unconstitutional about shifting financial liability to permittees for their *own* wrongful conduct, even if participating in expressive activity. *Cf. Claiborne Hardware*, 458 U.S. at 930 (recognizing the distinction between imposing liability on event organizers for the acts of third parties and the acts of their agents); *accord United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998).

Lastly, Defendants contend that *Claiborne Hardware* is inapposite because it did not concern a facial challenge to an indemnification provision. In *Claiborne Hardware*, the Supreme Court explained that "the presence of activity protected by

the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." 458 U.S. at 916–17. This principle is not constrained to the facts of one case. *See, e.g.*, *Long Beach*, 574 F.3d at 1039–41 (in a facial challenge to a parade ordinance's indemnification and hold-harmless clauses, holding that the regulation violated *Caliborne Hardware*'s prohibition against imposing liability on a speaker for actions outside of the speaker's control).

Accordingly, the motion to dismiss the facial challenge to the Indemnification, Hold-Harmless, and Reimbursement Provisions is denied.

III.    Leave to Amend

Plaintiffs ask for leave to amend their complaint. District courts should grant leave to amend after granting a motion to dismiss, "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015). By October 29, 2025, Plaintiffs may file a motion for leave to amend explaining why amendment would not be futile or otherwise unwarranted. If no motion is filed, the dismissal of the facial challenge to the One-and-Done Scheme will convert to a dismissal with prejudice.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The facial challenge to the One-and-Done Scheme is dismissed and the facial challenge to the Indemnification, Hold-Harmless, and Reimbursement

Provisions may proceed. The parties should file a written status report by October 29, 2025 with their respective positions on how this case should proceed.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: August 29, 2025